**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN TIRE DISTRIBUTORS, INC., *et al.*,[1] | ) | Case No. 24-12391 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF**
**RONALD J. BIENIAS, CHIEF RESTRUCTURING**
**OFFICER OF AMERICAN TIRE DISTRIBUTORS, INC., IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Ronald J. Bienias, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") at American Tire Distributors, Inc. ("ATD Inc." together with its affiliated debtors and debtors in possession, collectively, the "Debtors" and together with their non-Debtor affiliates, collectively, the "Company").[2]

2.      For almost a century, the Company has made an indelible mark on the tire industry. As one of the largest replacement tire distributors in North America based on dollar amount of wholesale sales and number of warehouses, the Company has been a leader in the tire replacement industry by virtue of its dedication to its over 80,000 customers throughout North America, as well as its commitment to the maintenance of a quality and comprehensive portfolio of tires, wheels, and related tools and accessories. The Company is headquartered in Huntersville, North Carolina

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are American Tire Distributors, Inc. (4594); ATD New Holdings II, Inc. (4985); ATD New Holdings III, Inc. (0977); ATD New Holdings, Inc. (3406); ATD Sourcing Solutions, LLC (5225); ATD Technology Solutions Inc. (N/A); FLX FWD Logistics, LLC (3334); Hercules Tire International Inc. (N/A); Terry's Tire Town Holdings, LLC (7409); The Hercules Tire & Rubber Company (3365); Tire Pros Francorp, LLC (1813); Tirebuyer.com, LLC (9093); and Torqata Data and Analytics LLC (4992). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 12220 Herbert Wayne Court, Huntersville, NC 28078.

[2]    Capitalized terms used but not immediately defined shall have the meanings assigned to them elsewhere in this Declaration, the Restructuring Support Agreement, or the DIP Motion, as applicable.

and has over 4,500 employees.  The Company has a long history of delivering top of the line products for all of its customers' and partners' needs.

3.      The Debtors commence these chapter 11 cases with a line of sight to successfully consummate a going concern sale.  By working constructively with an ad hoc group of lenders under the Debtors' Prepetition Term Loan Facility and 2024 Delayed Draw FILO Loans (the "Ad Hoc Group"), the Debtors have garnered support to continue their prepetition marketing process during these chapter 11 cases through the execution of a Restructuring Support Agreement. Additionally, after extensive negotiations with the Ad Hoc Group and the Prepetition ABL Agent on behalf of the Prepetition ABL Lenders, the Debtors have secured debtor-in-possession financing.  By acquiring support from their prepetition lenders, the Debtors are positioned to (i) facilitate their ongoing sale process and (ii) finance the operation of their business to minimize disruption, thereby preserving value for the Debtors' estates and various stakeholders and enabling the Company to continue serving their large and diverse customer base.

4.      As explained in further detail herein, the course following the Company's first chapter 11 restructuring in 2018 (the "2018 Restructuring") was complicated by a range of contributing factors.  From 2019 to 2021, due to a variety of factors, including the soaring inflation that followed the COVID-19 pandemic and the subsequent replacement tire sales boom, the Company experienced a sizable increase in profits from sales of its replacement tire and wheel products.  Around that time, the Company decided to expand beyond its existing businesses and invested its earnings in other automotive adjacencies (the "Adjacencies"), such as the businesses of Debtors Torqata Data and Analytics LLC ("Torqata") and Tirebuyer.com, LLC ("Tirebuyer.com").  Torqata operates a data-analytics business that specializes in the automotive industry, and Tirebuyer.com's main product is an online platform that helps customers find the right tires, for their needs and at great prices, in minutes.  At the end of 2022, however, the demand

for automotive products and services compressed, and the surge in profits that the Debtors' core business had enjoyed came to an end.

5.      Since 2023, the Debtors' profits have declined further, due in large part to new market headwinds.  Specifically, consumer adjustment to less expensive tires, overall depression of consumer demand, increased operating costs (*e.g.*, labor and logistics), and contraction of the Debtors' sales channels, have shifted the automotive aftermarket landscape in a way that has made it difficult for the Debtors to adjust quickly.  Also, the Adjacencies that the Debtors have invested in have not yet realized a net-positive effect on the Debtors' profits, compounding challenges arising from external forces.

6.      In light of these obstacles beyond the Company's control and the Debtors' inability to quickly rationalize their largely fixed cost structure while continuing to serve their national market, the Debtors began to explore all strategic alternatives, including an investment in or sale of some or all of its business.  Beginning in May 2022, the Company solicited interest from several potential strategic investors and purchasers, after receiving particular interest from a participant in the automotive replacement tires market.  Although no agreement was ultimately reached with either potential suitor, for the next two and a half years, the Company continued to solicit market interest with the assistance of an independent investment banker (the "Prepetition Marketing Process").  On June 28, 2024, one prospective purchaser (the "Potential Buyer") submitted a non-binding letter of intent ("NLOI") that required that the Company proceed on an exclusive basis with the Potential Buyer.  The Company, in consultation with its investment banker, evaluated the interest received to date and determined that it was in its best interest to proceed with the Potential Buyer on an exclusive basis.  Ultimately, no actionable agreement around the terms of a sale to the Potential Buyer was reached and the NLOI was terminated on October 9, 2024.

7.      Although the Prepetition Marketing Process has not resulted in a sale, the Prepetition Marketing Process has generated market awareness and interest in the Company's assets that the Debtors seek to capitalize on through a postpetition marketing process.

8.      Concurrent with the Prepetition Marketing Process, management took various steps to improve operations, including opening a regional distribution center to improve inventory circulation speed, evaluating its product offerings and retail demand trends, and renegotiating supply contracts with certain vendors.  Additionally, the Debtors have had to navigate certain management changes.  Specifically, in August of 2024, Stuart Schuette, the Company's Chief Executive Officer since 2016 resigned and was replaced by Michael Feder, a Partner & Managing Director (retired, on recall) of AP Services, LLC, an affiliate of AlixPartners LLP ("AlixPartners"). Shortly thereafter in October 2024, Ryan Walsh, the Chief Financial Officer, resigned and Josh Lewis, Vice President of Corporate Strategy and Planning, took on a special assignment along with his current responsibilities to replace Mr. Walsh's responsibilities.

9.      As further discussed herein, the Debtors, through their advisors, negotiated and executed that certain Third Amendment to the Prepetition ABL Credit Agreement, dated as of July 24, 2024 (the "Third Amendment") as part of its out-of-court restructuring efforts.  Through the Third Amendment, certain of the Company's existing lenders provided the Company with an infusion of cash by means of a delayed draw "first in, last out" facility, which resulted in $75 million of additional liquidity for the Debtors.

10.      In September, 2024, it became clear that an out-of-court transaction may not be actionable as the Debtors monthly financial performance continued to decline and liquidity issues mounted.  Accordingly, the Debtors began contingency planning and engaged (i) Kirkland & Ellis, LLP ("Kirkland") as legal counsel and (ii) AlixPartners, who had previously been engaged in June 2024 to examine potential opportunities for liquidity improvement across the Company, as

restructuring advisor.   In parallel, the Debtors engaged its proposed financial advisor and investment banker, Moelis & Company LLC ("Moelis" together with Kirkland and AlixPartners, the "Advisors").

11.     Starting in September 2024, the Debtors, with their Advisors, began negotiating extensively with the Ad Hoc Group, represented by Akin Gump Strauss Hauer & Feld LLP, as legal counsel, and Perella Weinberg Partners LP, as financial advisor, and with Wells Fargo Bank, National Association, the agent under the Prepetition ABL Facility (the "Prepetition ABL Agent"), represented by Otterbourg P.C., as legal counsel, and PKF Clear Thinking, as financial advisor. These discussions concerned substantially all aspects of a potential restructuring, including financing solutions for the Debtors' near-term liquidity challenges, a continued marketing process, and a potential transaction to recapitalize the business with the Debtors' existing stakeholders. Ultimately, these discussions proved successful and culminated in execution of a restructuring support agreement (the "Restructuring Support Agreement" or "RSA"), dated as of October 22, 2024, which includes broad support of the Prepetition Term Loan Lenders who hold approximately 90 percent of the outstanding obligations under the Prepetition Term Loan Facility and 100 percent of holders of the 2024 Delayed Draw FILO Loans.

12.     The Restructuring Support Agreement provides for the parties' good faith cooperation toward an in-court marketing and sale process, including through the proposed execution of a stalking horse agreement for the purchase of the Company's business as a going concern through a credit bid of the Ad Hoc Group's secured claims.  The Restructuring Support Agreement further contemplates the Debtors having access to critical debtor-in-possession financing to support continued operation of the Debtors' business and the ongoing Prepetition Marketing Process through a court-supervised sale process, which will allow the Debtors to achieve the highest or otherwise best bid for the Debtors' business, and, if necessary, conduct an

auction for any of their remaining assets. The Debtors expect to continue operating throughout these chapter 11 cases and remain focused on serving their customers and existing partnerships. With the support of the Ad Hoc Group, the Debtors seek authority to move through the chapter 11 process on an expedited basis, as memorialized by agreed-upon milestones in the term sheet to the DIP Facilities.

**Background and Qualifications**

13.    I am a Partner and Managing Director of AlixPartners, in its turnaround and restructuring services group in North America, which has a place of business at 300 N. LaSalle St., Suite 1800, Chicago, Illinois 60654. I was appointed as CRO of ATD Inc. on October 21, 2024. AlixPartners was retained by the Debtors as their restructuring advisor to assist in connection with liquidity, business planning, profit improvement and restructuring matters.

14.    AlixPartners is a global independent consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases. Specifically, AlixPartners' core turnaround & restructuring services include liability management, restructuring advisory, interim management & chief restructuring officer roles, lender & creditor advisory, bankruptcy, insolvency & case management, and liquidity management. Since its inception in 1981, AlixPartners, its predecessor entities, and its affiliate, AP Services, LLC, have provided turnaround, restructuring or crisis management services in numerous large cases.

15.    I received my B.B.A. in finance from Grand Valley State University and my M.B.A. from the University of Michigan. I have more than 25 years of corporate finance, advisory and restructuring experience. I have obtained the Certified Insolvency and Restructuring Advisor, Certified Turnaround Professional, and Certified Treasury Professional (inactive) designations.

Since joining AlixPartners, I have provided restructuring advice to companies, creditors, shareholders, and other interested parties on restructuring transactions both in chapter 11 and on an out-of-court basis. I have been involved in a number of chapter 11 cases, including Hayes Lemmerz International, Fleming Companies, Inc., New World Pasta Company, Spansion, Inc., HCR ManorCare, Inc., Noble Corporation PLC, LTL Management LLC, Lumileds Holding B.V., and Akumin Inc. I have previously served as chief restructuring officer for World Wide Packaging, LLC and Akumin, Inc.

16.     I submit this declaration (this "Declaration") to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and parties in interest in understanding the Debtors, their operations, their capital structure, the circumstances related to the commencement of the chapter 11 cases, and in support of (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on October 22, 2024 (the "Petition Date") and (b) the relief requested by the Debtors pursuant to the pleadings described herein (collectively, the "First Day Motions").

17.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

18.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into five sections:

- **Part I** provides an overview of the replacement tire industry, background information on the Debtors' corporate history and operations, as well as the Debtors' prior bankruptcy proceedings.

- **Part II** offers detailed information on the Debtors' daily business operations.

- **Part III** offers detailed information on the Debtors' prepetition capital and organizational structure.

- **Part IV** describes the circumstances leading to the filing of these chapter 11 cases and an overview of the Debtors' prepetition restructuring efforts.

- **Part V** summarizes the relief requested in and the legal and factual basis that support the First Day Motions.

## I.    The Debtors' History.

### A.    The Debtors' Corporate History.

19.    The Company has a storied past, beginning almost a century ago as Heafner Tire, a single tire mold recapper and gas station in Lincolnton, North Carolina, founded by James H. Heafner in 1935.  Over the next 80 years, Heafner Tire grew from small-town origins to become the nation's leading international tire and service distributor through implementing a strategic growth-by-acquisition business model.  Specifically, in 1985, 1991, and 1997, several major tire companies—Beach Tire Mart, Commonwealth Tire, and Oliver & Winston, respectively—were brought under the Heafner Tire brand, adding over 135 locations across the southeast.  Over the following two decades, Heafner Tire acquired and integrated over 23 different companies, transforming the Company into a truly national enterprise.  In 2002, Heafner Tire changed its name to American Tire Distributors to reflect this transformation.  Soon thereafter, the Company became an international enterprise when it acquired Regional Tire Distributors and formed National Tire Distributors in 2013 and Hercules Tire Holdings LLC in 2014.  These transactions, among others, catapulted the Company into a North American powerhouse.

20.    The Company was primarily a family-owned and operated business from its founding until a majority stake in the business was sold to a private equity firm in 1999.  As a

8

result of a series of corporate transactions, by the end of 2015, TPG Capital, L.P. ("TPG") and Ares Management, L.P. ("Ares") owned an equal share of the Company, with the remaining 6 percent belonging to management and other parties.

**B.      The 2018 Restructuring.**

21.      In 2018, in response to trends toward disintermediation, including specifically independent tire manufacturers Goodyear Tire & Rubber Company ("Goodyear") and Bridgestone Americas, Inc. ("Bridgestone") formed a joint venture partnership to distribute their own products directly to tire retailers, the Company began consolidating distribution centers and investing in a state-of-the-art delivery platform, as well as reducing costs.   In addition to these efforts, the Company explored deleveraging transactions and maturity extensions on their various loan facilities as the loss of the Goodyear and Bridgestone partnerships and the resulting tightening of terms with third-party vendors resulted in short-term sales declines.   However, despite these efforts, with the negative effect of ratings agency downgrades and constricted liquidity due to decreases in profits, the Company was unable to reach an out-of-court restructuring solution. Consequently, on October 4, 2018, ATD Inc. and eight of its affiliates filed for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.   Just seventy-six days later, on December 19, 2018, ATD Inc. and its affiliated debtors confirmed a chapter 11 plan of reorganization and emerged from chapter 11 protection on December 21, 2018.   In total, the 2018 Restructuring eliminated approximately $1.1 billion in debt and provided the Company with $1.005 billion of committed exit financing to support operations and future growth initiatives.

22.      Although the Company greatly benefitted from the deleveraging achieved through its 2018 Restructuring, new challenges emerged in the years that followed.   Specifically, the onset of the COVID-19 pandemic induced a sharp decline in demand in the automotive industry, which was followed by a surge in demand for used cars and replacement parts in 2021.   This was due in

significant part to a chip shortage that negatively impacted the new car industry as a result of COVID supply chain issues.  This produced a significant increase in the amount of replacement tire and wheel purchases which *temporarily* boosted sales and profits.  In addition to the surge in demand, rapid inflation led to the margin from each sale to skyrocket as the Debtors, who typically stockpile their inventory for six to twelve months at a time, were able to sell their pre-COVID inventory for post-COVID prices.  In time, it became clear that the Company's bottom line was being bolstered by temporary shifts in (a) the demand for their products, (b) high rates of inflation, and (c) available low cost on-hand inventories.  As the market rebounded from the aftermath of COVID, the Company's gross selling margins (*i.e.*, the revenues from high sales prices less the low cost of tires and wheels) began to narrow.

23.     In addition to the effect of these macroeconomic forces, the Company has faced certain shifts in consumer demand—including a shift in consumer demand to lower price tires.  In particular, demand for tier 4 tires (the most cost-effective tires on the market for retail consumers) has risen and demand in higher tiers, where the Debtors' product offerings have historically focused, has fallen.  This has resulted to the Debtors' inventory remaining on-hand and in storage for a longer time, slowing the Debtors' conversion of said inventory to revenue.

24.     Compounding the inflation issues that were to come, in 2021 and 2022, the Debtors invested their surplus, inflation-driven profits into other automotive business Adjacencies.  The synergies and other benefits that the Debtors anticipated to achieve from their investment in these Adjacencies have not yet materialized, and instead, the Debtors' operational and capital structure has become overextended.  In response, the Debtors have commenced these chapter 11 cases to address these challenges and refocus their business around its core competencies.

## II.     Business Operations.

25.     The Company operates the largest distribution network of replacement tires across North America measured by dollar amount of wholesale sales and number of warehouses. It provides over 80,000 customers with approximately 50,000 types of stock-keeping units ("SKUs") consisting of tires, wheels, and related tools and accessories. The Debtors' vast product offering, distribution and inventory management system, sales force and marketing services, and ability to cater to a broad customer base gives them a competitive edge over other smaller and regionally-focused replacement tire distributors. As of the date of this Declaration, the Debtors have distribution and mixing centers, warehouses, and administrative offices in forty-seven states in the United States.



### A.     Products and Value-Added Services

26.     The Debtors have a comprehensive portfolio of products that allows them to penetrate the replacement tire market across a broad range of price points with the bulk of the Debtors' product sales being derived from the tires that the Debtors either own or acquire through suppliers. Specifically, the Debtors obtain their inventory from eight of the top ten leading passenger and light truck tire brands in the United States and carry their proprietary, flagship brand, Hercules®, one of the leading private brands in North America in 2023.

11

27.     ***Flag and Associate Brands***.  The bulk of the Debtors' revenue is derived through selling replacement tires from the world's leading tire manufacturers.  These manufacturers are known as flag brands because they usually have the greatest brand recognition.  In the United States, the flag brands sold include Continental®, Michelin®, Cooper®, Kumho®, Nexen®, Pirelli®, Toyo-Nitto®, Yokohama®, Hankook®.  Such products are regarded as premium-quality in the market and command premium pricing as a result.  Manufacturers of flag brands generally provide marketing support for their products.  This, in addition to these brands' popularity and premium price points, has led to the Company generating stronger sales and higher per-tire profits for such brands relative to other associate or proprietary brands.  Flag brands also have offerings that are lower-priced and sold under different brand names.  The Debtors provide products from these brands as well, which can be attractive to customers as they are sometimes tied to manufacturer-specific incentive programs.  Such associate brands include General®, Uniroyal®, Mastercraft®, Mickey Thompson®, Laufen®, and BFGoodrich®.

28.     ***Proprietary and Exclusive Brands***.  Proprietary brands are those which the Company owns and markets while exclusive brands are lower-priced brands developed by third-party manufacturers exclusively for the Company.  In both scenarios, the Debtors hold or control the trademark to such brands.  Proprietary and exclusive brands serve as products for entry-level pricing, which allows the Debtors to provide its retail partners with quality products to capture cost-conscious consumers in the market.  The Debtors acquired the Hercules Tire & Rubber Company ("Hercules") in 2014.  Hercules provides a full line of tires for passenger cars and light and medium trucks and is the best-selling private label tire brand in the United States.  Exclusive brands include the Ironman® brand, which is the Debtors main producer of tier 4 tires which have been increasingly popular to retailer consumers.

29.    ***Other Products***.  The Debtors also sell aftermarket custom wheels and accessories and related tire supplies and tools, directly complementing the tire products because many customers purchase tires when purchasing custom wheels.  The Debtors offer over twenty different wheel brands and installation and service accessories, including proprietary brands such as TIS Offroad®, Motive Wheels®, Gear Offroad®, Ultra Motorsports®, and O.E. Performance®.  These brands represent a comprehensive portfolio of wheel brands and style collections in the industry.  Customers can also obtain tire supplies and tools from the Company, which allows it to offer a well-rounded product line.  Specifically, such products broaden the Company's portfolio and leverage its customer relationships.  The tire supplies and tools include a broad range of the most common tire-related products, including wheel weights, tire pressure management censors, lubricants, and valves.

30.    In 2023, the Company took its already popular, value-added service ATDOnline®, a 24/7 proprietary business-to-business online portal that brings the Company's partners instant access to pricing, order, and tracking, and turned it into a centralized hub, focused on helping customers manage and fulfill their auto aftermarket needs with ordering, customer management, and solution-focused tools.[3]  The ATDOnline® platform is focused on helping the Company's customers and partners grow their business through cutting costs and boosting profitability, with meaningful data metrics leveraged from the Torqata platform, and access to autoshop networks for discounts on products through PartnerPerks® and rebates and rewards through IPG®.

31.    Additionally, the Debtors operate TireBuyer.com as a direct business to consumer digital platform that allows the Debtors to leverage their distribution network to sell to consumers directly and drive installation business to their customers and partners.  The Debtors have

---

[3]    ATDOnline® is also known as Radius®.

leveraged this digital infrastructure to create Treadsy®, which allows the Debtors' independent tire retailer partners and other third-party businesses to reach consumers through their existing web platforms. Both of these platforms allow independent tire retailers and partners who otherwise do not have a large presence in the tire industry, to reach consumers that would not otherwise be accessible to them. This allows for the Company to access portions of the market and acquire customers that would otherwise be unavailable.

32. Lastly, Tire Pros® is a program through which qualified tire retailers, as loyal partners to the Company, can participate in a franchise program to receive advertising and marketing support by being promoted by this nationally recognized brand. Local participants in the program receive the benefits of the Tire Pros® national brand identity with minimal investment while still maintaining their local characteristics. The Debtors are able to increase volume penetration among and further align themselves with their franchisees in the process. As such, this service improves the Debtors' ability to integrate their infrastructure with their customers' operations and enable them to maintain high rates of customer retention and build strong customer loyalty. There are over 700 stores in the Tire Pros® network of franchised tire retailers.

**B.      Distribution System and Inventory Management and Routing Technology.**

33. The Debtors have developed a comprehensive distribution system to deliver products from a wide variety of tire manufacturers to tire retail customers across North America. In recent years, some manufacturers have reduced the number of retailers they service directly, while tire retailers have reduced the amount of inventory held at one time. At the same time, the variety of SKUs, including tire models and other parts required by cars on the road, has continued to expand, requiring that the Debtors' hold significantly more inventory in order to ensure that they have the specific tires and other SKUs that their customers require. Consequently, the

14

Debtors' distribution network has been a critical link between these tire manufacturers and tire retailers, efficiently and expeditiously facilitating their operational needs.

34. The Debtors strive to meet these expectations through their comprehensive distribution system that integrates their vast distribution network with their inventory management and routing technology. Specifically, the Debtors have approximately 1,500 delivery vehicles servicing more than 115 distribution centers across forty-seven states in the United States. At certain distribution centers, the Debtors maintain sophisticated bin locator systems, material handling equipment, and routing software that link customer orders to the present inventory and delivery routes.

35. The Debtors maintain inventory levels for the vast majority of SKUs that exist today to aspire to fulfill customer orders on a same or next day basis as a means to increase volume across the Company. Additionally, the Debtors are incentivized to hold large stockpiles of inventory as vendors within the tire industry customarily offer the Company vendor inducements, account credits, and bonuses in connection with a variety of vendor promotions, many of which are volume driven. The Company's inventory levels are also determined based on sales data derived from distribution centers (on a combined basis, an individual basis, or by geographic region), demand forecasts, as well as from vendors that supply the distribution centers and retail customer stores. All distribution centers stock a base inventory, have access to a broader hub and spoke network for inventory, and may expand beyond preset inventory levels as deemed appropriate by an executive sales and operations planning committee. Computer systems monitor inventory levels for all stock items and quantities are re-balanced from center-to-center to both maximize availability and inventory turns.

C.    **Customer Base.**

36.    The Company's customer base includes over 80,000 customers across North America.  These customers are highly diversified but generally fall within the following categories: (a) local, regional, and national independent tire retailers; (b) mass merchandisers; (c) warehouse clubs; (d) tire manufacturer-owned stores; (e) automotive dealerships; and (f) web-based marketers.  Among these, independent tire retailers make up the Debtors' largest customer group, accounting for approximately 60 percent of the Debtors' net sales in 2023.  The Debtors have significant market presence with each category of customer and believe that they are the only replacement tire distributor in North America that services each of these key market channels.

D.    **Business Development Strategies.**

37.    ***Program Offerings***.  The Debtors have various program offerings, in conjunction with their partnerships, that are designed to drive growth through customer service.  Such strategies add significant value to the Debtors' customers, thus promoting retention and loyalty to the brand.  One such marketing initiative that the Debtors employ involves assisting manufacturers in administering and managing certain manufacturer-run programs designed for tire retailers that sell the respective manufacturer's products.  These programs provide cooperative advertising funds, volume discounts, and other incentives for participating tire retailers, which provides them with significant value.   Such programs include Continental's Gold®, Michelin's Alliance®, and Cooper's Medallion®.

38.    ***Sales Force***.  The Debtors have a structured sales organization intended to both serve its existing customers and develop new ones.  This sales force is made up of four components:  (i) customer success centers, which handle outbound and inbound calls, program attainment, and customer service issues; (ii) auto dealer channels, which help grow and maintain the relationship with auto dealers and related manufacturers; (iii) corporate accounts channels,

16

which manage and grow relationships with large, national retailers; (iv) independent core sales channel and territory managers, which grow and manage new dealers and independent tire and automotive retail shops.

39.     The Debtors' salespeople and customer service representatives play a key role, consulting with tire retailers, helping their customers fill a gap left by tire manufacturers reducing their own sales teams.  Moreover, the sales force is continuously seeking to acquire new customers. Over the past few years, the Company has steadily trained and deployed sales personnel to help build sales and developed proprietary selling tools to allow sellers to partner with tire retailers to make more informed purchasing, stocking, and pricing decisions to drive program attainment and overall store profitability.

### III.    The Debtors' Prepetition Capital Structure.

#### A.    The Debtors' Organizational Structure.

40.     An overview of the Debtors' current organizational structure is reflected in the organizational chart attached hereto as **Exhibit A.**

17

**B.      The Debtors' Prepetition Capital Structure.**

41.      As of the Petition Date, the Debtors have approximately $1.9 billion in aggregate outstanding principal and accrued interest for funded debt obligations, as reflected below.

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued Interest | Approximate Applicable Premium | Approximate Total Claim Amount |
|---|---|---|---|---|---|
| Prepetition Revolving Credit Facility | October 22, 2026 | $708.6 million[4] | $2.3 million | N/A | $710.9 million |
| Prepetition FILO Facility | October 22, 2026 | $100 million | $0.2 million | N/A | $100.2 million |
| 2024 Delayed Draw FILO Loans | October 22, 2026 | $75 million | $1.95 million | $15.07 million | $92.02 million |
| Prepetition Term Loan Facility | October 22, 2028 | $975 million | $31.3 million | N/A | $1,006.3 million |
| *Total Funded Debt Obligations:* | | *$1,858.6 million* | *$35.75 million* | *$15.07 million* | *$1,909.42 million* |

**1.      The ABL Facility.**

42.      ***Prepetition Revolving Credit Facility and FILO Facility.***      ATD Inc., as administrative borrower, ATD New Holdings III, Inc., a Delaware corporation ("Parent"), each other borrower from time to time party thereto, each lender from time to time party thereto (the "Prepetition ABL Lenders"), and each L/C issuer and swing line lender from time to time party thereto and the Prepetition ABL Agent, entered into an asset-based credit agreement, dated as of October 22, 2021, as amended by that certain First Amendment to ABL Credit Agreement, dated as of April 13, 2023, as further amended by that certain Second Amendment to ABL Credit Agreement, dated as of July 16, 2024, and as further amended by the Third Amendment, as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time (the "Prepetition ABL Credit Agreement").

---

[4]    This includes the outstanding letters of credit in the aggregate amount of $49.2 million under the Prepetition Revolving Credit Facility.

43.     This Prepetition ABL Credit Agreement allows the Debtors to access approximately $1.1 billion in revolving credit commitments (the "Prepetition Revolving Credit Facility"), subject to the borrowing base calculation as defined therein.  In addition, the Prepetition ABL Credit Agreement includes approximately $100 million outstanding under a first-in, last-out facility (the "Prepetition FILO Facility").  Finally, the Third Amendment created a delayed draw "first-in, last-out" facility as a new tranche under the Prepetition ABL Credit Agreement by investors representing a majority of the Prepetition Term Loan Lenders (the "2024 Delayed Draw FILO Loans" together with the Prepetition FILO Facility and the Prepetition Revolving Credit Facility, the "Prepetition ABL Facility").

44.     The Prepetition ABL Facility is secured by a first-priority security interest in all accounts and payment intangibles, chattel paper and inventory (the "Prepetition ABL Priority Collateral").  The Prepetition ABL Facility also has a second-priority security interest in all Prepetition Term Loan Priority Collateral.  The 2024 Delayed Draw FILO Loans have a lien priority that is *pari* on Prepetition Term Loan Priority Collateral and third out on the Prepetition ABL Priority Collateral.

45.     The maturity date for the Prepetition ABL Facility is October 22, 2026.  As of the Petition Date, approximately $883.6 million in aggregate principal amount remained outstanding under the Prepetition ABL Facility.

### 2.     The Term Loan Facility.

46.     ATD Inc., as borrower, Parent, each lender from time to time party thereto (the "Prepetition Term Loan Lenders") and Bank of America, N.A., as administrative agent and collateral agent, entered into a term loan credit agreement dated as of October 22, 2021 (the "Prepetition Term Loan Facility") (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2023, as further amended by that certain Amendment No. 2 to

Credit Agreement, dated as of March 26, 2023 and as further amended by that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of July 24, 2024, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Agreement").

47.    Substantially all assets other than the assets securing the Prepetition ABL Facility serve as collateral for the Prepetition Term Loan Facility, including all equipment, real property, and equity interests of ATD Inc. and the Debtors (the "Prepetition Term Loan Priority Collateral"). In addition, the Prepetition Term Loan Facility is secured by a second-priority security interest in the Prepetition ABL Priority Collateral.  The maturity date for the Term Loan Facility is October 22, 2028.  As of the Petition Date, approximately $975 million in aggregate principal amount remained outstanding under the Term Loan Facility.

**IV.    Events Leading to Chapter 11 and Restructuring Actions.**

    **A.    Prepetition Challenges.**

48.    ***Inflation and the COVID-19 Pandemic.***  After the 2018 Restructuring, the Debtors had a deleveraged balance sheet and exit financing commitments that would support the reorganized businesses.  Despite an initially positive trajectory for the first three years post-bankruptcy in which the Debtors saw growth and rising profits, the Debtors eventually experienced profit declines due to (i) unpredictable market headwinds and (ii) certain strategic investments that did not have enough runway to realize success.

49.    Shortly after the 2018 Restructuring, the global economy was impacted by the unprecedented health risks and attendant work from home orders issued in response to the COVID-19 pandemic.  After an initial dramatic drop in demand across the automotive industry, the Debtors saw a dramatic surge in demand for their products.  This demand was fueled, in part, by spikes in used car sales due to (i) certain supplies necessary for the production of new cars were

disrupted by global supply chain issues and (ii) widespread aversion to public transportation during the pandemic. This demand coincided with soaring inflation rates. Together, these factors resulted in increased profits for the Debtors. Simply put, this spike in inflation allowed the Debtors to sell tires and wheels that it had acquired at pre-inflation prices, for post-inflation prices, temporarily lifting the margins that the Company realized. This profit growth was further fueled in 2021 as automotive sales surged to volumes "among the best in the past decade" when COVID-19 restrictions were lifted, vaccines began being widely administered, and certain retail customers began spending their COVID-19 stimulus checks on durable goods, such as tires and wheels.[5]

50.     The strong performance of the Company proved advantageous when in 2021, it was able to refinance the ABL facility and the term loan facility that were in place at the conclusion of the 2018 Restructuring. Through this transaction, the Company was able to: (i) achieve much more favorable interest rates on both facilities, which annualized to approximately $15-20 million cash interest savings; (ii) repay and retire the exit financing facility from the 2018 Restructuring; (iii) negotiate more favorable borrowing base concessions on the ABL facility, such as being able to include in-transit inventory and restricted cash as collateral; (iv) increase the revolving credit facility line by approximately 20 percent; and (v) extend maturities.

51.     The Debtors also charted a path of expansion into the broader automotive market and began investing their recent profits into replacement tire and wheel-distribution service adjacent businesses, such as Torqata, Tirebuyer.com, and Debtor FLX FWD Logistics, LLC. Specifically, the Debtors focused on expanding its digital platform presence with data analytics and online companies such as Torqata and Tirebuyer.com and through the expansion of its online portal, ATDOnline®, to connect its customers to free tools such as PartnerPerks® and IPG® rebates.

---

[5]    *10 Takeaways from U.S. Auto Sales: 2021*, Cox Automotive (Jan. 21, 2022), https://www.coxautoinc.com/market-insights/10-takeaways-from-u-s-auto-sales-2021/.

The Debtors also invested millions of dollars in necessary technological advancements that put further strains on their liquidity. Specifically, post-2018 Restructuring, the Debtors placed extremely high value on pricing methodologies and tools, routing technologies, and inventory balance technologies, as an opportunity to enhance long-term profitability. By diversifying their business portfolio, the Debtors ultimately diverted attention and resources from its core competencies and increased the size of its capital structure—the Debtors investments have yet to realize the benefits the Debtors originally envisioned when making them.

52. Ultimately, in 2023, the demand for automotive parts normalized. Inflation, however, continued to increase, making acquiring new inventory more expensive, depressing the Debtors' margin on tires sold. Namely, key variable costs, such as direct inventory purchases and freight and labor, have stabilized at higher levels. The car purchasing frenzy and subsequent demand for various automotive parts has continued to fall off and the Debtors are now left with an overleveraged balance sheet, increased fixed costs, declining revenue, and limited returns from its COVID-era investments.

53. ***Market Changes.*** In addition, the Debtors faced other dramatic market changes—a consumer trend toward lower-tier, less expensive tires, a shift in the market channels, and an increase in the variety of SKUs. These changes conflicted with the Debtors' initiatives to: (i) improve pricing; (ii) optimize volumes in the largely fixed distribution network; and (iii) promote turnover of their on-hand product assortment.

54. In 2022, consumers began opting for less expensive (*i.e.*, tier 4) tires. The Debtors inventory, however, mainly focuses on upper-tier (*i.e.*, tiers 1, 2, and 3) tires with a limited focus on the supply of tier 4 through their propriety Ironman® brand.[6] The Debtors either have limited

---

[6] The Debtors' Ironman® brand has a line of tier 4 tires. However, these tier 4 tires are at the higher-quality end of the spectrum and therefore top price end of tier 4 tires.

access to other tier 4 manufacturers or have chosen not to engage with such manufacturers in an effort to support brands that they already carry. Accordingly, the Debtors have struggled to quickly adapt their inventory and cost-structure, which, in turn, has continued to constrict their liquidity.

55. Simultaneously, the Debtors opportunity to reap the profits of their position in the middle of the nationwide supply chain was being severely limited as the tire sale market has shifted from a generally open market, one in which the Debtors could sell directly to a large number of retailers and command higher prices, to a fixed market in which a tire producer negotiates a fixed price with consumer-facing tire retailers, leaving the Debtors only the opportunity to service the arrangement within the pre-negotiated parameters. This shift is in large part due to consolidation in the consumer-facing tire retailer market, with major national brands being able to cut the Debtors out of negotiations to a significant extent. Historically, tires sold on an open price have the capability of netting up to six times the profit per tire than on a fixed priced. Further, in 2018, these fixed prices only accounted for approximately less than 10 percent of the business. In 2023, it accounted for nearly 40 percent. Accordingly, this shift has resulted in a massive secular decline in the industry and a consolidation in the amount of end-sellers that the Debtors can do business with.

56. Further, the effort to increase volume to participate in the fixed distribution network has contributed to lower margins due to 'secondary sales.' A secondary sale is a sale that the Debtors fill on behalf of an existing partner supplier, at a set price (cost plus set commission), from inventories otherwise available to serve open market customers. Rather than yielding cash, these sales yield non-cash credits for purchased inventory. Secondary sales offer the Debtors a way to drive volume and also balance out smaller markets where open sales are less successful. While this shift is seen as an opportunity to improve distribution efficiencies via larger volume in the

network, the Debtors do not make the full margin on their product. The benefits of the sale are realized through account credits that reduce cash outflows.

57.     Lastly, the variety of SKUs that the Debtors are required to maintain has exploded over the last five to ten years due to the number of cars (both gas and electric) currently on the market and the number of fitments, or fixed item of equipment, needed for each car. For example, the average car used to have limited pieces of equipment for any given function, it may now have over forty different pieces of equipment. This means that the Debtors must now carry all forty fitments to be able to fulfill each car's specific replacement needs. This proliferation of SKUs, which is driven mainly by consumer demands for pricing optionality, has resulted in the Debtors' need to invest in more inventory upfront. Ultimately, this means there is a higher cash outlay, more square footage of warehousing to hold the inventory, and holding onto the inventory longer than previously.

## B.     The Prepetition Marketing Process

58.     In May of 2022, the Company received communications from a potential strategic partner indicating interest in acquiring the Company's assets. The Company directed its investment banker to launch the Prepetition Marketing Process and, over a period of approximately six months, the Company contacted nine parties, all strategic investors in the automotive aftermarket industry. All interested parties were provided materials and given access to non-public information and management as appropriate. Throughout this process, one strategic party, the Potential Buyer, submitted an indication of interest to the Company, and updated its offer twice, with more targeted terms as it progressed through the diligence process. Due to a variety of factors, including differing views on potential transaction structures, in December 2022, the Company and the Potential Buyer put negotiations on hold.

59.     In June 2023, the Potential Buyer re-engaged with the Debtors, and after a few months of additional diligence with the Debtors, they submitted another indication of interest in November of 2023.  The Debtors continued to engage on potential transaction terms and on June 3, 2024, the Potential Buyer submitted a letter of intent to purchase substantially all of the Company's working capital assets.  The Debtors again contacted certain of the same strategic parties for renewed interest as a market check, but no other parties engaged.  On June 28, 2024, the Debtors executed the NLOI with the Potential Buyer, which required that the Debtors negotiate exclusively with the Potential Buyer.

60.     Over the next several months, as discussions continued, it became clear that a transaction was no longer actionable on terms proposed in the NLOI.  In September 2024, the strategic party sent a letter to the Debtors that it was no longer able to pursue a transaction on the terms set forth in the NLOI.

61.     Due in part to exclusivity restrictions imposed by the NLOI, on October 9, 2024, the Debtors terminated the NLOI, though they continue to engage with the Potential Buyer on the terms of a transaction.

62.     In September of 2024, the Debtors engaged Moelis to, among other things, continue the Prepetition Marketing Process, during the pendency of these chapter 11 cases.

### C.     Prepetition Initiatives

#### (i)     Special Committee.

63.     On October 4, 2024, the Debtors established a special committee comprised of three disinterested directors:  Patrick Bartels ("Mr. Bartels"), Roger Meltzer ("Mr. Meltzer"), and James Micali  ("Mr. Micali").  Mr. Meltzer and Mr. Bartels are seasoned restructuring experts, having decades of experience and dozens of engagements as independent directors between them.  Mr. Micali is an automotive industry expert, having previously served as both chief executive officer

and general counsel of Michelin North America, Inc., and having served on the board and audit subcommittee of ATD New Holdings, Inc., the Company's ultimate holding Company. The board of directors authorized the special committee to, among other things, consider and negotiate a restructuring, reorganization, or other transaction ("Transaction") and review, evaluate, and act upon any matters in which the existing directors might have an interest ("Conflicts Matters"). On October 21, 2024, I was engaged as CRO.

### (ii)    Restructuring Support Agreement.

64.    On October 22, 2024, the Debtors reached an agreement with the Ad Hoc Group to work collaboratively to implement a value-maximizing sale and auction process through these chapter 11 cases, which are memorialized in the Restructuring Support Agreement, attached hereto **Exhibit B**. Among other things, the Restructuring Support Agreement sets forth the key terms of the DIP Facilities through the DIP Term Sheet attached thereto and contemplates that the Debtors and the Ad Hoc Group will negotiate in good faith regarding the terms on which the Ad Hoc Group will serve as a stalking horse bidder through a credit bid for all or substantially all of the Debtors' assets, subject to the terms of bidding procedures that the Debtors will seek to have approved by this court.

### (iii)    Proposed DIP Financing.

65.    By the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (V) Granting Related Relief* ("DIP Motion"), filed contemporaneously herewith, the Debtors seek approval of entry into certain debtor-in-possession financing facilities and related DIP Documents to provide funding throughout the chapter 11 cases, in the form of a (a) $1,123.3 million superpriority

debtor-in-possession term loan credit facility and (b) $1,200 million superpriority debtor-in-possession asset-based financing facility (the "DIP Facilities"), the terms of which are described in the DIP Motion.

66.    As more fully described in the *Declaration of Ronald J. Bienias In Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* and the *Declaration of Rachel Murray in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, Scheduling a Final Hearing and (V) Granting Related Relief*, the Debtors require access to immediate liquidity to support their business operations during these chapter 11 cases and avoid value-destructive interruption of payments to the Debtors' vendors.  Accordingly, the Debtors' Advisors conducted outreach to potential providers of debtor-in-possession financing, including certain existing lenders and third-party financial institutions.  The Debtors, in consultation with their Advisors, ultimately determined that no viable alternatives were available to provide new money postpetition financing on an expedited timeline other than the DIP Facilities provided by the DIP Term Lenders and DIP ABL Lenders.  The Prepetition Term Loan Lenders who hold approximately 90 percent of the outstanding obligations under the Prepetition Term Loan Facility consent to the DIP Facilities. With this broad support and support from their other prepetition lenders, the Debtors see a path to a consensual consummation of the Restructuring Transactions.

**V.    Evidentiary Basis for Relief Requested in the First Day Motions.**

67.    On the Petition Date, the Debtors filed the following First Day Motions:

27

- **DIP Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief.*

- **Cash Management**: *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief.*

- **Utilities Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief.*

- **Wages Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief.*

- **Customer Programs Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Customer Programs and (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief.*

- **Insurance Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Entered into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (II) Approving Continuation of the Surety Bond Program, and (III) Granting Related Relief.*

- **Taxes Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief.*

- **Critical Vendors Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9) Claimants, Lien Claimants, and Foreign Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief.*

- **Creditor Matrix Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Serve Certain Parties in Interest*

*by Email, and (D) Approve the Form and Manner of Service of the Notice of Commencement, (E) Redact or Withhold Certain Confidential Information of Customers, and (F) Redact Certain Personally Identifiable Information of Individuals; (II) Modifying the Requirement to File a List of Equity Security Holders and Provide Notices Directly to Equity Security Holders; and (III) Granting Related Relief.*

- **Joint Administration Motion**. *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

- **DRC Retention Application**. *Application of Debtors for Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent.*

- **Equity Trading Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief.*

- **SOFAs and Schedules Motion.** *Motion of Debtors Seeking Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and Rule 2015.3 Financial Reports and (II) Granting Related Relief.*

68.     I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' advisors to ensure that I understand each First Day Motion and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

69.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is:  (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value; (b) critical to the Debtors' achieving a successful restructuring; and (c) in the best interest of the Debtors' estates and their stakeholders.  Of particular note, I believe that redaction of customer names is of paramount importance in these chapter 11 cases.  I believe that the Debtors' customer list is among its most valuable assets to a potential buyer in an auction scenario and that maintaining this confidential information is vital to ensuring the Debtors are able

29

to realize the full value of their business in a sale process.  Conversely, were this sensitive commercial information made public, I believe there would be a significant risk of customer poaching behavior by the Debtors' competitors.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 23, 2024

By: */s/ Ronald J. Bienias*
Name:  Ronald J. Bienias
Title:  Chief Restructuring Officer
American Tire Distributors, Inc.