## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AMERICAN TIRE DISTRIBUTORS, INC., *et al.*,[1] | ) | Case No. 24-12391 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) GRANT SENIOR SECURED PRIMING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND
(C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION
TO THE PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC
STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this motion:[2]

### Preliminary Statement

1.    The Debtors commenced these chapter 11 cases with less than $30 million in

available liquidity.  The debtor-in-possession financing documented by the DIP Documents, and

as described in this motion, is essential for the Debtors to continue to operate their businesses

during these chapter 11 cases, preserve the value of the Debtors' estates, and position the business

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are American Tire Distributors, Inc. (4594); ATD New Holdings II, Inc. (4985); ATD New Holdings III, Inc. (0977); ATD New Holdings, Inc. (3406); ATD Sourcing Solutions, LLC (5225); ATD Technology Solutions Inc. (N/A); FLX FWD Logistics, LLC (3334); Hercules Tire International Inc. (N/A); Terry's Tire Town Holdings, LLC (7409); The Hercules Tire & Rubber Company (3365); Tire Pros Francorp, LLC (1813); Tirebuyer.com, LLC (9093); and Torqata Data and Analytics LLC (4992).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 12200 Herbert Wayne Court, Huntersville, NC 28078.

[2]    A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Ronald J. Bienias, Chief Restructuring Officer of American Tire Distributors, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* filed contemporaneously herewith (the "First Day Declaration").  Capitalized terms used but not immediately defined shall have the meanings assigned to them elsewhere in the First Day Declaration, that certain restructuring support agreement, dated as of October 22, 2024 (the "Restructuring Support Agreement"), or this motion, as applicable.

for a successful going concern sale.  Additionally, the infusion of $250 million of new money by certain of the Debtors' existing lenders will provide a critical liquidity infusion to satisfy the Debtors' working capital and operational needs.  As discussed further herein, the Debtors have an immediate need for access to the DIP Facilities and the use of Cash Collateral, absent which the Debtors will suffer immediate and irreparable harm.

2.     The proposed DIP Lenders, including (i) an ad hoc group of Prepetition First Lien Term Loan Lenders (as defined herein) and the 2024 FILO Lenders (as defined herein) (collectively, the "DIP Term Lenders")[3] and (ii) the Prepetition ABL Lenders (as defined herein) (the "DIP ABL Lenders" and, together with the DIP Term Lenders, the "DIP Lenders"), have agreed to provide the Debtors with a DIP financing facility consisting of (x) the conversion of the Prepetition ABL Facility (as defined herein) to a superpriority debtor-in-possession asset-based financing facility (the "DIP ABL Facility" and, the loans extended thereunder, the "DIP ABL Loans" and, together with all obligations under the DIP ABL Facility, the "DIP ABL Obligations") and (y) new multiple draw term loan credit facility comprised of (1) $250 million (the "New Money DIP Term Loans") of new money, of which $125 million will be funded into escrow upon entry of the Interim Order (the "Interim New Money DIP Term Loans"), and the remainder will become available upon the entry of the Final Order (the "Final New Money DIP Term Loans"), (2) the conversion of all amounts outstanding under the 2024 Delayed Draw FILO Facility to 2024 FILO Roll-Up DIP Loans, and (3) the conversion of $750 million of Prepetition Term Loans to Term Loan Roll-Up DIP Loans.

---

[3]    The DIP Term Lenders hold in the aggregate approximately 90% of the Prepetition First Lien Term Loans and 100% of the 2024 Delayed Draw FILO Loans.

3.      The DIP Facilities are the product of extensive, hard fought, and arm's-length negotiations between the Debtors and the DIP Lenders over the last several weeks.  *See* Murray Decl. ¶ 2.  During that time, the Debtors and the DIP Lenders (through their respective advisors) exchanged multiple drafts of term sheets outlining the terms of the DIP Facilities and held numerous phone conferences negotiating the same.  *Id.* ¶ 15.  The DIP Facilities will provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively and efficiently administer these chapter 11 cases and to maintain operations during these chapter 11 cases without significant interruption.  Bienias Decl. ¶ 15.  The Prepetition Secured Parties[4] have also consented to or are deemed to have consented to the Debtors' use of their cash collateral in compliance with the Approved Budget and in exchange for the package of adequate protection provided under the DIP Documents and the Interim Order.

4.      While negotiating with the Debtors' existing lenders, the Debtors, with the assistance of their investment banker Moelis & Company ("Moelis"), evaluated opportunities for out-of-court and in-court financing, including the availability and viability of third-party financing as an alternative to the DIP Facilities.  As described in the Bienias Declaration, prior to the Petition Date, the Debtors faced significant headwinds brought on by rising inflation, residual effects of the COVID-19 pandemic, and ongoing shifts in (i) consumer demand and (ii) market channels in the tire industry.  Bienias Decl. ¶ 10–15.  Considering the Company's quickly deteriorating liquidity position, the Debtors were forced to quickly pivot to solicit proposals for DIP financing.

---

[4]    The "Prepetition Secured Parties" are comprised of (i) the lenders party to that certain Term Loan Credit Agreement, dated as of October 22, 2021, and Bank of America, N.A., as administrative agent and collateral agent, (the "Prepetition Term Loan Secured Parties"), (ii) the lenders party to that certain ABL Credit Agreement, dated as of October 22, 2021, and Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "Prepetition ABL Secured Parties"), and (iii) the lenders party to that certain Third Amendment to ABL Credit Agreement dated as of July 24, 2024, and Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "2024 Delayed Draw FILO Secured Parties").

Murray Decl. ¶ 9–10.   Moelis contacted several third-party financial institutions regarding potential postpetition financing.  *See id.* ¶ 12–13.  Despite this outreach, the Debtors received no third-party financing proposals.  *Id.* ¶ 15.  Accordingly, the Debtors negotiated intensely with their existing lenders, focusing their efforts on an ad hoc group of the Debtors' existing lenders (the "Ad Hoc Group"), which includes the lenders under the 2024 Delayed Draw FILO Facility that provided the Debtors with $75 million of new money in July 2024 and the Prepetition ABL Lenders.  *Id.* ¶ 14–15.  The DIP Facilities represent the only viable path to postpetition financing for the Debtors.  Entry into the DIP Facilities is a sound exercise of the Debtors' sound business judgment, and the DIP Facilities should be approved.

5.      The DIP Facilities include a "roll-up" component with respect to the DIP ABL Facility:  (a) upon entry of the Interim Order, (i) all Cash Management Obligations, Hedging Obligations, and issued and outstanding Letters of Credit (each as defined in the Prepetition ABL-FILO Credit Agreement) shall automatically be deemed exchanged for and issued under the DIP ABL Credit Agreement and shall constitute DIP Obligations (the "Initial ABL Roll-Up"), (ii) all cash, collections and proceeds of collateral securing the DIP ABL Facility (the "DIP ABL Priority Collateral") shall be deemed, on a dollar-for-dollar basis, to reduce the Revolving Credit Commitments (as defined in the Prepetition ABL-FILO Credit Agreement) and be deemed to be DIP Obligations in the same amount on a dollar-for-dollar basis (the "Creeping ABL Roll-Up"), and (b) upon the entry of the Final Order, all remaining outstanding Prepetition ABL Obligations will automatically be deemed exchanged and converted on a cashless basis into and constitute DIP Obligations (the "Full ABL Roll-Up" and, together with the Initial ABL Roll-Up and the Creeping ABL Roll-Up, the "DIP ABL Roll-Up Obligations").

6.      With respect to the New Money DIP Term Loans, the DIP Facilities also include a roll-up component:  (a) upon entry of the Interim Order, a "roll-up" of all 2024 Delayed Draw FILO Loans (as defined herein), including any accrued interest and make-whole premiums, into DIP Term Loan Obligations (such rolled up amounts, the "2024 FILO Roll-Up DIP Loans") plus a three-to-one "roll-up" of the Prepetition First Lien Term Loans to the Interim New Money DIP Term Loans actually funded (such rolled up amounts, the "Term Loan Roll-Up DIP Loans" and, together with the 2024 FILO Roll-Up DIP Loans and the New Money DIP Term Loans, the "DIP Term Loans" and, together with the DIP ABL Facility, the "DIP Facilities").  The proposed DIP Term Loan Facility also includes certain fees and expenses, discussed in greater detail below, which are paid on a non-cash basis up front, by including such amounts in the outstanding principal balance of the DIP Term Loan Facility on a "gross-up" basis.  The Debtors will incur $31.3 million in original issue discount and other fees on account of the Term Loan Roll-Up DIP Loans ($21.9 million of which is payable up front and $9.4 million of which will be payable in connection with the second draw) and $17 million in accrued interest and a make-whole premium on account of the 2024 FILO Roll-Up DIP Loans (all paid up front in connection with the first draw).  All such fees are payable in kind and included as DIP Obligations (as defined herein).  Because there will not be a roll-up on account of these amounts, the outstanding DIP Obligations on the Interim New Money DIP Term Loans will be $146.9 million and the outstanding DIP Obligations on account of the 2024 FILO Roll-Up DIP Loans will be $92 million.

7.      The DIP Facilities will provide the Debtors with access to crucially needed liquidity that will enable the Debtors to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs, make payments to critical vendors, and administer these chapter 11 cases, in each case in accordance with the agreed-upon

Budget.  As security for the DIP Obligations, all of the Debtors will guarantee the obligations under the DIP Facilities and grant the liens described herein.

8.      In addition, by this motion, the Debtors seek the Court's authorization to access and use cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").  Access to Cash Collateral, in addition to the liquidity provided by the DIP Facilities, will enable the Debtors to operate their businesses and administer their estates for the benefit of their stakeholders.  The Prepetition Secured Parties have consented or are deemed to have consented to the continued use of Cash Collateral on the terms included in the Interim Order and in accordance with the Approved Budget.

9.      The relief requested by this motion is necessary to preserve the Debtors' operations and maximize the value of the Debtors' estates for the benefit of all creditors.  For the reasons set forth in this motion, the First Day Declaration, and the DIP Declarations, the DIP Facilities and continued use of Cash Collateral, on the terms set forth in the Interim Order, are necessary to avoid immediate and irreparable harm and are in the best interests of the Debtors, their estates, and all stakeholders.  The Debtors respectfully request that the Court enter the Interim Order.

## **Relief Requested**

10.     The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):[5]

> a.      ***DIP ABL Facility***:  authorizing the Debtors to obtain senior secured debtor-in-possession asset-based financing on a superpriority basis that provides up to $1,200 million in the aggregate principal amount of a senior secured, superpriority, debtor-in-possession asset-based revolving credit facility, including a $80 million sublimit for the issuance of letters of credit, and providing for (i) the "roll up" of approximately $49 million in the face

---

[5]     The Debtors will file the form of the Final Order prior to the Final Hearing (as defined herein).

amount of undrawn letters of credit issued under the Prepetition ABL Facility (as defined herein) and all Cash Management Obligations into the DIP ABL Facility and (ii) the refinancing of the Prepetition ABL Facility pursuant to a "creeping roll-up" whereby all cash, collections and proceeds of any Prepetition ABL Priority Collateral (as defined herein) shall pay down the Prepetition ABL Obligations (as defined herein), and any remaining outstanding Prepetition ABL Obligations, together with all accrued and unpaid interest, fees and expenses shall be fully "rolled" into the DIP ABL Facility and shall constitute DIP Obligations upon the entry of the Final Order granting such relief, all in accordance with the terms and conditions set forth in this Interim Order and that certain Ratification and Amendment Agreement (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the schedules and exhibits attached thereto, the "DIP ABL Credit Agreement") attached to the Interim Order as Exhibit 4, by and among the American Tire Distributors, Inc. (the "DIP ABL Borrower"), any Debtors guarantors of the DIP ABL Obligations (the "DIP ABL Guarantors" and, together with the DIP ABL Borrower, the "DIP ABL Loan Parties"), the DIP ABL Lenders, Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "DIP ABL Agent" and, together with the DIP ABL Lenders, the "DIP ABL Secured Parties") and the other agreements, documents, instruments and/or amendments executed and delivered in connection therewith (collectively, the "DIP ABL Documents");

b.  ***DIP Term Loan Facility***:  authorizing Parent Borrower, as the borrower (the "DIP Term Loan Borrower" and, together with the DIP ABL Borrower, the "Borrowers") to obtain senior secured postpetition debtor-in-possession financing on a superpriority basis under a $1,123.3 million  term loan facility ($250 million of which is new money), (the "DIP Term Loan Facility" and, all obligations thereunder, the "DIP Term Loan Obligations" and, together with the DIP ABL Obligations, the "DIP Obligations") and for the Debtors (other than the DIP Term Loan Borrower) (collectively, the "DIP Term Loan Guarantors"; and together with the DIP Term Loan Borrower, collectively, the "DIP Term Loan Parties"; the DIP Term Loan Parties and the DIP ABL Loan Parties are hereinafter referred to as the "Loan Parties") to guarantee unconditionally the DIP Term Loan Obligations, all in accordance with the terms and conditions set forth in this Interim Order, the Final Order and the DIP Term Loan Documents (as defined herein), including that certain $250 million Senior Secured Debtor in Possession Term Loan Facility Summary of Terms and Conditions (as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Interim Order, the "DIP Term Loan Term Sheet" and, together with the DIP ABL Credit Agreement, the "DIP Agreements"), attached to the Interim Order as Exhibit 4, and, collectively with the schedules and exhibits attached thereto, all other DIP Term Loan Facility Documents (as defined in the DIP Term Loan Term Sheet), (and all

agreements, documents, instruments, and/or amendments executed and delivered in connection therewith, the "<u>DIP Term Loan Documents</u>" and, together with the DIP ABL Documents, the "<u>DIP Documents</u>") among the DIP Term Loan Parties, the lenders party thereto (the "<u>DIP Term Lenders</u>" and, together with the DIP ABL Lenders, the "<u>DIP Lenders</u>") and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, the "<u>DIP Term Loan Agent</u>" and, together with the DIP ABL Agent, the "<u>DIP Agents</u>" and, collectively with the DIP Lenders, the "<u>DIP Secured Parties</u>"), consisting of:

i.   new money term loans in an aggregate principal amount of up to $250 million available in two draws of which (A) a principal amount of $125 million will be funded into escrow in a single draw upon satisfaction of the conditions set forth in the DIP Term Loan Documents and the entry of this Interim Order and (B) an additional principal amount of $125 million which will be funded into escrow in a single draw upon satisfaction of the conditions set forth in the DIP Term Loan Documents and the entry of the Final Order;

ii.  upon entry of this Interim Order, a "roll up" of all 2024 Delayed Draw FILO Loans (as defined herein) into DIP Term Loan Obligations; and

iii. upon entry of this Interim Order, a "roll up" of Prepetition First Lien Term Loans held by the Prepetition Term Loan Lenders (or any of their affiliates) on a 3 to 1 ratio[6] of Prepetition Term Loan Obligations to Interim New Money DIP Term Loans actually funded and, upon entry of the Final Order, a "roll up" of additional Prepetition Term Loan Obligations held by the New Money DIP Loan Lenders on a 3 to 1 ratio of Prepetition Term Loan Obligations to Final New Money DIP Term Loans actually funded into DIP Term Loan Obligations;

c.   ***DIP Documents***:  approving the terms of, and authorizing the Debtors to enter into the DIP Documents, and certain guarantee, security, intercreditor, and other relevant documentation as may be necessary, appropriate, or desirable in connection with entry into the DIP Facilities, and to perform all of the Debtors' obligations arising thereunder;

d.   ***Cash Collateral***:  authorizing the Debtors to continue to use cash collateral (as defined by section 363(a) of the Bankruptcy Code, the "<u>Cash Collateral</u>") and all other Prepetition Collateral (as defined herein) subject

---

[6]   The ratio of total rolled-up claims in connection with the issuance of the New Money DIP Term Loans will be 3.7:1 after the first draw and 3.4:1 after the second draw.

to the terms and conditions set forth in the DIP Documents and the DIP Orders;

e. ***Security and Priority***:  in the relative priorities set forth on <u>Exhibit 2</u> to the Order, granting:

    i. subject and subordinate to (a) the Carve Out in all respects and (b) certain Permitted Liens as defined in the DIP Orders, as applicable, (I) the DIP ABL Liens and (II) superpriority administrative expense status and liens on the ABL Priority Collateral to claims arising from DIP ABL Obligations in favor of the DIP ABL Secured Parties, and

    ii. subject and subordinate to (a) the Carve Out in all respects, (b) certain Permitted Liens as defined in the DIP Orders, as applicable, and (c) the prepetition and postpetition liens[7] of the Prepetition ABL Secured Parties on the DIP ABL Priority Collateral (each as defined herein), (I) the New Money DIP Term Loan Liens on the ABL Priority Collateral and (II) superpriority administrative expenses status to claims arising from New Money DIP Term Loan Obligations in favor of the DIP Term Lenders;

    iii. subject and subordinate to (a) the Carve Out in all respects and (b) certain Permitted Liens as defined in the DIP Orders, as applicable, (I) the New Money DIP Term Loan Liens on the Term Loan Priority Collateral and (II) superpriority administrative expenses status to claims arising from New Money DIP Term Loan Obligations in favor of the DIP Term Lenders;

    iv. subject and subordinate to (a) the Carve Out in all respects, (b) certain Permitted Liens as defined in the DIP Orders, as applicable, and (c) the prepetition and postpetition liens of the Prepetition Term Loan Lenders and the 2024 Delayed Draw FILO Lenders, (I) the DIP ABL Liens on the Term Loan Priority Collateral and (II) superpriority administrative expenses status to claims arising from New Money DIP Term Loan Obligations in favor of the DIP Term Lenders;

f. ***Adequate Protection***:  authorizing the Debtors to incur the applicable Adequate Protection Obligations (as defined herein) in favor of the respective Prepetition Secured Parties;

---

[7] Excluding claims and liens arising under the Original FILO.

g.      ***Fees***:  authorizing the Debtors to pay the interest and fees required by the DIP Agents and the DIP Lenders under the DIP Documents as such become earned, due and payable;

h.      ***Automatic Stay***:  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders; and

i.      ***Final Hearing***:  scheduling a final hearing to consider entry of the Final Order (the "Final Hearing").

11.     In support of this motion, the Debtors file contemporaneously herewith the *Declaration of Rachel Murray in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, Scheduling a Final Hearing and (V) Granting Related Relief* (the "Murray Declaration") and the *Declaration of Ronald J. Bienias in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*  (the "Bienias Declaration" and, together with the Murray Declaration, the "DIP Declarations"), and the First Day Declaration.

## Jurisdiction and Venue

12.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") pursuant to 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.    The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 4001-2, and 9013-1.

## Background

15.    The Debtors are the largest distributor of replacement tires in North America based on dollar amount of wholesale sales.  With their network of over 110 distribution centers and 1,500 delivery vehicles, the Debtors service a geographic region covering more than 90 percent of the replacement tire market for passenger vehicles and light trucks in the United States.  The Debtors carry many of the nation's leading tire brands including Michelin®, Pirelli®, and Continental®.  In addition, the Debtors' proprietary Hercules® brand is a leading private tire brand in North America. The Debtors are headquartered in Huntersville, North Carolina.  The Debtors and their non-Debtor subsidiaries generated approximately $5.7 billion in revenue in fiscal year 2023 and currently employ over 4,500 people in the United States.

16.    On October 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this motion, the Debtors filed a motion

requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to

Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made

in these chapter 11 cases and no official committees have been appointed or designated.

### Concise Statement Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and Local Rule 4001-2

17. The below chart contains a summary of the material terms of the proposed DIP

Facilities, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[8]

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP ABL Borrowers**: American Tire Distributors, Inc. and each other Borrower from time to time party thereto.<br>*See* DIP ABL Credit Agreement, Preamble.<br>**DIP Term Loan Borrower**: American Tire Distributors, Inc.<br>*See* DIP Term Loan Term Sheet, "Borrower." |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP ABL Guarantors**: ATD New Holdings III, Inc., as parent guarantor, and the Subsidiaries of American Tire Distributors, Inc. identified as Guarantors in the DIP ABL Credit Agreement.<br>*See* DIP ABL Credit Agreement, "Collateral and Guarantee Requirement."<br>**DIP Term Loan Guarantors**: The Debtors identified in Schedule 1 to the DIP Term Loan Term Sheet.<br>*See* DIP Term Loan Term Sheet, "Guarantors." |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP ABL Lenders**: The several banks and other financial institutions or entities from time-to-time party to the DIP ABL Credit Agreement.<br>*See* Ratification and Amendment Agreement to DIP ABL Credit Agreement, Preamble.<br>**DIP Term Lenders**: The several financial institutions or entities from time-to-time party to the DIP Term Loan Facility Documents.<br>*See* DIP Term Loan Term Sheet, "DIP Lenders." |

---

[8]   The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents, as applicable.

[9]   Capitalized terms used herein but not otherwise defined herein shall have the meanings given to such terms in the Ratification and Amendment Agreement to DIP ABL Credit Agreement, DIP ABL Credit Agreement or DIP Term Loan Term Sheet, as applicable.

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| **DIP Agents**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP ABL Agent**: Wells Fargo Bank, National Association.<br><br>*See* DIP ABL Credit Agreement, Preamble.<br><br>**DIP Term Loan Agent**: Wilmington Savings Fund Society, FSB.<br><br>*See* DIP Term Loan Term Sheet, "DIP Term Loan Agent and DIP Escrow Agent." |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | **DIP ABL Facility**:  The maturity date with respect to the DIP ABL Facility (the "<u>DIP ABL Maturity Date</u>") shall be the earliest of:<br><br>(a) the date that is 120 days after the Petition Date (or such later date as Administrative Agent may approve in writing in its sole discretion); (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the chapter 11 cases that is confirmed pursuant to an order entered by the Court; (c) the acceleration of the Loans and the termination of the Commitments in accordance with the DIP ABL Credit Agreement; (d) the consummation of a sale of all or substantially all of the assets of the Loan Parties, and (e) dismissal of any of the chapter 11 cases or conversion of any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code. *See* DIP ABL Credit Agreement, "Maturity Date."<br><br>**DIP Term Loan Facility**:  The maturity date with respect to the DIP Term Loan Facility (the "<u>DIP Term Loan Maturity Date</u>") shall be the earliest of:<br><br>(a) the date that is 120 days after the Closing Date; *provided that* such date may be extended with the consent of the Supermajority New Money DIP Lenders by 30 days (and if such date shall be a business day, the next succeeding business day) so long as (i) no default or Event of Default shall exist or result therefrom, (ii) the representations and warranties are true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualified, true and correct in all respects) immediately prior to, and after giving effect to, such extension, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (iii) the DIP Orders shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Supermajority New Money DIP Lenders, and (iv) the Supermajority New Money DIP lenders, in their sole discretion, shall be satisfied with the Approved Budget; (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the chapter 11 cases that is confirmed pursuant to an order entered by the Court; (c) the acceleration of the DIP Term Loans and the termination of the DIP Term Loan Commitments in accordance with the DIP Term Loan Facility Documents; (d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code; and (e) dismissal of the chapter 11 cases or conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code.<br><br>*See* DIP Term Loan Term Sheet, "DIP Term Loan Facility Termination Date." |
| **Commitments**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A), (O) | **DIP ABL Facility**: The DIP ABL Facility shall consist of a $1,100 million asset-based revolving credit facility and a $100 million FILO term loan facility.<br><br>*See* Ratification and Amendment Agreement to DIP ABL Credit Agreement, "ABL DIP Facility"; Interim Order ¶ 3. |

| Bankruptcy Rule | Summary of Material Terms[9] |
| --- | --- |
| | **DIP Term Loan Facility**: The DIP Term Loan Facility shall consist of a new money term loan facility in an aggregate principal amount equal to $250 million, with $125 million available to the Debtors in a single draw upon the entry of the Interim Order, and the remaining $125 million available to the DIP Term Loan Borrower in a single draw upon the entry of the Final Order.<br><br>The proposed DIP Term Loan Facility also includes $31.3 million in fees and expenses, which are payable in kind and included as DIP Obligations. Because there will not be a roll-up on account of these amounts, the outstanding DIP Obligations on the Interim New Money DIP Term Loans will be $146.9 million and the outstanding DIP Obligations on account of the 2024 FILO Roll-Up DIP Loans will be $92 million.<br><br>*See* DIP Term Loan Term Sheet, "DIP Term Loan Facility"; Interim Order ¶ 3. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | **DIP ABL Facility**: The DIP ABL Facility shall bear interest consistent with the default rate defined in the DIP ABL Credit Agreement.<br><br>*See* DIP ABL Credit Agreement, "Applicable Rate."<br><br>**DIP Term Loan Facility**: At the option of the Borrower, the New Money DIP Term Loans shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period *plus* 9.50% per annum or Base Rate plus 8.50% per annum, *provided*, that the Borrower shall pay a portion of interest rate equal to Term SOFR plus 1.50% per annum or Base Rate plus 0.50% per annum, as applicable, in cash and the remaining 8.00% of such interest rate in-kind by adding such interest rate margin to the aggregate outstanding principal balance of the New Money DIP Term Loans, monthly in arrears, but subject, in the case of Term SOFR, to a 3.00% Floor.<br><br>*See* Annex A to DIP Term Loan Term Sheet, "Interest Rates." |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | **DIP ABL Facility**:<br><br><u>Conditions to Effectiveness</u>. The initial borrowing under the DIP ABL Credit Agreement is subject to the satisfaction or waiver of the following conditions precedent:<br><br>a. The preparation, authorization and execution of the ABL DIP Documents with respect to the ABL DIP Facility, in form and substance acceptable to the Loan Parties, the ABL DIP Lenders and ABL DIP Agent.<br><br>b. The ABL DIP Lenders and ABL DIP Agent shall have received and approved the Initial Budget.<br><br>c. The delivery of (i) a secretary's (or other officer's) certificate of the Borrowers and each of the other Loan Parties, dated as of the Ratification Effective Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrower.<br><br>d. The preparation, authorization and execution of the Term DIP Documents with respect to the Term Loan DIP Facility, the Term Loan DIP Facility shall be in full force and effect and there shall not be a default or event of default thereunder.<br><br>e. The Restructuring Support Agreement shall be in full force and effect.<br><br>f. The Structuring Fee and all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the ABL DIP Lender Advisors and all other counsel, financial advisors and other professionals of the |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | ABL DIP Lenders and ABL DIP Agent (whether incurred before or after the Petition Date) to the estimated earned, due and owing, and including estimated fees and expenses through the Ratification Effective Date) shall have been paid. |

     g.  All documentation and other information about the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations (including without limitation PATRIOT Act and beneficial ownership certificates), as has been reasonably requested in writing by ABL DIP Agent at least ten business days prior to the Ratification Effective Date will be provided not later than the date that is three business days prior to the Ratification Effective Date.

     h.  ABL DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the ABL DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order.

     i.  All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Court in the chapter 11 cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to ABL DIP Agent and the Required ABL DIP Lender.

<u>Conditions Precedent to all Extensions of Credit</u>.  The obligation of the DIP Lenders (or any member thereof) to make any Loans after the Ratification Effective Date under the DIP ABL Credit Agreement (or to extend any other credit under the DIP ABL Credit Agreement) at any time shall be subject to the following conditions precedent (except as otherwise expressly provided for in the DIP ABL Credit Agreement):

     a.  <u>Representations and Warranties</u>. The representations and warranties of the Borrowers and each other Loan Party contained in <u>Article V</u> or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension; <u>provided</u> that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; <u>provided, further,</u> that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect," or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; <u>provided</u>, the proceeds of which will be used to finance a Limited Condition Transaction, the foregoing will be limited to the Specified Representations.

     b.  <u>Defaults</u>. No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

     c.  <u>Request for Credit Extension</u>. The Administrative Agent and, if applicable, the relevant L/C Issuer or the Swing Line Lender shall have received a Committed Loan Notice, a Swing Line Loan Notice or a Letter of Credit Application, as applicable, relating to the Credit Extension, in each case, in accordance with the requirements of the DIP ABL Credit Agreement.

     d.  <u>Total Outstandings</u>. After giving effect to the Loans or Letters of Credit requested to be made or issued on any such date and the use of proceeds thereof, the Total Revolving Credit Outstandings shall not exceed the Line Cap at such time.

     e.  Solely with respect to Credit Extensions occurring on or after the date that is ten (10) business days after the entry of the Interim Order (or such later date as Lender may approve in writing in its sole discretion), a final order approving the Loan Documents in form and substance satisfactory to Administrative

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | Agent in its sole discretion (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms of the DIP ABL Credit Agreement, the "Final Financing Order") (it being understood and agreed that an order entered by the Court substantially in the form of the Interim Financing Order, with only such modifications as are satisfactory in form and substance to Lender in its sole discretion shall, if entered by the Court, be deemed acceptable to Lender), (i) shall have been entered by the Court and shall be in full force and effect and (ii) shall not have been (A) vacated, reversed, or stayed, or (B) amended or modified except as otherwise agreed to in writing by Lender in its sole discretion. |

Each Request for Credit Extension (other than a Committed Loan Notice requesting a (x) conversion of Loans to the other Type or (y) continuation of Term SOFR Loans or Canadian BA Rate Loans, as applicable) submitted by the Administrative Borrower shall be deemed to be a representation and warranty that the applicable conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

*See* DIP ABL Credit Agreement, Section 4.02.

**DIP Term Loan Facility**:

Conditions to the Initial Term Borrowing on the Closing Date. The obligation of each DIP Lender to fund the Initial Term Borrowing under the DIP Term Loan Term Sheet on the Closing Date is subject to satisfaction or due waiver of each of the following conditions precedent and the applicable conditions precedent set forth in "Conditions Precedent to the Initial Extension of Credit" of the DIP Term Loan Term Sheet:

    a.   DIP Agents' fee letter, in form and substance satisfactory to the DIP Agents' in their sole discretion, shall have been executed and delivered by each party thereto.

    b.   The DIP Escrow Account shall have been established.

    c.   The Petition Date shall have occurred, and each Loan Party (including Guarantors incorporated under the laws of Canada or any province thereof) shall be a debtor and a debtor in possession.

    d.   Not later than three business days following the Petition Date, the Court shall have entered the Interim DIP Order in form and substance consistent with the DIP Term Loan Term Sheet and otherwise acceptable to DIP Agents, the Required Consenting Lenders and the Fronting Lender, which Interim DIP Order shall not have been vacated, reversed, modified, amended, or stayed.

    e.   No trustee or examiner with expanded powers shall have been appointed with respect to any Loan Party or any of the Loan Parties' respective properties pursuant to section 1104 of the Bankruptcy Code.

    f.   All fees, invoiced costs and expenses (including, without limitation, reasonable, documented and invoiced legal fees and expenses), and other compensation contemplated by the DIP Term Loan Facility Documents or otherwise required to be paid to the Ad Hoc Group Advisors, the DIP Agents and the DIP Lenders on or before the Closing shall have been paid. It being understood and agreed that the DIP Agents shall be entitled to net any administrative and/or agency fees from the proceeds of the funded New Money DIP Term Loans.

    g.   The DIP Agents and the DIP Lenders shall have received, prior to the Closing Date, in form and substance satisfactory to the Required Consenting New

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | Money DIP Lenders, a thirteen-week rolling cash flow budget for the period from the Closing Date through the end of such thirteen-week period (such approved budget and subsequent budgets approved by the Supermajority New Money DIP Lenders as described below, the "Approved Budget").  Each budget provided after the Closing Date shall include the aggregate principal amount of undrawn and outstanding loans under the DIP ABL Facility. It being understood and agreed that the Approved Budget attached as Exhibit 3 to the Interim DIP Order is satisfactory to the Required Consenting New Money DIP Lenders. |
| | h.   The DIP Agents and the DIP Lenders shall have received, on or prior to the Closing Date, customary closing deliverables with respect to each Debtor addressing such customary matters as the DIP Lenders shall reasonably request, including good standing certificates, secretary's certificates with organizational documents, resolutions and incumbency certificates attached and officer's closing certificate, in each case, in form and substance reasonably satisfactory to the Required Consenting New Money DIP Lenders. |
| | i.   There shall exist no known unstayed action, suit, investigation, litigation, or proceeding pending in any court or before any arbitrator or governmental instrumentality (other than the chapter 11 cases) that would reasonably be expected to result in a Material Adverse Effect. |
| | j.   Since the Petition Date, there shall not have occurred any circumstance or conditions, which individually or in the aggregate, constitutes or is reasonably expected to constitute, a Material Adverse Effect. |
| | k.   All necessary and material governmental and third-party consents and approvals necessary in connection with the DIP Term Loan Facility and the transactions contemplated thereby shall have been obtained on or prior to the Closing Date (without the imposition of any materially adverse conditions to the DIP Lenders (taken as a whole) that are not acceptable to the Required Consenting New Money DIP Lenders) and shall remain in effect; and no law or regulation shall be applicable in the judgment of the Required Consenting New Money DIP Lenders, as applicable, that restrains, prevents, or imposes materially adverse conditions upon the DIP Term Loan Facility or the transactions contemplated thereby. |
| | l.   The DIP Agents and each DIP Lender who has requested the same at least five business days before the Closing Date shall have received, no later than three business days before the Closing Date, all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S. Patriot Act. |
| | m.   Granting valid and perfected liens, satisfactory to the DIP Lenders, for the benefit of the DIP Agents and the DIP Lenders via entry of the Interim Order, on the security interests in the DIP Collateral of the Loan Parties contemplated by the "Security and Priority" section above (including granted pursuant to a customary security agreement in form and substance satisfactory to the DIP Agents and the DIP Lenders); the Loan Parties shall have delivered Uniform Commercial Code financing statements, in suitable form for filing satisfactory to the DIP Agents. |
| | n.   The Restructuring Support Agreement shall be in full force and effect as of the Closing Date and shall not have been amended or modified without the consents required therein. |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | o.  All "first day orders" entered at the time of commencement of the chapter 11 cases shall be satisfactory in form and substance to the Required Consenting New Money DIP Lenders; *provided, however*, the DIP Orders shall be satisfactory in form and substance to the Required Consenting Lenders. |
| | p.  (i) The "Covenant Trigger Period" (as defined in the ABL Credit Agreement) and related provisions of the ABL Credit Agreement or the DIP ABL Credit Agreement, as applicable, shall have been amended on the terms satisfactory to the Required Consenting New Money DIP Lenders to reduce the Excess Availability threshold for the purposes of such "Covenant Trigger Period" definition (the "<u>ABL Excess Availability Threshold</u>") to the fixed amount of (x) upon entry of the Initial DIP Order, $64 million Order and (y) upon entry of the Final DIP Order and for the term of the DIP Term Loan Facility, $54 million; (ii) the definition of "Borrowing Base" and related provisions under the ABL Credit Agreement or the DIP ABL Credit Agreement, as applicable, shall remain unchanged and no discretionary reserves shall have been established as compared to those set forth in the ABL Credit Agreement in effect as of the date of the Restructuring Support Agreement and additional reserves added shortly prior to the Petition Date have been removed (collectively, together with interest rates referred to in clause R below, "<u>Certain ABL Components</u>") and (iii) the DIP Term Loan Agent and the DIP Lenders shall have received copies of such Ratification and Amendment Agreement with the DIP ABL Credit Agreement attached thereto as Exhibit A, duly executed by all parties thereto. |
| | q.  The loans (other than the 2024 Delayed Draw FILO Loans) under the ABL Credit Agreement or the DIP ABL Credit Agreement, as applicable, shall bear interest at the *per annum* rate equal to the Default Rate under and as defined in the ABL Credit Agreement in effect as of the date of the Restructuring Support Agreement. |
| | r.  (i) The Fronting Fee Letter and (ii) the Master Consent shall have been duly executed and delivered in each case to each of the parties signatory thereto. |
| | s.  All premiums, fronting or seasoning fees, and the reasonable fees, costs, and expenses of professionals for the Fronting Lender (including, without limitation, the reasonable fees, charges and expenses of Orrick, Herrington & Sutcliffe LLP and Mandel, Katz & Brosnan LLP), in each case pursuant to invoices delivered to the Debtors before the Closing Date, and all other amounts required to be paid to the Fronting Lender in accordance with the Fronting Fee Letter, shall have been paid (or will be paid with the proceeds of the Loan(s) authorized under the Interim Order). |
| | *See* DIP Term Loan Term Sheet, "Conditions Precedent to the Initial extension of Credit." |
| | <u>Conditions to All Credit Extensions</u>.  The obligation of each DIP Lender to honor any request for any DIP Term Loan after the Closing Date is subject to the following conditions precedent: |
| | a.  No Default or an Event of Default under the DIP Term Loan Facility Documents shall exist, or would result from such proposed funding or from the application of the proceeds therefrom, unless waived by the Supermajority New Money DIP Lenders. |
| | b.  The representations and warranties of the Loan Parties in the DIP Term Loan Facility Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | correct in all respects (after giving effect to any qualification therein)) immediately prior to, and after giving effect to, such funding or issuance, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, unless waived by the Required Consenting New Money DIP Lender. |

c. The making of such DIP Term Loan shall not violate any requirement of material law, the violation of which constitutes or is reasonably expected to constitute a Material Adverse Effect, after giving effect to the Interim DIP Order, the Final DIP Order, and any other order of the Court, and shall not be enjoined, temporarily, preliminarily or permanently, unless waived by the Required Consenting New Money DIP Lenders.

d. The making of such DIP Term Loan shall not result in the aggregate outstanding amount under the DIP Term Loan Facility exceeding the amount authorized by the Interim DIP Order or the Final DIP Order, as applicable (or any sub-cap expressed in the DIP Term Loan Facility Documents), unless waived by the Required Consenting New Money DIP Lenders.

e. With respect to the Final Draw, the Final DIP Order, which shall be consistent with the Interim DIP Order and otherwise in form and substance satisfactory to DIP Agents and the Required Consenting Lenders, and, so long as the New Money DIP Term Loans funded pursuant to the Initial Draw and any New Money DIP Term Loan Commitments have not been assigned by the Fronting Lender to the applicable DIP Lenders, the Fronting Lender, shall have been entered and the Interim DIP Order or Final DIP Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect, unless waived by the Required Consenting Lenders.

f. No Material Adverse Effect shall have occurred since the Petition Date, unless waived by the Required Consenting New Money DIP Lenders.

g. None of the chapter 11 cases shall have been dismissed or converted to a chapter 7 case, unless waived by the Required Consenting New Money DIP Lenders.

h. No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the chapter 11 cases, unless waived by the Required Consenting New Money DIP Lenders.

i. (A) with respect to the Initial Draw, the DIP Term Loan Agent shall have received, a written borrowing notice two business days prior to funding and (B) with respect to the Final Draw, the DIP Term Loan Agent shall have received, a borrowing notice five business days prior to funding, in each case, in the form set forth in the DIP Term Facility Documents and unless waived by the Required Consenting New Money DIP Lenders;

j. Satisfaction by the Debtors of all DIP Milestones that have occurred as of each borrowing, unless waived by the Supermajority New Money DIP Lenders;

k. The funding of the New Money DIP Term Loan complies with the Approved Budget, unless waived by the Supermajority New Money DIP Lenders; and

l. Prior to the Final Draw, all material "first day" orders shall have been entered on a final basis and shall be reasonably satisfactory in form and substance to

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | the Required Consenting New Money DIP Lenders; *provided*, *however*, the DIP Orders shall be satisfactory in form and substance to the Required Consenting Lenders. |
| | *See* DIP Term Loan Term Sheet, "Conditions Precedent to Each DIP Term Loan after Closing." |
| | <u>Withdrawal Conditions</u>.    The Borrower shall be allowed to make one or more withdrawals from the Escrow Account (each, a "<u>Loan Withdrawal</u>") after the Closing Date, subject to the satisfaction (or waiver by the Supermajority New Money DIP Lenders) of each of the following conditions: |

a. The DIP Term Loan Agent and the DIP Escrow Agent shall have received a Loan Withdrawal Notice in the form set forth on <u>Exhibit A</u> attached to the DIP Term Loan Term Sheet with respect to the New Money DIP Loans by no later than 12:00 Noon (New York time) one Business Day prior for a proposed withdrawal of such Loan Withdrawal on the immediately following Business Day (such date, the "<u>Proposed Withdrawal Date</u>"), which shall include a certification that the proceeds of such Loan Withdrawal shall be used pursuant to the Approved Budget (subject to Permitted Variances).

b. The representations and warranties of the Loan Parties set forth in the DIP Term Loan Term Sheet shall be true and correct in all material respects on and as of the Proposed Withdrawal Date as though made on and as of such Proposed Withdrawal Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

c. No default or Event of Default shall have occurred and be continuing on such Proposed Withdrawal Date or after giving effect to the Loan Withdrawal requested to be made.

d. Then applicable Approved Budget shall be in full force and effect on and as of the Proposed Withdrawal Date, and the withdrawal shall be in accordance with such Approved Budget (subject to Permitted Variances).

e. Then applicable DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Consenting Lenders.

f. The Loan Parties shall have satisfied each of the DIP Milestones (to the extent such DIP Milestone occurs prior to the Proposed Withdrawal Date) on or prior to the Proposed Withdrawal Date.

g. Since the Closing Date, there shall be no changes to the Certain ABL Components unless such changes have been made in compliance with the terms of the DIP Term Loan Term Sheet.

Any amounts withdrawn pursuant to a Loan Withdrawal that are not used pursuant to the Approved Budget shall either be (i) netted against any subsequent Loan Withdrawal or (ii) returned to the DIP Escrow Agent to be deposited in the DIP Escrow Account.

*See* DIP Term Loan Term Sheet, "Withdrawal Conditions."

| **Use of DIP Facilities and Cash Collateral** | The proceeds of (a) the New Money DIP Term Loans shall be used, in each case, subject to the Approved Budget and DIP Orders: (i) for the payment of working capital and other general corporate needs of the Debtors in the ordinary course of business; *provided*, *however*, that the payments to critical vendors shall be pursuant to critical |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | vendor designation and approval procedures approved by the Required Consenting New Money DIP Lenders; (ii) for the payment of the fees, costs, and expenses of administering the chapter 11 cases; (iii) to pay obligations arising from or related to the Carve Out; (iv) to pay such other prepetition obligations as set forth in the Approved Budget, or otherwise as approved by the Court, subject to the prior written consent of the Required Consenting New Money DIP Lenders acting in their sole discretion; (v) for the payment of the agency fees and reasonable and documented fees and expenses of the DIP Agents and the DIP Lenders owed under the DIP Term Loan Facility Documents; (vi) to make any adequate protection payments; and (vii) any other purposes of the Debtors permitted by the Approved Budget or approved by the prior written consent of the Required Consenting New Money DIP Lenders acting in their sole discretion, (b) the 2024 FILO Roll-Up Loans shall be deemed to be used to repay the equivalent principal amount of the 2024 Delayed Draw FILO Obligations outstanding under the ABL Credit Agreement, and (c) the Term Loan Roll-Up DIP Loans shall be deemed to be used to repay the equivalent principal amount of the Term Loan Obligations outstanding under the Term Loan Credit Agreement.<br><br>The proceeds of the ABL DIP Loans under the ABL DIP Facility shall be used only for the following purposes: (i) the Roll-Up, (ii) payment of certain prepetition amounts contemplated in the Approved Budget (including prepetition payments to critical vendors identified by the Loan Parties) and solely as authorized by the Court pursuant to orders approving the first day motions filed by the Loan Parties, which orders shall be in form and substance reasonably satisfactory to ABL DIP Agent, (iii) to the extent contemplated in the Approved Budget and in accordance with the terms of the ABL DIP Facility and the Interim DIP Order/Final DIP Order, (iv) payment of the costs and expenses of administering the chapter 11 cases (including payments benefiting from the Carve Out) subject to the terms and conditions of the ABL DIP Facility, in each case of the forgoing, solely in accordance with and subject to the credit agreement governing the terms of the ABL DIP Facility, Interim DIP Order and Final DIP Order; *provided*, that, in no event shall the use of such proceeds result in variances from the Approved Budget that would be an Event of Default and (v) for working capital and other general corporate needs of the Debtors in the ordinary course of business in accordance with the Approved Budget.<br><br>*See* Ratification and Amendment Agreement to DIP ABL Credit Agreement, Section 6.2; DIP Term Loan Term Sheet, "Purpose"; Interim Order ¶ 3. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral: the Prepetition Secured Parties.<br><br>*See* Interim Order, ¶ G(e). |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | The DIP Facilities also includes the following fees:<br><br>**DIP Term Loan Facility**:<br><br>   a.  *Upfront Fee.* The Debtors shall pay to DIP Term Lenders an upfront premium equal to 5.00% of the aggregate New Money DIP Term Loan Commitments, which shall be payable in kind as original issue discount or added to the principal amount of funded New Money DIP Term Loans on the Closing Date.<br><br>   b.  *Exit Fee.* Upon, and on the date of, any repayment or prepayment of any DIP Term Loans or termination of any commitments to make DIP Term Loans in full or in part (other than any termination of such commitments solely as a result of the borrowing of any DIP Term Loans under the DIP Term Loan Term Sheet), the Debtors shall pay to the DIP Term Loan Agent, for the ratable |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | account of each DIP Term Lender, an exit fee in an amount equal to 6.00% of the sum of the principal amount of all DIP Term Loans and terminated commitments to make DIP Term Loans, or in the case of a partial repayment or prepayment, of the principal amount so repaid or prepaid, which shall be payable in cash unless subject to a credit bid. <br><br> c. *DIP Term Loan Agent Fee.*  The Debtors shall pay to the DIP Term Loan Agent, as and when due and payable under the terms of the DIP Term Loan Agent Fee Letter, the fees set forth therein. <br><br> d. *Fronting Lender Fee.*  The Debtors shall pay to the Fronting Lender, as and when due and payable under the terms of the Fronting Lender Fee Letter, the fees set forth therein. <br><br> *See* Annex A to DIP Term Loan Term Sheet, "Upfront Premium" and "Exit Premium." <br><br> **DIP ABL Facility**: <br><br> a. *Structuring Fee.*  The Debtors shall pay to the ABL DIP Agent, as and when due and payable under the terms of the Ratification and Amendment Agreement, $900,000 as consideration for providing the ABL DIP Facility. <br><br> *See* Ratification and Amendment Agreement to DIP ABL Credit Agreement, Section 2. |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(E) and 4001-2(a)(iii) | The Debtors will use the proceeds of the DIP Facilities (including in connection with any letters of credit) and Cash Collateral in accordance with the Approved Budget, attached to the Interim Order as <u>Exhibit 3</u>, and each subsequent Approved Budget, subject to Permitted Variances. <br><br> *See* Interim Order, ¶ 21, <u>Exhibit 3</u>. |
| **Variance Covenant** <br> Local Rule 4001-2(a)(i)(E) and 4001-2(a)(iii) | As of the last date of each Test Period, commencing with the third full week after the Petition Date, (1) the unfavorable variance (as compared to the Approved Budget) of the cumulative operating cash receipts of the Debtors shall not exceed 10% and (2) the unfavorable variance (as compared to the Approved Budget) of the cumulative operating disbursements (other than all professional fees, including professional fees and expenses incurred by the Debtors, the DIP Term Loan Agent, the DIP Escrow Agent, the DIP Lenders, the DIP ABL Agent, the DIP ABL Lenders, U.S. Trustee and the Creditor's Committee that are owed and payable by the Debtors) shall not exceed 10% in each case, based on a rolling four-week period (collectively, the "<u>Permitted Variances</u>"). <br><br> *See* DIP Term Loan Term Sheet, "Financial Covenants"; Ratification and Amendment Agreement to DIP ABL Credit Agreement, "Permitted Variance." |
| **Chapter 11 Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(H) | In addition to the above milestones, the DIP ABL Credit Agreement and the DIP Term Loan Term Sheet also provide for the following milestones: <br><br> a. No later than October 22, 2024, the Debtors shall have commenced the chapter 11 cases in the Court and file, within 24 hours thereafter, the First Day Pleadings, including, with limitation, the DIP Motion; <br><br> b. No later than three (3) days following the Petition Date, the Court shall have entered the Interim Order; <br><br> c. No later than seven (7) days following the Petition Date, the Debtors shall have filed the Bidding Procedures Motion; |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | d.  No later than fourteen (14) days following the Petition Date, the Debtors and the Required Consenting New Money DIP Lenders shall have made a determination as to necessity and form of any Canadian proceedings;<br><br>e.  No later than twenty-one (21) days following the Petition Date, the Required Consenting Lenders and the ABL Secured Parties shall have agreed on a proposal for exit ABL financing for the Credit Bid Sale Transaction;<br><br>f.  No later than twenty-one (21) days following the Petition Date, the Debtors shall have provided a business plan acceptable to the Required Consenting Lenders;<br><br>g.  No later than thirty-five (35) days following the Petition Date, the Court shall have entered the Bidding Procedures Order;<br><br>h.  No later than thirty-five (35) days following the Petition Date, the Court shall have entered the Final DIP Order;<br><br>i.  No later than forty-five (45) days following the Petition Date, an entity formed by the Ad Hoc Group (the "Purchaser") and the ABL Secured Parties shall have executed a commitment letter providing for ABL exit financing on terms conditions acceptable to the Required Consenting Lenders;<br><br>j.  No later than forty-five (45) days after the Petition Date, the Purchaser shall have provided evidence acceptable to the ABL Agent of commitments from the owners of the Purchaser to provide any necessary financing in connection with the purchase and operation of the Purchased Assets (as defined in the Sale Term Sheet);<br><br>k.  No later than sixty (60) days following the Petition Date, the bid deadline in the Bidding Procedures Order shall have occurred.<br><br>l.  No later than sixty-five (65) days following the Petition Date, the auction in the Bidding Procedures Order shall have occurred, if applicable;<br><br>m.  No later than seventy (70) days following the Petition Date, the Court shall have entered the Sale Order; and<br><br>n.  No later than eighty (80) days following the Petition Date, the Sale Transaction shall be consummated; *provided, however*, if the successful bidder is not the Purchaser, then this Milestone may be extended with the consent of the Supermajority New Money DIP Lenders.<br><br>*See* RSA, Section 4.01. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-2(a)(i)(G) | The liens contemplated by the DIP ABL Credit Agreement and the DIP Term Loan Term Sheet will follow the priority set forth in <u>Exhibit 2</u> to the Interim Order.<br><br>*See* Interim Order Exhibit 2. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 12. |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| **Repayment Features / Provisions Limiting Repayment** <br> Local Rule 4001-2(a)(i)(I) | **DIP Term Loan Facility**: <br><br> Optional Prepayments:  The Borrower may, upon at least three (3) business days' notice, prepay in full or in part, subject to breakage costs and the Exit Fee set forth on <u>Annex A</u> attached to the DIP Term Loan Term Sheet but otherwise without premium or penalty, the DIP Term Loans; *provided* that each such partial prepayment shall be in an aggregate amount of $1,000,000 or multiples of $500,000 in excess thereof (or, if less, the then outstanding principal amount of the DIP Term Loans).  Once repaid, DIP Term Loans may not be re-borrowed. <br><br> *See* DIP Term Loan Term Sheet, "Optional Prepayments." <br><br> Mandatory Prepayments:  Mandatory prepayments of the DIP Term Loans shall be required with 100% of the net cash proceeds from (A) the sale or other disposition of assets of the Borrower and its subsidiaries outside the ordinary course of business, with any exceptions to be agreed; *provided* that net cash proceeds from the disposition of ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) shall not be required to be used to prepay DIP Term Loans to the extent required to prepay ABL Loans under the ABL Credit Agreement and/or loans under the ABL DIP Facility, (B) any casualty events, insurance and condemnation proceeds, subject to exceptions to be agreed, (C) any sale or issuance of debt (other than permitted debt to be agreed) and (D) any extraordinary receipts to be agreed, in each case, subject to breakage cost and the Exit Premium. <br><br> Any optional or mandatory prepayments of the DIP Term Loans shall be applied as follows: (a) to the extent such prepayment is done with the proceeds of the ABL Priority Collateral, such prepayment shall be applied *first*, to prepay the 2024 FILO Roll-Up DIP Loans until all such 2024 FILO Roll-Up Loans are repaid in full, *second*, to prepay New Money DIP Term Loans until all such New Money DIP Term Loans are repaid in full and, *third*, to prepay any Term Loan Roll-Up DIP Loans until all such Term Loan Roll-Up DIP Loans are repaid in full and (b) to the extent such prepayment is done with the proceeds of the Term Priority Collateral, such prepayment shall be applied *first*, to prepay the New Money DIP Term Loans until all such New Money DIP Term Loans are repaid in full and, *second*, to prepay any 2024 FILO Roll-Up DIP Loans and Term Loan Roll-Up DIP Loans *pro rata*, until all such 2024 FILO Roll-Up DIP Loans and Term Loan Roll-Up DIP Loans are repaid in full. <br><br> *See* DIP Term Loan Term Sheet, "Mandatory Prepayments." |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br> Local Rule 4001-2(a)(i)(Q) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest but subject to the limitations set forth in paragraph G of the Interim Order, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens. <br><br> *See* Interim Order ¶¶ G, 26, 27. |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(i)(Q) | The Interim Order provides for a standard and customary Challenge Period: <br><br>     a.    at the earlier of: <br><br>         (i)    subject to the Final Order, the commencement of a hearing to consider confirmation of a chapter 11 plan;  and |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | (ii) seventy-five calendar days after entry of the Interim Order (the "Challenge Period"); *provided* that <br><br> b.  if a chapter 11 trustee or chapter 7 trustee is appointed prior to the expiration of the Challenge Period, then such trustee will have the longer of (x) the remaining Challenge Period and (y) thirty days from the date of such trustee's appointment to commence a Challenge. <br><br> *See* Interim Order ¶ 27. |
| **Limitation on Estate Funds Related to the Challenge Period** <br> Local Rule 4001-2(a)(i)(L) | The Investigation Budget Cap with respect to Allowed Professional Fees to be incurred by the Creditors' Committee in connection with the Challenge is $75,000.00. <br><br> *See* Interim Order ¶ 30. |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) <br> Local Rule 4001-2(a)(i)(B), (G), (K) | Adequate Protection for the Prepetition Primed Parties.  Until the Prepetition Secured Obligations are Paid in Full, the Prepetition Primed Parties are entitled, pursuant to sections 361, 362, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection against the diminution in value, if any, of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Primed Parties' respective interests in the Prepetition Collateral from and after the Petition Date, if any, resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Primed Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Diminution in Value").  In consideration of the foregoing, the Prepetition Primed Parties are hereby granted the following (collectively, the "Adequate Protection Obligations"), in each case, subject in all respects to the Carve Out and in accordance with the priorities set forth in Exhibit 2 to the Interim Order: <br><br> a.  ABL Adequate Protection Liens; <br> b.  ABL Adequate Protection 507(b) Claims; <br> c.  Prepetition ABL Interest Payments; <br> d.  Term Loan Adequate Protection Liens; <br> e.  Term Loan Adequate Protection 507(b) Claims; <br> f.  Reporting; and <br> g.  Adequate Protection Fees and Expenses. <br><br> *See* Interim Order, ¶ 18. |
| **Termination Events/ Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(i)(M), (S) | The DIP Term Loan Term Sheet, DIP ABL Credit Agreement, and Interim Order contain events of default (collectively, the "DIP Termination Events") that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with the budget and variance reporting and failure to satisfy any of the case milestones (unless otherwise waived or extended). <br><br> *See* DIP ABL Credit Agreement, Section 8.01; DIP Term Loan Term Sheet, "Events of Default"; Interim Order, ¶ 22. |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| **Remedies Notice Period and Emergency Hearing**<br><br>Local Rule 4001-2(a)(i)(S), (T) | Upon the occurrence and during the continuation of a DIP Termination Event and following the giving of not less than five days' advance written notice by counsel for the applicable DIP Agent, which may be by email (such period, the "<u>Notice Period</u>," and such notice, the "<u>Enforcement Notice</u>"), to counsel to the Debtors, the U.S. Trustee, counsel to the counsel to the Ad Hoc Group, counsel to the non-noticing DIP Agent and counsel to the Creditors' Committee, subject to the obligations with respect to the Carve Out, (i) the DIP Agents, acting at the direction of applicable DIP Lenders (as set forth in the applicable DIP Documents) may exercise any rights and remedies against the DIP Collateral available to them under this Interim Order, the DIP Documents and applicable non-bankruptcy law, and the DIP Secured Parties may exercise such rights available to them under the DIP Documents or the Interim Order, (ii) the Prepetition Secured Parties may exercise any rights and remedies to satisfy the Prepetition Secured Obligations and Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, the Permitted Liens (if any) and the Carve Out, and consistent with the Prepetition Secured Facilities Documents, including the Prepetition Intercreditor Agreements, and the relative rights and priorities as set forth on Exhibit 2 to the Interim Order, and (iii) the commitment of each DIP Lender to make DIP Loans will be terminated to the extent any such commitment remains under the DIP Facilities.<br><br>*See* Interim Order ¶ 23, 24. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim Order ¶ 20(c). |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(U) | Subject to and upon entry of the Final Order, the DIP Liens shall not attach to the proceeds of any causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law.<br><br>*See* Interim Order ¶¶ 10, 11. |
| **506(c) Waiver; Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(V) 4001-2(a)(i)(W) | Except to the extent of the Carve Out, no costs or expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, as such pertains to the DIP Secured Parties or the DIP Obligations without the prior written consent of the DIP Agents.<br><br>Subject only to and effective upon entry of the Final Order granting such relief, except to the extent of the Carve Out, no costs or expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Prepetition Secured Agents.<br><br>Subject in all respects to the Carve Out, any and all payments or proceeds remitted to the DIP Agents on behalf of the DIP Lenders, or Prepetition Secured Agents on behalf of the Prepetition Secured Parties pursuant to the provisions of this Interim Order, the |

| Bankruptcy Rule | Summary of Material Terms[9] |
|---|---|
| | DIP Documents or any subsequent order of the Court shall be irrevocably received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors. *See* Interim Order ¶¶ 15, 16. |
| **Marshaling Provision** Local Rule 4001-2(a)(i)(X) | None of the DIP Lenders, the DIP Agents, or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine, and all proceeds thereof shall be received and used in accordance with this Interim Order. Further, subject only to and effective upon entry of the Final Order granting such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties. *See* Interim Order ¶ 14. |
| **Release** Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors and their estates will release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agents, the Prepetition Secured Parties and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, predecessors and predecessors in interest, each solely in their capacities as such (the "Released Parties"), of and from any and all claims, causes of actions, and liabilities arising out of, relating to, or in connection with any of the (a) the Prepetition Secured Facilities Documents or the transactions contemplated under such documents, and (b) the DIP Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, (iii) any and all claims and causes of action regarding the validity, priority, perfection, or availability of the liens of the Prepetition Secured Parties (including Avoidance Actions), and (iv) the Creeping ABL Roll-Up, other than claims and causes of action arising from the gross negligence, fraud, bad faith, or willful misconduct of the Released Parties. *See* Interim Order, ¶ 26. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will indemnify the DIP Lenders, the DIP Agents and their respective Indemnitees, and hold them harmless from and against all reasonable and out-of-pocket expenses, liabilities arising out of or relating to the transactions contemplated in the Interim Order and any actual or proposed use of the proceeds of any loans made under the DIP Term Loan Facility, and the other Indemnified Liabilities in accordance with, and subject to the limitations of the DIP Documents; *provided* that no Indemnified Person will be indemnified for any losses, claims, damages, liabilities, or related expenses to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such Indemnified Parties. *See* Interim Order, ¶ 28. |

**Explanation for Inclusion of Significant Provisions Pursuant to Local Rule 4001-2(a)(i)**

**I. The Significant Provisions Are Appropriate and Justified Under the Circumstances of These Chapter 11 Cases.**

18.     Local Rule 4001-2(a)(i) requires that the Debtors explain the reason for including certain significant provisions described in Local Rules 4001-2(a)(i)(N)–(X) (collectively, the "Significant Provisions").[10]   The Debtors believe that each of the Significant Provisions and the Carve Out is justified and necessary in the context and circumstances of these chapter 11 cases.

**A.     The DIP Roll-Up Obligations Are Appropriate.**

19.     Local Rule 4001-2(a)(i)(O) requires explicit disclosure of provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt. *See* Local Rule 4001-2(a)(i)(O). Here, the DIP Roll-Up Obligations consist of three components, each on a cashless, dollar-for-dollar basis: (a) a three-to-one "roll-up" of the Prepetition First Lien Term Loans into DIP Term Loans; (b) upon entry of the Interim Order, a roll-up of 100% of the 2024 Delayed Draw FILO Loans into DIP Obligations; and (c) a "creeping" roll-up of the ABL facility, providing that, (i) upon entry of the Interim Order, $49.2 million of Cash Management Obligations and issued and outstanding letters of credit will be automatically deemed exchanged and issued under the DIP ABL Credit Agreement and shall constitute DIP Obligations, (ii) between entry of the Interim Order and entry of the Final Order, all cash, collections, and proceeds of DIP ABL Priority Collateral will be deemed, on a dollar for dollar basis, to reduce the Prepetition ABL Obligations, and (iii) upon the entry of the Final Order, all remaining outstanding Prepetition ABL Obligations will be deemed exchanged and converted on a cashless basis into and constitute DIP Obligations.

---

[10]     Local Rules 4001-2(a)(i)(N) and 4001-2(a)(i)(P) are not applicable.  Local Rules 4001-2(a)(i)(U)–(X) are only applicable upon entry of the Final Order.

20.     As discussed in further details below, the DIP Roll-Up Obligations are a key condition for the DIP Term Lenders to provide the DIP Facility.  Without agreeing to the DIP Roll-Up Obligations, the Debtors would not have been able to achieve the cross-capital structure support for the DIP Facilities and a smooth transition into these chapter 11 cases.  Specifically, the Debtors believe that it is appropriate to grant the full roll-up of the 2024 Delayed Draw FILO Loans upon entry of the Interim Order, because that capital was provided earlier this year with the goal of bridging the Debtors to a strategic transaction, which transaction the Debtors intend to consummate through these chapter 11 cases.  Given these circumstances, the DIP Roll-Up Obligations are reasonable, appropriate, a sound exercise of the Debtors' business judgment, and the Debtors request that it should be approved.

**B.      The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate.**

21.     Local Rule 4001-2(a)(i)(Q) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order to investigate such matters.  *See* Local Rule 4001-2(a)(i)(Q).  Here, the Interim Order complies with this requirement by providing any statutory committee appointed in these chapter 11 cases, and all parties in interest in each case, with requisite standing (to the extent requisite standing is obtained pursuant to an order of this Court entered prior to seventy-five days from the entry of the Interim Order and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding) to file an adversary proceeding challenging the validity, extent, perfection, or priority of the Prepetition Liens on the Prepetition Collateral, the validity, allowability, priority, or amount of the Prepetition Secured Obligations, or the

Stipulations by the earlier of (i) seventy-five days after the entry of the Interim Order and (ii) the commencement of a hearing to consider confirmation of a chapter 11 plan.  *See* Interim Order ¶ 27.

**C.    The Provisions Immediately Approving All Terms and Conditions of the DIP Credit Agreements Are Appropriate.**

22.    Local Rule 4001-2(a)(i)(R) requires explicit disclosure of provisions that immediately approve all terms and conditions of the underlying loan agreement.  *See* Local Rule 4001-2(a)(i)(R).  Here, the Interim Order provides that upon entry, the parties to the DIP Facilities are authorized to enter into their respective obligations and that, upon execution, the DIP Documents shall constitute valid and binding obligations of the Debtors.  Moreover, to the extent the DIP Documents conflict with the Interim Order, the Interim Order controls.  *See* Interim Order ¶ 33.  This provision is necessary and appropriate for the Debtors to access the DIP Facilities and to provide all parties with the assurances that the Debtors' postpetition entry into the DIP Facilities is valid.  Without this provision, the Debtors would be unable to access the DIP Facilities or use Cash Collateral on an interim basis.

**D.    The Provisions Modifying the Automatic Stay, Providing for a Remedies Notice Period, and Providing for a Default Notice Hearing Are Appropriate.**

23.    Local Rules 4001-2(a)(i)(S) and (T) require explicit disclosure of provisions that modify the automatic stay upon a DIP Termination Event without a remedies notice period of at least five days and provisions that seek to limit what parties in interest may raise at an emergency hearing scheduled during the remedies notice period.  *See* Local Rules 4001-2(a)(i)(S) and (T).  Here, the Interim Order provides for a five-day remedies notice period for all DIP Termination Events.  *See* Interim Order ¶ 23.  Upon the delivery of an Enforcement Notice, the Debtors shall be entitled to seek an emergency hearing within the Notice Period to consider (a) whether a DIP Termination Event has occurred and (b) any appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral); *provided* that if a request for such hearing is

made prior to the end of the Notice Period, then the Notice Period will be continued until the Court hears and rules with respect thereto.  During the Notice Period, notwithstanding anything to the contrary in paragraph 24 of the Interim Order, (i) the DIP Secured Parties may not exercise any rights or remedies to satisfy the DIP Obligations, including any rights and remedies against the DIP Collateral, (ii) the Prepetition Secured Parties may not exercise any rights or remedies to satisfy the Prepetition Secured Obligations and the Adequate Protection Obligations, including any rights or remedies against the Prepetition Collateral, and (iii) the Debtors will continue to have the right to use Cash Collateral in accordance with the terms of the Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Debtors' Estates.  At the end of the Notice Period, unless the Court has entered an order to the contrary or otherwise fashioned an appropriate remedy, the Debtors' right to use Cash Collateral will immediately cease, unless otherwise provided in the Interim Order, and Prepetition Secured Parties, the DIP Agents and DIP Lenders will have the rights set forth in paragraph 23 of the Interim Order, without the necessity of seeking relief from the automatic stay.

24.    In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim Order should be approved.

### The Debtors' Prepetition Capital Structure

25.    As of the Petition Date, the Debtors had approximately $1.910 billion in total third-party funded debt obligations:

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued Interest | Approximate Applicable Premium | Approximate Total Claim Amount |
|---|---|---|---|---|---|
| **Revolving Credit Facility** | October 22, 2026 | $708.6 million[11] | $2.3 million | N/A | $710.9 million |
| **FILO Term Loan Facility** | October 22, 2026 | $100 million | $0.2 million | N/A | $100.2 million |
| **2024 Delayed Draw FILO Loans** | October 22, 2026 | $75 million | $1.95 million | $15.07 million | $92.02 million |
| **Term Loan Facility** | October 22, 2028 | $975 million | $31.3 million | N/A | $1,006.3 million |
| *Total Funded Debt Obligations:* | | *$1,858.6 million* | *$35.75 million* | *$15.07 million* | *$1,909.42 million* |

I.    **The Prepetition ABL Facility.**

26.    ***Revolving Credit Facility and FILO Term Loans.*** ATD Inc., as administrative borrower, ATD New Holdings III, Inc., a Delaware corporation, each other borrower from time to time party thereto, each lender from time to time party thereto (the "Prepetition ABL Lenders"), each L/C issuer and swing line lender from time to time party thereto and Wells Fargo Bank, National Association, as administrative agent and collateral agent, entered into an asset-based credit agreement, dated as of October 22, 2021, as amended by that certain First Amendment to ABL Credit Agreement, dated as of April 13, 2023, as further amended by that certain Second Amendment to ABL Credit Agreement, dated as of July 16, 2024, and as further amended by the Third Amendment, as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time (the "Prepetition ABL-FILO Credit Agreement").

27.    The Prepetition ABL Credit Agreement allows the Debtors to access $659.4 million in revolving credit commitments.  In addition, the DIP ABL Credit Agreement includes approximately $100 million outstanding under a first-in, last-out facility (the "Original FILO").  Finally, the Third Amendment created a delayed draw "first in last out" facility as a new tranche

---

[11]    This includes the outstanding letter of credit in the amount of $49.2 million under the Revolving Credit Facility.

under the DIP ABL Credit Agreement by investors representing a majority of the Term Loan Lenders (the "2024 Delayed Draw FILO Facility" and, the lenders thereunder, the "2024 Delayed Draw FILO Lenders" and, the loans thereunder, the "2024 Delayed Draw FILO Loans"; and the 2024 Delayed Draw FILO Facility, the Revolving Credit Commitments, and the Original FILO, collectively, the "Prepetition ABL Facility," and any obligations thereunder, the "Prepetition ABL Obligations").

28.     The Prepetition ABL Facility is secured by a first-priority security interest in all accounts and payment intangibles, chattel paper and inventory (the "Prepetition ABL Priority Collateral").  The Prepetition ABL Facility, other than the 2024 Delayed Draw FILO Facility, also has a second-priority security interest in all Prepetition Term Loan Priority Collateral (as defined herein).  The 2024 Delayed Draw FILO Liens are *pari* with the liens of the Prepetition Term Loan Secured Parties on the Prepetition Term Loan Priority Collateral.

29.     The maturity date for the Prepetition ABL Facility is October 22, 2026.  As of the Petition Date, approximately $[907.5] million in aggregate principal amount remained outstanding under the Prepetition ABL Facility.

## II.     The Prepetition Term Loan Facility.

30.     ATD Inc., each lender from time to time party thereto (the "Prepetition Term Loan Lenders") and Bank of America, N.A., as administrative agent and collateral agent, entered into a term loan credit agreement dated as of October 22, 2021 (the "Prepetition Term Loan Facility" and, the loans thereunder, the "Prepetition First Lien Term Loans") (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2023, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of March 26, 2023 and as further amended by that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of

July 24, 2024, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Agreement").

31.     Substantially all assets other than the assets securing the Prepetition ABL Facility serve as collateral for the Prepetition Term Loan Facility, including all equipment, real property, and equity interests of ATD Inc. and the Debtors (the "Prepetition Term Loan Priority Collateral"). In addition, the Prepetition Term Loan Facility is secured by a second-priority security interest in the Prepetition ABL Priority Collateral. The maturity date for the Prepetition Term Loan Facility is October 22, 2028. As of the Petition Date, approximately $975 million in aggregate principal amount remained outstanding under the Prepetition Term Loan Facility.

### The DIP Facilities

**I.      The Debtors' Need for Accessing the DIP Facilities and Use of Cash Collateral.**

32.     As described in the First Day Declaration, the Murray Declaration, and the Bienias Declaration, the Debtors require immediate access to the DIP Facilities in addition to continued use of Cash Collateral to fund operations, capital expenditures, and the administrative costs of these chapter 11 cases. The Debtors filed these chapter 11 cases with approximately $30 million in cash on hand, which is insufficient liquidity to operate their enterprise and continue paying their obligations as they come due. Bienias Decl. ¶ 12.

33.     The proposed DIP Facility will provide stability to the Debtors' business operations and facilitate a smooth entry into these chapter 11 cases. Further, the DIP Facilities will ensure the Debtors' ability to operate as a going concern during these cases, preserving value of the Debtors' estates for the benefit of their stakeholders.

34.     Absent the ability to access the funds available under the DIP Facility and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends,

including vendors, suppliers, and employees.  Bienias Decl. ¶ 12, 15.  These interruptions, in turn, would hinder the Debtors' ability to maximize the value of their estates, as the Debtors would be forced to curtail their operations significantly, to the detriment of all stakeholders.  *Id.*

## II.  Alternative Sources of Financing Are Not Available on Better Terms.

35.     Following the headwinds the Debtors have experienced in recent years, the Debtors faced a liquidity crisis.  The Debtors, with the assistance of their advisors, immediately pivoted to evaluating potential financing alternatives at its disposal.  *See* Murray Decl. ¶¶ 9–10.  Due to the Debtors' inability to secure senior financing without near-unanimity across their capital structure (which was not forthcoming), no material unencumbered collateral, and the Company's inability to continue making payments, including to its key vendors, without  defaulting under the Prepetition ABL Facility, there were no financing alternatives that could provide new money on an expedited timeline while also providing security to potential new money lenders.  Accordingly, the Debtors engaged in negotiations with the Ad Hoc Group and the Prepetition ABL Lenders to (i) provide near-term DIP financing and (ii) engage with the Debtors' other lenders to build greater consensus for a restructuring.  *Id.* ¶ 15.

36.     In the weeks leading up to the Petition Date, the Company engaged in arm's-length, hard fought negotiations with the DIP Lenders regarding the terms of the DIP Facility.  *Id.* ¶ 12, 15.

37.     In the weeks preceding the Petition Date, the Debtors, with the assistance of Moelis, also contacted several third-party financial institutions regarding providing postpetition financing to the Debtors.  *Id.* ¶ 11–12, 15.  The Debtors received no third-party financing proposals.  In consultation with their advisors, the Debtors determined that pursuing and negotiating the DIP Facility provided by the DIP Lenders represented the only viable path to obtaining critical funding.  The DIP Facility contains reasonable and appropriate terms and provisions under these

extraordinary circumstances and is the Debtors' best—and only—available option for postpetition funding.

**III.    The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.**

Absent the liquidity infusion to be provided by the DIP Facility, the Debtors may be forced to curtail their operations significantly.  Bienias Decl. ¶ 12.  Even if the Debtors had the ability to access Cash Collateral, cash on hand and expected inflows would likely not be sufficient to fund the Debtors' operations as a going concern in the near term and during these cases.  Without a new source of postpetition liquidity, the Debtors' businesses may be irreparably harmed.  *Id.*  Consequently, the DIP Facility is necessary to preserve the Debtors' operations and maximize the value of the Debtors' estates.

<u>**Basis for Relief**</u>

**I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.    Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

38.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because

such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

39.    Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

40.    Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

41.    The Debtors' determination to move forward with the DIP Facilities is a sound exercise of their business judgment following an arm's-length process and careful evaluation of available alternatives (or lack thereof). The Debtors require an immediate capital infusion in the form the DIP Facilities and access to Cash Collateral to operate their business postpetition, finance

working capital and payroll, maintain favorable relations with vendors, suppliers, customers, sureties, and other contract counterparties, fund these chapter 11 cases, and preserve the Debtors' assets during the pendency of these cases. *See* Bienias Decl. ¶ 12. Accordingly, the Debtors' access to the proposed DIP Facilities will enable the Debtors to stabilize their cash flows, continue operating in the ordinary course, and preserve going-concern value throughout the chapter 11 process. *Id.* ¶ 16. In particular, the Debtors believe that the Approved Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Approved Budget. *Id.* ¶ 14. Absent an expedient and fully funded chapter 11 cases, the Debtors will face a heightened business disruption that would significantly damage their business operations and going-concern value and materially impair creditors' recoveries. *Id.* ¶ 12–15.

42.     For these reasons, the Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal represents the only viable postpetition financing option available to the Debtors. *See* Murray Decl. ¶ 19. The DIP Facilities provide the Debtors with market-tested postpetition financing on the best available terms and are necessary for the Debtors to continue operating their business. *Id.* ¶ 2. Accordingly, the Court should authorize the Debtors to enter into the DIP Documents.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

43.     The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) and 364(d) of the Bankruptcy Code. More specifically, the Debtors propose to provide to the DIP Secured Parties, subject to the Carve Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP

Collateral, which include substantially all of the Debtors' assets, and, specifically, (a) a priming security interest in and lien on the Prepetition Collateral to the extent such Prepetition Collateral is subject to prepetition liens that secure the prepetition secured obligations of the Prepetition Secured Parties, (b) a junior security interest in and lien on the DIP Collateral to the extent such DIP Collateral is subject to the Permitted Liens, and (c) a first priority senior security interest in and lien on all property of the Debtors that is not subject to a valid, perfected and non-avoidable lien, subject to and as further provided for in the DIP Documents and the Interim Order.

44.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp*., 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

45.     As described above, the Debtors are unable to obtain unsecured credit.  Murray Decl. ¶¶ 14, 18.  Absent the DIP Facilities, which will provide sufficient liquidity to administer

these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities as set forth in the DIP Documents are fair, reasonable, and represent the best terms available to the Debtors to obtain DIP financing.  For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

46.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  As described above, the Debtors are not able to get credit on account of any unencumbered assets or on a junior secured basis.  Murray Decl. ¶¶ 11–12.  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either (a) the requisite number under the applicable of Prepetition Secured Parties have consented to being "primed" or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

47.     Here, the DIP Lenders, who represent 100 percent of Prepetition ABL Lenders and 90 percent of the Prepetition Term Loan Lenders, affirmatively consented to, and actively participated in providing, the proposed DIP Facilities.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Moreover, as more fully discussed herein and set forth in the Interim Order, the Debtors propose to provide an adequate protection package to protect the interests of the Prepetition Secured Parties whose security interest in and liens on the Prepetition Collateral are

being primed.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.    No Comparable Alternative to the DIP Facilities Is Reasonably Available.

48.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

49.    As discussed above, the Debtors, with the assistance of their advisors, ran a marketing process to gauge third-party lenders' interest in providing DIP financing.  *See* Murray Decl. ¶ 13–16.  To avoid an expensive priming fight in connection with an alternative postpetition financing facility, the Debtors would either need to (a) obtain the Prepetition Secured Parties' consent to an alternative financing priming their liens or (b) identify a third-party lender willing to provide postpetition financing on a junior basis. *Id.* ¶ 12.  Of the eight potential third-party lenders

that Moelis contacted to solicit proposals for DIP financing, only three parties executed a nondisclosure agreement and received access to additional diligence information, and none were willing to provide DIP financing on a junior or unsecured basis. *Id.* ¶ 11. In my experience, any attempt to prime the Prepetition Secured Parties, would likely result in expensive and distracting litigation and valuation dispute at the very outset of these chapter 11 cases, which would interfere with the Debtors' orderly reorganization of their business. *Id.* ¶ 12. Further, the Debtors do not believe they have sufficient unencumbered assets to secure adequate DIP financing to fund a non-consensual chapter 11 case. *Id.* ¶ 12. Accordingly, the Debtors believe that the proposed DIP Facilities represent the best and only available financing option available under the circumstances. *Id.* ¶ 2. Accordingly, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.     The Debtors Should Be Authorized to Use Cash Collateral.**

50.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order. As described in the Bienias Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' business and smooth entry into these chapter 11 cases. *See* Bienias Decl. ¶ 10. Accordingly, use of the Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition Secured Parties, and should be approved.

**E.      Adequate Protection Provided to the Prepetition Secured Parties Is Appropriate.**

51.      Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  *See* 11 U.S.C. § 363(e).  Section 364(d)(1) of the Bankruptcy Code also provides adequate protection for the secured creditors whose interest in properties are primed in connection with the debtors' obtaining of postpetition financing. *See* 11 U.S.C. § 364(d)(1)(B).  Further, section 362(d)(1) of the Bankruptcy Code provides that the automatic stay may be lifted for cause, including the lack of adequate protection for a party's interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

52. As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with certain forms of adequate protection to protect against the Diminution in Value, if any, of their interests in the Prepetition Collateral, including the Cash Collateral, resulting from the Debtors' use, sale, or lease of the Prepetition Collateral, priming of their security interests and liens by the liens securing the DIP Facilities, and the imposition of the automatic stay:

a. replacement liens on DIP Collateral in favor of the Prepetition Secured Parties subject and subordinate to the Carve Out, Permitted Liens (if any), with relative priority as set forth in Exhibit 2 attached to the Interim Order;

b. superpriority administrative expense claims to the extent provided by section 507(b) of the Bankruptcy Code in favor of the Prepetition Secured Parties in the amount of their respective Diminution in Value (i) subject and subordinate to the Carve Out with relative priority consistent with the relative priority of the replacement liens as set forth in Exhibit 2 attached to the Interim Order;

c. certain reports and notices on the operation of the Debtors, including monthly reports on the aging of the Debtors' accounts receivable and accounts payable, inventory, vendor payments, and preliminary profit and loss;

d. subject and subordinate to the Carve Out, payment of cash interest covering any outstanding Prepetition ABL Obligations (at the applicable default rate) as they become due;

e. the Prepetition Term Loan Secured Parties and the Prepetition ABL Secured Parties shall be entitled to delivery of all reports and notices deliverable to the DIP Secured Parties pursuant to the DIP Documents;

f. payment of all reasonable and documented professional fees and expenses for certain advisors to the DIP Term Lenders and the DIP ABL Agent;

g. subject to entry of the Final Order granting such relief, the waiver of (x) the Debtors' and the Estates' ability to surcharge the DIP Collateral pursuant to Bankruptcy Code section 506(c) with respect to the DIP Secured Parties and (y) the doctrine of "marshaling" and any other similar equitable doctrine with respect to the DIP Collateral, and (ii) subject to and upon entry of a Final Order granting such relief, the waiver of (x) the Debtors' and the Estates' ability to surcharge against the Prepetition Collateral (as defined herein) pursuant to Bankruptcy Code section 506(c) with respect to the Prepetition Secured Parties, effective as of the Petition Date, (y) the applicability of the "equities of the case" exception under Bankruptcy Code

section 552(b) with respect to the proceeds, products, offspring or profits of the Prepetition Collateral, and (z) the doctrine of "marshaling" and any other similar equitable doctrine with respect to any of the Prepetition Collateral; and

h.     cash payments covering any outstanding Prepetition ABL Obligations after the entry of this Interim Order, including interest equal to the applicable interest rate under the DIP ABL Credit Agreement with respect to DIP ABL Obligations to the extent such Prepetition ABL Obligations have not yet been exchanged or converted into DIP ABL Roll-Up Obligations.

53.     The proposed Adequate Protection Obligations are appropriate and are sufficient to protect the Prepetition Secured Parties from any potential Diminution in Value to the Cash Collateral. The Debtors' provision of the Adequate Protection Obligations is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**F.     The DIP Roll-Up Obligations Are Appropriate.**

54.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp*., 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

55.     Repayment of prepetition debt with roll-up is a common feature in debtor-in-possession financing arrangements.  The importance of a roll-up feature in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. June 10, 2024) (authorizing a $180 million DIP facility, including a $135 million roll-up (3:1 roll-up)); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (authorizing  a $270 million DIP facility, including a $90 million roll-up of the prepetition debt obligations (3:1 roll-up)); *In re Sientra, Inc*., No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) (authorizing a $90 million DIP facility, including a $67 million roll-up of the prepetition debt obligations (2.9:1 roll-up)); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (authorizing an approximately $644 million DIP facility, including a $501 million roll-up of the prepetition debt obligations (approximately 3.5:1 roll-up)); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (D.N.J. June 14, 2023) (authorizing an approximately $240 million DIP facility, including a $200 million roll-up of prepetition debt obligations (5:1 roll-up)).[12]

56.     Here, the proposed DIP Roll-Up Obligations are an exercise of the Debtors' sound business judgment.  As set forth above, the DIP Term Loan Term Sheet provides that, upon entry of the Interim Order, $375 million of the Debtors' Prepetition Term Loan Debt will "roll up" with the DIP Facility upon entry of the Interim Order, with an additional $375 million of the Debtors' Prepetition Term Loan Debt rolled up upon entry of the Final Order.  Additionally, upon entry of

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

the Final Order, 100% of the Debtors' 2024 Delayed Draw FILO Loans will "roll up" with the

DIP Facility.  Finally, the DIP ABL Credit Agreement provides that the DIP ABL Facility will (a)

roll up partially upon entry of the Interim Order, (b) continue to roll up on a "creeping" basis prior

to the entry of the Final Order, and (c) completely roll up upon entry of the Final Order.  The roll-

ups flow from the rights and priorities that the applicable DIP Lenders enjoyed on a prepetition

basis.  Prior to the Petition Date, and as set forth on Exhibit 1 to the Interim Order, (1) the liens

and security interests granted to the Prepetition Term Loan Secured Parties (the "Prepetition Term

Loan Liens") were first priority liens on the Prepetition Term Loan Priority Collateral (as defined

in the Prepetition ABL/Term Loan Intercreditor Agreement) and second priority liens the ABL

Priority Collateral, (2) the liens and security interests granted to the Prepetition ABL Secured

Parties (the "Prepetition ABL Liens") were first priority liens on the ABL Priority Collateral and

second priority liens the Prepetition Term Loan Priority Collateral, and (3) the liens and security

interests granted to the Prepetition ABL Secured Parties (the "2024 Delayed Draw FILO Liens")

were first priority liens on both the ABL Priority Collateral and the Prepetition Term Loan Priority

Collateral, which priority was granted to the 2024 Delayed Draw FILO Liens as key consideration

for the 2024 Delayed Draw FILO Lenders' (as defined herein) willingness to lend to the Debtors

earlier this year.

57.     The Debtors submit that the DIP Roll-Up Obligations are reasonable under the

circumstances of these chapter 11 cases. This repayment is a sound exercise of the Debtors'

business judgment and is a material component of the structure of the DIP Facilities.  Without

continued access to the additional liquidity provided under the DIP Facilities, the Debtors will be

unable to fund the administration of these chapter 11 cases.  Moreover, the Prepetition ABL

Lenders are likely oversecured, repaying creditors that stand to receive payment in full with

postpetition loans will not harm the Debtors' estates and other creditors. Rather, the proposed ABL roll-up feature merely affects the timing, not the amount, of the Prepetition ABL Lenders' recovery. Additionally, the DIP ABL Documents provides for the Creeping ABL Roll-Up to refinance the Prepetition ABL Facility, whereby all cash, collections and proceeds of the DIP ABL Priority Collateral will be deemed to reduce the Revolving Obligations. The Creeping Roll-Up will have the effect of preserving the prepetition lien priorities as between the Prepetition ABL Lenders and the DIP ABL Lenders. The Roll-Ups are a material component of the structure of the DIP Facilities and was required by the DIP ABL Lenders as a condition to their commitment to provide an increase in revolving commitments. Additionally, the Debtors believe that it is appropriate to grant the full roll-up of the 2024 Delayed Draw FILO Loans upon entry of the interim order, because that capital was provided earlier this year with the goal of bridging the Debtors to a strategic transaction, which transaction the Debtors intend to consummate through these chapter 11 cases.

58.     Without access to the New Money DIP Loans, an asset-based lending facility, and the consensual and immediate access to Cash Collateral, the Debtors' ability to maintain ordinary course business operation during these chapter 11 cases and to consummate the restructure transaction will be in jeopardy. *See* Murray Decl. ¶ 23. Finally, the Debtors' ability to obtain the DIP ABL Facility is an important consideration for the DIP Term Lenders in providing the DIP Term Loan Facility. Given these circumstances, the DIP Roll-Up Obligations are reasonable, appropriate, a sound exercise of the Debtors' business judgment, and should be approved.

**II.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agents and the DIP Lenders under the DIP Documents.**

59.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agents and the DIP Lenders.  These interest and fees are summarized below:

a.    **DIP ABL Facility:**

v.    *Interest Rate.*  The DIP ABL Facility shall bear interest consistent with the default rate defined in the DIP ABL Credit Agreement.

vi.    *Structuring Fee.*  The Debtors shall pay $900,000 to the ABL DIP Agent, as and when due and payable under the terms of the Ratification and Amendment Agreement, as consideration for providing the ABL DIP Facility.

b.    **DIP Term Loan Facility:**

i.    *Interest Rates.*  At the option of the Borrower, New Money DIP Term Loans will bear interest at a rate *per annum* equal to (a) Term SOFR (as defined in the Term Loan Credit Agreement, *provided* that if Term SOFR as so determined shall be less than 3.00 percent *per annum*, then Term SOFR shall be deemed to be 3.00 percent *per annum*) plus 9.50 percent or (b) Base Rate plus 8.50 percent *per annum*; *provided*, that the Borrower shall pay a portion of interest rate equal to Term SOFR plus 1.50 percent *per annum* or Base Rate plus 0.50 percent *per annum,* as applicable, in cash and the remaining 8.00 percent of such interest rate in-kind by adding such interest rate margin to the aggregate outstanding principal balance of the New Money DIP Term Loans.  The 2024 FILO Roll-Up DIP Loans and the Term Loan Roll-Up DIP Loans shall bear interest at the *per annum* non-default rate as set forth in the ABL Credit Agreement and the First Lien Credit Agreement, respectively, in each case payable monthly in arrears and such interest shall be payable in kind.

ii.    *Upfront Premium.*  5.00 percent of the aggregate New Money DIP Term Loan Commitments; to be paid in kind as an original issue discount  (such original issue discount to be 7.00 percent) or added to the principal amount of funded New Money DIP Term Loans on the Closing Date.

iii.    *Exit Premium*.    6.00 percent; earned upon any repayment or prepayment of the New Money DIP Term Loans or termination of

any or part of the New Money DIP Term Loan Commitments in accordance with the terms of the DIP Term Loan Facility and payable in cash upon such repayment, prepayment or termination, as applicable, including the repayment in full in cash or any other discharge of the New Money DIP Term Loans; *provided, however*, that to the extent the New Money DIP Term Loans are discharged as a result of the DIP Term Loan Agent exercising its credit bid rights for the full amount of the New Money DIP Term Loans as provided herein, such Exit Premium shall be satisfied by the credit bidding entity.

iv.  *Default Rate.*  2.00 percent *per annum* at all times automatically following the occurrence and during the continuation of an Event of Default.

60.    Courts in this district and others have approved similar aggregates in fees in large chapter 11 cases.  *See, e.g.*, *In re Wheel Pros, Inc.*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (approving a closing fee of 3 percent, an exit fee of 5 percent, and a letter of credit fee of 4.25 percent); *In re Vyaire Med., Inc.* No. 24-11217 (BLS) (Bankr. D. Del. Jun. 10, 2024) (approving a commitment fee of 2 percent of the new money DIP loan, a backstop fee of 5 percent, and an exit fee of 1.25 percent); *In re Strike, LLC*, No. 21-90054 (DRJ) (Bankr. S.D. Tex. Jan. 4, 2022) (approving a commitment fee of 7.5 percent and a termination fee of 3 percent of the DIP loans); *In re APC Auto. Techs. Intermediate Holdings, LLC*, No. 20-11466 (CSS) (Bankr. D. Del. June 23, 2020) (approving a closing fee of 5 percent of the new money DIP loans and a commitment fee of 35 percent of the equity of the reorganized debtors or approximately 11.5 percent of the new money DIP loans if the DIP facility was terminated other than under the plan effective date); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019) (approving a DIP funding fee of 8 percent of DIP loans and an undrawn fee of 3 percent of any undrawn outstanding commitments).[13]

---

[13]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

61.     As set forth in the Murray Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facilities are necessary and reasonable under the circumstances of these chapter 11 cases, and are the result of arm's-length and good-faith negotiations between the Debtors and the DIP Secured Parties.  *See* Murray Decl. ¶ 2.  The Debtors considered the fees described above when determining in their business judgment that the DIP Facilities constituted the best terms on which the Debtors could obtain postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facilities.

### III.    The DIP Agents and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e) of the Bankruptcy Code.

62.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

63.     As explained herein and in the Murray Declaration, the DIP Facilities are the result of (a) the Debtors' reasonable and informed determination that no alternative sources of postpetition financing are readily available to the Debtors (whether unsecured or secured) on terms better than the DIP Facilities, and (b) good-faith, arm's-length negotiations between the Debtors and the DIP Secured Parties.  *See* Murray Decl. ¶ 2.  The terms and conditions of the DIP Facilities

are necessary and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, upon realizing there was a lack of interest from third-party lenders to provide postpetition financing through a DIP marketing process, the Debtors and their advisors determined that the DIP Facilities, supported by a majority of the Prepetition Secured Parties, represent the best and the only available financing option.  *Id.* at ¶ 2, 13–15.  Accordingly, the Court should find that the obligations arising under the DIP Facilities and other financial accommodations made to the Debtors have been extended by the DIP Agents and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

### IV.    Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.

64.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral and to obtain credit pursuant to sections 363 and 364 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2), 4001(c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

65.    For the reasons discussed above and in the Bienias Declaration, the Debtors have an immediate need for the liquidity provided by the DIP Facilities and the use of Cash Collateral.  *See* Bienias Decl. ¶ 12.  The proposed DIP Facilities are critical to the Debtors' ability to fund their

operations while providing sufficient liquidity at the outset of these chapter 11 cases. *Id.* ¶ 14. In addition, the Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral. Access to the proceeds of the DIP Facilities and Cash Collateral are essential to the Debtors' orderly operation of their business, maintaining business relationships with their vendors and suppliers, paying wages and benefits, and satisfying other essential working capital needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. Without such access, the Debtors would be unable to maintain their business during these chapter 11 cases and would suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest, including the Prepetition Secured Parties. *Id.* ¶ 10–16.

66.    Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities and to use Cash Collateral. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## V.    The Automatic Stay Should Be Modified on a Limited Basis.

67.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to the extent necessary to permit the DIP Agents and the Prepetition Secured Parties to file financing statements, trademark filings, copyright filings, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them in the Interim Order.

68.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Wheel Pros, Inc.*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vyaire Med., Inc.* No. 24-11217 (BLS) (Bankr. D. Del. Jun. 10, 2024) (same); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. April 24, 2024) (same); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Feb. 14, 2024) (same); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Jun. 6, 2023) (same).[14]

## **Request for Final Hearing**

69.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## **Notice**

70.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the DIP Term Loan Agent; (g) the DIP ABL Agent; (h) the DIP Term Lenders; (i) the DIP ABL Lenders; (j) the Prepetition Secured Parties; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on

---

[14]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

71.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the DIP Orders, substantially in the form attached hereto, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  October 23, 2024
Wilmington, Delaware

*/s/ Laura Davis Jones*

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              ecorma@pszjlaw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
Chad J. Husnick, P.C. (*pro hac vice* pending)
David R. Gremling (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        anup.sathy@kirkland.com
              chad.husnick@kirkland.com
              dave.gremling@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*