**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN TIRE DISTRIBUTORS, INC., *et al.*,[1] | ) | Case No. 24-12391 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF**
**RONALD J. BIENIAS IN SUPPORT OF THE**
**MOTION OF DEBTORS FOR ENTRY OF INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS**
**TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE**
**CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Ronald J. Bienias, hereby declare under penalty of perjury:

1.     I am a Partner and Managing Director of AP Services, LLC, an affiliate of AlixPartners, LLP ("AlixPartners"), the proposed restructuring advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I am also the Chief Restructuring Officer of American Tire Distributors, Inc.

2.     I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are American Tire Distributors, Inc. (4594); ATD New Holdings II, Inc. (4985); ATD New Holdings III, Inc. (0977); ATD New Holdings, Inc. (3406); ATD Sourcing Solutions, LLC (5225); ATD Technology Solutions Inc. (N/A); FLX FWD Logistics, LLC (3334); Hercules Tire International Inc. (N/A); Terry's Tire Town Holdings, LLC (7409); The Hercules Tire & Rubber Company (3365); Tire Pros Francorp, LLC (1813); Tirebuyer.com, LLC (9093); and Torqata Data and Analytics LLC (4992).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 12220 Herbert Wayne Court, Huntersville, NC 28078.

*and (V) Granting Related Relief* (the "DIP Motion").[2]  The DIP Motion seeks authorization for the Debtors to enter into the proposed debtor-in-possession financing facility, which consist of a DIP Term Loan Facility and a DIP ABL Facility (each as defined herein), and for the Debtors to continue to use cash collateral (as defined by section 363(a) of the Bankruptcy Code, the "Cash Collateral") and all other Prepetition Collateral, subject to the terms and conditions set forth in the DIP Documents and the DIP Orders.

3.      Although AlixPartners is expected to be compensated for its work as the Debtors' proposed financial advisor in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony in connection therewith.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with the Debtors' management team, other members of the AlixPartners team, and the Debtors' Advisors, my review of information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and my views based upon my experience and knowledge.  I am above 18 years of age, and I am competent to testify, and if called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

## Background and Qualifications

4.      AlixPartners is a global independent consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to such terms in the *Declaration of Ronald J. Bienias, Chief Restructuring Officer of American Tire Distributors, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* filed contemporaneously herewith (the "First Day Declaration") or the DIP Motion, as applicable.

of similar size and complexity to these chapter 11 cases. Specifically, AlixPartners' core turnaround & restructuring services include liability management, restructuring advisory, interim management & Chief Restructuring Officer roles, lender & creditor advisory, bankruptcy, insolvency & case management, and liquidity management. Since its inception in 1981, AlixPartners, its predecessor entities, and its affiliate, AP Services, LLC, have provided turnaround, restructuring or crisis management services in numerous large cases.

5.      I received my B.B.A. in finance from Grand Valley State University and my M.B.A. from the University of Michigan. I have more than twenty-five years of corporate finance, advisory and restructuring experience. I have obtained Certified Insolvency and Restructuring Advisor, Certified Turnaround Professional, and Certified Treasury Professional (inactive) designations. Since joining AlixPartners, I have provided restructuring advice to companies, creditors, shareholders, and other interested parties on restructuring transactions both in chapter 11 and on an out-of-court basis. I have been involved in a number of chapter 11 cases, including Hayes Lemmerz International, Fleming Companies, Inc., New World Pasta Company, Spansion, Inc., HCR ManorCare, Inc., Noble Corporation PLC, LTL Management LLC, Lumileds Holding B.V., and Akumin Inc. I have previously served as Chief Restructuring Officer for World Wide Packaging, LLC and Akumin Inc., and have previously served as interim Chief Financial Officer for a number of clients.

6.      The Debtors initially retained AlixPartners in June 2024 to advise the Company on strategic and business alternatives and liquidity management. In July 2024, the Debtors engaged AlixPartners to provide cost and inventory reduction advisory services. In August 2024, the Debtors engaged AlixPartners to provide interim Chief Executive Officers services. In September 2024, the Debtors engaged AlixPartners in connection with these chapter 11 cases. Over the course

of its engagement, AlixPartners has evaluated the Debtors' operations and cash requirements to operate their business during these chapter 11 cases, including by assisting in the development of the Debtors' near-term cashflow forecasts. More recently, AlixPartners has (i) assisted the Debtors in the development of a longer-range business plan, (ii) supported the Debtors in their assessment of strategic alternatives, and (iii) provided as-needed resources in support of financing-related workstreams.

7.      Immediately following its engagement, AlixPartners began obtaining diligence from the Debtors and evaluating the Debtors' operations and near-term liquidity requirements for potential strategic alternatives and, subsequently, for the debtor-in-possession financing process. AlixPartners, under my supervision, has worked with the Debtors' restructuring professionals and key members of the Debtors' business—including, but not limited to, members of the treasury, finance, sales, and operations leadership teams—to evaluate and understand the Debtors' cashflows, financial reporting, and general operations, and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

**The Debtors' Capital Structure and DIP Facilities**

8.      As described in more detail in the First Day Declaration, the Debtors had approximately $1.9 billion in total funded debt obligations as of the Petition Date. The following table depicts the Debtors' prepetition capital structure as of the Petition Date:

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued Interest | Approximate Applicable Premium | Approximate Total Claim Amount |
|---|---|---|---|---|---|
| **Prepetition Revolving Credit Facility** | October 22, 2026 | $708.6 million[1] | $2.3 million | N/A | $710.9 million |
| **Prepetition FILO Facility** | October 22, 2026 | $100 million | $0.2 million | N/A | $100.2 million |
| **2024 Delayed Draw FILO Loans** | October 22, 2026 | $75 million | $1.95 million | $15.07 million | $92.02 million |
| **Prepetition Term Loan Facility** | October 22, 2028 | $975 million | $31.3 million | N/A | $1,006.3 million |
| *Total Funded Debt Obligations:* | | *$1,858.6 million* | *$35.75 million* | *$15.07 million* | *$1,909.42 million* |

9.      The DIP Facilities provide:  (a) $250 million superpriority, multiple draw term loan credit facility, with $125 million available upon entry of the Interim Order and the remaining $125 million available upon entry of the Final Order (the "DIP Term Loan Facility"); (b) continued access to the Prepetition ABL Facility (the "DIP ABL Facility"); and (c) the conversion of all amounts outstanding under the 2024 Delayed Draw FILO Facility to 2024 FILO Roll-Up DIP Loan.  The DIP Facilities also include certain "roll-up" components:  (a) with respect to the DIP Term Loan Facility, (i) a three-to-one "roll up" of the Prepetition Term Loan upon entry of the Interim DIP Order on amounts funded on an interim basis and (ii) a roll-up of all 2024 Delayed Draw FILO Loans upon entry of the Interim Order; and (b) with respect to the DIP ABL Facility, (i) upon entry of the Interim Order, approximately $54 million of Cash Management Obligations, Hedging Obligations, and issued and outstanding letters of credit will be automatically deemed exchanged and issued under the DIP ABL Credit Agreement and shall constitute DIP ABL Obligations, (ii) between entry of the Interim Order and entry of the Final

---

[1]   This includes the outstanding letters of credit in the aggregate amount of $49.2 million under the Prepetition Revolving Credit Facility.

Order, all cash, collections, and proceeds of DIP ABL Priority Collateral will be deemed, on a dollar for dollar basis, to reduce the Revolving Credit Commitments, and (iii) upon the entry of the Final Order, all remaining outstanding Prepetition ABL Obligations will be deemed exchanged and converted on a cashless basis into and constitute DIP ABL Obligations (the "Roll-Up DIP Loans," and collectively with the DIP Term Loan Facility and the DIP ABL Facility, the "DIP Facilities").[3]

### The Debtors' Immediate Need for Accessing the DIP Facilities and Cash Collateral

10.     I am familiar with the DIP Facilities, the material terms thereof, and the Debtors' immediate liquidity needs.  Based on my experience in the restructuring industry generally and my experience with the Debtors in particular, I believe that approval of the proposed DIP Facilities and continued use of Cash Collateral is essential for the Debtors for the continued normal course operation of the Debtors' business and a prerequisite to the successful consummation of the Restructuring Transactions contemplated by the Restructuring Support Agreement.

11.     The Debtors have recently faced significant headwinds brought on by rising inflation, residual effects of the COVID-19 pandemic, and ongoing shifts in (i) consumer demand and (ii) market channels in the tire industry.  Despite initial optimistic expectations during a replacement tire volume and pricing spike during the COVID-19 pandemic, gross selling margins eventually narrowed as (i) as the tire sale market shifted from an open-price market to a fixed market with consumer-facing tire sellers and (ii) consumer trends moved toward lower tier, less expensive tires.  In parallel, inflation continued to increase the cost of acquiring inventory and key variable costs, such as direct inventory purchases and freight and labor, stabilized at higher prices.

---

[3]     The material terms of the DIP Facilities are set forth in detail in the DIP Motion.  For the avoidance of doubt, any description of the DIP Facilities herein or in the Motion is qualified in its entirety by reference to the DIP Documents.

These challenges have placed increased pressure on the Debtors' balance sheet and have strained the Debtors' liquidity.

12.     Accordingly, the Debtors require immediate incremental liquidity on an urgent basis.  As of the Petition Date, the Debtors have approximately $34 million in cash on hand, which is insufficient to support their operations or make payments to the Debtors' essential manufacturing and vendor partners.  As a result, in the week prior to the Petition Date, the Debtors were unable to make any payments due to inventory vendors in the ordinary course and were forced to forego all such payments.  Although the Debtors attempted to manage relationships with suppliers and vendors, near-term payment demands and supply chain disruptions indicated that this stopgap measure was not sustainable.  Facing a liquidity crisis and the risk of jeopardizing key relationships with their vendor partners, the Debtors, with the assistance of their Advisors, including AlixPartners, determined that they required obtaining incremental and immediate liquidity to address their postpetition financing needs.  Absent the ability to access the funds available under the DIP Facility and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors, suppliers, and employees.

13.     Accordingly, AlixPartners, under my supervision, advised and assisted the Debtors in determining how much postpetition financing would be required to operate the Debtors' business and fund the administrative costs of this chapter 11 process.  As part of this evaluation, AlixPartners assisted in the development of the Debtors' 13-week cash-flow forecasts (the "Initial Approved DIP Budget," attached as Exhibit 3 to the Interim Order).  The Initial Approved DIP Budget accounts for anticipated operating receipts and disbursements during the projected period and considered several factors, including, but not limited to, the effect of the

chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, employee, customer, and vendor obligations, as well as the operational performance of the underlying business. Accordingly, based on the estimates contained in the Initial Approved DIP Budget, the AlixPartners team determined that the Debtors would require approximately $250 million in incremental liquidity to continue operations in the normal course on a postpetition basis and satisfy related administrative costs and expenses.

14. Based on my industry experience, my familiarity with the Debtors' operations, and extensive discussions with the Debtors' management team and advisors, including a team from AlixPartners acting under my supervision, I believe that the Initial Approved DIP Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases. Further, I believe that the DIP Facilities are essential to the preservation of the Debtors' estates and will provide the Debtors with sufficient liquidity to stabilize their operations, fund the administration of these chapter 11 cases, and provide the Debtors the runway to consummate a sale of their assets pursuant to the Restructuring Support Agreement.

15. Importantly, access to the liquidity provided by the DIP Facilities and access to Cash Collateral will provide a strong, clear message to the Debtors' customers, vendors, and employees that operations are appropriately funded and that the Debtors are able to (i) continue meeting the needs of their customers, (ii) compensate their employees in the normal course, (iii) pay vendors for postpetition goods and services, and (iv) pay vendors for court approved prepetition goods and services. This positive message will reduce the likelihood of prolonged supply chain interruptions, which would further exacerbate the Debtors' liquidity situation and negatively impact operational performance. Additionally, access to the DIP Facilities will provide the Debtors with sufficient funds to administer these chapter 11 cases, avoid value-destructive

business interruption, and enable the Debtors to continue their efforts to pursue a value-maximizing sale process.

**<u>Conclusion</u>**

16.     In light of the Debtors' circumstances, I believe that access to the DIP Facilities and Cash Collateral will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, pursue their restructuring goals, and responsibly administer these chapter 11 cases while consummating a value-maximizing sale as contemplated by the Restructuring Support Agreement.  For the reasons set forth in this Declaration, I submit that it would be appropriate for the Court to approve the DIP Facilities and the use of Cash Collateral as contemplated by the DIP Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 23, 2024                     Respectfully submitted,

_/s/ Ronald J. Bienias_
Ronald J. Bienias
Partner and Managing Director
AlixPartners LLP