# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| AMERICAN TIRE DISTRIBUTORS, INC., *et al.*,[1] | ) ) ) | Case No. 24-12391 (___) |
| Debtors. | ) ) | (Joint Administration Requested) |

**DECLARATION OF
RACHEL MURRAY IN
SUPPORT OF THE MOTION
OF DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL,
(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Rachel Murray, make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am a Managing Director of Moelis & Company LLC (together with its affiliates, "Moelis"), the proposed financial advisor and investment banker to the above captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are American Tire Distributors, Inc. (4594); ATD New Holdings III, Inc. (0977); ATD New Holdings, Inc. (3406); ATD Sourcing Solutions, LLC (5225); ATD Technology Solutions Inc. (n/a); FLX FWD Logistics, LLC (3334); Hercules Tire International Inc. (n/a); Terry's Tire Town Holdings, LLC (7409); The Hercules Tire & Rubber Company (3365); Tire Pros Francorp, LLC (1813); Tirebuyer.com, LLC (9093); and Torqata Data and Analytics LLC (4992). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 12200 Herbert Wayne Court, Huntersville, North Carolina 28078.

*and (V) Granting Related Relief* (the "DIP Motion").[2] In particular, I submit this Declaration in support of my view that the proposed debtor-in-possession financing facilities are (a) the product of an arm's-length, good-faith negotiation process, (b) the best and only available postpetition financing option currently available to the Debtors, and (c) contain reasonable terms and conditions under the circumstances.

3. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Moelis working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have overseen the Moelis team, which, since September 13, 2024, has been one of the principal restructuring advisors to the Debtors. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and postpetition financing efforts. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**Background and Qualifications**

4. Moelis is a leading international investment banking and financial advisory firm (NYSE: MC) with approximately 1,100 employees in locations around the world. Moelis provides a broad range of investment banking and financial advisory services including (a) mergers and acquisitions, (b) recapitalization and restructuring, (c) capital markets advisory, and (d) private funds advisory. Moelis has been, and is, involved in some large and complex

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the *Declaration of Ronald J. Bienias, Chief Restructuring Officer of American Tire Distributors, Inc., in Support of the Debtors Chapter 11 Petitions and First Day Motions* filed contemporaneously herewith (the "First Day Declaration") or the DIP Motion, as applicable.

restructuring cases throughout the United States, including advising debtors, creditors, acquirers, and official committees in numerous chapter 11 cases in this and other districts.

5.  I am a Managing Director of Moelis in Moelis' New York office, located at 399 Park Avenue, 4th floor, New York, NY 10022. Moelis is the proposed financial advisor and investment banker to the Debtors. As a Managing Director, I am responsible for the day-to-day activities of the Moelis deal team in this engagement. I have over ten years of experience in investment banking, providing in-court and out-of-court recapitalization and restructuring advisory services to companies, creditors, sponsors, and other interested parties. Furthermore, I have specific expertise in chapter 11 bankruptcies, mergers and acquisitions, lender negotiations, and distressed financings.

6.  Prior to joining Moelis, I worked in the external audit practice at Deloitte. I received an M.B.A. from The Wharton School at the University of Pennsylvania, a Masters in Accounting from the Leventhal School at the University of Southern California, and a Bachelors degree in Government from Harvard University. I am a Certified Public Accountant.

7.  I have represented clients on capital raising, M&A, liability management and restructuring transactions both in-court and out-of-court, including major chapter 11 cases across a range of industries, including but not limited to ATD Corporation, Jason Industries, Inc., Hornbeck Offshore Services Inc., Monitronics International, Inc., iHeartMedia, Inc., Knotel, Inc., Talen Energy Supply, LLC, Aegerion Pharmaceuticals, Inc., and Joerns WoundCo Holdings, Inc.

8.  The Debtors retained Moelis as of September 13, 2024 to serve as their financial advisor and investment banker in connection with a potential restructuring transaction, sale transaction, or capital raising transaction involving the Debtors' operations. I understand that the

Debtors engaged Moelis for these roles because of our familiarity with the Company and its industry, expertise on issues relating to financially distressed companies and our extensive experience acting as an advisor in both in- and out-of-court restructurings of companies of all sizes across a wide array of industries. Moelis and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate-compensated professional in various capacities in numerous chapter 11 cases in this and other districts. I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of the DIP Motion.

### The Debtors' Immediate Need for DIP Financing

9. As further explained in the First Day Declaration and the *Declaration of Ronald J. Bienias in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Bienias Declaration"), the Debtors enter these chapter 11 cases as a result of certain market headwinds and operational challenges, which have significantly constrained their liquidity. Accordingly, in the past several weeks, the Debtors, with the assistance of Moelis and their other advisors, explored various potential alternatives to improve their liquidity position and address certain constraints imposed by their capital structure. As part of this process, the Debtors engaged extensively with an ad hoc group of lenders under the Debtors' Prepetition Term Loan Facility and 2024 Delayed Draw FILO Loans (the "Ad Hoc Group") and the agent under the ABL Facility (the "Prepetition ABL Agent") to discuss various transaction and financing

4

alternatives, including potential out-of-court solutions, a continued prepetition marketing process, and incremental bridge financing options. Ultimately, after weeks of negotiations with the Ad Hoc Group and the Prepetition ABL Agent, the Debtors determined that commencing these chapter 11 cases was the only available alternative to access the funding necessary to operate the Debtors' business.

10.    As part of the Debtors' preparations for these chapter 11 cases, and as further described in the Bienias Declaration, filed contemporaneously herewith, my team worked with the Debtors and their other advisors to analyze the liquidity needs necessary to operate the Debtors' business on a postpetition basis and fund the administrative costs and expenses of this chapter 11 process. As discussed further in the Bienias Declaration, as part of this analysis, the Debtors and their advisors developed a 13-week cash flow forecast, which accounts for various factors that affect the Debtors' liquidity position. Based on this analysis, Moelis determined that the Debtors would require an immediate capital infusion in the form of the DIP Facilities and access to Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code) to administer these chapter 11 cases and to continue their efforts to preserve and maximize value of their estates. The DIP Facilities are necessary at the outset of these chapter 11 cases to avoid detrimental interruption of the Debtors' operations, fund these chapter 11 cases, and avoid irreparable harm to the Debtors' estates.

**The Debtors' Efforts to Secure Postpetition Financing**

11.     The Debtors, with Moelis' assistance, solicited new money postpetition financing proposals from various third parties and existing lenders.  Specifically, prepetition, Moelis engaged in discussions with the Ad Hoc Group, the Prepetition ABL Agent, and additional third-party potential lenders with respect to a potential financing.  The third-party financial institutions involved in the marketing process included well-known commercial banks and specialty institutions that routinely provide financings along these lines, including certain lenders that have a historical familiarity with the Debtors.  Moelis reached out to eight third-party lenders with respect to extending either a postpetition revolving facility to replace, and potentially upsize, the Debtors' existing Prepetition ABL Facility or providing financing on a non-consensual priming or junior basis (either unsecured or secured by liens junior to the Debtors' prepetition debt).  Three of the eight parties signed non-disclosure agreements with the Debtors to explore options related to replacing and potentially upsizing the Debtors' Prepetition ABL facility.  To date, none of the parties have been willing to engage on providing financing proposals on a non-consensual priming or junior basis.

12.     The Debtors, with the assistance of Moelis and the Debtors' other advisors, also engaged in extensive negotiations with the Ad Hoc Group and the Prepetition ABL Agent on behalf of the Prepetition ABL Lenders regarding potential postpetition financing.  As discussed below, the DIP marketing and negotiation process allowed the Debtors to secure the proposed DIP Facilities (as defined below) with the Ad Hoc Group and the Prepetition ABL Lenders (in such capacity, the "DIP Lenders").  The Debtors, in consultation with their advisors, ultimately determined that no viable alternatives were available to provide new money postpetition financing on an expedited timeline other than the proposed DIP Facilities.  The lack

of available alternatives was due to several factors, including: (a) no material unencumbered collateral; (b) process requirements and time required to implement certain alternative financing structures with ABL Priority Collateral and Term Loan Priority Collateral; (c) limited time before the Debtors would exhaust their liquidity; and (d) the fact that any financing secured by a priming lien on the Prepetition ABL Priority Collateral or the Prepetition Term Loan Priority Collateral would require the consent of, as applicable, the Prepetition ABL Lenders or the Prepetition Term Loan Lenders.  If the applicable parties did not consent to such financing, any third-party proposal that sought to incur liens with priority senior to the Prepetition ABL Liens or the Prepetition Term Loan Liens would require the Debtors to win a so-called "priming fight" in the beginning of the Debtors' chapter 11 cases.  It is my understanding that the Prepetition ABL Lenders and the Prepetition Term Loan Lenders will not consent to the Debtors' incurrence of priming financing from a third-party source.  I do not believe that any potential financing parties would be willing to enter into a financing agreement with the Debtors that could result in such a "priming fight."  Based on these facts, among others, I believe that a postpetition financing alternative to the DIP Facility that would provide sufficient funding for the chapter 11 cases was not available under the circumstances leading to these cases on a priming, junior secured, or unsecured basis.

I.       **The Prepetition Marketing Process.**

13.    Leading up to the Petition Date, the Debtors, with the assistance of Moelis and their other advisors, engaged with certain third-party financial institutions over the terms of a proposed DIP financing.  As noted above, each of the contacted parties declined to provide financing on a non-consensual priming or junior basis, with four of the parties declining to proceed with negotiating a non-disclosure agreement with respect to DIP financing altogether.

7

Two parties have expressed interest in exploring ABL refinancing options, executed a non-disclosure agreement, and received access to additional diligence by way of a virtual data room and various conversations with Moelis.

14. To date, the Debtors did not receive any DIP financing proposals from third-party lenders. Many of the parties cited that they were unwilling to extend financing to the Debtors in light of the fact that, based on my understanding, the Prepetition Term Loan Lenders and the Prepetition ABL Lenders hold priority liens on substantially all of the Debtors' assets. These potential sources of postpetition financing also expressed to Moelis that they would be unwilling to pursue a non-consensual priming DIP facility, nor would they be willing to offer postpetition financing to the Debtors on an unsecured or on a junior basis, subordinate to the claims of the Prepetition Term Loan Lenders and the Prepetition ABL Lenders. If the applicable parties did not consent to such financing, any third-party proposal that sought to incur liens with priority senior to the Prepetition Term Loan Lenders and the Prepetition ABL Lenders would require the Debtors to win a so-called "priming fight" in the beginning of the Debtors' chapter 11 cases. Also, many parties also expressed to Moelis that the Debtors' liquidity constraints made it challenging for them to provide a proposal in a workable timeframe.

15. Due to the lack of interest from third-party lenders, the Debtors determined that the most feasible source of postpetition financing would be from the Prepetition Term Loan Lenders and the Prepetition ABL Lenders. Accordingly, concurrent with the third-party DIP marketing process, the Debtors and their advisors engaged with and received DIP proposals from the Prepetition Term Loan Lenders and the Prepetition ABL Lenders. These good faith, arm's-length negotiations involved exchanging multiple drafts of term sheets, the DIP Order, the

DIP Credit Agreements, and other DIP Documents, as well as numerous telephone conferences between the Debtors, the DIP Lenders, and their respective advisors.

16. The Company's engagement with the Prepetition Term Loan Lenders and the Prepetition ABL Lenders resulted in the successful negotiation of the DIP Facilities, which provide the incremental liquidity the Debtors urgently need to maintain operations and contain terms acceptable to the Debtors and the DIP Lenders. The DIP Facilities also reflect concessions made by the DIP Lenders to the respective DIP Facilities in favor of the Debtors, including, as applicable, better economics, a longer maturity period, more favorable milestones for administering these chapter 11 cases, and less restrictive covenants. I do not believe that an extended marketing process was feasible given the Debtors' immediate need for liquidity and the expedited nature of these chapter 11 cases.

## II. The Alternative DIP Proposals.

17. As noted above, the Debtors ultimately did not receive any proposals from potential third-party investors and were able to coalesce the DIP proposals received from the Prepetition Term Loan Lenders and the Prepetition ABL Lenders. As such, substantially all of the Prepetition Term Loan Lenders and the Prepetition ABL Lenders have consented to, and are participating in, the DIP Facilities.

18. Further, my understanding is that all of the Debtors' material assets are encumbered by valid and perfected first-priority liens. Based on my experience and review of the Debtors' capital structure and financial records, given that (a) no party was willing to provide DIP financing on a junior or unsecured basis and (b) the Prepetition Term Loan Lenders and the Prepetition ABL Lenders were unwilling to consent to a priming DIP facility, any DIP financing other than the DIP Facilities provided by the Prepetition Term Loan Lenders and the Prepetition

ABL Lenders would result in a protracted and costly priming fight or valuation dispute at the outset of these chapter 11 cases. Regardless of the prospect of success, the expense and disruption associated with any such litigation would seriously strain the Debtors' liquidity and jeopardize the Debtors' successful administration of these chapter 11 cases.

19. As a result of the DIP process, I believe that the DIP Facilities represent the only viable financing option available under the circumstances and will provide the Debtors with immediate access to liquidity, allow access to Cash Collateral on a consensual basis, and otherwise represent the most realistic and operative path forward.

## The Terms of the Proposed DIP Facilities

20. As noted in the Motion, the DIP Facilities include: (a) $250 million superpriority, multiple draw term loan credit facility, with $125 million available upon entry of the Interim Order and the remaining $125 million available upon entry of the Final Order (the "DIP Term Loan Facility"); (b) continued access to the Prepetition ABL Facility (the "DIP ABL Facility"); and (c) the conversion of all amounts outstanding under the 2024 Delayed Draw FILO Facility to 2024 FILO Roll-Up DIP Loan. The DIP Facilities also include certain "roll-up" components: (a) with respect to the DIP Term Loan Facility, (i) a three-to-one "roll up" of the Prepetition Term Loan upon entry of the Interim DIP Order on amounts funded on an interim basis and (ii) a roll-up of all 2024 Delayed Draw FILO Loans upon entry of the Interim Order; and (b) with respect to the DIP ABL Facility, (i) upon entry of the Interim Order, approximately $54 million of Cash Management Obligations, Hedging Obligations, and issued and outstanding letters of credit will be automatically deemed exchanged and issued under the DIP ABL Credit Agreement and shall constitute DIP ABL Obligations, (ii) between entry of the Interim Order and entry of the Final Order, all cash, collections, and proceeds of DIP ABL Priority Collateral will be

deemed, on a dollar for dollar basis, to reduce the Revolving Credit Commitments, and (iii) upon the entry of the Final Order, all remaining outstanding Prepetition ABL Obligations will be deemed exchanged and converted on a cashless basis into and constitute DIP ABL Obligations (the "Roll-Up DIP Loans," and collectively with the DIP Term Loan Facility and the DIP ABL Facility, the "DIP Facilities").[3]

21.  The DIP Term Loan Facility also includes certain fees and expenses, which are paid on a non-cash basis up front, by including such amounts in the outstanding principal balance of the DIP Term Loan Facility on a "gross-up" basis. The Debtors will incur $31.3 million in original issue discount and other fees on account of the Term Loan Roll-Up DIP Loans ($21.9 million of which is payable up front and $9.4 million of which will be payable in connection with the second draw) and $17 million in accrued interest and a make-whole premium on account of the 2024 FILO Roll Up DIP Loans (all paid up front in connection with the first draw). All such fees are payable in kind and included as DIP Obligations.

### A. The Roll-Up of the Prepetition Obligations is Essential to the DIP Facilities.

22.  As noted above, the DIP Facilities include the Roll-Up DIP Loans. The roll-up was a requirement for the consideration provided by the DIP Lenders as part of their commitment to provide new money, postpetition access to the Debtors' Prepetition ABL Facility, and agreement to be primed by the postpetition financing. Indeed, the DIP Lenders made clear that they would not be willing to provide the DIP Facilities without a roll-up of the prepetition obligations. As part of extensive and hard-fought negotiations regarding the DIP Facilities, the Debtors continuously insisted that the roll-up only be based on amounts actually funded.

---

[3] The material terms of the DIP Facilities are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the DIP Facilities herein or in the Motion is qualified in its entirety by reference to the DIP Documents.

23. Based on these circumstances, I believe that the roll-up of prepetition obligations is essential to the proposed DIP Facilities—which, for the reasons set forth herein and in the Motion, is the best and, in fact, only financing option currently available to the Debtors. Based on my conversations with the Debtors and their other advisors, without the DIP Facilities (including the roll-up), the Debtors will not be able to operate their business postpetition, which could significantly derail the success of the Debtors' chapter 11 cases. Accordingly, I believe the proposed DIP Roll-Up Obligations are reasonable and appropriate under the circumstances.

**Conclusion**

24. In sum, I believe that the Debtors lack viable postpetition financing alternatives to the DIP Facilities. Based on my understanding of the Debtors' projections and liquidity position, the Debtors urgently require access to the DIP Facilities. I believe that the DIP Facilities reflects the best possible financing currently available to the Debtors and that the terms thereof, taken as a whole, are reasonable under the facts and circumstances of these chapter 11 cases and necessary to preserve the Debtors' assets. As such, I believe that the DIP Facilities should be approved.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 23, 2024          /s/ Rachel Murray
                                                            Rachel Murray
                                                            Managing Director
                                                            Moelis & Company LLC

                                                            *Proposed Investment Banker for the Debtors*