**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN TIRE DISTRIBUTORS, INC., *et al.*, | Case No. 24-12391 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| | **Ref. Docket No. 16** |

**AD HOC GROUP OF EXCLUDED TERM LENDERS' LIMITED OBJECTION TO
MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING,
(B) GRANT SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL
HEARING; AND (V) GRANTING RELATED RELIEF**

An ad hoc group of certain minority lenders under the Debtors' prepetition term loan

facility (the "Ad Hoc Group of Excluded Term Lenders")[2] hereby submit this limited objection

(this "Limited Objection") to the *Motion of Debtors for Entry of Interim and Final Orders (I)*

*Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming*

*Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II)*

*Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are American Tire Distributors, Inc. (4594); ATD New Holdings II, Inc. (4985); ATD New Holdings III, Inc. (0977); ATD New Holdings, Inc. (3406); ATD Sourcing Solutions, LLC (5225); ATD Technology Solutions Inc. (N/A); FLX FWD Logistics, LLC (3334); Hercules Tire International Inc. (N/A); Terry's Tire Town Holdings, LLC (7409); The Hercules Tire & Rubber Company (3365); Tire Pros Francorp, LLC (1813); Tirebuyer.com, LLC (9093); and Torqata Data and Analytics LLC (4992).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 12200 Herbert Wayne Court, Huntersville, NC 28078.

[2] As set forth in the Rule 2019 statement filed contemporaneously with this Objection, the members of the Ad Hoc Group of Excluded Term Lenders currently represent approximately 7.2% of the outstanding debt under the Debtors' prepetition term loan facility stemming from that certain term loan credit agreement dated as of October 22, 2021 (the "Prepetition Term Loan Facility" and such holders, the "Prepetition Term Lenders").

*Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "DIP Motion")

(Dkt. No. 16),[3] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.       The Ad Hoc Group of Excluded Term Lenders supports the Debtors, these

Chapter 11 Cases, and the restructuring transactions set forth in the RSA (the "RSA

Transactions").  However, due to the refusal of the Ad Hoc Group of Controlling Term Lenders

to allow the Excluded Term Lenders the customary and contractually required opportunity to

participate in the Term DIP Facility on a pro rata basis (referred to herein as the "Minority Term

Lender DIP Exclusion") notwithstanding the Excluded Term Lenders' request to sign the RSA

and participate in the Term DIP Facility both prior to and after the Petition Date—and the

Debtors' multiple requests to the Ad Hoc Group of Controlling Term Lenders that they be

permitted to do so—the Ad Hoc Group of Excluded Term Lenders has no choice but to object to

the Term DIP Facility and entry of the Final DIP Order.  *See* Exhibits A, B, and C.

2.       It is patently clear that the sole purpose of the Minority Term Lender DIP

Exclusion is to strip value from the Excluded Term Lenders by ensuring that the Controlling

Term Lenders will get 100% of the benefit of participating in the Term DIP Facility and DIP

Term Roll-Up (as defined below), even though they only hold 90% of the Prepetition Term

Loans.  The DIP Term Roll-Up, together with the DIP FILO Roll-Up (each as defined below)

moves approximately $1.123.3 billion of debt ahead (in both lien and payment priority) of the

Prepetition Term Loans held by the Excluded Term Lenders.  As a result of the Minority Term

Lender DIP Exclusion, the Debtors' representation to the Court at the first day hearing that the

---

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion or the Restructuring Support Agreement, attached as Exhibit B to the *Declaration of Ronald J. Bienias, Chief Restructuring Officer of American Tire Distributors, Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") (Dkt. No. 15).

3.4:1 roll-up only primes the Prepetition Term Lenders' interests in the prepetition term collateral—presumably a representation on which the Court relied in granting the Term DIP Facility on an interim basis—is simply not true.[4]

3.      Unless the Minority Term Lender DIP Exclusion is removed, the 3.4:1 roll-up does not withstand the "heightened scrutiny" this Court and other courts apply in approving the extraordinary relief of a roll-up, let alone the 3.4:1 roll-up requested here.  Specifically, the Minority Term Lender DIP Exclusion renders the Term DIP Facility and other RSA Transactions unlawful as a matter of applicable state contract and federal bankruptcy law, is arbitrary and grossly inequitable, and seeks to abuse the Controlling Term Lenders' leverage as "Required Lenders" under the Prepetition Term Loan Facility in relation to both the minority Excluded Term Lenders and the Debtors, who acquiesced to the Minority Term Lender DIP Exclusion notwithstanding their multiple requests to remove it.  Although the economic value of the Minority Term Lender DIP Exclusion is a moving target based on the amount of the credit bid (dictated by the Controlling Term Lenders) or third-party cash overbid, its removal has a modest effect on the expected recoveries of the Controlling Term Lenders (as they already hold 90% of the Prepetition Term Loans, so there is not much to take from the 10% of Prepetition Term Lenders).  Yet, the Minority Term Lender DIP Exclusion *devastates* the recovery of the Excluded Term Lenders.

4.      The Controlling Term Lenders' insistence on the Minority Term Lender DIP Exclusion is especially confounding given that it is *directly* prohibited by the Prepetition Term Loan Credit Agreement and would therefore render the Term DIP Facility unlawful as a result of the DIP Term Roll-Up (which is a non-pro rata payoff of Prepetition Term Loans from deemed

---

[4] *See infra.* ¶53.

proceeds of the Term DIP Facility).  The Excluded Term Lenders—in funding and/or buying into the Prepetition Term Loans in the secondary market—relied on the broad "sacred right" protections in the Prepetition Term Loan Credit Agreement prohibiting non-pro rata payments and purchases of Prepetition Term Loans and non-pro rata distributions of proceeds of collateral. The DIP Term Roll-Up is directly prohibited by these provisions unless the Minority Term Lender DIP Exclusion is removed.

5.      The Court should not override bargained for contractual rights where they were intended to protect against this very situation and serve no other purpose than to provide an incremental recovery to the Controlling Term Lenders.  Moreover, overriding bargained for contractual rights is especially inappropriate where the relief the Excluded Term Lenders are seeking—removal of the Minority Term Lender DIP Exclusion—is not prejudicial to the Debtors or the Controlling Term Lenders themselves.

6.      The roll-up would not only circumvent bargained-for contractual rights set forth in the Prepetition Term Loan Credit Agreement, but it also serves a means to get around the "same class, same treatment" requirement set forth in Section 1123(a)(4) of the Bankruptcy Code.  Such circumvention is also prohibited by the "sub rosa" plan doctrine, as the DIP financing and RSA will effectively distribute all of the Debtors' asset value without satisfying the plan confirmation requirements, including Section 1123(a)(4) and 1129(a)(3) (requiring that a plan must be proposed in "good faith" and not by any means forbidden by law).

7.      Finally, unless the Minority Term Lender DIP Exclusion is removed, the Term DIP Facility is not "fair and reasonable," nor a proper exercise of the Debtors' business judgment.  The Minority Term Lender DIP Exclusion is not a necessary component of the Term DIP Facility, and the Controlling Term Lenders would still fund the Term DIP Facility and

pursue the other RSA Transactions on the exact same terms if it was removed.  Indeed, no rational investor would refuse to fund debtor-in-possession financing on the exact same terms it has already agreed to fund on the basis that it has to *reduce* its credit exposure as a result of reallocating up to 10% of its commitments to small and passive minority lenders within its same facility.

8.      In sum, the Minority Term Lender DIP Exclusion is nothing more than a brazen attempt to ignore the Excluded Term Lenders' contractual rights and applicable bankruptcy law with respect to the approval of roll-ups on the assumption that either the Excluded Term Lenders will not put up a fight or that the Court will just hold its nose (as the Debtors have been forced to do) and rubber stamp this egregious and unnecessary grab for extra recovery.  Both of these assumptions are wrong.  The Ad Hoc Group of Excluded Lenders respectfully requests that the Court condition approval of the Term DIP Facility on a final basis on the removal of the Minority Term Lender DIP Exclusion, and the requirement that the Excluded Term Lenders be entitled to participate in their pro rata share of the Term DIP Facility.

## **BACKGROUND**

### I.      **Relevant Prepetition Debt**

9.      In 2021, the Company refinanced the ABL facility and the term loan facility that were in place at the conclusion of the 2018 restructuring.  See First Day Declaration, at ¶50. Through this transaction, the Company was able to: (i) achieve much more favorable interest rates on both facilities; (ii) repay and retire the exit financing facility from the 2018 restructuring; (iii) negotiate more favorable borrowing base concessions on the ABL facility; (iv) increase the revolving credit facility line by approximately 20 percent; and (v) extend maturities. See id.

10.     To that end, on October 22, 2021, American Tire Distributors, Inc., as borrower ("ATD Inc."), the other loan parties party thereto, the Prepetition Term Lenders, and Bank of America, N.A., as successor administrative agent and collateral agent (in such capacity, the "Prepetition Term Loan Agent"), entered into a term loan credit agreement (as amended and restated, the "Prepetition Term Loan Credit Agreement). *See id.* at ¶46. As of the Petition Date, approximately $975 million in aggregate principal amount remained outstanding under the Term Loan Facility (plus accrued interest of $31.3 million) (referred to herein as the "Prepetition Term Loans"). *See id.* at ¶47.

11.     On the same day, ATD Inc., as administrative borrower, ATD New Holdings III, the other loan parties party thereto, and the lenders from time to time party thereto (the "Prepetition ABL Lenders") entered into an asset-based credit agreement (as amended and restated, the "Prepetition ABL Credit Agreement"). *See id.* at ¶42. As of the Petition Date, approximately $883.6 million in aggregate principal amount remained outstanding under the Prepetition ABL Facility. *See id.* at ¶45.

12.     The obligations under the Prepetition Term Loan Facility are secured, subject to certain exceptions, by a first priority lien on all equipment, real property, and equity interests of ATD Inc. and the Debtors (the "Prepetition Term Loan Priority Collateral"), and a second priority security interest in all accounts and payment intangibles, chattel paper and inventory (the "Prepetition ABL Priority Collateral" and together with the "Prepetition Term Loan Priority Collateral," the "Prepetition Collateral"). *See id.* at ¶44.

13.     In July 2024, the Company secured a $75 million delayed draw "first-in, last-out" facility (the "2024 Delayed Draw FILO Facility") as a new tranche under the Prepetition ABL Credit Agreement. *See id.* at ¶43. The 2024 Delayed Draw FILO Facility was funded by the

Controlling Term Lenders (the "2024 Delayed Draw FILO Lenders"). *See id*. The obligations under the 2024 Delayed Draw FILO Facility are secured by a lien that is pari on the Prepetition Term Loan Priority Collateral and third out on the Prepetition ABL Priority Collateral. *See id*. at ¶44.

**II.     RSA Negotiations**

14.     In and around September 2024, the Debtors retained Kirkland & Ellis LLP, as legal advisor, AlixPartners as restructuring advisor, and Moelis & Company LLC as financial advisor and investment banker, to address their liquidity concerns. *See id*. at ¶10. According to the First Day Declaration, in September 2024, the Debtors also began engagement with an ad hoc group of term and Prepetition Term Lenders and 2024 Delayed Draw FILO Lenders (each, a "Controlling Term Lender" and, collectively, the "Ad Hoc Group of Controlling Term Lenders") represented by Akin Gump Strauss Hauer & Feld LLP ("Akin") and Potter Anderson & Corroon LLP as legal counsel, and Perella Weinberg Partners LP ("PWP") as financial advisor, to facilitate a restructuring, including financing solutions for the Debtors' near-term liquidity challenges, a continued marketing process, and a potential transaction to recapitalize the business with the Debtors' existing stakeholders. *See id*. at ¶11.

**III.     Chapter 11 Filing; RSA and DIP Motion**

15.     On October 23, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). *See id*. at ¶16.

16.     Immediately prior to commencing the Chapter 11 Cases, the Debtors entered into a Restructuring Support Agreement (the "RSA") with the Controlling Term Lenders. *See id*. at ¶11. Among other things, the RSA provides that the Debtors and the Ad Hoc Group of

Controlling Term Lenders will negotiate in good faith on the terms of (i) a stalking horse credit

bid for all or substantially all of the Debtors' assets and (ii) sets forth the key terms of (a) a

$1.123.3 billion superpriority debtor-in-possession term loan credit facility to be funded by the

Controlling Term Lenders (the "Term DIP Facility") and (b) a $1.200 billion superpriority

debtor-in-possession asset-based financing facility (the "ABL DIP Facility"; together with the

Term DIP Facility, the "DIP Facilities").  *See id.* at ¶¶12; 65.

17.     On October 23, 2024, the Debtors filed the DIP Motion seeking approval of the

DIP Facilities on an interim and final basis.  *See* Dkt. No. 16.  On October 25, 2024, the

Bankruptcy Court entered an order approving the DIP Motion on an interim basis (the "Interim

DIP Order") and scheduled a hearing on Bankruptcy Court approval of the DIP Facilities on a

final basis.  *See* Dkt. No. 90.

18.     The relevant terms of the Term DIP Facility include the following:

- **New Money Commitments**: $250 million (the "New Money DIP Term Loans").

- **Roll-Up**: (a) a 3-to-1 roll-up of the Prepetition First Lien Term Loans into DIP Term Loans (the "DIP Term Roll-Up"); (b) a roll-up of 100% of the 2024 Delayed-Draw FILO Loans into DIP obligations upon entry of the interim order (the "DIP FILO Roll-Up" and together with the "DIP Term Roll-Up, the "Roll-Up").

- **Fees:**
  - **OID:** 7.00% to be paid in kind as an original issue discount or added to the principal amount of funded New Money DIP Term Loans in connection with each DIP draw.

  - **Upfront Premium:** 5.00% of the aggregate New Money DIP Term Loan Commitments;[5] to be paid in kind as an original issue discount or added to the principal amount of funded New Money DIP Term Loans on the Closing Date.[6]

  - **Exit Fee:** 6.00% earned upon any repayment or prepayment of the New Money DIP Term Loans or termination of any or part of the New Money DIP Term Loan Commitments in accordance with the terms of the DIP Term Loan

---

[5] As defined in the RSA DIP Term Sheet, the "New Money DIP Term Loan Commitments" means the commitment to fund the New Money DIP Term Loans.

[6] As defined in the RSA DIP Term Sheet, the "Closing Date" means the date on which Closing occurs (i.e. the initial extension of credit).

Facility and payable in cash upon such repayment, prepayment or termination, as applicable, including the repayment in full in cash or any other discharge of the New Money DIP Term Loans.

- **Interest:** The Debtors' choice of "Term SOFR+9.5%" or "Base Rate+8.5%," with a default rate of 2%. The Debtors would be required to pay a portion of the interest in cash and the remaining 8% in-kind, subject to a 3% floor in the case of Term SOFR.

## IV.    Ad Hoc Group of Excluded Lenders Outreach

19.     As early as September 2024, individual members of the Ad Hoc Group of Excluded Term Lenders began reaching out to Akin, PWP, and certain Controlling Term Lenders seeking to get involved and were turned away with little to no information provided. *See* Exhibits A, B.

20.     On October 30, 2024, the Ad Hoc Group of Excluded Term Lenders engaged King & Spalding LLP and Young Conaway Stargatt & Taylor, LLP to represent them in connection with the Chapter 11 Cases for the primary purpose of obtaining the ability to participate in their respective pro rata share of the Term DIP Facility and signing the RSA.

21.     Following informal requests for pro rata participation, on November 9, 2024, the Ad Hoc Group of Excluded Lenders sent a letter to the Controlling Term Lenders and the Debtors indicating their willingness to immediately sign the RSA if given the opportunity to participate in their pro rata share of the Term DIP Commitments (and also expressing their willingness to waive the Upfront Fee such that it would become a backstop/structuring fee for the Controlling Term Lenders). *See* Exhibit C.[7]  Despite the Ad Hoc Group of Excluded Lenders' efforts to avoid needless litigation and reach a settlement, the Ad Hoc Group of Controlling Term Lenders refused the Ad Hoc Group of Excluded Lenders' request for fair and

---

[7] One of the parties to the letter, Sound Point Capital (by and through Sound Point Luna, LLC, BlueMountain Fugi Management, LLC, and Sound Point Capital Management, LP) left the Ad Hoc Group of Excluded Lenders subsequent to sending the letter.

customary treatment.  Hence, the Ad Hoc Group of Excluded Lenders filed this Limited

Objection.

## ARGUMENT

I.    **The Minority Term Lender DIP Exclusion Renders the Term DIP Facility in Breach of the Prepetition Term Loan Credit Agreement**

22.    It is black letter bankruptcy law that the substantive rights of the debtor and

creditors are created by state law unless a specific provision of the Bankruptcy Code requires

different treatment.  *See Butner v. U.S.*, 440 U.S. 48, 55 (1978) ("Property interests are created

and defined by state law.  Unless some federal interest requires a different result, there is no

reason why such interests should be analyzed differently simply because an interested party is

involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and

federal courts within a state serves to reduce uncertainty, to discourage forum shopping, and **to**

**prevent a party from receiving a 'windfall merely by reason of the happenstance of**

**bankruptcy**.") (emphasis added); *see also In re Orexigen Therapeutics, Inc.*, 596 B.R. 9, 14

(Bankr. D. Del. 2018) ("*Butner* is eminent for its proposition that state law rights are respected in

bankruptcy absent a contrary bankruptcy rule or policy.").

23.    Given that (i) there is no specific provision in the Bankruptcy Code authorizing

roll-ups, and (ii) the Minority Term Lender DIP Exclusion renders the Roll-Up *directly* contrary

to the bankruptcy policy of equity and "same class, same treatment," the Roll-Up must comply

with the Prepetition Term Loan Credit Agreement.  Here, unless the Minority Term Lender DIP

Exclusion is removed from the Term DIP Facility, the Debtors and the Controlling Term Lenders

will be in breach of the Excluded Term Lenders' "sacred" contractual rights protecting against

non-pro rata payments and distribution of proceeds under the Prepetition Term Loan Credit Agreement.[8]

24.     The Debtors have properly characterized the DIP Term Roll-Up as a payment of Prepetition Term Loans from the proceeds of the Term Loan Roll-Up DIP Loans.  *See*, *e.g.*, RSA DIP Term Sheet (definition of "Purpose") ("(c) the Term Loan Roll-Up DIP Loans shall be deemed to be used to repay the equivalent principal amount of the Term Loan Obligations outstanding under the Term Loan Credit Agreement") (emphasis added).

25.     Sections 10.01(d) and (h) of the Prepetition Term Loan Credit Agreement provide, *inter alia*, that "no such amendment, waiver or consent" shall:

> (d) change any provision of this Section 10.01 or Section 8.04 or Section 10.07(b)(ii)(F)-(J) that would alter the pro rata sharing of payments, ratable reduction of Loans or the definition of "Required Lenders" without the written consent of each Lender directly and adversely affected thereby; [or]
>
> . . .
>
> (h) (i) except to the extent the opportunity to participate as a consenting Lender in any applicable amendment pursuant to which such provisions are so modified has been offered on an equal and ratable basis to all existing Lenders, amend Section 2.12(a), 2.13 or 8.04 in a manner that would alter the pro rata sharing of payments thereunder or (ii) except to the extent an opportunity to participate in the applicable "priming" debt has been offered to all existing Lenders on a pro rata basis, modifications that subordinating any of the Obligations to any other Indebtedness or subordinating the Liens securing the Obligations to the Liens securing any other Indebtedness (in each case of the foregoing, except (x) Indebtedness that is permitted under this Agreement (as in effect on the Closing Date) to be senior in right of payment to the Obligations and/or be secured by a Lien on the Collateral that is senior to the Lien securing the Obligations, as applicable or (y) in connection with any "debtor-in-possession" facility (or similar financing under applicable law)), in each case without the written consent of each Lender directly and adversely affected thereby.

*See* Prepetition Term Loan Credit Agreement, at §§ 10.01(d), (h).

---

[8] Excerpts of the relevant provisions of the Prepetition Term Loan Credit Agreement are attached hereto as Exhibit D.  There is a scrivener's error with respect to clauses (F)-(J) and they are numbered (6)-(10) instead.

26.     With respect to the sacred right set forth in Section 10.01(d) of the Prepetition Credit Agreement, Section 10.07(b)(ii)(H) provides that a "Parent and its Subsidiaries may not purchase any Loans or Term Commitments so long as any Event of Default has occurred and is continuing." Here, the Prepetition Term Loans were accelerated as a result of the Debtors' Chapter 11 Cases, and thus, an Event of Default exists under the Prepetition Term Loan Credit Agreement. *See id.* at § 8.01(f). Accordingly, each Prepetition Term Loan Lender that does not have the opportunity participate in the Term DIP Facility and the DIP Term Roll-Up is "directly and adversely affected" by the non-pro rata payment by the Borrower.[9]

27.     Section 10.01(d) also protects against any amendment or consent that alters the pro rata protections set forth in Section 8.04 (entitled "Application of Funds") without the consent of each adversely affected Lender. Section 8.04 provides that, in certain circumstances, including in any bankruptcy or insolvency proceeding, "any amounts received on account of the Obligations shall be applied by the Administrative Agent, subject to the Applicable Intercreditor Agreement then in effect," in the following order:

> Third, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

> Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them . . . .

*Id.* at § 8.04. The DIP Term Roll-Up (and the credit bid of such DIP Term Roll-Up Loans itself) is in direct violation of this sacred right as well.

---

[9] The Term DIP Facility and other RSA Transactions also appear to be a scheme to get around ratable distribution requirements with respect to the Prepetition Term Loan Agent exercising the remedy of credit bidding the Prepetition Term Loan Obligations at the direction of Required Lenders, and the proceeds of such credit bid or sale to a third party being distributed ratably among the Prepetition Term Lenders.

28.     Section 10.01(h) provides additional sacred rights that render the Minority Term Lender DIP Exclusion a breach of the Prepetition Term Loan Credit Agreement as a result of the Roll-Up.  As set forth *supra*, ¶25, Clause (i) of Section 10.01(h) of the Prepetition Term Loan Credit Agreement prohibits any amendment to Section 2.12(a), 2.13 or 8.04 of the same in a manner that would alter the pro rata sharing payments thereunder "except to the extent the opportunity to participate as a consent Lender in any applicable amendment" to such provisions "has been offered on an equal and ratable basis all existing Lenders."  *See* Prepetition Term Loan Credit Agreement, at § 10.01(h)(i).  None of the Excluded Term Lenders were provided an opportunity to participate in the Term DIP Facility and, therefore, have not consented to the non-pro rata payments of Prepetition Term Loans by way of the DIP Term Roll-Up.

29.     Section 2.12(a) of the Prepetition Term Loan Credit Agreement requires the Administrative Agent to distribute to each Lender its "Applicable Percentage" (i.e., its ratable share) of any payments received by the Administrative Agent, and Section 2.13 provides that if "any Lender shall obtain on account of the Loans made by it any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them."  *See* Prepetition Term Loan Credit Agreement, at §§ 2.12(a), 2.13.

30.     Moreover, Clause (ii) of Section 10.01(h) includes "Serta" protections whereby "Required Lenders" can only consent to the incurrence of "priming debt" and subordinate the liens to a new credit facility if such "priming debt" has been offered to all existing Lenders on a

pro rata basis.  There is a carveout from this requirement for "priming" debt incurred "in connection with any 'debtor-in-possession' facility (or similar financing under applicable law)." However, whereas Section 10.01(h) clearly permits the "Required Lenders" to consent to priming debt in the form of debtor-in-possession financing even if not offered to all Lenders, there is no similar carve-out for changing the pro rata sharing provisions "in connection with any 'debtor-in-possession' facility."

31.     If the parties intended for non-pro rata payment of term loans in connection with debtor-in-possession financing to be a valid and permissible basis to get around the various pro rata sharing protections set forth in Section 10.01(d) and (h), such a carveout would have—and could have—been included.  *See In re TPC Grp., Inc.*, No-22-10493 (CTG), 2022 WL 2498751 (Bankr. D. Del. July 6, 2022)*, aff'd, In re TPC Grp.*, *Inc*. No 22-10493 (CTG), 2022 WL 2952518 (D. Del. July 26, 2022) (finding that sacred right provision was "primarily directed at protecting the holders' rights to ratable treatment and should not be read as an anti-subordination provision in disguise" and noting that "[t]o the extent such holders want to be protected against self-interested actions by borrowers and other holders, they must include such protections in the terms of their agreements").

32.     The Prepetition Term Lenders funded and/or acquired the Prepetition Term Loans in reliance on broad protections limiting non-pro rata payments and distribution of proceeds from the Prepetition Term Loan Priority Collateral, and such protections warrant denial of the Term DIP Facility unless the Minority Term Lender DIP Exclusion is removed.  Doing so would not prejudice the Controlling Term Lenders or the Debtors.  On the other hand, the Minority Term Lender DIP Exclusion is contrary to core bankruptcy principles of equity and "same class, same treatment."

II.    **The Roll-Up Is Unlawful and Inequitable Unless the Minority Term Lender DIP Exclusion Is Removed**

33.    As set forth in the DIP Motion, "[r]epayment of prepetition debt with roll-up is a common feature in debtor-in-possession financing arrangements" and it has been routinely approved by courts within the Third Circuit." *See* DIP Motion, at ¶55.  If the Minority Term Lender DIP Exclusion were removed and the Ad Hoc Group of Excluded Term Lenders were provided the opportunity to participate in their pro rata share of the Term DIP Facility commitments, then the Roll-Up would be appropriate and lawful under relevant law.  However, as long as the Minority Term Lender DIP Exclusion remains, the Bankruptcy Court should not approve the Roll-Up.

34.    A roll-up is a practice in bankruptcy common law whereby bankruptcy courts authorize the payment of prepetition claims from the proceeds of DIP loans.  *See In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 512 (Bankr. D. Del. 2010) (stating that "[m]ost simply, a [roll-up] is the payment of a pre-petition debt with the proceeds of a post-petition loan").  As explained by this Court in *Capmark*:

> [t]he proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor. As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order. In both a refinancing and a roll-up, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Id.* at 510–11.

35.    Courts disfavor roll-ups.  *See, e.g., Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (stating that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that section 364 does not authorize the granting of administrative expense priority for prepetition debt); *see also In re*

*Verasun Energy Corp.*, No. 08-12606 (BLS), (Bankr. D. Del. Dec. 3, 2008) (Dkt. No. 316, Dec.

3, 2008 Hr'g Tr. at 32:20–25) (noting that the Bankruptcy Courts for the District of Delaware

and the Southern District of New York and other courts have found that "roll-ups are not favored,

[rather, they] are strongly discouraged on day one, and the bottom line is that for approval a

substantial showing [of need for the financing] has to be made").  Further, as the U.S. Supreme

Court itself has noted, courts authorizing the conversion of prepetition debt into postpetition debt

typically only do so where it serves "significant Code-related objectives" by "[e]nabl[ing] a

successful reorganization and mak[ing] even the disfavored creditors better off." *Czyzewski v.*

*Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (citations omitted).

36.     One of the primary reasons courts approve roll-ups—notwithstanding any express

authority to do so in the Bankruptcy Code—is to incentivize lenders to participate in the debtor-

in-possession financing.  *See* 3 Collier on Bankruptcy ¶ 364.06[2] (Richard Levin & Henry J.

Sommer eds., 16th ed.) ("Notwithstanding [scrutiny over approval of roll-ups], roll-ups have

become common in recent years and are viewed by prepetition lenders (who serve as the source

of postpetition financing in a substantial majority of cases) as an important tool for mitigating

risk and incentivizing participation in the postpetition financing.").  Here, the Excluded Term

Lenders have been intentionally excluded from participating because, as discovery from the

Controlling Term Lenders will show, they want to modestly boost their recovery through

stripping value from the minority Excluded Term Lenders by ensuring they are unable to

participate in their pro rata share of the Term DIP Commitments.

37.     The DIP Motion notes that the "[r]epayment of prepetition debt with roll-up is a

common feature in debtor-in-possession financing arrangements" and cites to multiple cases in

this Court and within the Third Circuit approving roll-ups.  *See* DIP Motion, at ¶ 55.  However,

none of the cases cited by the Debtors involve the approval of a roll-up where minority lenders within the exact same class of loans of the majority lenders arranging and backstopping the proposed DIP were excluded from participating and objected to such exclusion.  In fact, of the cases cited approving roll-ups, the two involving debtor-in-possession financing provided by a majority of senior secured lenders under a syndicated credit facility—the fact pattern here—offered minority lenders their pro rata share of the DIP commitments on the same terms except for a backstop fee.  *See, e.g.*, *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. June 10, 2024) (authorizing a $180 million DIP facility, including a $135 million roll-up (3:1 roll-up) where minority lenders were offered their pro rata share of the DIP commitments and majority lenders received a backstop fee of 5.0% of new money commitments); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (authorizing a $270 million DIP facility, including a $90 million roll-up of the prepetition debt obligations (3:1 roll-up) where minority lenders were offered their pro rata share of the DIP commitments and majority lenders received a backstop fee of 7.00% of new money commitments or 10% of new common stock, subject to dilution from management incentive plan).

38.     By way of additional recent comparison, the debtor-in-possession financing in the recently filed in the Franchise Group Inc. cases, which has a 2:1 roll-up and similar fees, was reluctantly approved by the Court on an interim basis.  There, minority first lien lenders were offered the opportunity to participate in their pro rata share, and the majority first lien lenders obtained a backstop fee of 10% of the new money commitments.  *See In re Franchise Group, Inc.*, Case No. 24-12480 (JTD) (Bankr. D. Del. Nov. 7, 2024), Dkt. No. 134.

39.     Unless the Minority Term Lender DIP Exclusion is removed, the Term DIP Facility and the DIP Term Roll-Up allows the Controlling Term Lenders to use debtor-in-

possession financing to take a completely fungible and equal class of creditors as of the Petition Date and create two drastically different classes of creditors by judicial decree. The big controlling class of Prepetition Term Lenders get all of the pie; the small minority class of Prepetition Term Lenders *may* get a scrap of crust. This is prohibited under bankruptcy law. *See*, *e.g.*, *In re Washington Mutual, Inc.*, 442 B.R. 314, 360 (Bankr. D. Del. 2011) (holding that a plan that excluded small creditors of a class from participating in rights offering available to large creditors violated Section 1123(a)(4)); *In re Pacific Drilling S.A.*, Case No. 17-13193 (MEW), 2018 Bankr. LEXIS 3024, at *5 (Bankr. S.D.N.Y. Oct. 1, 2018) ("The theory of the Bankruptcy Code is that when the big creditors sit in a room and negotiate a deal, the little creditors who are in the same boat get the same deal.").

40.     Although the Debtors and Controlling Term Loan Lenders may argue that Section 1123(a)(4) only applies to a chapter 11 plan and not the terms of debtor-in-possession financing, that is directly contrary to applicable case law where courts only allow roll-ups if they are otherwise consistent with Bankruptcy Code objectives. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. at 468.

41.     The economic destruction and inequity that the Excluded Term Lenders will suffer as a result of the Minority Term Lender DIP Exclusion is a moving target that depends on either (i) the credit bid amount (which is determined at the discretion of the Controlling Term Lenders), or (ii) purchase price and terms of a successful third-party cash bid. Regardless, a range of recoveries with respect to the range of potential distributable value available to satisfy the Prepetition Term Loans and New Money DIP Term Loans underscores the grossly inequitable effect on the Excluded Term Lenders' recovery if they cannot participate in their pro rata share of the Prepetition Term Loans.

42.     For example, in a scenario where the credit bid or distributable cash proceeds is an amount equal to (i) the entirety of the DIP Term Loans and (ii) $25 million of non-rolled up Prepetition Term Loans ($1148.30 billion of credit bid debt or cash proceeds in total), the Controlling Term Lenders would obtain a blended recovery of 89% compared with a recovery of 9.8% for the Excluded Term Lenders.  In the same scenario where the Minority Term Lender DIP Exclusion is removed and all of the Prepetition Term Lenders participate in their pro rata share of the DIP Facility, the Controlling Term Lenders and Excluded Term Lenders would recover 83.4% and 82.0%, respectively, on their claims.  Thus, approval of the Term DIP Facility could sanction a result whereby the Controlling Term Lenders get less than an additional 6% of total recovery on their claims by retaining the Minority Term Lender DIP Exclusion, but the Excluded Term Lenders recover a small fraction of what the Controlling Term Lenders receive notwithstanding that they held completely equal and fungible claims under the same facility as of the Petition Date.[10]

43.     The Minority Term Lender DIP Exclusion is nothing more than the Controlling Term Lenders using their bargaining leverage as the "Required Lenders" to squeeze recovery from minority Excluded Term Lenders vis-à-vis the bankruptcy process and the power of this Court.  Courts have held that this is exactly the situation where DIP financing should not be approved.  *See In re Ames Dep't Stores,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that post-petition financing should be approved only if "the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); *see also In re LandSource Communities Development, LLC*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 14, 2008), Hr'g Tr. 206:12–

---

[10] A full chart of illustrative recoveries illustrating the difference between a Term DIP Facility with and without the Minority Term Lender DIP Exclusion is attached hereto as Exhibit E.

16 (stating that "[t]he standard here is not that there's only one option available to the Debtor, and therefore the Court has to approve it, [rather,] in my view such an arrangement has to be ***fair and reasonable*** under the circumstances") (emphasis added).  The Court should not approve a 3.4:1 roll-up (on top of already rich financing fees) if a small minority of Prepetition Term Lenders is excluded from participating in the Term DIP Facility, particularly where conditioning approval on removal does not prejudice the Controlling Term Lenders nor jeopardize the Debtors' access to the Term DIP Facility and the other RSA Transactions.

### III.    The Minority Term Lender DIP Exclusion Renders the Term DIP Facility a "Sub Rosa" Plan

44.    If the Minority Term Lender DIP Exclusion remains and the Roll-Up is approved, it effectively sanctions using debtor-in-possession financing to get around plan confirmation requirements and renders the Term DIP Facility and the other RSA Transactions a "sub rosa" plan.  Upon approval of the Term DIP Facility on a final basis, the Chapter 11 Cases are essentially over for the Excluded Term Lenders, as (i) $1.123 billion of DIP Term Loans with a superpriority lien and priority would prime the Prepetition Term Loans, (ii) the Controlling Term Lenders will determine in their sole discretion the amount of the credit bid of Prepetition Term Loans (and therefore the amount of equity in the credit bid acquisition entity (the "Purchaser") distributed to the Excluded Term Lenders), and (iii) the Prepetition Collateral and the distributable value in connection therewith will be acquired by the Purchaser.  In the event of a third-party cash overbid, the cash proceeds will be distributed in accordance with the waterfall, and the Excluded Term Lenders will receive a fraction of what they would receive had they been able to participate in their pro rata share of the Term DIP Commitments.

45.    Thus, the Term DIP Facility and RSA (which, although has not been assumed by the Debtors, is incorporated vis-à-vis the milestones and Events of Default set forth in the DIP

Term Credit Agreement) predetermines material plan terms and the distribution of the Debtors'

enterprise value to intentionally thwart the plan confirmation requirements of same class, same

treatment.  *See In re Am. Capital Equipment, LLC*, 688 F.3d 145, 154-55 (3d Cir. 2012) ("a

bankruptcy court may address the issue of plan confirmation where it is obvious . . . that a later

confirmation hearing would be futile because the plan . . . is patently unconfirmable"); *see also*

*In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 815–16 (Bankr. S.D.N.Y. 2020) (noting that "DIP

financings sometimes trigger sub rosa plan issues" and that "courts will reject proposed DIP

loans as improper sub rosa plans where the terms of the loan include concessions to creditors or

parties in interest that are unauthorized under, or in conflict with, provisions under the

Bankruptcy Code").

46.     Here, unlike most cases where the bankruptcy court has found a DIP financing

constitutes a "sub rosa" plan, the Court need only condition approval of the Term DIP Facility on

removal of the Minority Term Lender DIP Exclusion—not send the parties back to the drawing

board with respect to overall debtor-in-possession financing package.

### IV.     The Debtors' Acceptance of the Minority Term Lender DIP Exclusion Is Inconsistent with the Prudent Exercise of the Debtors' Business Judgment

47.     As set forth in the DIP Motion, "[c]ourts grant a debtor considerable deference in

acting in accordance with its business judgment in obtaining postpetition secured credit, so long

as the agreement to obtain such credit does not run afoul of the provisions of, and policies

underlying, the Bankruptcy Code."  See, e.g., In re L.A. Dodgers LLC, 457 B.R. 308, 313

(Bankr. D. Del. 2011) (stating "courts will almost always defer to the business judgment of a

debtor in the selection of the lender"); In re Trans World Airlines, Inc., 163 B.R. 964, 974

(Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such

facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115

B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

48.     Here, the Debtors' acceptance of the Minority Term Lender DIP Exclusion renders entry into the Term DIP Facility as a breach of the Prepetition Term Loan Facility and is inconsistent with Debtors' business judgment because, in addition to being unlawful and grossly inequitable, it is not a necessary term. ██████████████████████████████

██████████████████████████████████████████████████████████████████

██    *See* Exhibit F.  Neither the Debtors nor Ad Hoc Group of Controlling Term Lenders can credibly represent that the Controlling Term Lenders would not provide the Term DIP Facility without the Minority Term Lender DIP Exclusion.  Discovery from each of the Controlling Term Lenders, which is ongoing, will demonstrate as much.

49.     Discovery will also show the Term DIP Facility and the other RSA Transactions were carefully negotiated by sophisticated advisors to fund a value-maximizing sale process to either: (i) sell the Debtors' operating assets to a third party for cash; or (ii) effectuate a "change of control" to the Prepetition Term Lenders.  In either scenario, funding the Term DIP Facility without the Minority Term Lender DIP Exclusion would still be in their best interests, and no member of the Ad Hoc Group of Controlling Term Lenders can credibly state otherwise.

50.     The Ad Hoc Group of Controlling Term Lenders may assert that the Minority Term Lender DIP Exclusion is fair because of the work that they have done structuring the Term DIP Facility and the other RSA Transactions, and the risk that they took in arranging and funding

the new money commitments under the Term DIP Facility.  The Minority Term Lender DIP

Exclusion is completely inappropriate as a surrogate for a backstop or structuring fee.  For one, it

is completely nonsensical that the Ad Hoc Group of Controlling Term Lenders should be

compensated for funding debtor-in-possession financing with a 3.4:1 roll-up by cutting out the

Excluded Term Lenders from participating in their contractually required pro rata share.  Rather,

the Minority Term Lender DIP Exclusion exists because the Term DIP Facility is so attractive as

an investment, that the Controlling Term Lenders want to ensure they can fund more than their

pro rata share.

51.     All but one of the Controlling Term Lenders also hold the DIP FILO Roll-Up.

Such Controlling Term Lenders have been compensated by getting the entirety of their ABL

FILO rolled up into the Term DIP Facility.  This provides them with a 3.5:1 roll-up (including a

roll-up of a $15.07 million make whole claim), whereas the Prepetition Term Lenders that are not

holding the DIP FILO Roll-Up (i.e., the Excluded Term Lenders) only receive a 3:1 roll-up.

52.     While the Excluded Term Lenders note that the Court granted the 3:1 roll-up on

an interim basis, the Court appears to have relied in part on an inaccurate statement by the

Debtors that the Prepetition Term Loans are only being primed with respect to their interests in

the Prepetition Term Loan Priority Collateral by the DIP FILO Roll-Up.  *See* First Day Hearing

Transcript, at 43:3-10 ("And, Your Honor, we only put this slide up to say that we think that just

the ratio, you know, 3:1 in case of the term loan claims and 100 percent in case of the FILO

claims, isn't the whole story, because as Your Honor will see, ***even the term loan claims are

only being primed with respect to the term loan collateral by the FILO facility***.  The FILO

facility, having already enjoyed the senior position with respect to the ABL collateral.")

(emphasis added).  While this may be true for the Controlling Term Lenders, the Excluded Term

Lenders are absolutely getting primed by $1.123 billion of DIP Term Loans with respect to their interests in the Prepetition Term Loan Priority Collateral (unless the Minority Term Lender DIP Exclusion is removed and the Excluded Term Lenders have the opportunity to participate in their pro rata share of the Term DIP Commitments, which they are prepared to do).

53.     Finally, the Minority Term Lender DIP Exclusion needlessly complicates this case and hurts the other creditor constituencies.  If the Minority Term Lender DIP Exclusion is removed, at least 97% of the Prepetition Term Lenders will be a party to the RSA.  This will provide the Debtors and the Ad Hoc Group of Controlling Term Lenders flexibility with respect to negotiating with the official committee of unsecured creditors on the terms of a wind down plan, including the waiver of the Prepetition Term Loans' diminution of value claim and deficiency claim as is common in settlements with similar fact patterns.  If the Excluded Term Lenders are not able to participate in their pro rata share of the Term DIP Facility and do not sign the RSA, this will needlessly complicate such settlement negotiations, and reduce general unsecured creditor recoveries.  Moreover, if the Ad Hoc Group of Controlling Lenders take the position that they are unilaterally able to waive the Prepetition Term Lenders' deficiency claim and/or diminution in value claim, that just further underscores the gross disparity in economic outcomes the Excluded Term Lenders face if they cannot participate in their pro rata share of the Term DIP Commitments.

## <u>RESERVATION OF RIGHTS</u>

This Limited Objection is without prejudice to, and the Ad Hoc Group of Excluded Term Lenders hereby fully reserves, its right to raise additional arguments with respect to the proposed Term DIP Facility and any final order approving the DIP Motion.  This Limited Objection is also

without prejudice to the rights of the Ad Hoc Group of Excluded Term Lenders to seek other appropriate relief, including additional discovery in connection therewith.

The Ad Hoc Group of Excluded Term Lenders reserve all rights to request payment of all reasonable and documented out-of-pocket costs and expenses by the Debtors as provided for in Section 10.04 of the Prepetition Term Loan Credit Agreement and as adequate protection.

## CONCLUSION

WHEREFORE, the Ad Hoc Group of Excluded Term Lenders respectfully requests that the Court: (i) deny the DIP Motion unless the Minority Term Lender DIP Exclusion is removed and the Excluded Term Lenders are entitled to participate in their pro rata share of the Term DIP Commitments, and (ii) grant such other relief as is just and proper.

Dated:  November 12, 2024
Wilmington, Delaware

/s/ Ashley E. Jacobs
Kevin A. Guerke (DE No. 4096 )
Ashley E. Jacobs (DE No. 5635)
Rebecca L. Lamb (DE No. 7223)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 N. King St.
Wilmington, DE 19801
Telephone: (302) 571-6600
 Email:  kguerke@ycst.com
               ajacobs@ycst.com
               rlamb@ycst.com

-and-

Michael R. Handler (*pro hac vice* pending)
Nancy M. Bello (*pro hac vice* pending)
KING & SPALDING LLP
1185 Avenue of the Americas,
34th Floor
New York, NY 10036
Telephone: (212) 556-2100
Email:  mhandler@kslaw.com
               nbello@kslaw.com

Thaddeus D. Wilson (*pro hac vice* pending)
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600
Email: thadwilson@kslaw.com

*Counsel to the Ad Hoc Group of Excluded Term
Lenders*

32379748.1

**Exhibit A**
(*Filed Under Seal*)

**Exhibit B**
(*Filed Under Seal*)

**Exhibit C**

TO:    RSA Ad Hoc Group
Attention: Guggenheim Partners, LLC, KKR Credit Advisors (US) LLC, Monarch
Alternative Capital Management LP, Silver Point Capital, L.P., Sculptor Capital
Management LP
c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park, Bank of America Tower
New York, NY 10036
Attention: Philip C. Dublin; Naomi Moss
Email: pdublin@akingump.com; nmoss@akingump.com

American Tire Distributors, Inc.
Attention: Patrick Bartels, Roger Meltzer, James Micali, Ronald J. Bienias
c/o Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Attention: Anup Sathy, P.C.; Chad J. Husnick, P.C.; David Gremling
E-mail: anup.sathy@kirkland.com, chad.husnick@kirkland.com,
dave.gremling@kirkland.com

VIA ELECTRONIC MAIL

November 9, 2024

Re: In re American Tire Distributors, Inc., Case No. 24-12391 (CTG)

Ladies and Gentlemen:

Reference is hereby made to: (i) that certain Term Loan Credit Agreement, dated as of October 22, 2021 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2023, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of March 26, 2023, and as further amended by that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of July 24, 2024, and as may be further amended, modified and supplemented from time to time, the "Prepetition Term Loan Credit Agreement," and the holdings thereunder, the "Prepetition Term Loans") by and among American Tire Distributors, Inc., as borrower ("ATD"), the other loan parties party thereto, the lenders from time to time party thereto (the "Term Loan Lenders"), and Bank of America, N.A., (in such capacity, the "Agent"); (ii) that certain Restructuring Support Agreement entered into as of October 22, 2024 between and among the Company Parties and the Consenting Stakeholders (the "RSA Ad Hoc Group"), as defined in the agreement (the "RSA"); and (iii) the Debtors' *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition*

*Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V)*
*Granting Related Relief* (Dkt No. 16) (the "<u>DIP Motion</u>").  Capitalized terms used herein but not
otherwise defined shall have the meaning ascribed such terms in the RSA.

The undersigned lenders (each an "<u>Excluded Term Lender</u>," and collectively, the "<u>Ad
Hoc Group of Excluded Term Lenders</u>")[1] represented by King & Spalding LLP ("<u>K&S</u>") and
Young Conaway Stargatt & Taylor, LLP ("<u>YCST</u>") are writing to: (i) formally request the
opportunity to participate in our pro rata share (based on holdings of Prepetition Term Loans as
of Petition Date) of the New Money DIP Facility Commitments and the Roll-Up Term Loan
Commitments (collectively, the " <u>DIP Term Loan Commitments</u>") as required by the terms of the
Prepetition Term Loan Credit Agreement and applicable bankruptcy law and (ii) confirm that, if
given the opportunity to participate, we would work constructively and efficiently to execute the
RSA and other relevant documentation.

The Ad Hoc Group of Excluded Term Lenders is optimistic that the RSA Ad Hoc Group
will reconsider their decision to decline to offer the Excluded Term Lenders the customary
opportunity to participate in their pro rata share of the DIP Term Loan Commitments.  The Ad
Hoc Group of Excluded Term Lenders appreciates the hard work and resources the members of
the RSA Ad Hoc Group and their respective advisors have put into negotiating the terms of the
DIP Term Loan Facility and RSA.  In consideration of these efforts, each Excluded Term Lender
is willing to waive its share of the Upfront Fee (such that it effectively becomes a
structuring/backstop fee) if provided the opportunity by the RSA Ad Hoc Group to participate in
its pro rata share of the DIP Term Loan Commitments.

By our calculations, the incremental economic benefit to the RSA Ad Hoc Group of not
offering pro rata participation to the Excluded Term Lenders is minimal, while our recovery
would be completely devastated.  Accordingly, absent the right to participate in the DIP Term
Loan Commitments on a pro rata basis, we will have no choice but to object to the DIP Term
Loan Facility and pursue related litigation.  We think intra-lender litigation concerning this issue
is a needless distraction, value destructive, and a waste of all parties' precious resources.  We
also remind the RSA Ad Hoc Group that the Prepetition Term Loan Credit Agreement has broad
pro rata sharing of payment and proceeds provisions that prohibit the proposed roll up of
Prepetition Term Loans unless the DIP Term Loan Commitments are offered on a pro rata basis
to the Excluded Term Lenders.[2]

---

[1] The Ad Hoc Group of Excluded Term Lenders collectively hold approximately $80 million of Prepetition Term
Loans.

[2] *See* Section 10.01(d) (sacred right prohibiting any amendment or modification to Section 8.04 (application of
proceeds) and Section 10.07(b)(ii)(H) requiring ratable sharing of payments/reduction of loans) and Section 10.01(h)
(prohibiting any amendment to Section 2.12(a) (requiring all payments made by the Borrower to be distributed by
the Agent to the Lenders on ratable basis), 2.13 (requiring Lenders purchase ratable share of Loans from other
Lenders if they receive any payment in excess of its ratable share) and 8.04 (application of proceeds) "except to the
extent the opportunity to participate as a consent Lender in any applicable amendment [to such provisions] … has
been offered on an equal and ratable basis to all existing Lenders").

We look forward to your response, and are at the ready to review and sign the necessary documentation (including the RSA) if given the opportunity to participate in our pro rata share of the DIP Term Loan Commitments as soon as you make them available.

      Yours Truly,


      The Undersigned Members of the Ad Hoc Group of Excluded Term Lenders


[Signature Pages Immediately Follow on Next Page]


Cc: Michael R. Handler, King & Spalding LLP, counsel to the Ad Hoc Group of Excluded Term Lenders

    Ashley E. Jacobs, Young Conaway Stargatt & Taylor, LLP, counsel to the Ad Hoc Group of Excluded Term Lenders

    Douglas McGovern, Perella Weinberg Partners LP, financial advisor to the RSA Ad Hoc Group

    Rachel Murray, Moelis & Company LLC, financial advisor to the Debtors

**[Signature Pages Omitted]**

**Exhibit D**

*Exhibit A*

# TERM LOAN CREDIT AGREEMENT[1]

Dated as of October 22, 2021
among

## AMERICAN TIRE DISTRIBUTORS, INC.,
as the Borrower,

## ATD NEW HOLDINGS III, INC.,
as Parent,

## BANK OF AMERICA, N.A.,
as Administrative Agent and Collateral Agent,

## THE LENDERS FROM TIME TO TIME PARTY HERETO, and

## BANK OF AMERICA, N.A., CITIBANK, N.A. and WELLS FARGO SECURITIES, LLC,
as Joint Lead Arrangers and Joint Bookrunners

---

[1] Conformed through Amendment No. 1 to Credit Agreement, dated as of October 22, 2021, Amendment No. 2 to Credit Agreement, dated as of March 26, 2023 and Amendment No. 3 to Credit Agreement, dated as of July 24, 2024.

between the accounts and records maintained by any Lender and the Register, the Register shall be conclusive in the absence of demonstrable error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Term Note payable to such Lender or its registered assigns, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

Section 2.12    Payments Generally.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in immediately available funds not later than ~~3:00 p.m~~3:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office. All payments received by the Administrative Agent after ~~3:00 p.m~~3:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    Except as set forth in the definition of "Interest Period", if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. With Respect to any payment that the Administrative Agent makes for the account of the Lenders hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "Rescindable Amount"): (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative agent has for any reason otherwise erroneously made such payment; then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this clause (c) shall be conclusive, absent manifest error.

(d)    If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof,

#98654237v4

the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)        The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)        Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)        Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.04. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Applicable Percentage of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13        Sharing of Payments. If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans made by it any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided that (x) if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon, (y) the provisions of this Section 2.13 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant and (z) the provisions of this Section 2.13 shall not be construed to apply to any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Term Commitments of that Class or any increase in the Applicable Rate (or other pricing term, including any fee, discount or premium) in respect of Loans or Term Commitments of Lenders that have consented to any such extension to the extent such transaction is permitted hereunder. The Borrower agree that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the

Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of demonstrable error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    ~~Incremental Credit Extensions~~[Reserved].

~~(a) At any time and from time to time, subject to the terms and conditions set forth herein, the Borrower may, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request to increase the amount of Term Loans or add one or more additional tranches of term loans~~ (including, for the avoidance of doubt, any incremental delayed draw term facilities) (any such Term Loans or additional tranche of term loans, the "Incremental Term Loans" or the "Incremental Facilities"). Notwithstanding anything to contrary herein, the aggregate principal amount of all Incremental Facilities (other than Refinancing Incremental Term Loans) (determined at the time of incurrence), together with the aggregate principal amount of all Incremental Equivalent Debt, shall not exceed the sum of (i) the Unrestricted Incremental First Lien Amount, plus (ii) the Voluntary Prepayment Amount, plus (iii) the Incremental Incurrence Amount (the sum of clauses, (i), (ii) and (iii), the "Incremental Amount"). Each Incremental Facility shall be in an integral multiple of $1,000,000 and be in an aggregate principal amount that is not less than $5,000,000, provided that such amount may be less than the applicable minimum amount if such amount represents all the remaining availability hereunder as set forth above.~~

~~(b) Each Incremental Facility will become effective pursuant to an amendment (each, an "Incremental Amendment") and each Incremental Amendment will set forth the amount and terms of the relevant Incremental Facility.~~ The terms of each Incremental Facility will be as agreed between ~~the Borrower and the Persons providing such Incremental Facility;~~ *provided* that:

~~(i) other than with respect to any Qualifying Bridge Facility, any mandatory prepayments of any Incremental Term Loans shall be made on a pro rata basis or less than pro rata basis with any corresponding mandatory prepayment of the Loans (but not on a greater than pro rata basis, except for (A) any repayment of such Incremental Term Loans at maturity and (B) any greater than pro rata repayment of such Incremental Term Loans with the proceeds of Credit Agreement Refinancing Indebtedness),~~

~~(ii) other than with respect to any Qualifying Bridge Facility, any Incremental Term Loans shall not have a final maturity date earlier than the Latest Maturity Date applicable to the Initial Term Loans,~~

~~(iii) other than with respect to any Qualifying Bridge Facility, any Incremental Term Loans shall not have a Weighted Average Life to Maturity that is shorter than the Weighted Average Life to Maturity of the Initial Term Loans, and~~

~~(iv) except to the extent otherwise permitted by this~~ Section 2.14, the terms and conditions (including, if applicable, as to collateral but excluding as to subordination, interest rate, redemption premium and prepayment premiums) of any such Incremental Term Loans, are, as determined by the Borrower, to be either (x) substantially identical to or less favorable to the

have determined in good faith that such restrictions will not adversely affect in any material respect its obligation or ability to make any payments required hereunder; and

(n)    restrictions arising in any agreement relating to (i) any Cash Management Obligation to the extent such restrictions relate solely to the cash, bank accounts or other assets or activities subject to the applicable cash management services and (ii) any Swap Contacts;

Section 7.11    Canadian Defined Pension Benefit Plans. No Canadian Guarantor or Affiliate shall become liable under or contribute to any Canadian Defined Pension Benefit Plan.

Section 7.12    Special Covenant Regarding Material Intellectual Property. Notwithstanding anything herein to the contrary, ~~(x) immediately after giving effect to the designation of any Subsidiary as an Unrestricted Subsidiary, such Unrestricted Subsidiary shall not own, or hold exclusive rights in, any Material Intellectual Property, (y) following any designation of any Subsidiary as an Unrestricted Subsidiary, none of Parent, the Borrower or the Restricted Subsidiaries shall transfer (by means of Investment, Disposition or otherwise) any Material Intellectual Property to such Unrestricted Subsidiary and (z)~~ no Loan Party shall transfer (by means of Investment, Disposition or otherwise) any Material Intellectual Property to any Non-Loan Party, other than in connection with the bona fide tax planning matters of the Loan Parties; provided, that, for the avoidance of doubt, this Section 7.12 shall not restrict the Borrower or its Restricted Subsidiaries from licensing intellectual property on a non-exclusive basis to any ~~Unrestricted Subsidiary or~~ Non-Loan Party to the extent not otherwise prohibited.

## ARTICLE VIII~~ARTICLE VIII~~

### Events of Default and Remedies

Section 8.01    Events of Default. Any of the following events referred to in any of clauses (a) through (j) inclusive of this Section 8.01 shall constitute an "Event of Default":

(a)    Non-Payment. Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within ten (10) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    Specific Covenants. The Borrower or any Subsidiary Guarantor or, in the case of Section 7.10, Parent, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a), Section 6.04 (solely with respect to Parent and the Borrower), Section 6.17, Section 6.20 or Article VII; or

(c)    Other Defaults. The Borrower or any Subsidiary Guarantor fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made and such incorrect or misleading representation, warranty, certification or statement of fact, if capable of being cured, remains

so incorrect or misleading for ten (10) days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders; or

(e)    Cross-Default. The Borrower or any Subsidiary Guarantor (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount exceeding the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than (i) with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and (ii) any event requiring prepayment pursuant to customary asset sale events, insurance and condemnation proceeds events, change of control offers events and excess cash flow and indebtedness sweeps), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, all such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all such Indebtedness to be made, prior to its stated maturity; provided that (x) this clause (e)(B) shall not apply to secured Indebtedness that becomes due (or requires an offer to purchase) as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and (y) an "Event of Default" under the ABL Credit Agreement shall not constitute an Event of Default hereunder unless the ABL Lenders have actually declared all ABL Obligations to be immediately due and payable in accordance with the terms of the ABL Credit Agreement and such declaration has not been rescinded by the ABL Lenders on or before such date; provided, further, that such failure or breach is unremedied and is not waived by the required holders of such Indebtedness; or

(f)    Insolvency Proceedings, Etc. Except with respect to any dissolution or liquidation of a Restricted Subsidiary expressly permitted by Section 7.04 in connection with the consummation of a Permitted Tax Restructuring, Parent, the Borrower or any of the Restricted Subsidiaries which is a Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or an order for relief is entered in any such proceeding; or

(g)    Judgments. There is entered against a Loan Party a final, enforceable, and non-appealable judgment or order from a court of competent jurisdiction for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance or another indemnity obligation) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(h)    Invalidity of Collateral Documents. Any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or Section 7.05) or solely as a result of acts or omissions by the Administrative Agent or any Lender or the

satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to create a valid and perfected lien, with the priority set forth in the Applicable Intercreditor Agreement on a material portion of the Collateral covered thereby; or any Loan Party contests in writing the validity or enforceability of any material provision of any Collateral Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Collateral Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Collateral Document; or

(i)     _Invalidity of Guarantees_. Any Guarantee, after its execution and delivery, provided by any other Guarantor that is a Material Subsidiary, or any material provision thereof, ceases to be in full force and effect (other than pursuant to the terms hereof or thereof) or any Loan Party denies or disaffirms in writing any such Guarantor's material obligations under its Guarantee (other than (x) as a result of repayment in full of the Obligations and terminations of the Term Commitments, (y) upon the release of such Guarantor as provided for under the Loan Document or in accordance with its terms or (z) resulting from acts or omissions of a Secured Party or the application of applicable law); or

(j)     _Change of Control_. There occurs any Change of Control; or

(k)     _ERISA_. (i) An ERISA Event occurs which, individually or together with other ERISA Events which have occurred, has resulted or could reasonably be expected to result in liability of a Loan Party in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan the remaining balance of which could reasonably be expected to result in a Material Adverse Effect.

Notwithstanding anything to the contrary in this Agreement, with respect to any Default or Event of Default, the words "exists," "is continuing" or similar expressions with respect thereto shall mean that the Default or Event of Default has occurred and has not yet been cured or waived; _provided_ that, any court of competent jurisdiction may (x) extend or stay any grace period prior to when any actual or alleged Default becomes an actual or alleged Event of Default or (y) stay the exercise of remedies by any Administrative Agent upon the occurrence of an actual or alleged Event of Default, in each case, in accordance with the requirements of applicable Law. If any Default or Event of Default occurs due to (i) the failure by any Loan Party to take any action by a specified time, such Default or Event of Default shall be deemed to have been cured at the time, if any, that the applicable Loan Party takes such action, (ii) the failure by the Borrower to provide notice thereof pursuant to Section 6.03, such Default or Event of Default shall be deemed to have been cured upon the Borrower's delivery of such notice, or (iii) the taking of any action by any Loan Party that is not then permitted by the terms of this Agreement or any other Loan Document, such Default or Event of Default shall be deemed to be cured on the earlier to occur of (x) the date on which such action would be permitted at such time to be taken under this Agreement and the other Loan Documents, including pursuant to an applicable amendment or waiver permitting such action, or otherwise and (y) the date on which such action is unwound, otherwise modified or otherwise ceases to exist to the extent necessary for such revised action to be permitted at such time by this Agreement and the other Loan Documents (including after giving effect to any amendments or waivers), but only so long as, in the case of each of the foregoing clauses (i), (ii) and (iii), such Event of Default has been cured pursuant to clause (i), (ii) or (iii), as applicable, prior to the time at which the Administrative Agent or the Required Lenders have declared that an Event of Default has occurred or the Loans have been accelerated hereunder.

#98654237v4

Notwithstanding anything to the contrary in this <u>Section 8.01</u>, an Event of Default (the "<u>Initial Default</u>") may not be cured pursuant to this <u>Section 8.01</u>:

(i)     if the taking of any action by any Loan Party or Subsidiary that is not permitted during, and as a result of, the continuance of such Initial Default directly results in the cure of such Initial Default and the applicable Loan Party or Subsidiary had actual knowledge at the time of taking any such action that the Initial Default had occurred and was continuing,

(ii)    in the case of an Event of Default under <u>Section 8.01(h)</u> or <u>(i)</u> that directly results in material impairment of the rights and remedies of the Lenders, Collateral Agent and Administrative Agent under the Loan Documents and that is incapable of being cured,

(iii)   in the case of an Event of Default under <u>Section 8.01(c)</u> arising due to the failure to perform or observe <u>Section 6.05</u> or <u>6.06</u> that directly results in a material adverse effect on the ability of the Borrower and the other Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Document to which the Borrower or any of the other Loan Parties is a party, or

(iv)   in the case of an Event of Default under <u>Section 8.01(f)</u> or (j); or

(v)     -in the case of an Initial Default for which (i) the Borrower failed to give notice to the Administrative Agent and the Lenders of such Initial Default in accordance with <u>Section 6.03</u> of this Agreement and (ii) the Borrower has actual knowledge of such failure to give such notice.

Section 8.02     <u>Remedies Upon Event of Default</u>.

(a)     <u>General</u>. Except as otherwise provided in <u>Section 8.02(b)</u> below, if any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(i)     declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(iii)   exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

<u>provided</u> that upon the occurrence of an Event of Default under <u>Section 8.01(f)</u> or (g) with respect to Parent or the Borrower, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

(b)     <u>Limitations on Remedies</u>. Notwithstanding anything to the contrary in any Loan Document, any notice of Default, Event of Default or acceleration provided to the Borrower by the Administrative Agent on behalf of one or more Lenders that have expressly requested that such notice be given to the Borrower must be accompanied by a written Net Short Representation from any such Lender

(other than a Regulated Bank) delivered to the Borrower (with a copy to the Administrative Agent); *provided* that (A) in the absence of any such written Net Short Representation, each such Lender shall be deemed to have represented and warranted to the Borrower and the Administrative Agent that it is not a Net Short Lender (it being understood and agreed that the Borrower and the Administrative Agent shall be entitled to rely conclusively on each such representation and deemed representation (including, with respect to the Administrative Agent, as provided in <u>Section 10.28(e)(i)</u>)) and (B) no Net Short Representation shall be required to be delivered during the pendency of a Default or Event of Default caused by a bankruptcy or similar insolvency proceeding.

Section 8.03    <u>Exclusion of Immaterial Subsidiaries</u>. Solely for the purpose of determining whether a Default has occurred under clause (f) or (g) of Section 8.01, any reference in any such clause to any Restricted Subsidiary or Loan Party shall be deemed not to include any Subsidiary that is an Immaterial Subsidiary or at such time could, upon designation by the Borrower, become an Immaterial Subsidiary affected by any event or circumstances referred to in any such clause unless the Consolidated EBITDA of such Subsidiary together with the Consolidated EBITDA of all other Subsidiaries affected by such event or circumstance referred to in such clause, shall exceed 5% of the TTM Consolidated EBITDA of the Borrower and the Restricted Subsidiaries.

Section 8.04    <u>Application of Funds</u>. If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), including in any bankruptcy or insolvency proceeding, any amounts received on account of the Obligations shall be applied by the Administrative Agent, subject to the Applicable Intercreditor Agreement then in effect, in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under <u>Section 10.04</u> and amounts payable under <u>Article III</u>) payable to each Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under <u>Section 10.04</u> and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this <u>clause Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this <u>clause Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this <u>clause Fourth</u> held by them;

<u>Fifth</u>, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

<u>Last</u>, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

at such time, where such payment is a Rescindable Amount, then in any such event, each Lender Party receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Lender Party in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each Lender Party irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount. The Administrative Agent shall inform each Lender Party promptly upon determining that any payment made to such Lender Party comprised, in whole or in part, a Rescindable Amount. Notwithstanding anything to the contrary herein or in any other Loan Document, the provisions of this paragraph are solely agreements among the Lender Parties and the Administrative Agent and shall not impose any obligations on the Borrower and the Loan Parties.

Section 9.16    <u>Appointment of Hypothecary Representative (Quebec)</u>. Without limiting the powers of the Collateral Agent hereunder or under any of the Collateral Documents, each Lender hereby appoints the Collateral Agent to act as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Québec) (in such capacity, and any successor to the Collateral Agent in such capacity, the "Hypothecary Representative") for all present and future Lenders and other Secured Parties for the purposes of each Deed of Hypothec. Each new Lender shall be deemed to have confirmed and ratified the appointment of the Collateral Agent as Hypothecary Representative by its execution of an assignment agreement. Each successor Collateral Agent shall automatically (and without any further action) become the successor Hypothecary Representative for the purposes of each Deed of Hypothec. If requested by the Hypothecary Representative, the Loan Parties shall cause to be prepared and registered notices of replacement (as contemplated by Article 2692 of the Civil Code of Québec) in each applicable register of the Province of Québec in which a hypothec created pursuant to each Deed of Hypothec is registered. The Hypothecary Representative shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favour of the Collateral Agent in this Agreement, which shall apply mutatis mutandis. Notwithstanding Section 10.14 hereof, the appointment and replacement of the Hypothecary Representative pursuant to this Section 9.16 shall be governed by the laws of the Province of Québec.

## <span style="color:blue">ARTICLE X</span><span style="color:red">ARTICLE X</span>

### Miscellaneous

Section 10.01    <u>Amendments, Etc</u>. Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that no such amendment, waiver or consent shall:

(a)    extend or increase the Term Commitment of any Lender without the written consent each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent set forth in <u>Section 4.02</u> or the waiver of any Default, mandatory prepayment or mandatory reduction of the Term Commitments shall not constitute an extension or increase of any Term Commitment of any Lender);

(b)        postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or Section 2.08, fees or other amounts without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Term Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)        reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby, it being understood that any change to the definition of Senior Secured Leverage Ratio, Senior Secured Leverage Ratio or Total Leverage Ratio or in the component definitions thereof shall not constitute a reduction in the rate of interest or fees; provided that only the consent of the Required Lenders shall be necessary to (i) amend the definition of "Default Rate", (ii) to waive any obligation of the Borrowers to pay interest at the Default Rate or (iii) effectuate or implement any changes in accordance with Section 3.02;

(d)        change any provision of this Section 10.01 or Section 8.04 or Section 10.07(b)(ii)(F)-(J) that would alter the pro rata sharing of payments, ratable reduction of Loans or the definition of "Required Lenders" without the written consent of each Lender directly and adversely affected thereby;

(e)        release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; provided that any transaction permitted under Section 7.04 or Section 7.05 shall not be subject to this clause (e) to the extent such transaction does not result in the release of all or substantially all of the Collateral;

(f)        release all or substantially all of the value of the Guarantees in any transaction or series of related transactions, without the written consent of each Lender; provided that any transaction permitted under Section 7.04 or Section 7.05 shall not be subject to this clause (f) to the extent such transaction does not result in the release of all or substantially all of the Guarantees;

(g)        change the definition of "Required Lenders" without the written consent of each Lender; or

(h)        (i) except to the extent the opportunity to participate as a consenting Lender in any applicable amendment pursuant to which such provisions are so modified has been offered on an equal and ratable basis to all existing Lenders, amend Section 2.12(a), 2.13 or 8.04 in a manner that would alter the pro rata sharing of payments thereunder or (ii) except to the extent an opportunity to participate in the applicable "priming" debt has been offered to all existing Lenders on a pro rata basis, modifications that subordinating any of the Obligations to any other Indebtedness or subordinating the Liens securing the Obligations to the Liens securing any other Indebtedness (in each case of the foregoing, except (x) Indebtedness that is permitted under this Agreement (as in effect on the Closing Date) to be senior in right of payment to the Obligations and/or be secured by a Lien on the Collateral that is senior to the Lien securing the Obligations, as applicable or (y) in connection with any "debtor-in-possession" facility (or similar financing under applicable law)), in each case without the written consent of each Lender directly and adversely affected thereby.

and provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) Section 10.07(h) may not be amended, waived or otherwise modified without

the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (iii) (A) any amendment or waiver that by its terms affects the rights or duties of Lenders holding Loans or Term Commitments of a particular Class (but not the Lenders holding Loans or Term Commitments of any other Class) will require only the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto if such Class of Lenders were the only Class of Lenders and (B) in determining whether the requisite percentage of Lenders have consented to any amendment, modification, waiver or other action, any Defaulting Lenders shall be deemed to have voted in the same proportion as those Lenders who are not Defaulting Lenders, except with respect to (x) any amendment, waiver or other action which by its terms requires the consent of all Lenders or each affected Lender and (y) any amendment, waiver or other action that by its terms adversely affects any Defaulting Lender in its capacity as a Lender in a manner that differs in any material respect from other affected Lenders, in which case the consent of such Defaulting Lender shall be required. Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, and the Borrower and the Administrative Agent (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans, ~~the Incremental Term Loans, if any,~~ and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding anything to the contrary contained in this <u>Section 10.01</u>, any guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities, errors, omissions, mistakes or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents. Furthermore, with the consent of the Administrative Agent at the request of the Borrower (without the need to obtain any consent of any Lender), any Loan Document may be amended to cure ambiguities, omissions, errors, mistakes or defects and the Agents' and Borrower's joint determination of the existence of any such ambiguity, omission, error, mistake or defect is conclusive evidence of the existence of such ambiguity, omission, error, mistake or defect.

Neither the Administrative Agent nor the Collateral Agent shall amend or waive any provision of an Applicable Intercreditor Agreement (other than to cure ambiguities, omissions, mistakes or defects or to add other parties thereto (to the extent contemplated by Section 7.01)) without the written consent of the Required Lenders.

Notwithstanding anything in this <u>Section 10.01</u> to the contrary, (a) technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent to the extent necessary (i) to integrate any ~~Incremental~~ Facilities~~, Refinancing Incremental Term Loans or~~ <u>or</u> Extended Term Loans or Refinancing Term Loans~~,~~<u>)</u> <u>and</u> (ii) ~~to integrate terms or conditions from any Incremental Amendment that are more restrictive than this Agreement in accordance with Section 2.14(d) and (iii)~~ to make any amendments permitted by <u>Section 1.03</u> and to give effect to any election to adopt IFRS and (b) without the consent of any Lender, the Loan Parties and the Administrative Agent or any collateral agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into (x) any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to

167

become Collateral for the benefit of the Secured Parties or as required by local law to give effect to, or protect any security interest for benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Loan Document or (y) any Applicable Intercreditor Agreement, in each case, with the holders of Indebtedness permitted by this Agreement to be secured by the Collateral. Without limitation of the foregoing, the Borrower may, without the consent of any Lenders, upon delivery to the Administrative Agent (i) increase the interest rates (including any interest rate margins or interest rate floors), fees and other amounts payable to any Class or Classes of Lenders hereunder, (ii) increase, expand and/or extend the call protection provisions and any "most favored nation" provisions benefiting any Class or Classes of Lenders hereunder (including, for the avoidance of doubt, the provisions of ~~Sections~~Section 2.05(a)(iii) ~~and 2.14(b)(ii)~~ hereof) and/or (iii) with the consent of the Administrative Agent, modify any other provision hereunder or under any other Loan Document in a manner, as determined by the Administrative Agent in its sole discretion, more favorable to the then-existing Lenders or Class or Classes of Lenders, in each case in connection with the issuance or incurrence of any ~~Incremental Facilities or~~ other Indebtedness permitted hereunder, where the terms of any such ~~Incremental Facilities or~~ other Indebtedness are more favorable to the lenders thereof than the corresponding terms applicable to other Loans or Term Commitments then existing hereunder, and it is intended that one or more then-existing Classes of Loans or Term Commitments under this Agreement share in the benefit of such more favorable terms in order to comply with the provisions hereof relating to the incurrence of such ~~Incremental Facilities or~~ other Indebtedness; provided that the Administrative Agent will have at least five Business Days (or such shorter period to which the Administrative Agent may consent in its reasonable discretion) after written notice from the Borrower to provide such consent and may, in its sole discretion, provide written notice to the Lenders regarding any such proposed amendment.

Notwithstanding anything to the contrary herein, in connection with any determination as to whether the Required Lenders have (A) consented (or not consented) to any amendment or waiver of any provision of this Agreement or any other Loan Document or any departure by any Lender Party therefrom, (B) otherwise acted on any matter related to any Loan Document, or (C) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, any Lender (other than any Lender that is a Regulated Bank) that, as a result of its interest in any total return swap, total rate of return swap, credit default swap or other derivative contract (other than any such total return swap, total rate of return swap, credit default swap or other derivative contract entered into pursuant to bona fide market making activities), has a net short position with respect to the Loans and/or Commitments (each, a "Net Short Lender") shall have no right to vote any of its Loans and Commitments and shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Net Short Lenders. For purposes of determining whether a Lender has a "net short position" on any date of determination: (i) derivative contracts with respect to the Loans and Commitments and such contracts that are the functional equivalent thereof shall be counted at the notional amount thereof in Dollars, (ii) the notional amounts in other currencies shall be converted to the dollar equivalent thereof by such Lender in a commercially reasonable manner consistent with generally accepted financial practices and based on the prevailing conversion rate (determined on a mid-market basis) on the date of determination, (iii) derivative contracts in respect of an index that includes any of the Borrower or other Loan Parties or any instrument issued or guaranteed by any of the Borrower or other Loan Parties shall not be deemed to create a short position with respect to the Loans and/or Commitments, so long as (x) such index is not created, designed, administered or requested by such Lender or its Affiliates and (y) the Borrower and the other Loan Parties and any instrument issued or guaranteed by any of the Borrower or other Loan Parties, collectively, shall represent less than five percent (5%) of the components of such index, (iv) derivative transactions that are documented using either the 2014 ISDA Credit Derivatives Definitions or the 2003 ISDA Credit Derivative Definitions

168

(collectively, the "ISDA CDS Definitions") shall be deemed to create a short position with respect to the Loans and/or Commitments if such Lender is a protection buyer or the equivalent thereof for such derivative transaction and (x) the Loans or the Commitments are a "Reference Obligation" under the terms of such derivative transaction (whether specified by name in the related documentation, included as a "Standard Reference Obligation" on the most recent list published by Markit, if "Standard Reference Obligation" is specified as applicable in the relevant documentation or in any other manner), (y) the Loans or the Commitments would be a "Deliverable Obligation" under the terms of such derivative transaction or (z) any of the Borrower or other Loan Parties (or its successor) is designated as a "Reference Entity" under the terms of such derivative transaction, and (v) credit derivative transactions or other derivatives transactions not documented using the ISDA CDS Definitions shall be deemed to create a short position with respect to the Loans and/or Commitments if such transactions are functionally equivalent to a transaction that offers the Lender protection in respect of the Loans or the Commitments, or as to the credit quality of any of the Borrower or other Loan Parties other than, in each case, as part of an index so long as (x) such index is not created, designed, administered or requested by such Lender and (y) the Borrower and other Loan Parties and any instrument issued or guaranteed by any of the Borrower or other Loan Parties, collectively, shall represent less than five percent (5%) of the components of such index. In connection with any such determination, each Lender shall promptly notify the Administrative Agent in writing that it is a Net Short Lender, or shall otherwise be deemed to have represented and warranted (such representation and warranty, a "Net Short Lender Representation") to the Borrower and the Administrative Agent that it is not a Net Short Lender (it being understood and agreed that the Borrower and the Administrative Agent shall be entitled to rely on each such representation and deemed representation and shall have no duty to (x) inquire as to or investigate the accuracy of any such representation or deemed representation or (y) otherwise ascertain or monitor whether any Lender, Eligible Assignee or Participant or prospective Lender, Eligible Assignee or Participant is a Net Short Lender or make any calculations, investigations or determinations with respect to any derivative contracts and/or net short positions). Without limiting the foregoing, the Administrative Agent, in its capacity as such, shall not (A) be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to the Net Short Lenders or (B) have any liability with respect to or arising out of any assignment or participation of Loans to any Net Short Lender (except to the extent otherwise arising hereunder or under any Loan Document)).

Section 10.02    Notices and Other Communications; Facsimile Copies.

(a)    General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower and the Administrative Agent.

give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall require.

Section 10.03   No Waiver; Cumulative Remedies. No failure by any Lender or the Administrative Agent or Collateral Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04   Attorney Costs and Expenses. The Borrower agree (a) if the Closing Date occurs, to pay or reimburse the Administrative Agent and the Lead Arrangers for all reasonable and documented or invoiced out-of-pocket costs and expenses associated with the syndication of the Loans and Term Commitments and the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including all Attorney Costs of a single firm of counsel (and any other counsel retained with the Borrower's consent (such consent not to be unreasonably withheld or delayed)) and one local and foreign counsel in each relevant jurisdiction, and (b) to pay or reimburse the Administrative Agent, the Lead Arrangers and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all costs and expenses incurred in connection with any workout or restructuring in respect of the Loans, all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of counsel to the Administrative Agent). The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by any Agent. The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05   Indemnification by the Borrower. Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless each Agent-Related Person, each Lender, each Lead Arranger and their respective Affiliates and their and their Affiliates' respective partners, directors, officers, employees, counsel, agents, advisors, and other representatives (collectively, the "Indemnitees") from and against any and all losses, liabilities, damages, claims, and reasonable and documented or invoiced out-of-pocket fees and expenses (including reasonable Attorney Costs of one counsel for all Indemnitees and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all Indemnitees (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee)) of any such Indemnitee arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnitee is a party thereto and whether or not such proceedings are brought by the Borrower, its equity holders, its Affiliates, creditors or any other third person) that relates to the Transaction, including the financing contemplated hereby, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery,

172
#98654237v4

such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate (or if the Federal Funds Rate is not available, a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation).

Section 10.07    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except as otherwise provided herein (including without limitation as permitted under Section 7.04), neither Parent nor any of their respective Subsidiaries may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto (other than to any Disqualified Lender (other than during the continuation of a Specified Event of Default)) shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)(i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees ("Assignees") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(1)    the Borrower; provided that, (I) no consent of the Borrower shall be required for an assignment (1) of any Term Loan to any other Lender, any Affiliate of a Lender or any Approved Fund or (2) if a Specified Event of Default has occurred and is continuing, to any Assignee and (II) the Borrower shall be deemed to have consented to any such assignment of any Term Loan unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

(2)    the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to another Lender, an Affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

(1)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Term Commitment or Loans of any Class, the amount of the Term Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with

respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consent;

(1) provided that (1) no such consent of the Borrower shall be required if a Specified Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption;

(3)    (1) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and any documentation required by Section 3.01(f) and (2) the Assignee shall have delivered to the Administrative Agent all documentation and other information that the Administrative Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer", and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(4)    the Assignee shall not be a natural person, or a Disqualified Lender (and such Assignee shall be required to represent that it is not a Disqualified Lender or an Affiliate of a Disqualified Lender that would constitute a Disqualified Lender but for the fact that it is not readily identifiable as such on the basis of its name); provided that the list of Disqualified Lenders shall not be posted or otherwise distributed to the Lenders, prospective Lenders and prospective assignees;

(5)    the Assignee shall not be a Defaulting Lender; and

(6)    in case of an assignment to an Affiliated Lender, (1) after giving effect to such assignment and to all other assignments with all Affiliated Lenders, the aggregate principal amount (without duplication) of all Term Loans and Term Commitments then held by all Affiliated Lenders (other than Affiliated Debt Funds) shall not exceed 25% of the aggregate unpaid principal amount of the Term Loans then outstanding (determined at the time of such purchase), (2) any Loans and Term Commitments assigned to, or purchased by, Parent or any of their Subsidiaries shall be canceled promptly upon such assignment, (3) in the event that any proceeding under the Bankruptcy Code shall be instituted by or against the Borrower or any other Guarantor, each Affiliated Lender shall acknowledge and agree that they are each "insiders" under Section 101(31) of the Bankruptcy Code and, as such, the claims associated with the Loans and Term Commitments owned by it shall not be included in determining whether the applicable class of creditors holding such claims has voted to accept a proposed plan for purposes of Section 1129(a)(10) of the Bankruptcy Code, or, alternatively, to the extent that the foregoing designation is deemed unenforceable for any reason, each Affiliated Lender shall vote in such proceedings in the same proportion as the allocation of voting with respect to such matter by those Lenders who are not Affiliated Lenders, except to the extent that any plan of reorganization proposes to treat the Obligations held by such Affiliated Lender in a manner that is less favorable in any material respect to such Affiliated Lender than the proposed treatment of similar

Obligations held by Lenders that are not Affiliated Lenders; provided that this clause (3) shall not apply to Affiliated Debt Funds, (4) such Affiliated Lender (other than Affiliated Debt Fund) will not receive information provided solely to Lenders and will not be permitted to attend or participate in (or receive any notice of) Lender meetings or conference calls and will not be entitled to challenge the Administrative Agent's and the Lenders' attorney-client privilege as a result of their status as Affiliated Lenders and (5) notwithstanding anything to the contrary contained herein, any such Loans acquired by an Affiliated Lender (other than the Borrower) may, with the consent of the Borrower, be contributed to the Borrower (whether through any of its direct or indirect Parent Entities or otherwise) and exchanged for debt or equity securities of Parent or such other direct or indirect parent that are otherwise permitted to be issued at such time, provided that such Loans shall be canceled promptly upon such contribution;

(7)    notwithstanding anything in Section 10.01 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have (x) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (y) otherwise acted on any matter related to any Loan Document or (z) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, all Loans and Term Commitments held by Affiliated Debt Funds may not account for more than 49.9% (pro rata among such Affiliated Debt Funds) of the Loans and Term Commitments (without duplication) of consenting Lenders included in determining whether the Required Lenders have consented to any action pursuant to Section 10.01;

(8)    a Parent and its Subsidiaries may not purchase any Loans or Term Commitments so long as any Event of Default has occurred and is continuing;

(9)    any purchases by Affiliated Lenders shall require that such Affiliated Lender clearly identify itself as an Affiliated Lender in any Assignment and Assumption executed in connection with such purchases or sales and each such Assignment and Assumption shall contain customary "big boy" representations but no requirement to make representations as to the absence of any material non-public information; and

(10)    notwithstanding anything in Section 10.01 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom (unless the action in question affects any Affiliated Lenders (other than Affiliated Debt Funds) in a disproportionately adverse manner than its effect on the other Lenders), or any plan of reorganization pursuant to the Bankruptcy Code, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, no

176

Affiliated Lender (other than Affiliated Debt Fund) shall have any right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action and:

(1) (1) all Loans and Term Commitments held by any Affiliated Lenders (other than Affiliated Debt Funds) shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders have taken any actions; and

(2) (2) all Loans and Term Commitments held by Affiliated Lenders (other than Affiliated Debt Funds) shall be deemed to be not outstanding for all purposes of calculating whether all Lenders have taken any action unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non pro rata basis.

(c)    Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500 (provided that (x) the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and (y) such processing and recordation fee shall not be payable in the case of assignments by any Affiliate of the Lead Arrangers), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.03, 3.04, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Term Note (if any), the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e). For greater certainty, any assignment by a Lender pursuant to this Section 10.07 shall not in any way constitute or be deemed to constitute a novation, discharge, recession, extinguishment or substitution of the existing Indebtedness and any Indebtedness so assigned shall continue to be the same obligation and not a new obligations.

(d)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Commitments of, and principal amounts (and related interest amounts) of the Loans, owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent demonstrable error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register is intended to ensure that all Loans are at all times maintained in "registered form" within the meaning of Section 5f.103(c) of the United States Treasury Regulations and Section 871(h) and 881(c) of the Code.

The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, an Affiliated Lender (but excluding any Affiliated Debt Funds) or, so long as whether a prospective participant is a Disqualified Lender may be communicated to a Lender upon request, a Disqualified Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Term Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 10.01(a), (b), (c), (d), (e) or (f) that directly affects such Participant. Subject to Section 10.07(f), the Borrower agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.03 and 3.04 (through the applicable Lender), subject to the requirements and limitations of such Sections (including Section 3.01(f)) and Sections 3.05 and 3.06, to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(b) (provided that any documentation required to be provided under Section 3.01(f) shall be provided solely to the participating Lender). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Any Lender that sells participations and any Granting Lender shall maintain a register on which it enters the name and the address of each Participant or SPC and the principal amounts and related interest amounts of each Participant's or SPC's interest in the Term Commitments and/or Loans (or other rights or obligations) held by it (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent demonstrable error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation interest or granted Loan as the owner thereof for all purposes notwithstanding any notice to the contrary. In maintaining the Participant Register, such Lender shall be acting as the non-fiduciary agent of the Borrower solely for this purpose (without limitation, in no event shall such Lender be a fiduciary of the Borrower for any purpose). No Lender shall have any obligation to disclose all or any portion of a Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, or its other obligations under this Agreement) except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103(c) of the United States Treasury Regulations and Section 871(h) and 881(c) of the Code.

(f)    A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.03 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.

(g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.03 and 3.04, subject to the requirements and limitations of such Sections (including Section 3.01(e) and (f) and Sections 3.05 and 3.06), to the same extent as if such SPC were a Lender, but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.03 or 3.04) except to the extent any entitlement to greater amounts results from a Change in Law after the grant to the SPC occurred, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Term Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(i)    Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)    No Agent-Related Person shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Lenders; further, without limiting the generality of the foregoing clause, no Agent-Related Person shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Lender.

(k)    (i) Any Lender may, so long as no Event of Default has occurred and is continuing or would result therefrom, assign all or a portion of its rights and obligations with respect to the Term Loans and the Term Commitments under this Agreement to (x) Parent, the Borrower or any of its Subsidiaries or (y) Affiliated Lender (including any Affiliated Debt Fund), in each case, through (i) Dutch auctions open to all Lenders in accordance with the procedures to be agreed among the Lenders and the Borrower or (ii) open market purchase on a non-pro rata basis, in each case subject to the

following limitations (including pursuant to any privately negotiated open-market transactions at, below or above par for cash, securities or any other consideration with one or more Lenders that are not made available for participation to all Lenders or all Lenders of a particular class) and to the applicable limitations in Section 10.07(b)(6); *provided*, that:

>> (1)     if the assignee is Parent or a Subsidiary of the Borrower, upon such assignment, transfer or contribution, the applicable assignee shall automatically be deemed to have contributed or transferred the principal amount of such Term Loans, *plus* all accrued and unpaid interest thereon, to the Borrower; and

>> (2)     if the assignee is the Borrower (including through contribution or transfers set forth in clause (1) above or Section 10.07(l)(ii)), (A) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer and (B) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register.

>(l)     (ii) Any Affiliated Lender may, in its discretion (but is not required to), assign all or a portion of its rights and obligations with respect to the Term Loans and the Term Commitments under this Agreement to Parent, the Borrower or any of its Subsidiaries (regardless of whether any Default or Event of Default has occurred and is continuing or would result therefrom), on a non-pro rata basis, for purposes of cancelling such Term Loans or Term Commitments, which may include contribution (with the consent of the Borrower) to the Borrower (whether through any Parent Entity or otherwise) in exchange for Equity Interests of the Borrower (or any Parent Entity) that are otherwise permitted to be incurred or issued by the Borrower (or such direct or indirect Parent Entity) at such time.

>Section 10.08   Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' partners, directors, officers, employees, trustees, investment advisors, professionals and other experts or agents, including accountants, legal counsel, independent auditors and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and in no event shall such disclosure be made to any Disqualified Lender (other than a Net Short Lender (x) that provides a Net Short Representation at the time of such disclosure or (y) as to which the disclosing party does not have actual knowledge that such Person is a Net Short Lender) pursuant to this clause (a) but only to the extent that a list of such Disqualified Lenders is available to all Lenders upon request)); (b) to the extent requested by any Governmental Authority, to any pledgee referred to in Section 10.07(g); (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement (it being understood that in no event shall such disclosure be made to any Disqualified Lender (other than a Net Short Lender (x) that provides a Net Short Representation at the time of such disclosure or (y) as to which the disclosing party does not have actual knowledge that such Person is a Net Short Lender) pursuant to this clause (d) but only to the extent the list of such Disqualified Lenders is available to all Lenders upon request); (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower (it being understood that in no event shall such disclosure be made to any Disqualified Lender (other than a Net Short Lender (x) that provides a Net Short Representation at the time of such disclosure or (y) as to which the disclosing party

**Exhibit E**

**For Illustrative Purposes Only**

| *Dollars in millions unless stated otherwise* | | Term DIP Exclusion | | Term DIP Pro Rata Participation* | |
| --- | --- | --- | --- | --- | --- |
| **Scenario** | *Distributable Value* | RSA TL Lenders<br>% Recovery | Excluded TL Lenders<br>% Recovery | RSA TL Lenders<br>% Recovery | Excluded TL Lenders<br>% Recovery |
| **1**  Distributable Value to Prepetition TL Lenders (DIP+TL Roll-Up) | $ *1,123.30* | 87.8% | 0.0% | 81.6% | 80.1% |
| **2**  Distributable Value (DIP+TL Roll-Up) + $25MM of Prepetition TL Loans | *1,148.30* | 89.0% | 9.8% | 83.4% | 82.0% |
| **3**  Distributable Value (DIP+TL Roll-Up) + $50MM of Prepetition TL Loans | *1,173.30* | 90.2% | 19.5% | 85.2% | 84.0% |
| **4**  Distributable Value (DIP+TL Roll-Up) + $100MM of Prepetition TL Loans | *1,223.30* | 92.6% | 39.0% | 88.8% | 87.9% |
| **5**  Distributable Value (DIP+TL Roll-Up) + $200MM of Prepetition TL Loans | *1,323.30* | 97.3% | 78.0% | 95.9% | 95.6% |

*\*Assumes participation of 100% of Prepetition TL Lenders (RSA TL Lenders + Excluded Lender Ad Hoc Group)*

## Exhibit F
(*Filed Under Seal*)