**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN TIRE DISTRIBUTORS, INC., *et al.*,[1] | ) | Case No. 24-12391 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  Docket Nos. 16, 186** |

**REPLY OF THE AD HOC GROUP TO THE LIMITED OBJECTION**
**OF THE MINORITY LENDER GROUP TO THE DEBTORS' DIP MOTION**

The ad hoc group of certain unaffiliated beneficial holders and/or investment advisors or managers of beneficial holders of the DIP Term Loans[2] and Prepetition Term Loans (the "Ad Hoc Group"), by and through its undersigned counsel, files this reply (this "Reply") in support of the DIP Motion and in response to the objection [Docket No. 186] (the "Minority Group Objection")[3] filed by the ad hoc group of certain minority lenders (the "Minority Lender Group")[4] in connection

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are American Tire Distributors, Inc. (4594); ATD New Holdings II, Inc. (4985); ATD New Holdings III, Inc. (0977); ATD New Holdings, Inc. (3406); ATD Sourcing Solutions, LLC (5225); ATD Technology Solutions Inc. (N/A); FLX FWD Logistics, LLC (3334); Hercules Tire International Inc. (N/A); Terry's Tire Town Holdings, LLC (7409); The Hercules Tire & Rubber Company (3365); Tire Pros Francorp, LLC (1813); Tirebuyer.com, LLC (9093); and Torqata Data and Analytics LLC (4992).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 12220 Herbert Wayne Court, Huntersville, NC 28078.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 16] (the "DIP Motion").

[3]    Despite characterizing the Minority Group Objection as a "limited" objection, the Minority Lender Group asks the Court to deny the DIP Motion.  Since no other financing source, including the Minority Lender Group, proposed a competing debtor in possession financing facility, denial of the DIP Motion would leave the Debtors with no ability to fund these chapter 11 cases.  Thus, rather than functioning as a "limited" objection, if sustained, the Minority Group Objection could result in the conversion of the Debtors' chapter 11 cases to chapter 7, a fire sale liquidation of their assets and the loss of employment for approximately 4,500 people.

[4]    Based on the 2019 statement filed by the Minority Lender Group on November 12, 2024, the Minority Lender Group holds in the aggregate approximately 7.2% of the Prepetition Term Loans.  It is worth noting that, after the TL Roll-Up following entry of *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic*

with approval of the relief sought in the DIP Motion on a final basis.[5]  In response to the Minority Group Objection and in further support of the DIP Motion, the Ad Hoc Group respectfully states as follows:

**Preliminary Statement**

1.       The Minority Lender Group has chosen to double down on an obstructionist, value destructive path with the apparent goal of bullying the Ad Hoc Group and the Debtors into changing the terms of the extensively negotiated DIP Term Loan Facility or persuading the Court to deny the DIP Motion without providing the Debtors with an alternative.  The decision to take this risky path is premised on the Minority Lender Group's misguided assessment that they can create enough of a distraction from the inquiries central to the approval of debtor in possession financing to divert attention from the fact that the highly negotiated, intertwined package of the DIP Facilities (of which the DIP Term Loan Facility, including the TL Roll-Up,[6] is an integral part) provides desperately needed liquidity to the Debtors at a time when no other postpetition financing is available.  There can be no dispute that approval of the DIP Term Loan Facility on a final basis is in the best interests of the Debtors' estates, and the Debtors' agreement to the fully

---

*Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*  [Docket No. 90] (the "Interim DIP Order"), the Ad Hoc Group holds approximately 85.2% of the Prepetition Term Loans, and it is anticipated that, upon entry of the final order approving the DIP Motion (the "Final DIP Order"), the Ad Hoc Group would hold approximately 63.3% of the Prepetition Term Loans.

[5]    The Debtors unilaterally extended the deadline for the Official Committee of Unsecured Creditors (the "Committee") to object to the DIP Motion.  The Ad Hoc Group reserves all rights to supplement this Reply and respond to any issues raised by the Committee ahead of any hearing on the DIP Motion.

[6]    The "TL Roll-Up" means the automatic deemed exchange and conversion on a cashless basis of Prepetition Term Loan Obligations into DIP Term Loan Obligations as follows: for every dollar of New Money DIP Term Loans funded by a New Money DIP Term Lender, three dollars of the Prepetition Term Loan Obligations beneficially owned by such New Money DIP Term Lender (or any of its affiliates) as of the date of such funding shall be deemed exchanged and converted on a cashless basis into and shall constitute DIP Term Loan Obligations until the ratio of New Money DIP Term Loans funded by such New Money DIP Term Lender to rolled up Prepetition Term Loan Obligations of such New Money DIP Term Lender (or any of its affiliates) reaches 1:3.  *See* Interim DIP Order at ¶ I(e).

integrated terms of the DIP Term Loan Facility represents a sound exercise of the Debtors' business judgment.

2. Most notably, by the Minority Group Objection, the Minority Lender Group launches an irrelevant sideshow regarding the DIP Term Loan Facility, alleging that the Minority Lender Group's not being offered an opportunity to participate in the DIP Term Loan Facility on a pro rata basis violates the Prepetition Term Loan Credit Agreement. Moreover, in the Minority Group Objection, the Minority Lender Group invents a term found nowhere in the DIP Documents—"Minority Term Lender DIP Exclusion"—to describe "the refusal of the [Ad Hoc Group] to allow the [Minority Lender Group] the customary and contractually required opportunity to participate in the [DIP Term Loan Facility] on a pro rata basis." Minority Group Objection at ¶ 1. However, the Minority Lender Group does not request that an actual provision in the DIP Documents be removed and has not challenged the economics of the DIP Term Loan Facility as unreasonable; to the contrary, the Minority Lender Group wishes to participate in the DIP Term Loan Facility and asks that the Court condition approval of the DIP Term Loan Facility on its participation. Instead, the Minority Lender Group fixates on the alleged breach of the Prepetition Term Loan Credit Agreement and, despite the fact that this argument has nothing to do with the question of whether entry into the DIP Term Loan Facility is an appropriate exercise of the Debtors' business judgment, the Minority Lender Group insists that this purported breach mandates denial of the DIP Term Loan Facility unless the Minority Lender Group is afforded an opportunity to participate on a pro rata basis.

3. The Minority Lender Group's relentless pursuit of this meritless argument is a bit like a dog chasing a car: it is unclear what they will actually do if they catch it. If the Minority Lender Group wins on its argument that the DIP Term Loan Facility (including the TL Roll-Up)

violates the Prepetition Term Loan Credit Agreement and consequently should not be approved, then all they will have achieved is taking the Debtors' **only** postpetition financing option off the table. There is no alternative. The Minority Lender Group did not offer one—in fact, they have had three and a half weeks since the start of these cases to make their own competing, committed DIP financing proposal if they felt so strongly that the DIP Term Loan Facility is inappropriate, but they chose not to. Not only that, but the Minority Lender Group also sat on the sidelines at the hearing on interim approval of the DIP Motion, bided their time while the risk of lending new money to the Debtors decreased as the chapter 11 cases progressed constructively and then demanded that they be entitled to participate fully in the DIP Term Loan Facility on a pro rata basis.[7]

4.      This, in turn, makes the Minority Lender Group's strategy in these cases all the more transparent. The Minority Lender Group wants to benefit from all the hard work the Ad Hoc Group has done prior to and during these chapter 11 cases and the significant risk its members have taken by committing to fund $250 million of New Money DIP Term Loans at a time when the Debtors had, among other challenges, no business plan, limited tire inventory with no guarantees of future shipments, a senior executive team consisting primarily of turn-around professionals, a deadline for reaching agreement with the DIP ABL Lenders on the terms of a new ABL facility and no sure path forward to emergence from chapter 11, without putting in any effort

---

[7]     As discussed *infra*, the Minority Lender Group also grossly mischaracterizes the negotiations surrounding their participation in the DIP Term Loan Facility: contrary to the insinuation that the Ad Hoc Group summarily ignored their entreaties for participation in the DIP Term Loan Facility, in actuality, the Ad Hoc Group generously offered the Minority Lender Group the opportunity to participate on a pro rata basis in connection with the final draw under the DIP Term Loan Facility (*i.e.*, each member of the Minority Lender Group could fund its pro rata share of the Final New Money DIP Term Loans and roll up three dollars of its Prepetition Term Loan Obligations for every dollar of Final New Money DIP Term Loans funded). One Prepetition Term Loan Lender left the Minority Lender Group and signed the Restructuring Support Agreement following this offer.

or taking on any of the foregoing risk. And they are putting the success of the Debtors' chapter 11 cases in the crosshairs as a result.

5.     Yet, try as the Minority Lender Group might to deflect attention from this motive by launching every argument imaginable against approval of the DIP Term Loan Facility in their "limited" Minority Group Objection, the central inquiry here is really quite simple: is entry into the DIP Facilities a sound exercise of the Debtors' business judgment? As stressed in the DIP Motion, the First Day Declaration, the DIP Declarations and at the first day hearing, the Debtors have a critical need for access to the liquidity provided by the DIP Facilities, and there is no alternative source of postpetition financing available to the Debtors. Moreover, the DIP Term Loan Facility and the DIP ABL Facility are inextricably intertwined with each other, so the Minority Lender Group's attempt to condition approval of the DIP Term Loan Facility on their inclusion therein imperils not only the Debtors' access to the DIP Term Loan Facility but also to the DIP ABL Facility, which, in turn, risks the success of these chapter 11 cases. Accordingly, entry into the DIP Facilities is necessary and reflects the Debtors' exercise of their sound business judgment, and the terms of the DIP Facilities are reasonable and appropriate, and the Ad Hoc Group respectfully requests that the DIP Motion be granted in its entirety and the Minority Group Objection be overruled.

## Background[8]

### A.     The Ad Hoc Group's Efforts to Support the Debtors' Out-of-Court Sale Process Despite the Debtors' Mounting Challenges

6.     The Ad Hoc Group's efforts to support the Debtors started well before the commencement of these chapter 11 cases. Since May 2022, the Debtors have marketed their

---

[8]  Capitalized terms used but not defined in this Background section shall have the meanings ascribed to them in (a) the *Declaration of Ronald J. Bienias, Chief Restructuring Officer of American Tire Distributors, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Decl.");

businesses for sale.  *See* First Day Decl. at ¶ 6.  More than two years into that process, in June 2024, the Debtors determined to proceed on an exclusive basis with a particular prospective buyer (the "Potential Buyer").  *See id.*  However, shortly thereafter, it became apparent that the myriad operational, industry-wide and related issues confronting the Debtors since 2022 were coming to a head, and the Debtors needed a cash infusion to be in a position to bridge to a sale with the Potential Buyer.  *See id.* at ¶¶ 4, 5.  In response thereto, through an amendment to the Prepetition ABL-FILO Credit Agreement in July 2024, certain members of the Ad Hoc Group stepped up to commit to provide $75 million of additional liquidity to the Debtors in the form of the 2024 Delayed Draw FILO Loans.  *See id.* at ¶ 9.

7.      Unfortunately, the additional liquidity did not solve all of the Debtors' issues. Compounding the Debtors' diminishing financial performance, in August 2024, the Debtors' chief executive officer resigned.  *See id.* at ¶ 8.  In October 2024, the Debtors' chief financial officer resigned, and the non-binding letter of intent with the Potential Buyer was terminated.  *See id*. at ¶¶ 6, 8.

**B.      Facing Dire Circumstances, the Debtors, Yet Again, Looked to the Ad Hoc Group for Contingency Planning**

8.      Faced with no near-term, viable out-of-court sale transaction and significant turnover in the executive suite, the Debtors again looked to the members of the Ad Hoc Group for contingency planning.  *See id.* at ¶¶ 10, 11.  At the same time, the Debtors' monthly financial performance continued to decline, and liquidity continued to become further constrained.  *See id.*

---

(b) the *Declaration of Ronald J. Bienias in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 17] (the "Bienias DIP Decl."); and (c) the *Declaration of Rachel Murray in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 18] (the "Murray DIP Decl."), as applicable.

at ¶ 10.  Despite the recent $75 million cash infusion, the Debtors' leadership vacancies, mounting performance and liquidity issues and the uncertainty surrounding the path forward for the Debtors, the Ad Hoc Group again partnered with the Debtors to consider restructuring options and a landing spot for the Debtors and their more than 4,500 employees.  *See id.* at ¶¶ 2, 11.

9.      In connection therewith, the Ad Hoc Group and the Debtors engaged in extensive discussions and good faith, arm's-length negotiations concerning restructuring alternatives for the Debtors, including:  potential out-of-court solutions, a continued prepetition marketing process and incremental bridge financing options.  *See* Murray DIP Decl. at ¶ 9.  During the course of these discussions and related negotiations and diligence efforts, it became clear that the Debtors' options were more limited than anticipated.  *See id.*  Less than two months after commencing restructuring negotiations, the Ad Hoc Group and the Debtors executed the Restructuring Support Agreement.  *See* First Day Decl. at ¶ 3.  The Restructuring Support Agreement establishes the framework for an in-court marketing and sale process for the Debtors and debtor in possession financing, including $250 million of new money from the Ad Hoc Group.  *See id.* at ¶ 12.  Given the dire circumstances requiring an immediate liquidity solution,[9] the Ad Hoc Group made this commitment to partner with the Debtors on less than perfect information and accepted the attendant risks.

10.     While the Debtors worked with the Ad Hoc Group to establish a framework for their cases, the Debtors also engaged in negotiations with the Prepetition ABL Agent, on behalf of the Prepetition ABL Lenders, concerning postpetition financing and specifically, continued access to the Prepetition ABL Facility in the form of the DIP ABL Facility.  *See id.* at ¶ 11; Murray Decl. at ¶¶ 15, 20.  Pursuant to the agreement reached by the Debtors and the Prepetition ABL Lenders,

---

[9]     The Prepetition ABL Lenders were unwilling to allow the Debtors continued access to the Prepetition ABL Facility absent the provision of new money on terms they found acceptable.

access to the DIP ABL Facility was conditioned upon the preparation, authorization and execution

of the DIP Documents with respect to the DIP Term Loan Facility, the DIP Term Loan Facility's

being in full force and effect and there being no default or event of default thereunder.  *See* DIP

ABL Credit Agreement at § 7.5.[10]

C.      **The Debtors and the Ad Hoc Group Engaged in Good Faith, Arm's-Length Negotiations with Respect to DIP Financing, and Third Parties Lacked Interest**

11.     Although the Debtors sought potential alternative sources of capital, the Ad Hoc

Group and the Prepetition ABL Lenders provided the Debtors with the only actionable postpetition

financing facility.  The Debtors' process for soliciting postpetition financing involved outreach to

thirty-eight (38) third parties, but none were prepared to provide the necessary support to the

Debtors.  *See* Murray DIP Decl. at ¶¶ 11, 15.  Thereafter, the Debtors, the Ad Hoc Group and the

Prepetition ABL Agent, on behalf of the Prepetition ABL Lenders, engaged in good faith, arm's-

length negotiations, including, among other things, (a) the exchanging of multiple drafts of

financing term sheets, orders approving the DIP Facilities and other related documents and

(b) numerous conference calls among the parties and their respective advisors.  *See id.* at ¶ 15.

The agreed upon DIP Term Loan Facility involved concessions from the Ad Hoc Group, including,

among others, better economics for the Debtors, a longer maturity period and more favorable

milestones for administering the chapter 11 cases.  *See id.* at ¶ 16.  However, during the

negotiations, the Ad Hoc Group remained steadfast on certain of the terms, including limiting

participation in the DIP Term Loan Facility to the Ad Hoc Group, certain members of which had

---

[10]   Moreover, the DIP ABL Credit Agreement establishes milestones by when the Credit Bidding Term Lenders (as defined in the DIP ABL Credit Agreement) and the DIP ABL Agent must reach agreement on the terms and conditions of a senior secured asset-based revolving credit facility in connection with the financing of a stalking horse credit bid.  *See* DIP ABL Credit Agreement at Annex A at (d) and (g).  Failure to meet any such milestones would be an immediate event of default under the DIP ABL Credit Agreement, which would result in the termination of the Debtors' access to the DIP ABL Facility and put an end to the Debtors' restructuring efforts. *See id.* at § 6.5.

also provided the Debtors with the 2024 Delayed Draw FILO Loans.  *See, e.g.*, Minority Group

Objection, Ex. F.

12.     Moreover, the trajectory of the Debtors' chapter 11 cases was far from certain at

the time the parties agreed to the terms of the DIP Term Loan Facility.  While the parties executed

the Restructuring Support Agreement in parallel, the Restructuring Support Agreement provides

for the commitment to work in good faith on the terms of a stalking horse credit bid in connection

with the Debtors' in-court sale process.  *See* Restructuring Support Agreement § 5.01(a).  The

members of the Ad Hoc Group took on significant risk, directly on the heels of having provided

the 2024 Delayed Draw FILO Loans, in agreeing to provide $250 million of new money to the

Debtors.  In exchange, each component of the DIP Term Loan Facility was critical to the Ad Hoc

Group's willingness to provide much needed capital to the Debtors.  In particular, the TL Roll-Up

and limiting participation in the DIP Term Loan Facility to the members of the Ad Hoc Group was

bargained-for consideration in exchange for providing new money.  The postpetition financing

package for which the Debtors seek final approval is not only "the best possible financing currently

available to the Debtors," *see* Murray DIP Decl. at ¶ 24, it is the only financing available for the

Debtors.

**D.     The Minority Lender Group's Gamesmanship Comes at the Expense of the Debtors
and Their Stakeholders**

13.     In short, the Ad Hoc Group's efforts facilitated the Debtors' soft landing into

chapter 11 and the continuation of operations during an anticipated postpetition marketing process.

On the other end of the spectrum, since its formation, the Minority Lender Group has engaged in

gamesmanship that can only be described as value-destructive for the Debtors and their

stakeholders and an expensive and unnecessary distraction from progressing the Debtors' chapter

11 cases.  The Minority Lender Group has made no effort to offer the Debtors alternative financing;

rather, the Minority Lender Group seeks to piggyback off the work done, and risks taken by, the Ad Hoc Group.

14.   On Friday, November 1, 2024,[11] counsel to the Minority Lender Group first contacted counsel to the Ad Hoc Group and counsel to the Debtors to set up a call on the same day.  *See* **Exhibit A** (November 1, 2024 email) hereto.  Counsel to the Ad Hoc Group and counsel to the Debtors agreed to a call that day, which took place at 5:00 p.m. (prevailing Eastern Time).

15.   Four days later, on Tuesday, November 5, 2024, counsel to the Minority Lender Group sent counsel to the Ad Hoc Group (a) broad discovery requests with a production deadline of Friday, November 8, 2024, (b) a deposition notice for "the largest holder" in the Ad Hoc Group for a deposition on Monday, November 11, 2024 and (c) a deposition notice for the Ad Hoc Group's investment banker for a deposition on Tuesday, November 12, 2024.  *See* **Exhibit B** (November 5, 2024 email) hereto.  Over the next two days, counsel to the Ad Hoc Group held calls with counsel to the Minority Lender Group to discuss the discovery requests and deposition notices and exchanged emails regarding search terms for discovery requests.  On November 6, 2024, counsel to the Ad Hoc Group relayed a settlement proposal to counsel to the Minority Lender Group.  The proposal was not met with a response.

16.   On Friday, November 8, 2024, the Ad Hoc Group served its objections and responses to the Minority Lender Group's requests for the production of documents.  *See* Docket No. 176.  That same day, at 10:11 p.m. (prevailing Eastern Time), counsel to the Minority Lender Group sent counsel to the Ad Hoc Group document requests for each member of the Ad Hoc Group, which sought document production by Tuesday, November 12, 2024, and asked counsel to

---

[11]   In the Minority Group Objection, the Minority Lender Group mischaracterizes (i) its members' general outreach efforts prior to retaining counsel *after* deciding not to appear at the first day hearing and *after* entry of the Interim DIP Order when it became clear that the Debtors had a soft landing into chapter 11 and (ii) the terms and effect of the Restructuring Support Agreement.

accept service on behalf of each member of the Ad Hoc Group.  *See* **Exhibit C** (November 8, 2024 email) hereto.

17.     On Saturday, November 9, 2024, counsel to the Minority Lender Group sent a letter (the "November 9 Letter")[12] to counsel to the Ad Hoc Group and counsel to the Debtors demanding full participation in the DIP financing package provided by the Ad Hoc Group, despite having (a) no legal or contractual right to such, (b) done none of the work leading up to the Debtors' chapter 11 cases, (c) taken none of the risks that the Ad Hoc Group took by funding $125 million into these chapter 11 cases on imperfect information, on an expedited timeline and with no certainty as to recoveries, (d) made the decision not to appear at the first day hearing or otherwise make their objections to the DIP financing known prior to entry of the Interim DIP Order and (e) served harassing discovery requests on the Ad Hoc Group, and each member thereof, without providing any explanation as to their relevance.  Brazenly, in their demand for full participation in the DIP Term Loan Facility, the Minority Lender Group had the gall to say its members would "waive" their pro rata share of the Upfront Premium approved under the Interim DIP Order, a premium that the Minority Lender Group had and has no entitlement to receive.  November 9 Letter at p. 2.

18.     In response to the November 9 Letter, on November 11, 2024, counsel to the Ad Hoc Group sent counsel to the Minority Lender Group a letter (the "November 11 Letter")[13] generously offering the members thereof the opportunity to participate on a full pro rata basis in the second $125 million of New Money DIP Term Loans, which recognized the risk taken, and work put in, by the Ad Hoc Group in committing to the full $250 million of New Money DIP Term

---

[12]   The November 9 Letter is attached as Exhibit C to the Minority Group Objection.

[13]   A true and correct copy of the November 11 Letter is attached hereto as **Exhibit D**.

Loans and funding the first $125 million thereof.  As a result of that offer, a member of the Minority

Lender Group left that group to participate in the DIP financing package on the terms set forth in

the November 11 Letter.

19.     The rest of the Minority Lender Group, however, took a different course.   On

November 12, 2024, the Minority Lender Group responded by email (the "November 12 Email")[14]

to the November 11 Letter—which letter provided them exactly what they were looking for in the

November 9 Letter, but with respect to the Final New Money DIP Loans and not the Initial New

Money DIP Loans—and, again, insisted that they be allowed to participate in the TL Roll-Up

approved upon entry of the Interim DIP Order "as if" they had funded the Initial New Money DIP

Term Loans.  *See* November 12 Email.  The Minority Lender Group also made the request that

members of the Minority Lender Group ***who do not participate in the new money at all*** receive a

1.5:1 roll-up of their Prepetition Term Loan Obligations "as if they participated" in the new money.

*See id.*  Following this, the Minority Lender Group opted to serve deposition notices and document

requests on each of the members of the Ad Hoc Group for depositions to take place on November

18, 2024.  On November 13, 2024, the Ad Hoc Group produced 213 documents in response to the

Minority Lender Group's requests and plans to produce hundreds more today.  On November 15,

2024, a representative from the Ad Hoc Group's investment banker, Perella Weinberg Partners LP

("PWP"), is scheduled to be deposed as a corporate representative of the Ad Hoc Group and PWP.

20.     On November 13, 2024, the Ad Hoc Group served objections to the Minority

Lender Group's document requests to the individual Ad Hoc Group Members.  Just prior to filing

this Reply, the Ad Hoc Group filed a discovery letter requesting that the Court quash each of the

deposition notices served on the individual members of the Ad Hoc Group for the reasons detailed

---

[14]    A true and correct copy of the November 12 Email is attached hereto as **Exhibit E**.

therein—namely that they seek testimony that is wholly irrelevant to approval of the DIP Motion and the legal arguments made in the Minority Group Objection and are intended solely to harass the members of the Ad Hoc Group.

**<u>Argument</u>**

**A.      The DIP Term Loan Facility Does Not Violate the Prepetition Term Loan Credit Agreement, and the Minority Lender Group's Attempt to Condition Approval of the DIP Term Loan Facility on Its Inclusion in the DIP Term Loan Facility Should Be Overruled**

21.      The Minority Lender Group takes the position that the Court should not approve the DIP Term Loan Facility unless the Minority Lender Group is allowed to participate in the DIP Term Loan Facility (including the full TL Roll-Up) because the TL Roll-Up allegedly violates the Prepetition Term Loan Credit Agreement.  *See* Minority Group Objection at ¶¶ 8, 32, 43, 46, p. 25. The Minority Lender Group's assertion that the DIP Term Loan Facility violates the Prepetition Term Loan Credit Agreement is premised on a flawed reading of the Prepetition Term Loan Credit Agreement.  Yet, even if the Minority Lender Group were correct (they are not) that the Prepetition Term Loan Credit Agreement was violated because participation in the DIP Term Loan Facility was not made available to all Prepetition Term Loan Lenders on a pro rata basis, the redress is not to deny the DIP Motion, which would have disastrous effects on these chapter 11 cases.[15]

22.      Notwithstanding the plethora of meandering and inapplicable arguments set forth in the Minority Group Objection, the crux of the Minority Lender Group's grievance appears to be the existence of the TL Roll-Up, pursuant to which each DIP Term Lender is converting three dollars of its Prepetition Term Loans into DIP Term Loans for each dollar of New Money DIP

---

[15]      The Ad Hoc Group has been insistent on the participation-related terms of the TL Roll-Up since the outset of negotiations with respect to the DIP Facilities and, contrary to the Minority Lender Group's reckless and baseless assertions (*see* Minority Group Objection at ¶¶ 7, 48), the Minority Lender Group's attempt to unilaterally change this critical term of the DIP Term Loan Facility risks stranding the Debtors with no DIP financing, zero alternatives and a critical need for a source of funding for their chapter 11 cases.

Term Loans it funds into the DIP Term Loan Facility.[16]  In the Minority Group Objection, the Minority Lender Group argues that the TL Roll-Up violates Sections 2.12(a), 2.13 and 8.04[17] of the Prepetition Term Loan Credit Agreement and that these provisions are "sacred" rights under the Prepetition Term Loan Credit Agreement that cannot be amended or waived without the consent of each Prepetition Term Loan Lender adversely affected thereby.  *See* Minority Group Objection at ¶¶ 22-32.   The Minority Lender Group is wrong not only on its reading and application of the Prepetition Term Loan Credit Agreement but also on the appropriate remedy for any alleged wrongs and the standard governing the approval of debtor in possession financing.

23.     Relying on a tortured reading of the Prepetition Term Loan Credit Agreement, the Minority Group Objection asks the Court to (x) read into the Prepetition Term Loan Credit Agreement restrictions and prohibitions with respect to roll-ups in the context of debtor in possession financing and (y) ignore the clear intent of the drafters regarding the actual meaning of such provisions.  Putting aside whether a violation of the Prepetition Term Loan Credit Agreement warrants denying approval of the DIP Motion when the Debtors have no other alternative, the fundamental premise of the Minority Lender Group's argument is twofold:  (i) the TL Roll-Up

---

[16]  The Minority Lender Group attempts to inflate artificially the size of the roll-up by combining the two distinct roll-ups of 2024 Delayed Draw FILO Obligations and Prepetition Term Loan Obligations.  Citations to a 3.4:1 or 3.5:1 roll-up are incorrect and evidence either a deliberate misreading or woefully misguided understanding of the DIP Term Loan Facility.  *See* Minority Group Objection at ¶¶ 3, 43, 50-51.  The 2024 Delayed Draw FILO Loans and Prepetition Term Loans are governed by separate credit agreements (the Prepetition ABL-FILO Credit Agreement and Prepetition Term Loan Credit Agreement, respectively), benefit from liens of different priorities on the ABL Priority Collateral and Term Loan Priority Collateral and were lent by different lenders (*i.e.*, while there is overlap between the 2024 Delayed Draw FILO Lenders and the Prepetition Term Loan Lenders in the Ad Hoc Group, the two groups of lenders are not identical).  Finally, the 2024 Delayed Draw FILO Loans were provided at a different time and under notably different circumstances than the Prepetition Term Loans.  Whereas the Company entered into the Prepetition Term Loan Facility in October 2021, the 2024 Delayed Draw FILO Lenders lent the 2024 Delayed Draw FILO Loans three months prior to the Petition Date, in July 2024, to provide additional liquidity to bridge to a potential transaction with the Potential Buyer shortly before it became clear that an out-of-court transaction would not be actionable.

[17]  The Prepetition Term Loan Credit Agreement referenced in this Reply is attached hereto as **Exhibit F**.

violates Sections 2.12(a), 2.13 and 8.04 of the Prepetition Term Loan Credit Agreement and (ii) there are no applicable exceptions permitting the waiver or amendment of such provisions.

24.    First and foremost, the Prepetition Term Loan Credit Agreement is clear—certain restrictions do not apply in the context of debtor in possession financing.  Specifically, although the incurrence of priming debt is a "sacred" right requiring the approval of each affected Prepetition Term Loan Lender, unless an opportunity to participate in such priming debt is offered to all Prepetition Term Loan Lenders, priming debt incurred as *debtor in possession financing* is an exception and only requires the approval of "Required Lenders" under the Prepetition Term Loan Credit Agreement.  Likewise, even if the TL Roll-Up violates any of Sections 2.12(a), 2.13 or 8.04 (it does not, as described below), these provisions are amendable and waivable by "Required Lenders" under the Prepetition Term Loan Credit Agreement, and amendments and opportunities related thereto are not required to be offered to all Prepetition Term Loan Lenders in the context of debtor in possession financing as set forth in Section 10.01(h) of the Prepetition Term Loan Credit Agreement.[18]

25.    As acknowledged by the Minority Lender Group, Section 10.01(h) is what is customarily known in the financing market as a "Serta" blocker, which prevents non-pro rata exchanges and uptier transactions in the out-of-court context, unless offered to all lenders.  As is customary for "Serta" blockers, there is an exclusion in the context of debtor in possession financings.  It would be an unconventional reading of Section 10.01(h) to interpret the debtor in

---

[18]    Although any amendment or waiver of Section 2.12(a), 2.13 or 8.04 generally requires the written consent of each Prepetition Term Loan Lender directly and adversely affected thereby, Section 10.01(h)(i) contains an exception to this rule "in connection with any "debtor-in-possession" facility."  Prepetition Term Loan Credit Agreement § 10.01(h)(i).  In other words, in connection with entry into the DIP Term Loan Facility, the Ad Hoc Group, which constitutes "Required Lenders" under the Prepetition Term Loan Credit Agreement, was able to amend or waive Sections 2.12(a), 2.13 and 8.04.  *See id.* §§ 10.01 (setting forth the general rule of "Required Lender" consent for amendments and waivers); 10.01(h)(i) (describing the "sacred" right standard for amendments or waivers of Sections 2.12(a), 2.13 and 8.04, except in connection with DIP financing).

possession financing exclusion as applying only to the portion of the "Serta" blocker relating to the incurrence of priming debt but not to the portion relating to non-pro rata exchanges, which is the reading that the Minority Lender Group encourages the Court to adopt.  Moreover, if the intention of the Prepetition Term Loan Credit Agreement drafters was that the Prepetition Term Loan Lenders be able to participate in a "priming" debtor in possession financing facility on a non-pro rata basis under Section 10.01(h)(ii) but not be able to participate in a critical component of such facility (*i.e.*, a roll-up being provided in exchange for value given by the lenders under such facility) on a non-pro rata basis—which would be a very odd construct—this intent could have been stated clearly and directly in the debtor in possession financing-related exclusion.  Under the logic espoused by the Minority Lender Group, each Prepetition Term Loan Lender must roll up its Prepetition Term Loans on a ratable basis or else violate the Prepetition Term Loan Credit Agreement, irrespective of the amount of new money lent by such Prepetition Term Loan Lender (if any).  To be clear, under the Minority Lender Group's reading, Required Lenders can consent to a priming debtor in possession financing facility that is not open to all Prepetition Term Loan Lenders and provide new value in connection with that facility, yet the Prepetition Term Loan Lenders participating in such facility would be forced to share in any roll-up—notwithstanding the fact that the non-participating Prepetition Term Loan Lenders provide no new value—because the Prepetition Term Loan Credit Agreement would mandate that all Prepetition Term Loan Lenders share ratably in any roll-up.[19]

---

[19]    The Minority Lender Group also cites to a violation of Section 10.01(d) (which makes the amendment of Section 8.04 a "sacred" right); however, as discussed, the debtor in possession financing exception to the "sacred" rights treatment of Section 8.04 embodied in Section 10.01(h)(i) applies here.  *See* Minority Group Objection at ¶ 27.  In addition, the Minority Lender Group claims that the TL Roll-Up violates Section 10.07(b)(ii)(H) (governing the Debtors' purchase of Prepetition Term Loans during the continuance of an Event of Default), but the TL Roll-Up does not involve the purchase of Prepetition Term Loans by the Debtors, so this provision is inapplicable.  *See* Minority Group Objection at ¶ 26.

26.    Furthermore, notwithstanding the fact that Sections 2.12(a), 2.13 and 8.04 of the Prepetition Term Loan Credit Agreement are waivable, the TL Roll-Up does not violate these provisions, and any attempt to claim that it does stretches and mischaracterizes the language and intent of the Prepetition Term Loan Credit Agreement.  Each of these provisions clearly was drafted in contemplation of situations in which proceeds are distributed to the Prepetition Term Loan Lenders as repayment, and in satisfaction, of outstanding Prepetition Term Loan Obligations. These provisions ***do not*** account for—and have no applicability to—the automatic deemed exchange and conversion of Prepetition Term Loan Obligations into DIP Term Loan Obligations provided for in the Interim DIP Order and the proposed Final DIP Order.

27.    For example, Section 2.12(a) governs the mechanics of how payments under the Prepetition Term Loan Credit Agreement are to be made by the Prepetition Term Loan Borrower to the Prepetition Term Loan Lenders.  Section 2.12(a) does not contemplate any application in the context of a roll-up, as the provision covers payments made "hereunder" (*i.e.*, payments described within the four corners of the Prepetition Term Loan Credit Agreement) and outlines the process whereby the Prepetition Term Loan Borrower makes payments to the Prepetition Term Loan Agent, which, in turn, disburses to each Prepetition Term Loan Lender its "Applicable Percentage (or other applicable share as provided herein)."  Prepetition Term Loan Credit Agreement § 2.12(a).  This section of the Prepetition Term Loan Credit Agreement simply is not applicable here.

28.    Section 2.13 contemplates that a Prepetition Term Loan Lender that receives payment on account of its Prepetition Term Loans in excess of its ratable share of Prepetition Term Loans must turn over such excess funds by first notifying the Administrative Agent and then purchasing Prepetition Term Loans from the other Prepetition Term Loan Lenders to share the

excess payment with them.  *Id.* § 2.13.  Here, the DIP Term Lenders are not receiving any payments on account of their Prepetition Term Loans.  Rather, they are converting some of their Prepetition Term Loans into DIP Term Loans on a cashless basis in consideration for the New Money DIP Term Loans they are providing to the Debtors.  Indeed, the amount of the TL Roll-Up to which the Prepetition Term Loan Lenders are entitled is tied to the amount of new money they fund. Moreover, while the Minority Lender Group references Section 2.13, this provision on its face is not applicable, and it is unclear how such a provision would work in the context of the TL Roll-Up, since, pursuant to the TL Roll-Up, the Prepetition Term Loan Obligations are not actually paid down and satisfied.  They remain outstanding—now just as DIP Term Loan Obligations—so there is no excess payment that the Prepetition Term Loan Lenders receive that they could share with the other Prepetition Term Loan Lenders by purchasing their loans.  The same logic applies to Section 8.04, the waterfall provision, since there is no actual repayment of the Prepetition Term Loans, and all Prepetition Term Loan Obligations being rolled up remain outstanding, now as DIP Term Loan Obligations, until such later time as they are satisfied pursuant to a plan, a sale under Bankruptcy Code section 363 or further order of the Court.  *See id.* § 8.04.

29.     The inapplicability of these provisions is further underscored when considered in light of the clear language of the Interim DIP Order and the proposed Final DIP Order, which states:

> The DIP Term Loan Roll-Up Obligations shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Term Loan Lenders to fund amounts under the DIP Term Loan Facility and not as adequate protection for, or otherwise on account of, any 2024 Delayed Draw FILO Obligations or Prepetition Term Loan Obligations.

Interim DIP Order at ¶ I(e).[20]  The DIP Term Loan Roll-Up Obligations are being incurred and provided to the DIP Term Lenders as compensation for such DIP Term Lenders' agreement to provide new money to the Debtors and thereby serve the well-recognized purpose of incentivizing lenders to advance funds to debtors in possession on a postpetition basis.  Moreover, the DIP Term Loan Roll-Up Obligations are neither made "on account of" the Prepetition Term Loan Obligations, nor do they result in the Prepetition Term Loan Lenders' receipt of proceeds that satisfy the outstanding Prepetition Term Loan Obligations.  In sum, the Minority Lender Group's attempt to shoehorn the TL Roll-Up into provisions of the Prepetition Term Loan Credit Agreement that clearly were not drafted with a roll-up in mind and in direct contravention of the plain language of the Interim DIP Order is misleading and results in an absurd reading of the language and intent of the Prepetition Term Loan Credit Agreement.

30.    Beyond its incorrect reading of the Prepetition Term Loan Credit Agreement, the Minority Lender Group is also wrong about the remedy to which they are entitled for the alleged breach of the Prepetition Term Loan Credit Agreement as well as the standard governing the approval of debtor in possession financing.  Notably, if the TL Roll-Up resulted in a breach of the Prepetition Term Loan Credit Agreement (and, again, it does not), the Minority Lender Group's appropriate remedy would be to attempt to bring an action for breach of contract—not to recklessly hijack the final hearing on approval of the DIP Facilities, arguing that the DIP Term Loan Facility should be denied unless the Minority Lender Group's demands are met.  The Minority Lender

---

[20]    The Minority Lender Group asserts that the Debtors "have properly characterized the DIP Term Roll-Up as a payment of Prepetition Term Loans from the proceeds of the Term Loan Roll-Up DIP Loans," but the language of the Interim DIP Order controls over phrasing included in a term sheet.  *See* Interim DIP Order at ¶ 33; Minority Group Objection at ¶ 24.  Moreover, this reference to the use of proceeds of the Term Loan Roll-Up DIP Loans for purposes of the deemed repayment of the equivalent principal amount of the Prepetition Term Loan Obligations was included solely for administrative convenience and to clarify that the Prepetition Term Loan Obligations were not being double counted.

Group also nonsensically asserts that since (i) there is no Bankruptcy Code provision specifically governing roll-ups and (ii) the Minority Lender Group's exclusion from the TL Roll-Up allegedly runs afoul of a plan confirmation standard (there is no plan on file), then "the [TL] Roll-Up must comply with the Prepetition Term Loan Credit Agreement."  Minority Group Objection at ¶ 23. It goes without saying that this is decidedly *not* the standard for assessing the propriety of debtor in possession financing.

**B.      Entry into the DIP Term Loan Facility, Including the TL Roll-Up, Is an Exercise of the Debtors' Sound Business Judgment, and the Terms of the DIP Term Loan Facility Are Reasonable and Appropriate**

31.      The *actual* standard for the approval of debtor in possession financing, which the Debtors correctly set forth in the DIP Motion, is whether entry into such debtor in possession financing represents a sound exercise of a debtors' business judgment and does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").  Here, the question of whether the Debtors exercised their prudent business judgment in agreeing to the DIP Facilities is not even a close call, and it is telling that nowhere in the Minority Group Objection does the Minority Lender Group challenge the Debtors' exercise of their business judgment in determining that entry into the DIP Term Loan Facility is in the best interests of the Debtors' estates, which is the issue properly before the Court on the DIP Motion.

32.      In the weeks leading up to the Petition Date, the Debtors engaged in extensive, arm's-length negotiations with the Ad Hoc Group and Prepetition ABL Agent, on behalf of the Prepetition ABL Lenders, with respect to various restructuring alternatives for the Debtors. Murray DIP Decl. at ¶ 9.  As discussed above, it ultimately became apparent that an out-of-court solution would not be possible, and the parties pivoted to preparing for these chapter 11 cases,

including, among other things, negotiating the terms of the DIP Facilities.  *Id.*  Importantly, at a time when the Debtors' outlook was precarious and no other lenders or third parties were willing to offer the Debtors postpetition financing, the Ad Hoc Group stepped up and, with limited information and recognizing the potential risks related thereto, committed to partner with the Debtors and provide the funding and support that the Debtors required to commence these chapter 11 cases and thereby attempt to preserve their businesses as a going concern.

33.     The Minority Lender Group now asserts that its members must be permitted to participate in the DIP Term Loan Facility fully (retroactively with respect to the initial TL Roll-Up approved upon entry of the Interim DIP Order and in the final TL Roll-Up upon entry of the proposed Final DIP Order) on a pro rata basis, alleging that the Minority Lender Group was excluded because the DIP Term Loan Facility "is so attractive as an investment[] that the [Ad Hoc Group] want[s] to ensure they can fund more than their pro rata share."  Minority Group Objection at ¶ 50.  This assertion utterly mischaracterizes the facts and contradicts the Minority Lender Group's own actions.  Besides the Ad Hoc Group and Prepetition ABL Agent, no other potential financing sources—including the members of the Minority Lender Group—offered the Debtors a viable alternative to the DIP Facilities.  Besides the DIP Facilities, there is no alternative debtor in possession financing facility that the Debtors can access to fund their cases and preserve the value of the Debtors' estates.  Accordingly, the Minority Lender Group's argument that entry into the DIP Term Loan Facility is not an exercise of the Debtor's sound business judgment because they were excluded therefrom is untenable.

34.     Throughout the negotiations in respect of the DIP Term Loan Facility, and in exchange for the significant risk attendant to providing postpetition financing to the Debtors, the Ad Hoc Group insisted on the TL Roll-Up and limiting participation in the DIP Term Loan

Facility.  These terms were, and are, reasonable, appropriate and critically important to the Ad Hoc Group, despite the Minority Lender Group's baseless assertions to the contrary.  *See* Minority Group Objection at ¶¶ 7, 48.

35.    Moreover, the Minority Lender Group's transparent attempts to bully the Ad Hoc Group through overbroad and harassing discovery should not be countenanced.  Nor is it appropriate to condition approval of the DIP Term Loan Facility on the Minority Lender Group's full pro rata participation in the TL Roll-Up, as the Minority Lender Group insists, because (i) the Ad Hoc Group only agreed to provide postpetition financing to the Debtors in exchange for the terms for which they bargained in good faith and at arm's-length and (ii) the terms of the DIP Term Loan Facility fit together as one comprehensive package, not a bundle of individual provisions that can be swapped in and out at the whim of the Minority Lender Group.

36.    In sum, the Debtors commenced these chapter 11 cases with a critical need for liquidity to prevent interruption to their operations, fund their cases and avoid harm to the Debtors' estates, and the DIP Facilities are the Debtors' only potential source of postpetition financing to meet these needs.  *See* Murray DIP Decl. at ¶ 10.  Without the DIP Facilities, the Debtors' only alternative would be to liquidate, which would be to the detriment of all stakeholders.  For these reasons and based on the evidence put forth by the Debtors in connection with the "first day" hearing, entry into the DIP Facilities was and remains a sound exercise of the Debtors' business judgment.

## C.    The DIP Term Loan Facility Is Not a "Sub Rosa" Plan

37.    Throughout the Minority Group Objection, the Minority Lender Group makes flippant, unsupported statements, including that the DIP Term Loan Facility is a "sub rosa" plan, in furtherance of its request that the Court deny the DIP Motion.  Despite the Minority Lender Group's assertion, the DIP Term Loan Facility and the other transactions contemplated by the

Restructuring Support Agreement do not constitute an impermissible "sub rosa" plan.  This argument and the Minority Lender Group's attempt to distort the narrative of these chapter 11 cases, as evidenced throughout the Minority Group Objection, reflects a desperate attempt to rewrite the Bankruptcy Code and afford the Minority Lender Group leverage and credibility that do not exist.  The Minority Lender Group argues that the Court should deny the DIP Motion because the DIP Term Loan Facility does not meet the standards for approval of a chapter 11 plan, including but not limited to, treatment of classes of creditors under Bankruptcy Code section 1123(a)(4).  Minority Group Objection at ¶ 6.  The Minority Lender Group's attempts to apply confirmation standards to the DIP Term Loan Facility reveals the frivolous nature of their objection and weakness of their arguments.  It is simple:  the Bankruptcy Code's requirements for confirmation of a plan do not apply to approval of debtor in possession financing,[21] and the Minority Lender Group's argument that the DIP Term Loan Facility and the Restructuring Support Agreement "predetermine[]" the terms of a plan and "intentionally thwart" such requirements is factually incorrect and nothing more than a red herring.  Minority Group Objection at ¶ 45.

38.    A "sub rosa" plan is a "de facto plan of reorganization" that "has the effect of dictating the terms of a prospective chapter 11 plan," by "either (i) dispos[ing] of all claims against the estate or (ii) restrict[ing] creditors' rights to vote." *In re Energy Future Holding Corp.*, 527

---

[21] The Minority Lender Group misleadingly asserts that plan confirmation requirements in the Bankruptcy Code apply to debtor in possession financing because "courts only allow roll-ups if they are otherwise consistent with Bankruptcy Code objectives."  Minority Group Objection at ¶ 40.  However, the case the Minority Lender Group cites in support of this proposition, *Czyzewski v. Jevic Holdings Corp.*, 580 U.S. 451 (2017), is inapposite.  In *Jevic*, the Supreme Court held that a bankruptcy court could not approve distributions to creditors in a structured dismissal that violated the Bankruptcy Code's priority rules without creditor consent.  *Czyzewski*, 580 U.S. at 464-71.  However, in making this decision, the Supreme Court differentiated interim distributions that preserve a debtor's going concern value and permit a debtor to restructure and revitalize its business from the final distributions of the structured dismissal in question.  *Id*. at 468.  The Supreme Court recognized that interim distributions that may violate Bankruptcy Code priority rules, including roll-ups that convert prepetition claims into postpetition claims of lenders who finance a debtor's chapter 11 cases, have "significant Code-related objectives that the priority-violating distributions serve" and facilitate successful reorganizations for the benefit of stakeholders.  *Id*.

B.R. 157, 168 (D. Del. 2015) (quoting *In re Capmark Fin. Grp.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010)).  Neither the Restructuring Support Agreement nor the DIP Term Loan Facility purports to lock in the terms of a chapter 11 plan, as described below.  To the contrary, the Restructuring Support Agreement reflects a commitment by the Ad Hoc Group and the Debtors to negotiate the terms of a stalking horse credit bid in connection with the sale process.  The trajectory of these chapter 11 cases was, at the time they were filed, and remains, unknown.  As such, it is patently obvious that the DIP Term Loan Facility and the Restructuring Support Agreement are not an end run around chapter 11 confirmation requirements and do not constitute an impermissible "sub rosa" plan.

39.     As explained in the First Day Declaration, the Debtors filed these chapter 11 cases on an expedited basis as a result of a failed prepetition marketing process, declining monthly financial performances and a mounting liquidity crisis.  First Day Decl. at ¶¶ 6-10.  As the Debtors' business faced increasing turmoil and the necessity of filing chapter 11 cases in the near term became increasingly apparent, the Ad Hoc Group and the Debtors worked expeditiously to reach a solution that would prevent the Debtors' untimely liquidation.  The fruits of these labors are the Restructuring Support Agreement, which provides a framework for the Debtors' chapter 11 cases, and the DIP Facilities, including the DIP Term Loan Facility, which ensure that the Debtors have sufficient funds to do just that.  Neither dictates chapter 11 plan terms.  Instead, the Minority Group Objection fabricates imaginary plan terms and ignores the reality of what is transpiring in these chapter 11 cases.

40.     These chapter 11 cases were not prepackaged or prearranged with a fully baked plan and confirmation strategy.  Rather, on the eve of filing, the Debtors and the Ad Hoc Group executed the Restructuring Support Agreement, pursuant to which they agreed to work in good

faith to execute a stalking horse asset purchase agreement to potentially effectuate a transfer of ownership pursuant to a sale under Bankruptcy Code section 363. *See* Restructuring Support Agreement at §§ 5.01(a)(v), 8.01(e). The Restructuring Support Agreement does not contemplate definitively that a plan will be filed, solicited and confirmed or predetermine the Debtors' future owner. Although the Minority Group Objection contends that the DIP Term Loan Facility and the Restructuring Support Agreement predetermine the Minority Lender Group's recoveries under a plan in contravention of the "same class, same treatment" plan requirement, the reality is that the Debtors and the Ad Hoc Group entered these chapter 11 cases uncertain of the road ahead, and it remains unclear at this juncture whether a plan will ever be filed. The Restructuring Support Agreement does not have "the practical effect of dictating the terms of a prospective Chapter 11 plan" but rather comprises the "building block[s]" of a transaction and path toward restructuring and away from liquidation. *In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014).[22] As such, the Minority Lender Group's argument that the Restructuring Support Agreement and DIP Term Loan Facility effectively supplant a plan and its recovery scheme fails at the outset.

41.     Likewise, the DIP Term Loan Facility is not a mechanism by which the Minority Lender Group's recoveries are diminished in circumvention of plan confirmation requirements, which, again, do not apply to debtor in possession financing, which is assessed under the business judgment standard. To the contrary, the DIP Term Loan Facility was funded by the Ad Hoc Group

---

[22]   The Minority Lender Group cites to *In re Latam Airlines Grp., S.A.*, 620 B.R. 722 (Bankr. S.D.N.Y. 2020) for the proposition that debtor in possession financings can constitute sub rosa plans. Minority Group Objection at ¶ 45. However, the debtor in possession financing facility in *Latam* differs greatly from the DIP Term Loan Facility. In deciding that certain terms of the *Latam* debtor in possession financing facility amounted to an improper sub rosa plan, the bankruptcy court noted that (i) the facility locked in a 20% discount to plan value on stock issued to lenders in satisfaction of debtor in possession financing loans, if the debtors elected to distribute stock; (ii) pursuant to the credit agreement, all the debtors' shareholders were entitled to acquire stock at plan value; and (iii) the credit agreement required that only a "Company Approved Reorganization Plan" could be confirmed, or else an event of default would occur. *Id.* at 819-20. Although the *Latam* court found that these provisions indirectly affected creditor rights so as to give rise to a sub rosa plan, no comparable provisions are included in the DIP Term Loan Facility.

for the purpose of avoiding a freefall bankruptcy and liquidation that would have been catastrophic for all stakeholders.  In consideration for this infusion of cash, the Ad Hoc Group received certain benefits, including the TL Roll-Up.  These benefits, however, do not amount to a sub rosa plan.  They are simply lender incentives that cannot be said to have the same effect as a plan of reorganization.  *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 318 (9th Cir. BAP 1992) (rejecting the argument that an enhancement fee paid to a postpetition lender in connection with a sale of a debtor's assets was part of a sub rosa plan because it allowed a senior creditor to be paid more than the full amount of its claim at the expense of junior creditors and stating that, while the sale of assets may have had the effect of a plan, the enhancement fee did not).  To the extent that the Minority Lender Group objects to the contemplated transactions on the grounds that such transactions constitute a sub rosa plan, the Minority Lender Group should raise such objections at the sale hearing, if any, rather than at the hearing on final approval of the DIP Motion.  *See, e.g.*, *Coach USA, Inc.*, Case No. 24-11258 (MFW) (Bankr. D. Del. July 16, 2024) [Docket No. 309], Hr'g Tr. at 214:14-18 ("I agree with the debtor, however, that to the extent there is a challenge to this whole process that it's a sub rosa plan that is a sale objection and not appropriate for proceeding with bid protections or a DIP.").  The terms of the DIP Term Loan Facility, including the TL Roll-Up, prevented the collapse of the Debtors' businesses, are paving the way for a value-maximizing sale process that will allow the Debtors the opportunity to remain a going concern to the benefit of their employees and all other stakeholders and do not constitute an impermissible "sub rosa" plan.

## Conclusion

42.     For all the foregoing reasons and the reasons set forth in the DIP Motion, the Ad Hoc Group respectfully requests that the Court (i) overrule the Minority Group Objection, (ii) grant

the relief requested in the DIP Motion, (iii) enter the Final DIP Order and (iv) grant such other and

further relief as is just, proper and equitable.

Dated: November 14, 2024
      Wilmington, Delaware

Respectfully submitted,

*/s/ M. Blake Cleary*
**POTTER ANDERSON & CORROON LLP**
M. Blake Cleary (No. 3614)
L. Katherine Good (No. 5101)
Gregory J. Flasser (No. 6154)
Sameen Rizvi (No. 6902)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: bcleary@potteranderson.com
      kgood@potteranderson.com
      gflasser@potteranderson.com
      srizvi@potteranderson.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Philip C. Dublin (admitted *pro hac vice*)
Naomi Moss (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: pdublin@akingump.com
      nmoss@akingump.com

- and -

Marty L. Brimmage, Jr. (*pro hac vice* pending)
Lacy M. Lawrence (*pro hac vice* pending)
Rachel Biblo Block (No. 6012)
2300 N. Field St., Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com
      llawrence@akingump.com
      rbibloblock@akingump.com

*Counsel for the Ad Hoc Group*