UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Chapter 11
                                    . Case No. 24-12391 (CTG)
AMERICAN TIRE DISTRIBUTORS          .
INC., *et al.,*                     . (Jointly Administered)
                                    .
                                    . Courtroom No. 7
                                    . 824 Market Street
            Debtors.                . Wilmington, Delaware 19801
                                    .
                                    . Thursday, November 21, 2024
. . . . . . . . . . . . . . . .  2:00 p.m.

TRANSCRIPT OF ZOOM HEARING
BEFORE THE HONORABLE CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Laura Davis Jones, Esquire
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          919 North Market Street
                          17th Floor
                          Wilmington, Delaware 19801

                          -and-

                          Chad J. Husnick, Esquire
                          KIRKLAND & ELLIS, LLP
                          KIRKLAND & ELLIS INTERNATIONAL, LLP
                          333 West Wolf Point Plaza
                          Chicago, Illinois 60654

(APPEARANCES CONTINUED)

Audio Operator:           Teasha Marsh, ECRO

Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Ad Hoc Group
of Term Loan Lenders:          Philip C. Dublin, Esquire
                               AKIN GUMP STRAUSS HAUER & FELD, LLP
                               One Bryant Park
                               Bank of America Tower
                               New York, New York 10036

For the Official
Committee of
Unsecured Creditors:           Benjamin W. Butterfield, Esquire
                               MORRISON & FOERSTER, LLP
                               250 West 55th Street
                               New York, New York 10019

For Wells Fargo Bank,
National Association:          Daniel F. Fiorillo, Esquire
                               OTTERBOURG, P.C.
                               230 Park Avenue
                               New York, New York 10169

INDEX

MOTIONS:                                                        PAGE

Agenda
Item 1:    Motion of Debtors for Entry of Interim and        4
           Final Orders (I) Authorizing the Debtors to
           (A) Obtain Post-petition Financing and (B)
           Utilize Cash Collateral, (II) Granting Liens
           and Superpriority Administrative Expense
           Claims, (III) Modifying the Automatic Stay,
           (IV) Scheduling a Final Hearing, and (V)
           Granting Related Relief
           [Filed 10/23/2024] (Docket No. 16)

           Court's Ruling:                                    15

Transcriptionist's Certificate                                24

(Proceedings commenced at 2:00 p.m.)

THE COURT:  Good afternoon, all.

This is Judge Goldblatt.  We are on the record in, In re American Tire Distributors, Inc., which is Case Number 24-12391.

We're proceeding this afternoon by way of Zoom and I'm happy to pass the virtual podium to counsel for the debtor to report on where things stand, so Mr. Husnick, the floor is yours.

MR. HUSNICK:  Good afternoon, Your Honor.  Chad Husnick with Kirkland & Ellis, appearing on behalf of the ATD debtors.

Your Honor, first and foremost, thank you for letting us appear virtually this afternoon and for giving us this additional time this week so we could work with our various stakeholders, including the objecting parties to bring resolution to the DIP.

I am pleased to report that I believe we have full resolution on all issues presented in the DIP.  I'll summarize very briefly what the change to the overall structure was that resulted in consensus and then we can decide to go from there.

The changes are very narrow.  Change number one is to remove, and really the only change, is to remove the term loan roll-up piece of the DIP facility, just the term loan

roll-up.  The FILO, the 2024 FILO, which is approximately $90 million, which was rolled up on the interim order, that will remain in place, but does not present the same issues that were grappled with at the DIP hearing earlier this week, Your Honor.

With respect to the term loan roll-up piece that is being removed, I want to be clear that it is being retroactively, such that even the portion that was rolled up at the interim stage will be not rolled up as a result of these changes.

We filed -- and last, and probably most importantly, there are no changes to the overall economics and pricing as a result of this change.  So, overall, the terms have improved for the debtors' estates from our perspective.  So, Your Honor, with that, I believe that, in large part, mooted the argument or the objection of the King & Spalding minority Ad Hoc Group.  And we've confirmed with them that the changes that were reflected in the order, as filed with the Court last night, do, in fact, resolve their objections and that there are no additional changes to the order needed.

I believe we also have, obviously, agreement from the DIP lenders themselves, that is the group represented by Akin Gump, Mr. Dublin and Mr. Brimmage, as well as the ABL lenders, represented by the Otterbourg firm.

And I think, finally, the Official Committee, which did not have an objection due to changes that have already been made, I don't believe we inadvertently generated an objection from the Committee, but I'll let them separately confirm.  I see Mr. Butterfield nodding or shaking his head.

And so, with that, Your Honor, the debtors would respectfully request, subject to any comments Your Honor has, that the Court enter the order, authorizing the DIP as modified.

THE COURT:  Okay.  So, Mr. Husnick, so, first of all, thank you for that explanation; that's very helpful.  I did work my way through the redline, and so I just want to make sure I'm following this correctly.

Essentially, with respect to the term loan DIP, that remains in place and is going forward on its original terms with the original lenders of the term loan DIP, just without the roll-up.  Is that essentially -- and I appreciate the point, the retroactive points, with respect to overriding what we said in the interim order.

Do I have that --

MR. HUSNICK:  That is correct.

You have that correct, Your Honor.  Sorry, I was talking over you.

THE COURT:  No worries.

Okay.  Mr. Dublin, is that consistent with your

understanding of what's happening here?

MR. DUBLIN:  Good afternoon, Your Honor.

Phil Dublin, Akin Gump Strauss Hauer & Feld, on behalf of the Majority Ad Hoc Group of those DIP lenders.

Yes, Your Honor, but with the caveat that, as you'll recall during the testimony on Tuesday -- I think it was Tuesday -- our days seem to run together these days.

THE COURT:  Yeah, you too, huh?

(Laughter)

MR. DUBLIN:  We did have Sound Point that accepted our prior settlement offer.  So, they were not a lender under the DIP previously, but we'll be working them into this because we're not going to take away an opportunity from somebody that was on board with the settlement.

THE COURT:  Okay.  Understood.

MR. DUBLIN:  But other than that, that is correct.

THE COURT:  Okay.  Let me hear if there's any other party in interest that would like the opportunity to be heard.

Mr. Butterfield, I see your camera is on.  Anything from the Committee's perspective?

MR. BUTTERFIELD:  Good afternoon, Your Honor.  Ben Butterfield of Morrison & Foerster, proposed counsel to the Committee.

It wasn't clear to me whether we were planning to

walk through the order.  There was one comment we wanted to make.  We also wanted to just (indiscernible) a little bit more about the order generally.

Is now a good time we could do that or we could wait until we walk through the order.

THE COURT:  Mr. Husnick, I mean, look, the order is on the docket and I've reviewed it.  Obviously, if anyone wants to walk through it and make whatever record they think appropriate, I'm more than happy to permit that.  I'm not going to mandate it, but if you've got -- so, why don't we ask, Mr. Husnick, were you otherwise planning ongoing through the changes?

(No verbal response)

THE COURT:  No, okay.

So, Mr. Butterfield, to the extent that you've got comments with respect to the order, I'm more than happy to pull open the redline and give you the chance to be heard, with respect to whatever provisions concern you.

MR. BUTTERFIELD:  Okay.  Yeah, so just to be clear, we don't have an objection, right.  But there was one section that we wanted to talk about just on the record to kind of confirm everyone's understanding as to what we intended.  But I also thought it would helpful just to make a few comments about the DIP, generally.

THE COURT:  Absolutely.

MR. BUTTERFIELD:  Okay.  Well, I'll start by thanking the parties for reaching a consensual resolution on the DIP.  I think everyone understands the importance of getting this financing in place and moving the cases forward and I'm glad we resolved our differences, you know, particularly, with respect to the minority lenders.

You know, we talked a lot about the DIP lenders in this case, $250 million of new money.  There is another group that is providing the debtors and their estates with hundreds of millions of dollars of financing during the case, right.  You all know who that is; it's the tire manufacturers, the post-petition vendors.  That's $500 million or more -- probably more -- for goods and services they're providing to be paid on credit.  And, you know, as Mr. Husnick said at the first day hearing or, sorry, the second day hearing on Tuesday, you know, these vendors are the lifeblood of the debtors' businesses.

And so when the Committee got involved, our number one concern was making sure that this was not one of those cases where post-petition creditors are going to be stranded, you know, not on our watch.  And so, you know, we flagged this in our initial objection; unfortunately, we had to file it.  We were hoping to get it resolved in advance.  We weren't able to.

But I'm now pleased to report that the debtors,

the lenders, and the Committee, we're all on the same page. However this case is resolved -- and this is really a message for vendors -- however this case is resolved, whether through a credit bid, whether through a third-party sale, through a plan, the goal of all the parties is that ordinary course operational liabilities will be assumed or paid in cash.

And on that basis, on that representation between the lenders and the debtors, we really got comfortable with the financing.  It was going -- it was a huge roadblock for us when we first saw the order.  So I want to thank Phil and Mr. Dublin and also the Debtors' counsel for helping us put that concern to bed.

A few key changes I just want to flag for people on the record.  The 506(c) waiver -- that's paragraph 15 -- we have qualified that waiver with the assumption or payment of ordinary course operational liabilities.  So for the waiver to kick in, it is subject to the payment, assumption or payment of those liabilities.

This kind of goes to the vendors' point.  If we weren't -- if we didn't have this qualification, (indiscernible), obviously, could put the vendors in a horrible spot.

We -- I know we got rid of a portion of the roll-up, the term loan portion.  There still is a portion of the roll-up that remains; that's the ABL roll-up.  The ABL

lenders have agreed -- and you'll see this in Section 4(a) of the order -- the ABL lenders have agreed that there will be no cross-collateralization, with respect to the roll-up.  You know, we thought that was critical to preserving potential recovery for unsecured creditors in the case.

And our latest point for the new-money DIP, the DIP lenders have agreed to take reasonable steps to marshal away from unencumbered assets; that's in paragraph 14.

And that brings us to the paragraph that we want to talk about on the record, paragraph 30.  Your Honor, these DIP orders, they keep getting longer and longer.  I think this one is 368 pages long.  The actual order itself is 86 pages long.  And, you know, we understand there are completely legitimate reasons for that, for the lengthy orders, but when you keep adding language, you always have the possibility of unintended consequences.

So paragraph 30, this is effectively a covenant, and I'll give Your Honor a second to get there.

THE COURT:  So, I'm sorry, you said it's paragraph 30 or page 30?

MR. BUTTERFIELD:  Paragraph 30.  So it's page 75 on the version we're looking at, Docket 309.

THE COURT:  On the redline?

MR. BUTTERFIELD:  Not the redline.  I was looking at the clean.

THE COURT:  I see.

Okay.  Well, you said it's paragraph 30.  I can find that.  They are in numerical order, which helps.

MR. BUTTERFIELD:  They are in numerical order; that is correct.

THE COURT:  Okay.  So the paragraph that's a limitation on the use of DIP facilities?

MR. BUTTERFIELD:  Yeah.  And, look, we know what this provision is, right.  This is the covenant that says the debtors won't use the proceeds of the DIP or their cash or their assets to finance a challenge.  And there's a challenge budget, which we agreed to, so we're okay with the concept, generally, no problem.

THE COURT:  Yep.

MR. BUTTERFIELD:  But the language itself is really broad and what we focused on was paragraph 30(a), which effectively says, and, you know, I'm pulling out the bit, the portions that we were concerned about.  So it says that, you know, (indiscernible) it basically says the debtors' assets will not be used to -- and then it goes to (A), investigate analyze... two of the things you can't do are object to or contest.

And then if you track all the way down to the end of (A), right before (B), it says you can't object to or contest any other rights or interests of any of the DIP

agents, the DIP secured parties, or the prepetition secured parties.

And, look, I don't think this is what was intended. I think was kind of belt-and-suspenders language that kind of grew over time. But if you read that language, literally, they're objecting to the rights or the interests of the lenders is not -- the fees incurred for that purpose can't be compensated, rights or interests of the lenders.

You know, maybe we're worried about nothing, and that's what we heard from the DIP lenders, but that could include this DIP -- you know, our objection to the DIP, to the DIP motion, objecting to a sale or a plan, objecting to adequate protection. Just think the things that a Committee needs to do -- to perform its fiduciary duties.

And so we spoke to the DIP lenders. We've been assured that's not what this provision is intending and we're happy to proceed on that assurance, but we thought it was important to put it on the record while we had the opportunity.

THE COURT: Okay. Very well.

Anyone wish to be heard on that topic?

MR. DUBLIN: Your Honor, Phil Dublin, again.

We confirm we're not looking to prevent the Committee from doing their job. The purpose of the budget limitation is with respect to the challenges, to the debt,

and the like, which are customary.

So Mr. Butterfield and his colleagues, or, actually, the Committee should feel comfortable that they should -- they can go forth and (indiscernible) their fiduciary duties.

And everybody, obviously, reserves all rights with respect to fee applications and the like, but we're not looking to limit what they do in furtherance of their obligations.

THE COURT:  Okay.  Mr. Butterfield, we're clear there?

MR. BUTTERFIELD:  We are.  Thank you, Your Honor.

And thank you to Mr. Dublin and Ms. Moss at the Akin firm and to the Kirkland team.

And that's it for us, thank you.

THE COURT:  Okay.  Very well.  Thank you.

Mr. Fiorillo, I see you've turned on your camera. Let me give you a chance to be heard.

MR. FIORILLO:  Thank you, Your Honor.

For the record, Dan Fiorillo from Otterbourg P.C., counsel for the DIP ABL agent, Wells Fargo Bank, N.A.

Your Honor, I'll be very brief, I've just got a lot to say since we've been (indiscernible) and an outside observer, an interested outside observer, with respect to the resolution associated with the term loan DIP.

I just want to address one point that the Committee counsel raised in his quick review of the DIP order regarding the 506(c) waiver section of the order.  I believe it's paragraph 15 in the final version.

The qualification on the assumption and payment of ordinary course operational liabilities, that's with respect to the term loan obligations and the term loan collateral that secure those obligations.  It was not intended to apply to the ABL.  The ABL lenders are not looking to assume or credit bid any operating obligations in connection with this case.  So that was, just call it a "clarification."  I just wanted to make sure it was clear on the record.

THE COURT:  Okay.  Any other party that wants to be heard with respect to that matter?

(No verbal response)

THE COURT:  Okay.  Thank you, Mr. Fiorillo.

MR. FIORILLO:  Thank you.

THE COURT:  Is there any other party that would like to be heard with respect to approval of the DIP in the form of the order that has been docketed?

(No verbal response)

THE COURT:  Okay.  Seeing no objection, I have had a chance to review the revised order and I am delighted to approve this DIP and allow this case to proceed in an orderly and appropriate manner.

Let me say just a few things.  First of all, I want to thank the parties.  I appreciate the way that our hearing on Tuesday unfolded.  It threw a bit of a wrench into some folks' planning and required some amount of scrambling and hard work to put everything back together again and everyone's spirit of cooperation and good faith in getting to this consensual and appropriate resolution is very much appreciated by me.  It's, I think, you all have my thanks and appreciation for the good work you've done over the last however many hours.

You know, on reflecting on Tuesday, two things that I aspire to be somewhat more patient with the parties than I may have been.  So, to the extent that I was short with anyone, I want to apologize for that and thank you all for indulging me.  I do want to run the court in a way that moves the cases forward, but also doesn't -- in which I'm not snapping at anyone.  So I appreciate everyone's patience in that regard.

You know, with respect to -- look, I only want to say very, very briefly, the following.  I heard, you know, Mr. Husnick's description that the economics of this are marginally better for the estate than the prior deal.  And just to be clear how I see my job, I don't think I'm here to alter the negotiating leverage or trying to rebid anybody in terms of the economics of what is negotiated before you come

here, based on what everyone's rights are under applicable law and your respective documents.

I know that, certainly, there are some who might not share my view, but my basic view is that this is a market process and that I'm not here to alter the negotiating leverage, only within very broad parameters to satisfy myself that it's within the bounds of commercial reasonableness and that the debtor is doing the best they can, you know, as an fiduciary, to do right by the estate.

My concern, you know, wasn't to alter the leverage; it was animated by a point raised by the objectors that I was being asked to enter an order that affected their rights and, you know, that issue has now been resolved.  So I don't need to say, you know, much more about it.

Just so that I'm clear, though, I do want to just say, look, I meant what I said in TPC in that in a circumstance in which there's a document that just has a hole in it and it creates an opportunity for a majority to take advantage of a minority group within the context of a loan agreement, you know, I think, as I said there, that sort of is what it is, that these are sophisticated parties.  They can fairly be held to the terms of their agreement.

I said in TPC that, you know, lenders under a syndicated loan agreement do not need to behave as musketeers.  I think that there is, you know, little, if any,

work to be done for the duty of good faith and fair dealing in the context of loan agreements negotiated among sophisticated parties.  And that what separated this case from that was my reading of the actual language.

And so I don't think I need to use -- to say more than that, but I just wanted to be clear that to the extent anyone viewed these determinations as inconsistent, I, at least, think that it's really all the same principle, which is the documents sort of say what they say.

Okay.  So in terms of mechanics, is the -- has the order been uploaded or should we await it being uploaded?  I want to make sure we get it entered promptly and that we not be disruptive.

I appreciate the really hard work that folks are doing to make sure that this process minimized the disruption to the business and I want to make sure that we're doing our fair share to keep things going.

MR. HUSNICK:  Your Honor, Chad Husnick with Kirkland.

I will actually work with the Pachulski firm to make sure it's appropriately uploaded.  I know we filed it. I'm not certain that we uploaded that to chambers.

THE COURT:  Okay.  All right.  Terrific.

As long as you can work with Delaware counsel to make sure that that is uploaded in a manner that allows

chambers to go ahead and push the button, that would be terrific.

Ms. Jones?

MS. DAVIS JONES:  Yes, Your Honor, that is in progress.

THE COURT:  Okay.  Terrific.

Look, thanks, all, to everyone for the good work that led to this resolution.

From the debtors' perspective, Mr. Husnick, is there anything further?

MR. HUSNICK:  Your Honor, at the risk of burning all the goodwill that we built this morning, I wanted to inform Your Honor that I think we are largely resolved on issues or objections that we received to the bidding procedures that are scheduled for next Tuesday.

THE COURT:  Okay.  You haven't burned goodwill yet.

MR. HUSNICK:  Cognizant of the fact that it's Thanksgiving week and that the hearing is going to be at 3:00 in the afternoon on Tuesday, I was going to inquire if the Court would mind holding that hearing virtually, obviously, subject to me making sure that I lock down the deal that I believe -- deal in principle -- that I believe has been negotiated with both objectors.

THE COURT:  Okay.  So let me say the following.

Let's -- to the -- let me start with this.  To the extent the deal is, in fact -- all you're asking me to do is enter an agreed order and putting clarifications on the record, or the like; there, you're not even asking for anything.  I'm always happy to do a consensual hearing by Zoom.

The issue is what if it's not consensual and my usually view is contested motions, you know, we do it the old-fashioned way; we come to court.

Let me ask -- let me suggest the following.  To the extent it's consensual, we don't have an issue.  I appreciate that this is a holiday week.  I'm probably not comfortable doing an evidentiary hearing by Zoom, but if there are pure legal points that require a conversation with lawyers and that's all it needs -- we don't have any -- everyone agrees that there are no disputed questions of fact, I'm happy to permit an argument to take place over Zoom under the circumstances.  I don't normally do that, but in view of the circumstances, I would do that.

But if we are going to have an evidentiary hearing, I'm going to be a pain for everyone and make you come to Delaware and do it in person.

MR. HUSNICK:  That sounds very fair, Your Honor, and I'd say (indiscernible) to make sure that doesn't happen.

THE COURT:  That would be great.

So, if I said that it could only be by Zoom if it

were fully consensual, would that change your incentives?

MR. HUSNICK:  Your Honor, I'm going to resolve everything.

THE COURT:  I'm kidding.

MR. HUSNICK:  Sort of, (indiscernible) is, we're going to get it done.

THE COURT:  For the record, I was joking and I appreciate everyone's hard work to resolve things that are properly resolved without the Court's involvement.

I am, when necessary, really happy to do my job and resolve those disputes that you bring to me.

Okay.  From the debtors' perspective, anything further?

MR. HUSNICK:  Nothing further, Your Honor.  Thank you very much for your time.

THE COURT:  Okay.  Any other party in interest that just --

MR. DUBLIN:  Your Honor, just --

THE COURT:  Yes, go ahead.

MR. DUBLIN:  -- just one question.

In my personal calendar I had the hearing at 10 o'clock in the morning on Tuesday.  I just want to make sure that we have the right time.

THE COURT:  That's a fair question.

MR. HUSNICK:  (Indiscernible.)

MR. DUBLIN:  (Indiscernible) that time?

MR. HUSNICK:  Yeah.

MR. DUBLIN:  Okay.

THE COURT:  Hold on.  Let's see what's on my calendar, not that that's any more important than anybody else's.

(Pause)

THE COURT:  On Tuesday, I have it at 3 o'clock, yes.

MR. DUBLIN:  Okay.  Thank you for the clarification.

THE COURT:  All right.  Very well.

Okay.  Is there any other party in interest that would like to be heard on any other matter while we are here this afternoon?

(No verbal response)

THE COURT:  Okay.  Seeing no one, again, thanks again to all of you for the very good work in getting to this commercially sensible and appropriate resolution.  We are very happy to enter that order.

If an issue arises that requires our attention, you all know how to reach us; if not -- well, if I don't get to see you on the Tuesday before Thanksgiving, I hope everyone has a good holiday.  And if I do get to see you on the Tuesday before Thanksgiving, I'll say I look forward to

seeing you all then.

So, with that, we're adjourned.  Thank you.

COUNSEL:  Thank you, Your Honor.

(Proceedings concluded at 2:24 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

/s/ William J. Garling                    November 21, 2024

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable