# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AMERICAN TIRE DISTRIBUTORS, INC., *et al.*,[1] | ) | Case No. 24-12391 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE
## AMENDED JOINT CHAPTER 11 PLAN OF AMERICAN
## TIRE DISTRIBUTORS, INC. AND ITS DEBTOR AFFILIATES

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

Anup Sathy, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
David R. Gremling (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           anup.sathy@kirkland.com
                     chad.husnick@kirkland.com
                     dave.gremling@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward A. Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:           ljones@pszjlaw.com
                     tcairns@pszjlaw.com
                     ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors
In Possession*

Dated:  February 18, 2025

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' federal tax identification numbers, are American Tire Distributors, Inc. (4594); ATD New Holdings II, Inc. (4985); ATD New Holdings III, Inc. (0977); ATD New Holdings, Inc. (3406); ATD Sourcing Solutions, LLC (5225); ATD Technology Solutions Inc. (N/A); FLX FWD Logistics, LLC (3334); Hercules Tire International Inc. (N/A); Terry's Tire Town Holdings, LLC (7409); The Hercules Tire & Rubber Company (3365); Tire Pros Francorp, LLC (1813); Tirebuyer.com, LLC (9093); and Torqata Data and Analytics LLC (4992). The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 12200 Herbert Wayne Court, Huntersville, NC 28078.

| IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT |
|---|

**THE DEADLINE TO VOTE ON THE PLAN IS
[March 24, 2025] at 4:00 p.m. (prevailing Eastern Time)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY
RECEIVED</u> BY DONLIN, RECANO & COMPANY, LLC. ON OR BEFORE THE
VOTING DEADLINE AS DESCRIBED HEREIN.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE
STATEMENT TO CERTAIN HOLDERS OF CLAIMS AGAINST THE DEBTORS FOR
PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *AMENDED
JOINT CHAPTER 11 PLAN OF AMERICAN TIRE DISTRIBUTORS, INC. AND ITS
DEBTOR AFFILIATES.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE
RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO
DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER
ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE
INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK
FACTORS DESCRIBED IN <u>ARTICLE XII</u> HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN CREDITORS
OF THE DEBTORS THAT ARE SIGNATORIES TO THE RSA, INCLUDING THE
CONSENTING PREPETITION TERM LENDERS.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING
SOLICITED TO <u>VOTE TO ACCEPT</u> THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS
OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX,
OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT,
THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.
FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE
INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT
CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS,
SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN
ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS
RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN.
ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND
ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE
EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH
DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH
ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR
DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT
AND THE TERMS AND PROVISIONS OF THE PLAN, THE RSA, THE ASSET

PURCHASE AGREEMENT, THE SALE ORDER, OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE OR DESCRIBED HEREIN, THE PLAN, THE RSA, THE ASSET PURCHASE AGREEMENT, THE SALE ORDER, OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.

MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE. THE DEBTORS RECOMMEND THAT INTERESTED PARTIES CONSULT THEIR OWN LEGAL COUNSEL.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN

**IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THE DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED OR WAIVED.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE**

BOUND BY THE TERMS OF THE PLAN AND THE WIND-DOWN TRANSACTIONS CONTEMPLATED THEREBY.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING <u>ARTICLE XII</u> OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTOR'S FUTURE PERFORMANCE.    THERE   ARE   RISKS,   UNCERTAINTIES,   AND   OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE   RISKS,   UNCERTAINTIES,   AND   FACTORS   MAY   INCLUDE   THE FOLLOWING: THE DEBTORS' ABILITY TO CONSUMMATE THE ASSET SALE AND CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR THE ASSET SALE IS NOT CONSUMMATED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS

**ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; AND ADVERSE TAX CHANGES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY WIND-DOWN TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

# <u>TABLE OF CONTENTS</u>

**Page**

I.     **INTRODUCTION.**................................................................................................................1

II.    **PRELIMINARY STATEMENT.**........................................................................................1

III.   **OVERVIEW OF THE PLAN.**............................................................................................4

IV.   **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.** ..........................................................................................................................5

    A.    What is chapter 11?................................................................................................5

    B.    Why are the Debtors sending me this Disclosure Statement? ...............................5

    C.    Am I entitled to vote on the Plan?.........................................................................5

    D.    What is the Asset Sale and how does it relate to the Plan? ...................................6

    E.    What will I receive from the Debtors if the Plan is consummated? .......................7

    F.    Are any regulatory approvals required to consummate the Plan? .........................8

    G.    What happens to my recovery if the Plan is not confirmed or does not go effective? .....................9

    H.    What is the deadline to vote on the Plan? .............................................................9

    I.    How do I vote for or against the Plan?..................................................................9

    J.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?..................................................................................................9

    K.    What are the sources of Cash and other consideration required to fund the Plan?.........................10

    L.    Is there potential litigation related to the Plan?..................................................10

    M.    Will the final amount of Allowed Term Loan Deficiency Claims and Allowed General Unsecured Claims affect the recovery of Holders of Allowed Term Loan Deficiency Claims and Allowed General Unsecured Claims under the Plan? .................................................10

    N.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, or Priority Tax Claim? ................................................11

        1.    Administrative Claims Not Assumed by the Purchaser...................................11

        2.    Professional Fee Claims...................................................................................12

        3.    Priority Tax Claims...........................................................................................13

        4.    Statutory Fees. .................................................................................................14

        5.    Restructuring Expenses.....................................................................................14

O.    What is the effect of the Plan on the Debtors' ongoing business? ................................14
P.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............14
Q.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is
       the Confirmation Hearing set to occur? ................................................................15
R.    What is the purpose of the Confirmation Hearing? ..............................................16
S.    Whom do I contact if I have additional questions with respect to this Disclosure
       Statement or the Plan? ..................................................................................16
T.    Who Supports the Plan? ..................................................................................17
U.    Could subsequent events potentially affect recoveries under the Plan? ....................17
V.    Do the Debtors recommend voting in favor of the Plan? ......................................17

V.    SOLICITATION AND VOTING PROCEDURES. ................................................17
A.    Holders of Claims Entitled to Vote on the Plan. ................................................18
B.    Voting Record Date. ......................................................................................18
C.    Voting on the Plan. ........................................................................................18
D.    Ballots Not Counted. ......................................................................................19
E.    Notices of Non-Voting Status. ..........................................................................20
F.    Confirmation Hearing. ....................................................................................20

VI.    THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW. ................21
A.    ATD's Corporate History. ................................................................................21
B.    ATD's 2018 Restructuring. ..............................................................................21
C.    Debtors' Business Operations. ..........................................................................22
       1.    Products and Value-Added Services. ........................................................22
       2.    Distribution System and Inventory Management and Routing Technology. ..........24
       3.    Customer Base. ..................................................................................25

VII.    THE COMPANY'S ORGANIZATIONAL AND CAPITAL STRUCTURE. ....................25
A.    Organizational Structure. ................................................................................25
B.    Prepetition Capital Structure. ..........................................................................25
       1.    The ABL Credit Agreement. ..................................................................26
       2.    The Term Loan Credit Agreement. ..........................................................26

VIII.    EVENTS LEADING TO THESE CHAPTER 11 CASES. ......................................27
A.    Prepetition Challenges. ....................................................................................27
       1.    Inflation and the COVID-19 Pandemic. ..................................................27
       2.    Market Changes. ................................................................................28
B.    The Prepetition Marketing Process. ....................................................................29
C.    Prepetition Initiatives. ....................................................................................30
       1.    Corporate Governance Efforts. ..............................................................30
       2.    The RSA. ..........................................................................................30

| | | | |
|---|---|---|---|
| **IX.** | **EVENTS OF THE CHAPTER 11 CASES.** | | **30** |
| | A. | First Day Relief. | 30 |
| | B. | Appointment of Official Committee of Unsecured Creditors. | 31 |
| | C. | DIP Financing. | 31 |
| | D. | Bidding Procedures, the Postpetition Marketing Process, and the Asset Sale. | 32 |
| | E. | Special Committee Investigation. | 34 |
| | F. | Second Day Relief and Debtors' Other Motions. | 45 |
| | G. | Rejection of Certain Executory Contracts and Unexpired Leases. | 45 |
| | H. | The Debtors' Professionals' Retention Applications. | 47 |
| | I. | Expected Timetable of the Chapter 11 Cases. | 47 |
| | J. | Bar Date Motion. | 48 |
| | K. | Schedules and Statements. | 49 |
| | L. | Removal Extension. | 49 |
| | M. | Section 365(d)(4) Extension Motion. | 49 |
| | N. | Exclusivity Extension Motion. | 49 |
| | O. | Litigation Matters. | 49 |
| | | | |
| **X.** | **SUMMARY OF THE PLAN.** | | **50** |
| | A. | Classification and Treatment of Claims and Interests. | 50 |
| | | 1. Classification of Claims and Interests. | 50 |
| | | 2. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. | 50 |
| | B. | Means for Implementation of the Plan. | 51 |
| | | 1. General Settlement of Claims and Interests. | 51 |
| | | 2. Asset Sale. | 51 |
| | | 3. Wind-Down. | 51 |
| | | 4. Corporate Action. | 57 |
| | | 5. Cancellation of Securities and Agreements. | 57 |
| | | 6. Effectuating Documents; Further Transactions. | 58 |
| | | 7. Exemption from Certain Taxes and Fees. | 58 |
| | | 8. Preservation of Causes of Action. | 59 |
| | C. | Treatment of Executory Contracts and Unexpired Leases. | 60 |
| | | 1. Assumption and Rejection of Executory Contracts and Unexpired Leases. | 60 |
| | | 2. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 61 |
| | | 3. Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 61 |
| | | 4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 62 |
| | | 5. Insurance Policies. | 63 |
| | | 6. D&O Liability Insurance Policies. | 64 |
| | | 7. Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 64 |
| | | 8. Reservation of Rights. | 64 |
| | | 9. Nonoccurrence of Effective Date. | 65 |
| | D. | Settlement, Release, Injunction, and Related Provisions. | 65 |
| | | 1. Term of Injunctions or Stays. | 65 |
| | | 2. Release of Liens. | 65 |
| | | 3. Releases by the Debtors. | 66 |
| | | 4. Releases by Holders of Claims and Interests. | 67 |
| | | 5. Exculpation. | 69 |
| | | 6. Injunction. | 69 |
| | E. | Conditions Precedent to Confirmation and the Effective Date. | 70 |
| | | 1. Conditions Precedent to the Effective Date. | 70 |
| | | 2. Waiver of Conditions. | 72 |
| | | 3. Substantial Consummation. | 72 |
| | | 4. Effect of Nonoccurrence of Conditions to the Effective Date. | 72 |

| XI. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. | 72 |
|---|---|---|
| | A. | Confirmation Hearing. | 72 |
| | B. | Confirmation Standards. | 73 |
| | | 1. | Requirements of Section 1129(a) of the Bankruptcy Code. | 73 |
| | | 2. | Best Interests of Creditors—Liquidation Analysis. | 73 |
| | | 3. | Feasibility. | 76 |
| | | 4. | Valuation. | 76 |
| | C. | Acceptance by Impaired Classes. | 76 |
| | D. | Confirmation Without Acceptance by All Impaired Classes. | 77 |
| | | 1. | No Unfair Discrimination. | 77 |
| | | 2. | Fair and Equitable Test. | 77 |

| XII. | CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING. | 78 |
|---|---|---|
| | A. | Risks Related to the Confirmation and Consummation of the Plan. | 78 |
| | | 1. | Parties in Interest May Object to the Plan's Classification of Claims and Interests. | 78 |
| | | 2. | The Conditions Precedent to the Effective Date of the Plan May Not Occur. | 78 |
| | | 3. | The Debtors May Fail to Satisfy Vote Requirements. | 78 |
| | | 4. | The Debtors May Not Be Able to Secure Confirmation of the Plan. | 79 |
| | | 5. | The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Consenting Classes. | 79 |
| | | 6. | The Debtors Could Lose Exclusivity. | 80 |
| | | 7. | These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed. | 80 |
| | | 8. | The Debtors May Object to the Amount or Classification of a Claim or Interest. | 80 |
| | | 9. | Risk of Nonoccurrence of the Effective Date. | 80 |
| | | 10. | Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan. | 81 |
| | | 11. | The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved. | 81 |
| | | 12. | The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtors. | 81 |
| | | 13. | The Total Amount of Allowed Administrative and Priority Tax Claims May Be Higher and/or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtors. | 81 |
| | | 14. | The Final DIP Order is Subject to Significant Conditions and Milestones That May Be Difficult to Satisfy. | 81 |
| | | 15. | Certain Tax Implications of the Plan. | 82 |
| | B. | Other Risks. | 82 |
| | | 1. | The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases. | 82 |
| | | 2. | The Debtors May Not Consummate the Asset Sale. | 82 |
| | | 3. | Even if Wind-Down Transactions are Implemented, the Debtors Will Continue to Face Risks. | 83 |
| | C. | Disclosure Statement Disclaimer. | 83 |
| | | 1. | The Financial Information Contained in this Disclosure Statement Has Not Been Audited. | 83 |
| | | 2. | Information Contained in this Disclosure Statement Is for Soliciting Votes. | 83 |
| | | 3. | This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission. | 83 |
| | | 4. | No Legal or Tax Advice Is Provided to You by this Disclosure Statement. | 83 |
| | | 5. | This Disclosure Statement May Contain Forward Looking Statements. | 83 |
| | | 6. | No Admissions Made. | 84 |
| | | 7. | Failure to Identify Litigation Claims or Projected Objections. | 84 |
| | | 8. | No Waiver of Right to Object to Claims against or Interests in the Debtors. | 84 |

9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors...................................................................................................84

10.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. ..................84

11.     No Representations Outside this Disclosure Statement Are Authorized. .........................85

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.....................................................................................................................................85**

A.      Introduction.............................................................................................................85

B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ................87

C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote..............................................................................................87

1.      Consequences to Class 3 Holders of Term Loan Secured Claims. ..................87

2.      Consequences to Class 4 Holders of Term Loan Deficiency Claims..............88

3.      Consequences to Class 5 Holders of General Unsecured Claims. ...................89

4.      Accrued Interest.............................................................................................89

5.      Market Discount. ...........................................................................................89

6.      Limitation on the use of Capital Losses..........................................................90

7.      Medicare Tax. ...............................................................................................90

D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims. .....................................................................................................90

1.      Gain Recognition............................................................................................90

2.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest (Including OID and Interest Attributable to Accrued but Untaxed Interest) under the Plan. ................................................................................91

E.      FATCA. .................................................................................................................92

F.      Information Reporting and Backup Withholding........................................................93

**XIV.    RECOMMENDATION OF THE DEBTORS. ..............................................................94**

**EXHIBITS**

EXHIBIT A    Chapter 11 Plan

EXHIBIT B    Corporate Structure Chart

## I.      INTRODUCTION.

American Tire Distributors, Inc. and its affiliated debtors, as debtors and debtors in possession (each a "Debtor," and collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to certain Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Chapter 11 Plan of American Tire Distributors, Inc. and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time, the "Plan").[2] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors will seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Donlin, Recano & Company, LLC[3] ("Donlin Recano"), the Debtors' notice and claims agent (the "Notice, Claims, and Solicitation Agent"), no later than **[March 24, 2025], at 4:00 p.m., prevailing Eastern Time** (the "Voting Deadline").   The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## II.     PRELIMINARY STATEMENT.

The Debtors and their non-Debtor affiliates (collectively, "ATD" or the "Company") operate one of the largest replacement tire distributors in North America based on number of warehouses and dollar amount of wholesale sales.  The Company has been a leader in the tire replacement industry by virtue of its dedication to its over 80,000 customers throughout North America, as well as its commitment to the maintenance of a quality and comprehensive portfolio of tires, wheels, and related tools and accessories.  The Company is headquartered in Huntersville, North Carolina, employs approximately 4,200 individuals, and has a long history of delivering top of the line products for its customers' and partners' needs.

The Company has faced and addressed various challenges in recent years.  Following the Company's first chapter 11 restructuring in 2018 (the "2018 Restructuring"), a range of contributing factors complicated the Company's operations.  From 2019 to 2021, the Company experienced a sizable increase in profits from sales of its replacement tire and wheel products due to a variety of factors, including the soaring inflation that followed the COVID-19 pandemic and the subsequent replacement tire sales boom.  Around that time, the Company decided to expand beyond its existing businesses and invested its earnings in other automotive adjacencies (the "Adjacencies"), such as the businesses of Debtors Torqata Data and Analytics LLC ("Torqata"), which operates a data-analytics business specialized to the automotive industry, and Tirebuyer.com, LLC ("Tirebuyer.com" or "Tirebuyer"), whose main product is an online platform

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

[3]    On January 14, 2025, Donlin Recano & Company, Inc. gave notice to all parties that its name had changed to Donlin Recano & Company, LLC effective as of January 10, 2025. *See Notice of Name Change of Claims and Noticing Agent* [Docket No. 601].

that helps customers find the right tires for their needs and at the best price. By the end of 2022, however, the demand for automotive products and services compressed, and the surge in profits that the Debtors' core business had enjoyed came to an end.

Since that time, the Debtors' profits have declined further, due in large part to new market headwinds. Specifically, a shift in consumer demand to less expensive tires, increased operating costs (*e.g.*, labor and logistics), and contraction of the Debtors' sales channels, have shifted the automotive aftermarket landscape in a way that has made it difficult for the Debtors to adjust quickly. Furthermore, the Debtors' investments in Adjacencies have not yet realized a net-positive effect on the Debtors' profits, compounding challenges arising from external forces.

Given the obstacles facing the Company and its inability to quickly rationalize its largely fixed cost structure, the Company began to explore all strategic alternatives, including an investment in or sale of some or all of its business. Starting in May 2022, the Company solicited interest from several potential investors and purchasers. With the assistance of an investment bank, the Company received particular interest from two potential buyers—the 2022 Bidders (as defined herein). While transactions did not ultimately progress with the 2022 Bidders at that time, the Company continued to solicit market interest and negotiate with certain interested parties for the next two and a half years, including with ongoing assistance from an investment bank (such process, the "Prepetition Marketing Process").

The Company's efforts to market its assets gained renewed traction in 2024 and, as described in more detail in Article VIII.B herein, a prospective purchaser that was one of the 2022 Bidders (such buyer, the "Prepetition Potential Buyer") submitted a non-binding letter of intent on June 28, 2024 (the "Prepetition LOI"). For a time, the Company negotiated with the prospective buyer on an exclusive basis pursuant to the Prepetition LOI. Ultimately, the Company and the prospective buyer did not reach an actionable agreement and the Prepetition LOI was terminated on October 9, 2024.

In parallel, Company management took certain steps to improve operations, including opening a regional distribution center to improve inventory circulation speed, evaluating its product offerings and retail demand trends, and renegotiating supply contracts with certain vendors.

The Company also worked proactively to manage its prepetition liquidity constraints. As discussed further in Article VII.B herein, the Debtors, through their advisors, negotiated and executed that certain Third Amendment to the ABL Credit Agreement, dated as of July 24, 2024 (the "Third Amendment") to gain access to liquidity needed to fund the Company's operations through a potential out-of-court sale. Pursuant to the Third Amendment, certain members of the Ad Hoc Group (as defined below) provided the 2024 Delayed Draw FILO Loans, which provided $75 million of additional liquidity for the Debtors and was critical in ensuring the Company continued to operate in the ordinary course with minimal disruption.

Despite its efforts, the Company was unable to consummate an out-of-court sale and the Debtors' monthly financial performance continued to decline and liquidity issues mounted. The Company engaged Kirkland & Ellis LLP ("Kirkland") as legal counsel, Moelis & Company LLC ("Moelis") as investment banker, and AP Services, LLC, an affiliate of

AlixPartners, LLP (collectively, "AlixPartners," and together with Kirkland and Moelis, the "Advisors") as restructuring advisor to continue its exploration of strategic alternatives.

Starting in September 2024, the Debtors, with their Advisors, began negotiating extensively with an ad hoc group of prepetition lenders (the "Ad Hoc Group"), and their advisors, including Akin Gump Strauss Hauer & Feld LLP, as counsel to the Ad Hoc Group, and Perella Weinberg Partners LP, as financial advisor to the Ad Hoc Group, as well as with Wells Fargo Bank, National Association, ("Wells Fargo"), the ABL Agent.  Wells Fargo is represented by Otterbourg P.C., as legal counsel and Carl Marks Advisors, as financial advisor.[4] These discussions concerned substantially all aspects of a potential restructuring, including financing solutions for the Debtors' near-term liquidity challenges, a continued marketing process, and a potential transaction to recapitalize the business with the Debtors' existing stakeholders. Ultimately, these discussions proved successful and culminated in execution of the RSA on October 22, 2024, which contemplated the commencement of, and certain transactions to be consummated during, these Chapter 11 Cases.  The RSA enjoys broad support from the Consenting Stakeholders, who hold approximately 90 percent of the outstanding obligations under the Term Loan Credit Agreement and 100 percent of holders of the 2024 Delayed Draw FILO Loans.

Among other things, the RSA provided for the parties' good faith cooperation during an in-court marketing process (the "Postpetition Marketing Process"), which explored third party interest in the Company's assets and contemplated the execution of a stalking horse credit bid asset purchase agreement, by and between the Debtors and the Purchaser, a limited liability company formed by the members of the Ad Hoc Group.  The RSA also contemplated the key terms of the DIP Facilities, which have provided the financing for these Chapter 11 Cases and the continued operation of the Debtors' business.

In furtherance of the Debtors' Postpetition Marketing Process, on November 26, 2024, the Court entered the Bidding Procedures Order, which established the Bidding Procedures to market and sell the Debtors' assets [Docket No. 361].  The Bidding Procedures are designed to procure the highest or otherwise best available offer(s) for the Debtors' assets.  Consistent with the RSA, members of the Ad Hoc Group agreed to submit a stalking horse credit bid for substantially all of the Company's assets (the "Credit Bid") and thereby provide a floor for potential bidding.  And on November 26, 2024, shortly before entry of the Bidding Procedures Order, the Debtors entered into the stalking horse Asset Purchase Agreement with the Purchaser memorializing the Credit Bid.  The Debtors Filed the agreed form of the Asset Purchase Agreement [Docket No. 355-1] to disclose its terms to all parties in interest and potential other bidders in the Debtors' sale process and facilitate a competitive marketing process.  The Bidding Procedures Order and the Asset Purchase Agreement worked in tandem to ensure the Debtors obtained fair market value by setting a minimum purchase price for the Debtors' assets and testing it in the marketplace.

The Bidding Procedures Order provided for a bid deadline of January 10, 2025, at 11:59 p.m. (prevailing Eastern Time) (the "Bid Deadline").  Ultimately, after a robust marking

---

[4]    Prior to retaining Carl Marks Advisors, Wells Fargo retained PKF Clear Thinking, as financial advisor, in these Chapter 11 Cases.

process that began prepetition and continued postpetition, the highest and best—and only—bid received by the Debtors in advance of the Bid Deadline was the Credit Bid.  Therefore, consistent with the Bidding Procedures Order, the Debtors Filed the *Notice of (I) Selection of Winning Bidder and (II) Cancellation of Auction* [Docket No. 596] on January 12, 2025, identifying the Credit Bid as the winning bid and cancelling the auction.  In summary, the Credit Bid provides for (i) a "credit bid" pursuant to section 363(k) of the Bankruptcy Code of (x) 100 percent of the Claims arising under the New Money DIP Credit Agreement, including accrued and unpaid interest as of the date when the Asset Sale closes, and (y) $585 million of the Term Loan Secured Claims, and (ii) the assumption of substantial liabilities—the Assumed Liabilities (as defined in the Asset Purchase Agreement)—including certain of the Debtors' ordinary course liabilities, all Cure Costs (as defined in the Asset Purchase Agreement), outstanding obligations under the Debtors' critical vendor program, and all Allowed Claims against the Debtors arising under section 503(b)(9) of the Bankruptcy Code (not to exceed $1,300,000.00 in the aggregate).

Following the Sale Hearing on February 10, 2025, the Bankruptcy Court approved the Asset Sale and entered the Sale Order (as defined herein) on February 11, 2025.  The Debtors plan to work diligently with the Purchaser to close the Asset Sale contemplated by the Asset Purchase Agreement, which represents the Debtors' best and only path forward to maximize value, as soon as possible.  Finally, after Closing (as defined in the Asset Purchase Agreement) the Asset Sale, the Debtors will implement the Wind-Down of their Estates to orderly liquidate any remaining assets pursuant to the Plan.

## III.    OVERVIEW OF THE PLAN.

The Debtors believe that the Plan maximizes the value of recoveries to all stakeholders and generally distributes all property of the Debtors' Estates, that is or becomes available for distribution, according to the priorities established by the Bankruptcy Code and applicable law.  The Plan provides the ability of the Debtors to satisfy Administrative Claims not assumed by the Purchaser, Priority Tax Claims, Statutory Fees and other Restructuring Expenses, Other Secured Claims, and Other Priority Claims in full.  Additionally, the Plan provides for the liquidation of the Debtors' remaining assets, if any, following consummation of the Asset Sale, and the orderly wind-down of the Debtors' Estates.  The Plan also provides the ability, following the Asset Sale, to distribute Distributable Proceeds (if any) to Holders of Term Loan Deficiency Claims and General Unsecured Claims pursuant to the Waterfall Recovery.

**THE DEBTORS DO NOT CURRENTLY EXPECT DISTRIBUTABLE PROCEEDS TO RESULT IN ANY MATERIAL VALUE OR DISTRIBUTIONS TO HOLDERS OF TERM LOAN DEFICIENCY CLAIMS OR GENERAL UNSECURED CLAIMS.**

**IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.**

A.    *What is chapter 11?*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims against or interests in the Debtors whose votes on the Plan are being solicited.

The Plan contemplates a parallel Asset Sale of substantially all of the Debtors' assets to the Purchaser pursuant to the Asset Purchase Agreement, as approved by the Bankruptcy Court pursuant to both the procedures set forth in the Bidding Procedures Order and the Sale Order. Following the Asset Sale, the Plan provides for the orderly Wind-Down and dissolution of the Debtors' Estates. This Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.    *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (as defined herein). Each category of Holders of Claims against or Interests in the Debtors,

as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | Term Loan Deficiency Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims against and Interests in the Debtors (other than Administrative Claims not assumed by the Purchaser, Professional Fee Claims, Priority Tax Claims, Statutory Fees, and Restructuring Expenses) are classified into Classes for all purposes, including voting, Confirmation, and distributions. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims against and Interests in each Debtor pursuant to the Plan. As set forth in more detail in the Plan, the Plan constitutes a separate chapter 11 plan for each of the Debtors, and the classification of Claims against and Interests in the Debtors set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Certain of the Debtors may not have Holders of Claims against or Interests in the Debtors in a particular Class or Classes, and such Claims against or Interests in the Debtors shall be treated as set forth in Article III of the Plan.

D.      *What is the Asset Sale and how does it relate to the Plan?*

The proposed Plan contemplates the Debtors consummating the Asset Sale in accordance with the Sale Order, the procedures set forth in the Bidding Procedures Order, and on the terms set forth in the Asset Purchase Agreement. The Asset Sale, as detailed within and governed by the Asset Purchase Agreement and Sale Order, includes, among other things, the Purchaser acquiring substantially all the Debtors' assets pursuant to a credit bid under section 363(k) of the Bankruptcy

Code.  The Debtors marketed their assets to other potential purchasers but did not receive a higher or better offer than the Credit Bid reflected in the Asset Purchase Agreement.

      E.     *What will I receive from the Debtors if the Plan is consummated?*

The table below summarizes the treatment and projected recovery of all classified Claims against and Interests in each Debtor (as applicable) under the Plan**.  The classification and treatment, and any projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change.  In particular, to the extent any distributions are to be made to Holders of General Unsecured Claims, recoveries available to the Holders of General Unsecured Claims against various Debtor entities could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds any estimates.**  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

Recoveries, if any, for Holders of Allowed Claims against the Debtors in the Voting Classes (as defined herein) are speculative and remain subject to various contingencies, including the ability of the Debtors or the Wind-Down Debtors, as applicable, to monetize any Excluded Assets (as defined in the Asset Purchase Agreement).  Recoveries, if any, to Holders of Allowed Term Loan Secured Claims, will depend on the amount of proceeds of any Collateral for the Term Loans retained by the Debtors after the closing of the Asset Sale.

Recoveries, if any, to Holders of Allowed Term Loan Deficiency Claims and General Unsecured Claims will depend on the ultimate amount of "Distributable Proceeds," which means, on the Effective Date, following the closing of the Asset Sale, all Cash and other Wind-Down Debtors' Assets remaining in the Estates that are Excluded Assets under the Asset Purchase Agreement and that are not Collateral for the Term Loans, less the Wind-Down Reserve.

**THE DEBTORS DO NOT CURRENTLY EXPECT DISTRIBUTABLE PROCEEDS TO RESULT IN ANY MATERIAL VALUE OR DISTRIBUTIONS TO HOLDERS OF TERM LOAN DEFICIENCY CLAIMS OR GENERAL UNSECURED CLAIMS.**

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or Wind-Down Debtors, as applicable: (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; or (ii) the Collateral securing such Holder's Allowed Other Secured Claim. |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor: (i) payment in full in Cash; or (ii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. |
| 3 | Term Loan Secured Claims | Except to the extent that a Holder of an Allowed Term Loan Secured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of the proceeds of any Collateral for the Term Loans, if any. |

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| 4 | Term Loan Deficiency Claims | Except to the extent that a Holder of an Allowed Term Loan Deficiency Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Term Loan Deficiency Claim shall receive its share of the Distributable Proceeds[5] attributable to each applicable Debtor, if any, in accordance with the Remaining Waterfall Recovery Allocation.[6] |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its share of the Distributable Proceeds attributable to each applicable Debtor, if any, in accordance with the Remaining Waterfall Recovery Allocation. |
| 6 | Intercompany Claims | On the Effective Date, each Allowed Intercompany Claim shall, at the election of the applicable Debtor or Wind-Down Debtors, be: (i) converted to equity; (ii) otherwise set off, settled, distributed, contributed, cancelled, or released; or (iii) otherwise addressed at the option of the Debtors or Wind-Down Debtors, as applicable, without any distribution, in each case, in accordance with the Transaction Steps Memorandum. |
| 7 | Intercompany Interests | On the Effective Date, each Allowed Intercompany Interest shall, at the election of the applicable Debtor or Wind-Down Debtors, be: (i) set off, settled, addressed, distributed, contributed, merged, cancelled, or released; or (ii) otherwise addressed at the option of the Debtors or Wind-Down Debtors, as applicable, without any distribution, in each case, in accordance with the Transaction Steps Memorandum. |
| 8 | Equity Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, board of managers, members, shareholders or officers of any Debtor or Wind-Down Debtor, as applicable, all Equity Interests shall be cancelled, and the Holders thereof shall not receive or retain any property on account of such interests under the Plan. |
| 9 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims against any applicable Debtor shall be cancelled, released, and extinguished and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims. |

F.      *Are any regulatory approvals required to consummate the Plan?*

Except to the extent required pursuant to the terms of the Asset Purchase Agreement, there are no known U.S. or international regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or

---

[5]     As defined in the Plan, the term "Distributable Proceeds" means, on the Effective Date, following the closing of the Asset Sale, all Cash and other Wind-Down Debtors' Assets remaining in the Estates that are Excluded Assets (as defined in the Asset Purchase Agreement) under the Asset Purchase Agreement and that are not Collateral for the Term Loans, less the Wind-Down Reserve. **THE DEBTORS DO NOT CURRENTLY EXPECT DISTRIBUTABLE PROCEEDS TO RESULT IN ANY MATERIAL VALUE OR DISTRIBUTIONS TO HOLDERS OF TERM LOAN DEFICIENCY CLAIMS OR GENERAL UNSECURED CLAIMS.**

[6]     As defined in the Plan, the term "Remaining Waterfall Recovery Allocation" means the proportionate share of Distributable Proceeds attributable to each Holder of an Allowed Claim in Class 4 and Class 5, which shall be calculated as the proportion that an Allowed Term Loan Deficiency Claim or Allowed General Unsecured Claim, as applicable, bears to the aggregate amount of Allowed Term Loan Deficiency Claims plus Allowed General Unsecured Claims at each applicable Debtor Entity.

documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

G.     *What happens to my recovery if the Plan is not confirmed or does not go effective?*

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code, and in the alternative, the Chapter 11 Cases may be dismissed.  Conversion to a chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for certain Holders of Allowed Claims in the Voting Classes (as defined herein). *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  See Fed. R. Bankr. P. 1019(2), 3002(c).

H.     *What is the deadline to vote on the Plan?*

**The Voting Deadline is [March 24, 2025], at 4:00 p.m., prevailing Eastern Time**.

I.     *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is actually received by the Debtors' Notice, Claims, and Solicitation Agent on or before the Voting Deadline, which is [March 24, 2025] at 4:00 p.m. prevailing Eastern Time. *See* Article V of this Disclosure Statement, entitled "*Solicitation and Voting Procedures*." **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

J.     *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?*

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X.E of this Disclosure Statement, entitled "*Conditions Precedent to Confirmation and the Effective Date*," for a discussion of the conditions

precedent to consummation of the Plan. "Consummation" means the occurrence of the Effective Date.

K.    *What are the sources of Cash and other consideration required to fund the Plan?*

The Plan Administrator shall fund distributions under the Plan (if any) with the proceeds of any Collateral and with the Distributable Proceeds and in accordance with the Waterfall Recovery.[7] **THE DEBTORS DO NOT CURRENTLY EXPECT DISTRIBUTABLE PROCEEDS TO RESULT IN ANY MATERIAL VALUE OR DISTRIBUTIONS TO HOLDERS OF TERM LOAN DEFICIENCY CLAIMS OR GENERAL UNSECURED CLAIMS.**

L.    *Is there potential litigation related to the Plan?*

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article XII.A.4 of this Disclosure Statement, entitled "*The Debtors May Not Be Able to Secure Confirmation of the Plan.*"

M.    *Will the final amount of Allowed Term Loan Deficiency Claims and Allowed General Unsecured Claims affect the recovery of Holders of Allowed Term Loan Deficiency Claims and Allowed General Unsecured Claims under the Plan?*

The Debtors' estimate of aggregate Allowed Term Loan Deficiency Claims is approximately $421.3 million. The Debtors' estimate of aggregate Allowed General Unsecured Claims ranges from approximately $106.6 million to $189.6 million. The Debtors' combined estimate ranges from $527 million to $610.9 million.

Although the Debtors' estimate of Allowed Term Loan Deficiency Claims and Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of Allowed Term Loan Deficiency Claims and Allowed General Unsecured Claims set forth herein is subject to material change (either higher or lower), which could materially affect Class 4 and 5 recoveries, if any, and reflects the Debtors' current view on potential rejection damages. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed Term Loan Deficiency Claims and

---

[7]    The identity of the Plan Administrator will be disclosed in the Plan Supplement.

Allowed General Unsecured Claims, if any, could change as well, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Holders of Allowed Term Loan Deficiency Claims and Allowed General Unsecured Claims, if any, and such changes could be material.

N. *What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, or Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Statutory Fees, and Restructuring Expenses have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

1. <u>Administrative Claims Not Assumed by the Purchaser.</u>

Except with respect to those Administrative Claims assumed by the Purchaser in connection with the Asset Sale, which are subject to the terms of the Sale Order and Asset Purchase Agreement, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable, or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtors no later than the Administrative Claims Bar Date. **Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down**

**Debtors, or their property, and such Administrative Claims shall be deemed released and extinguished as of the Effective Date without the need for any objection from the Debtors or the Wind-Down Debtors or any notice to or action, order, or approval of the Bankruptcy Court.** Objections to such requests must be Filed and served on the Wind-Down Debtors and the requesting party by the Administrative Claims Objection Deadline. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

For the avoidance of doubt, any dispute with respect to the amount of an Assumed Liability (as defined in the Asset Purchase Agreement) under the Asset Purchase Agreement shall be resolved between the Purchaser and the Holder of such Assumed Liability.

2.    <u>Professional Fee Claims</u>.

(a)    Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five days after the Effective Date (except as otherwise provided in Article II.B.5 of the Plan). All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Debtors or the Wind-Down Debtors, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

(b)    Professional Fee Escrow Account.

On the Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Wind-Down Debtors using Cash on hand. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors, as applicable. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed, or otherwise payable pursuant to Article II.B.4 of the Plan. When such Allowed Professional Fee Claims have been paid in full, any remaining amount held in the Professional Fee Escrow Account (the "<u>Professional Fee Escrow Remainder</u>") shall promptly be distributed to the Wind-Down Reserve, without any further action or order of the Bankruptcy Court. For the avoidance of doubt, the Professional Fee Escrow Remainder shall not be distributed to the Wind-Down Reserve until all reasonable and documented legal, professional,

or other fees and expenses related to administration of the Chapter 11 Cases, implementation of the Plan and Consummation incurred by the Debtors and/or the Committee have been paid, including in accordance with Article II.B.4 of the Plan.

(c)      Professional Fee Amount.

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five Business Days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount estimated as of the Effective Date shall be utilized by the Debtors or the Wind-Down Debtors, if applicable, to determine the amount to be funded to the Professional Fee Escrow Account.

(d)      Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, implementation of the Plan and Consummation incurred by the Debtors and/or the Committee.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(e)      Substantial Contribution.

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors, the Committee, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

3.     <u>Priority Tax Claims</u>.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

4.      Statutory Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors.  On and after the Effective Date, to the extent applicable, the Debtors or the Wind-Down Debtors, as applicable, shall pay or cause to be paid any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor or Wind-Down Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code, whichever occurs first.

5.      Restructuring Expenses.

On the Effective Date, the Debtors or the Wind-Down Debtors, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses without any requirement to File retention applications, fee applications, Proofs of Claim, or any other applications in the Chapter 11 Cases, and without any requirement of further notice or Bankruptcy Court review or approval.  Such Restructuring Expenses shall be Allowed as Administrative Claims upon incurrence and shall not be subject to any offset, defense, counter-claim, reduction, or credit.

O.      *What is the effect of the Plan on the Debtors' ongoing business?*

The Debtors intend to sell substantially all of their assets through the Asset Sale on the terms set forth in the Asset Purchase Agreement and wind down under chapter 11 of the Bankruptcy Code.  The buyer's decisions with respect to the operation of the business following the consummation of the Asset Sale will not be impacted by Confirmation of the Plan.

Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the Wind-Down of the Wind-Down Debtors in accordance with the Wind-Down Transaction and the terms of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

P.      *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, releases by Holders of Claims or Interests, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors' Estates for the benefit of all parties in interest.

14

Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, all Holders of Claims against or Interests in the Debtors who affirmatively opt in to the releases provided by the Plan will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released all Claims and Causes of Action against the Debtors and the Released Parties.

The Plan does not contain any non-consensual release of any non-Debtor by any third party. However, parties may "opt in" to receive the releases provided under the Plan, which requires that they give the releases as well. For Holders of Claims against the Debtors that are classified into the Voting Classes (as defined herein), the ballot includes an option to opt in to the releases. To affirmatively opt in to granting a release, Holders of Claims in the Voting Classes who return a ballot must check the box indicated on the ballot. Holders of Disputed Claims (as defined in the Disclosure Statement Order) and Holders of Claims against or Interests in the Debtors in Classes 1, 2, 8, and 9 can also opt in to the releases. To affirmatively opt in to the releases, such Holders of Claims against or Interests in the Debtors must complete, sign, and date the Opt In Form (as defined in the Disclosure Statement Order) and return it to Donlin Recano in accordance with the instructions provided in the Opt In Form.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article X.D of this Disclosure Statement, entitled "*Settlement, Release, Injunction, and Related Provisions.*"

Q.  *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **[March 27, 2025], at [●] [a/p].m., prevailing Eastern Time**. The Confirmation Hearing is being held on the same day as the hearing to approve the adequacy of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order). The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and the consent rights set forth in the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objecting to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *The Charlotte Observer* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

R.       *What is the purpose of the Confirmation Hearing?*

At the Confirmation Hearing, the Bankruptcy Court will determine if the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely Filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan. Some of the key requirements for confirmation of a chapter 11 plan are that: (i) the Plan is accepted by all Impaired Classes of Claims against or Interests in the Debtors, or, if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of creditors. A plan is typically considered not to "discriminate unfairly" if similarly situated creditors do not received disparate recoveries without reasonable justification. A plan will generally be considered "fair and equitable" with regards to unsecured creditors if it satisfies the absolute priority rule, meaning if a senior class of creditors rejects the plan, a more junior class of creditors cannot receive a recovery until the senior class is paid in full. Finally, the "best interests" of creditors test means that a voting creditor must either accept the plan or receive more than they would in a hypothetical chapter 7 liquidation. For a more detailed discussion of the Confirmation Hearing and the confirmation requirements, *see* Article XI of this Disclosure Statement, entitled "*Statutory Requirements for Confirmation of the Plan*".

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

The deadline by which all objections to the Plan must be Filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **[March 24, 2025], at 12:00 p.m., prevailing Eastern Time** (the "Plan Objection Deadline"), pursuant to the Combined Hearing Notice (as defined in the Disclosure Statement Order).

S.       *Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice, Claims, and Solicitation Agent, Donlin Recano:

*By regular mail, hand delivery or overnight mail at:*

Donlin, Recano & Company, LLC
c/o Equiniti
Re: American Tire Distributors, Inc., et al.
48 Wall Street, 22nd Floor
New York, NY 10005

*By electronic mail at:*

atdinfo@drc.equiniti.com
Please reference "American Tire Distributors, Inc. – Solicitation Inquiry" in the
subject line.

*By telephone at:*

(866) 666-1597 (Toll Free) or +1 (212) 771-1128 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice, Claims, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice, Claims, and Solicitation Agent at https://www.donlinrecano.com/atd (free of charge) or the Bankruptcy Court's website at https://deb.uscourts.gov (for a fee).

T.      *Who Supports the Plan?*

The Plan is supported by the Debtors and certain creditors of the Debtors that are signatories to the RSA, including certain Holders of Term Loan Secured Claims and Term Loan Deficiency Claims.

U.      *Could subsequent events potentially affect recoveries under the Plan?*

Potentially, yes.  Any number of subsequent events may interfere with the Plan recoveries.

V.      *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a distribution to the Debtors' creditors that is equal to or greater than would otherwise result from any other available alternative.  The Debtors believe the Plan is in the best interests of all Holders of Claims or Interests, and that other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## V.      SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in Classes 3, 4, and 5 that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.      *Holders of Claims Entitled to Vote on the Plan.*

Under the provisions of the Bankruptcy Code, not all Holders of Claims against or Interests in a Debtor are entitled to vote on a chapter 11 plan.  The table in Article IV of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table in Article IV.C, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3, 4, and 5 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 6, 7, 8, or 9.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.      *Voting Record Date.*

**The Voting Record Date is [February 20, 2025]**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims against or Interests in the Debtors have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C.      *Voting on the Plan.*

**The Voting Deadline is [March 24, 2025], at 4:00 p.m., prevailing Eastern Time**. In order for your vote to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Notice, Claims, and Solicitation Agent on or before the Voting Deadline.  For information on opting in to the releases, please refer to the Disclosure Statement Order and Article IV.P of this Disclosure Statement.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* to one of the below addresses:

---

**DELIVERY OF BALLOTS**

**By first class mail at:**

**Donlin, Recano & Company, LLC
re: American Tire Distributors, Inc.
attn: Voting Department
P.O. Box 2053
New York, NY 10272-2042**

**OR**

**By overnight courier or personal delivery at:**

**Donlin, Recano & Company, LLC
c/o Equiniti
Re: American Tire Distributors, Inc., et al.
48 Wall Street, 22nd Floor
New York, NY 10005**

**If you would like to coordinate hand delivery of your Ballot, please send an email to DRCVote@drc.equiniti.com and provide the anticipated date and time of your delivery.**

---

**OR**

**SUBMIT AN ELECTRONIC BALLOT THROUGH THE DEBTORS' NOTICE, CLAIMS, AND SOLICITATION AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT HTTPS://WWW.DONLINRECANO.COM/CLIENTS/ATD/VOTE.**

**PLEASE SELECT JUST ONE OPTION FOR SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN**

D.      *Ballots Not Counted.*

**No ballot will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballot; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was Filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than

the Notice, Claims, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Notice, Claims, and Solicitation Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

     E.    *Notices of Non-Voting Status.*

    As explained more fully in the Disclosure Statement Order, Holders of Disputed Claims, or Holders of Claims against and Interests in the Debtors that are not in the Voting Classes, other than Holders of Claims and Interests in Classes 6 and 7, will receive a Notice of Non-Voting Status and Opt In Form in lieu of a Solicitation Package (each as defined in the Disclosure Statement Order).  Each Notice of Non-Voting Status and Opt In Form will include, among other things:  (a) instructions as to how to view or obtain copies of this Disclosure Statement (including the Plan and the other exhibits hereto), the Disclosure Statement Order, and all other materials in the Solicitation Package (excluding ballots) from Donlin Recano free of charge or the Court's website via PACER; (b) an Opt In Form by which all Holders or potential Holders of Claims or Interests can elect to opt in to the releases contained in Article VIII of the Plan; (c) a disclosure regarding the releases and the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan; (d) notice of the Plan Objection Deadline; (e) notice of the Combined Confirmation Hearing; and (f) information related thereto.

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE, CLAIMS, AND SOLICITATION AGENT AT**
>
> **(866) 666-1597 (Toll Free) or +1 (212) 771-1128 (International)**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
> NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

     F.    *Confirmation Hearing.*

    The Bankruptcy Court has scheduled the Confirmation Hearing for **[March 27, 2025], at [●] [a/p].m., prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time by the Debtors or Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or the Filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and the Solicitation and Voting Procedures.

    Objections to Confirmation of the Plan must be Filed and served on the Debtors, and certain other parties, by **no later than [March 24, 2025], at 12:00 p.m., prevailing Eastern Time,** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

The Debtors will publish notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *The Charlotte Observer* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

## VI.     THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.

### A.     *ATD's Corporate History.*

The Company has a storied past, beginning almost a century ago as Heafner Tire, a single tire mold recapper and gas station in Lincolnton, North Carolina, founded by James H. Heafner in 1935. Over the next 80 years, Heafner Tire implemented a strategic growth-by-acquisition business model and grew from small-town origins to become the nation's leading international tire and service distributor. Specifically, in 1985, 1991, and 1997, several major tire companies—Beach Tire Mart, Commonwealth Tire, and Oliver & Winston, respectively—were brought under the Heafner Tire brand, adding over 135 locations across the southeast. Over the following two decades, Heafner Tire acquired and integrated over 23 different companies, transforming the Company into a truly national enterprise. In 2002, Heafner Tire changed its name to American Tire Distributors to reflect this transformation. Soon thereafter, the Company became an international enterprise when it acquired Regional Tire Distributors and formed National Tire Distributors in 2013 and Hercules Tire Holdings LLC in 2014. These transactions, among others, catapulted the Company into a North American powerhouse.

The Company was primarily a family-owned and operated business from its founding until a majority stake in the business was sold to a private equity firm in 1999. As a result of a series of corporate transactions, by the end of 2015, TPG Capital and Ares Management, owned 94 percent of the Company, with the remaining 6 percent belonging to management and other parties.

### B.     *ATD's 2018 Restructuring.*

In 2018, in response to trends toward disintermediation—*i.e.*, the reduction in use of intermediary businesses and distributors within the tire industry—including independent tire manufacturers Goodyear Tire & Rubber Company ("Goodyear") and Bridgestone Americas, Inc. ("Bridgestone") forming a joint venture partnership to distribute their own products directly to tire retailers, the Company began consolidating distribution centers and investing in a state-of-the-art delivery platform, as well as reducing costs. In addition to these efforts, the Company explored deleveraging transactions and maturity extensions on their various loan facilities, as the loss of the Goodyear and Bridgestone partnerships resulted in short-term sales declines. The Company was ultimately unable to reach an out of-court restructuring solution. Consequently, on October 4, 2018, American Tire Distributors, Inc. ("ATD Inc.") and eight of its affiliates filed for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware. Just seventy-six days later, on December 19, 2018, ATD Inc. and its affiliated debtors confirmed a chapter 11 plan of reorganization and emerged from chapter 11 protection on December 21, 2018. In total, the 2018 Restructuring eliminated approximately $1.1 billion in debt and provided

the Company with approximately $1 billion of committed exit financing to support operations and future growth initiatives.

Although the Company greatly benefitted from the deleveraging achieved through its 2018 Restructuring, new challenges emerged in the years that followed.  Specifically, the onset of the COVID-19 pandemic induced a sharp decline in demand in the automotive industry, which was followed by a surge in demand for used cars and replacement parts in 2021.  This was due in significant part to a chip shortage that negatively impacted the new car industry as a result of COVID-19 era supply chain issues.  This produced a significant increase in the amount of replacement tire and wheel purchases which temporarily boosted sales and profits.  In addition to the surge in demand, rapid inflation led to the margin from each sale to skyrocket as the Debtors, who typically stockpile their inventory for six to twelve months at a time, were able to sell their pre-COVID inventory for post-COVID prices.  In time, it became clear that the Company's bottom line was being bolstered by temporary shifts in (a) the demand for their products, (b) high rates of inflation, and (c) available low-cost inventories.  As the market rebounded from the aftermath of COVID-19, the Company's margins began to narrow.

In addition to the effect of these macroeconomic forces, the Company faced certain shifts in consumer demand—including a shift in consumer demand to lower price tires.  In particular, demand for tier 4 tires (the most cost-effective tires on the market for retail consumers) has risen, and demand in higher tiers, where the Debtors' product offerings have historically focused, has fallen.  This resulted in the Debtors' inventory remaining on-hand and in storage for a longer time, slowing the Debtors' conversion of inventory to revenue.

Compounding the issues caused by inflation, in 2021 and 2022, the Debtors invested their surplus, inflation-driven profits into other automotive business Adjacencies.  The synergies and other benefits that the Debtors anticipated to achieve from their investment in these Adjacencies have not yet materialized, and instead, the Debtors' operational and capital structure has become overextended.  In response, the Debtors commenced these Chapter 11 Cases to address these challenges.

C.    *Debtors' Business Operations.*

The Company operates the largest distribution network of replacement tires across North America measured by dollar amount of wholesale sales and number of warehouses. It provides over 80,000 customers with approximately 50,000 types of stock-keeping units ("SKUs") consisting of tires, wheels, and related tools and accessories.  The Debtors' vast product offering, distribution and inventory management system, sales force and marketing services, and ability to cater to a broad customer base gives them a competitive edge over other smaller and regionally focused replacement tire distributors.

1.    Products and Value-Added Services.

The Debtors have a comprehensive portfolio of products that allows them to penetrate the replacement tire market across a broad range of price points with the bulk of the Debtors' product sales being derived from the tire delivery and sales.  The Debtors obtain their inventory from eight of the top ten leading passenger and light truck tire brands in the United States and carry their

proprietary, flagship brand, Hercules®, one of the leading private brands in North America in 2023.

*Flag and Associate Brands*.  In the United States, the flag brands that the Debtors sell include Continental®, Michelin®, Cooper®, Kumho®, Nexen®, Pirelli®, Toyo-Nitto®, Yokohama®, and Hankook®.  These brands are regarded as premium-quality and command premium pricing as a result.  Manufacturers of flag brands generally provide marketing support for their products.  This, in addition to these brands' popularity and premium price points, has led to the Company generating stronger sales and higher per-tire profits for such brands relative to other associate or proprietary brands.  Flag brands also have offerings that are lower priced and sold under different brand names.  The Debtors provide products from these brands as well, which can be attractive to customers as they are sometimes tied to manufacturer-specific incentive programs.  Such associate brands include General®, Uniroyal®, Mastercraft®, Mickey Thompson®, Laufen®, and BFGoodrich®.

*Proprietary and Exclusive Brands*.  The Company also sells certain proprietary brands, which the Company owns and markets, and exclusive brands, which are developed by third-party manufacturers exclusively for the Company.  In both cases, the Debtors hold or control the trademark to such brands.  Proprietary and exclusive brands serve as products for entry-level pricing, which allows the Debtors to provide its retail partners with quality products to capture cost-conscious consumers in the market.  The Debtors acquired the Hercules Tire & Rubber Company ("Hercules") in 2014.  Hercules provides a full line of tires for passenger cars and light and medium trucks and is the best-selling private label tire brand in the United States.  Exclusive brands include the Ironman® brand, which is the Debtors' main producer of tier 4 tires which have increased in popularity in recent years.

*Other Products*.  The Debtors also sell aftermarket custom wheels and accessories and related tire supplies and tools, directly complementing the tire products because many customers purchase tires when purchasing custom wheels.  The Debtors offer over twenty different wheel brands and installation and service accessories, including proprietary brands such as TIS Offroad®, Motive Wheels®, Gear Offroad®, Ultra Motorsports®, and O.E. Performance®. These brands represent a comprehensive portfolio of wheel brands and style collections in the industry. Customers can also obtain tire supplies and tools from the Company, which allows it to offer a well-rounded product line.  Specifically, such products broaden the Company's portfolio and leverage its customer relationships.  The tire supplies and tools include a broad range of the most common tire-related products, including wheel weights, tire pressure management censors, lubricants, and valves.

In 2023, the Company took its already popular, value-added service ATDOnline®, a 24/7 proprietary business-to-business online portal that brings the Company's partners instant access to pricing, order, and tracking, and turned it into a centralized hub, focused on helping customers manage and fulfill their auto aftermarket needs with ordering, customer management, and solution focused tools.  The ATDOnline® platform is focused on helping the Company's customers and partners grow their business through cutting costs and boosting profitability, with meaningful data metrics leveraged from the Torqata platform, and access to autoshop networks for discounts on products through PartnerPerks® and rebates and rewards through IPG®.

Additionally, the Debtors operate TireBuyer.com as a direct business to consumer digital platform that allows the Debtors to leverage their distribution network to sell to consumers directly and drive installation business to their customers and partners.  The Debtors have leveraged this digital infrastructure to create Treadsy®, which allows the Debtors' independent tire retailer partners and other third-party businesses to reach consumers through their existing web platforms. Both of these platforms allow independent tire retailers and partners who otherwise do not have a large presence in the tire industry, to reach consumers that would not otherwise be accessible to them.  This allows for the Company to access portions of the market and acquire customers that would otherwise be unavailable.

Lastly, Tire Pros® is a program through which qualified tire retailers, as loyal partners to the Company, can participate in a franchise program to receive advertising and marketing support by being promoted by this nationally recognized brand.  Local participants in the program receive the benefits of the Tire Pros® national brand identity with minimal investment while still maintaining their local characteristics.  The Debtors are able to increase volume penetration among, and further align themselves with, their franchisees in the process.  As such, this service improves the Debtors' ability to integrate their infrastructure with their customers' operations and enables them to maintain high rates of customer retention and build strong customer loyalty.  There are over 700 stores in the Tire Pros® network of franchised tire retailers.

## 2. Distribution System and Inventory Management and Routing Technology.

The Debtors have developed a comprehensive distribution system to deliver products from a wide variety of tire manufacturers to tire retail customers across North America.  In recent years, some manufacturers have reduced the number of retailers they service directly, while tire retailers have reduced the amount of inventory held at one time.  At the same time, the variety of SKUs, including tire models and other parts required by cars on the road, has continued to expand, requiring that the Debtors hold significantly more inventory in order to ensure that they have the specific tires and other SKUs that their customers require.  Consequently, the Debtors' distribution network has been a critical link between these tire manufacturers and tire retailers, efficiently and expeditiously facilitating their operational needs.

The Debtors strive to meet these expectations through their comprehensive distribution system that integrates their vast distribution network with their inventory management and routing technology.  Specifically, the Debtors have approximately 1,500 delivery vehicles servicing more than 115 distribution centers across forty-seven states in the United States.  At certain distribution centers, the Debtors maintain sophisticated bin locator systems, material handling equipment, and routing software that link customer orders to the present inventory and delivery routes.

The Debtors maintain inventory levels for the vast majority of SKUs that exist today to aspire to fulfill customer orders on a same or next day basis as a means to increase volume across the Company.  Additionally, the Debtors are incentivized to hold large stockpiles of inventory as vendors within the tire industry customarily offer the Company vendor inducements, account credits, and bonuses in connection with a variety of vendor promotions, many of which are volume driven.  The Company's inventory levels are also determined based on sales data derived from distribution centers (on a combined basis, an individual basis, or by geographic region), demand forecasts, as well as from vendors that supply the distribution centers and retail customer stores.

All distribution centers stock a base inventory, have access to a broader hub and spoke network for inventory, and may expand beyond preset inventory levels as deemed appropriate by an executive sales and operations planning committee. Computer systems monitor inventory levels for all stock items and quantities are re-balanced from center-to-center to both maximize availability and inventory turns.

> 3. Customer Base.

The Company's customer base includes over 80,000 customers across North America. These customers are highly diversified but generally fall within the following categories: (a) local, regional, and national independent tire retailers; (b) mass merchandisers; (c) warehouse clubs; (d) tire manufacturer-owned stores; (e) automotive dealerships; and (f) web-based marketers. Among these, independent tire retailers make up the Debtors' largest customer group, accounting for approximately 60 percent of the Debtors' net sales in 2023. The Debtors have significant market presence with each category of customer and believe that they are the only replacement tire distributor in North America that services each of these key market channels.

## VII. THE COMPANY'S ORGANIZATIONAL AND CAPITAL STRUCTURE.

> A. *Organizational Structure.*

ATD's current organizational structure is reflected in a comprehensive organizational chart attached hereto as **Exhibit B**.

> B. *Prepetition Capital Structure.*

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $1.9 billion in aggregate outstanding principal and accrued interest of funded debt obligations.

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued Interest | Approximate Applicable Premium | Approximate Total Claim Amount |
|---|---|---|---|---|---|
| **Revolving Credit Loans** | October 22, 2026 | $708.6 million[8] | $2.3 million | N/A | $710.9 million |
| **Original FILO Term Loans** | October 22, 2026 | $100 million | $0.2 million | N/A | $100.2 million |
| **2024 Delayed Draw FILO Loans** | October 22, 2026 | $75 million | $1.95 million | $15.07 million | $92.02 million |
| **Term Loans** | October 22, 2028 | $975 million | $31.3 million | N/A | $1,006.3 million |
| *Total Funded Debt Obligations:* | | *$1,858.6 million* | *$35.75 million* | *$15.07 million* | *$1,909.42 million* |

---

[8] This includes the outstanding letters of credit in the aggregate amount of $49.2 million issued under the ABL Credit Agreement.

1.     The ABL Credit Agreement.

ATD Inc., as administrative borrower, ATD New Holdings III, Inc., a Delaware corporation ("Parent"), each other borrower from time to time party thereto, each lender from time to time party thereto, and each L/C issuer and swing line lender from time to time party thereto and the ABL Agent, entered into the ABL Credit Agreement, an asset-based credit agreement, dated as of October 22, 2021, as amended by that certain First Amendment to ABL Credit Agreement, dated as of April 13, 2023, as further amended by that certain Second Amendment to ABL Credit Agreement, dated as of July 16, 2024, and as further amended by the Third Amendment, as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

The ABL Credit Agreement allows the Debtors to access, by way of the Revolving Credit Loans, approximately $1.1 billion in revolving credit commitments, subject to the borrowing base calculation as defined therein. In addition, the ABL Credit Agreement includes approximately $100 million outstanding under the Original FILO Term Loans. Finally, the Third Amendment created the 2024 Delayed Draw FILO Loans, a delayed draw "first-in, last-out" facility, as a new tranche under the ABL Credit Agreement by investors representing a majority of the Term Loan Lenders (as defined herein) (the Revolving Credit Loans, Original FILO Term Loans, and 2024 Delayed Draw FILO Loans, collectively, the "ABL Facility").

The ABL Facility is secured by a first-priority security interest in all accounts and payment intangibles, chattel paper and inventory (the "ABL Priority Collateral"). The ABL Facility also has a second priority security interest in all Term Loan Priority Collateral (as defined herein). The 2024 Delayed Draw FILO Loans have a lien priority that is pari on Term Loan Priority Collateral and third out on the ABL Priority Collateral.

The maturity date for the ABL Facility is October 22, 2026. As of the Petition Date, approximately $883.6 million in aggregate principal amount remained outstanding under the ABL Facility.

2.     The Term Loan Credit Agreement.

ATD Inc., as borrower, Parent, each lender from time to time party thereto (the "Term Loan Lenders") and Bank of America, N.A., as administrative agent and collateral agent, entered into a term loan credit agreement dated as of October 22, 2021 (the "Term Loan Credit Agreement") (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of March 26, 2023, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of March 26, 2023 and as further amended by that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of July 24, 2024, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Term Loan Facility").

Substantially all assets other than the assets securing the ABL Facility serve as collateral for the Term Loan Facility, including all equipment, real property, and equity interests of ATD Inc. and the Debtors (the "Term Loan Priority Collateral"). In addition, the Term Loan Facility is secured by a second priority security interest in the ABL Priority Collateral. The maturity date for

the Term Loan Facility is October 22, 2028. As of the Petition Date, approximately $975 million in aggregate principal amount remained outstanding under the Term Loan Facility.

## VIII.  EVENTS LEADING TO THESE CHAPTER 11 CASES.

A.   *Prepetition Challenges.*

1.   <u>Inflation and the COVID-19 Pandemic.</u>

After the 2018 Restructuring, the Debtors had a deleveraged balance sheet and exit financing commitments that would support the reorganized businesses. Despite an initially positive trajectory for the first three years post bankruptcy in which the Debtors saw growth and rising profits, the Debtors eventually experienced profit declines due to (i) unpredictable market headwinds and (ii) certain strategic investments that did not have enough runway to realize success.

As discussed in <u>Article VII</u> herein, shortly after the 2018 Restructuring, the global economy was impacted by the unprecedented health risks and attendant work from home orders issued in response to the COVID-19 pandemic. After an initial drop in demand across the automotive industry, the Debtors saw a dramatic surge in demand for their products. In 2021, due in part to the Company's strong performance during the COVID-19 era, it was able to refinance the ABL facility and the term loan facility that were in place at the conclusion of the 2018 Restructuring. Through this transaction, the Company was able to: (i) achieve much more favorable interest rates on both facilities, which annualized to approximately $15-20 million cash interest savings; (ii) repay and retire the exit financing facility from the 2018 Restructuring; (iii) negotiate more favorable borrowing base concessions on the ABL facility, such as being able to include in transit inventory and restricted cash as collateral; (iv) increase the revolving credit facility line by approximately 20 percent; and (v) extend maturities.

To better solidify their industry footing, the Debtors also charted a path of expansion into the broader automotive market and began investing the COVID-19 era profits into replacement tire and wheel-distribution service adjacent businesses, such as Torqata, Tirebuyer.com, and FLX FWD Logistics, LLC, and invested millions of dollars in necessary technological advancements. While those investments diversified the Debtors' business portfolio, they ultimately diverted attention and resources from the Debtors' core competencies and increased the size of the capital structure. The Debtors' investments have yet to realize the benefits the Debtors originally envisioned when making them and have hampered liquidity.

Ultimately, in 2023, the demand for automotive parts normalized. Inflation, however, continued to increase, making acquiring new inventory more expensive, depressing the Debtors' margin on tires sold. Namely, key variable costs, such as direct inventory purchases and freight and labor, stabilized at higher levels. The car purchasing frenzy and subsequent demand for various automotive parts continued to fall off and the Debtors were left with an overleveraged balance sheet, increased fixed costs, declining revenue, and limited returns from its COVID-19 era investments.

2.     Market Changes.

In addition, the Debtors faced other dramatic market changes—a consumer trend toward lower-tier, less expensive tires, a shift in the market channels, and an increase in the variety of SKUs. These changes conflicted with the Debtors' initiatives to: (i) improve pricing; (ii) optimize volumes in the largely fixed distribution network; and (iii) promote turnover of their on-hand product assortment.

In 2022, consumers began opting for less expensive (*i.e.*, tier 4) tires. The Debtors inventory, however, mainly focuses on upper-tier (*i.e.*, tiers 1, 2, and 3) tires with a limited focus on the supply of tier 4 tires through their propriety Ironman® brand. The Debtors either have limited access to other tier 4 manufacturers or have chosen not to engage with such manufacturers in an effort to support brands that they already carry. Accordingly, the Debtors have struggled to quickly adapt their inventory and cost-structure, which, in turn, has continued to constrict their liquidity.

Simultaneously, the Debtors' opportunity to reap the profits of their position in the middle of the nationwide supply chain was severely limited as the tire sale market shifted from a generally open market, one in which the Debtors could sell directly to a large number of retailers and command higher prices, to a fixed market in which a tire producer negotiates a fixed price with consumer facing tire retailers, leaving the Debtors only the opportunity to service the arrangement within the pre negotiated parameters. This shift is in large part due to consolidation in the consumer-facing tire retailer market, with major national brands being able to cut the Debtors out of negotiations to a significant extent. Historically, tires sold on an open price have the capability of netting up to six times the profit per tire than on a fixed priced. Further, in 2018, these fixed prices only accounted for approximately less than 10 percent of the business. In 2023, they accounted for nearly 40 percent. Accordingly, this shift has resulted in a massive secular decline in the industry and a consolidation in the amount of end sellers with which the Debtors can do business.

Further, the effort to increase volume to participate in the fixed distribution network has contributed to lower margins due to "secondary sales." A secondary sale is a sale that the Debtors fill on behalf of an existing partner supplier, at a set price (cost plus set commission), from inventories otherwise available to serve open market customers. Rather than yielding cash, these sales yield non-cash credits for purchased inventory. Secondary sales offer the Debtors a way to drive volume and also balance out smaller markets where open sales are less successful. While this shift is seen as an opportunity to improve distribution efficiencies via larger volume in the network, the Debtors do not make the full margin on their product. The benefits of the sale are realized through account credits that reduce cash outflows.

Lastly, the variety of SKUs that the Debtors are required to maintain has exploded over the last five to ten years due to the number of cars (both gas and electric) currently on the market and the number of fitments, or fixed items of equipment, needed for each car. For example, while the average car used to have limited pieces of equipment for any given function, it may now have over forty different pieces of equipment. This means that the Debtors must now carry all forty fitments to be able to fulfill each car's specific replacement needs. This proliferation of SKUs, which is driven mainly by consumer demands for pricing optionality, has resulted in the Debtors' need to

invest in more inventory upfront.  Ultimately, this means there is a higher cash outlay, more square footage of warehousing to hold the inventory, and holding onto the inventory longer than previously.

        B.    *The Prepetition Marketing Process.*

In May of 2022, the Company received communications from a potential strategic partner indicating interest in acquiring the Company's assets.  The Company directed its investment banker to launch the Prepetition Marketing Process and, over a period of approximately six months, the Company contacted nine parties, all strategic investors in the automotive aftermarket industry.  All interested parties were provided materials and given access to non-public information and management as appropriate.  Throughout this process, two parties, Bidder A and Bidder B (collectively, the "2022 Bidders"), submitted non-binding indications of interest ("IOIs") to the Company.  As described in Article IX.E herein, due to a variety of factors, including differing views on potential transaction structures, in December 2022, the Company and the 2022 Bidders put negotiations on hold.

In June 2023, the Prepetition Potential Buyer—which was, as indicated, one of the 2022 Bidders—re-engaged with the Debtors, and after a few months of additional diligence with the Debtors, submitted another indication of interest in November 2023.  The Debtors continued to engage on potential transaction terms and on June 3, 2024, the Prepetition Potential Buyer submitted the Prepetition LOI to purchase substantially all of the Company's working capital assets.  The Debtors again contacted certain of the same strategic parties for renewed interest as a market check, but no other parties engaged.  On June 28, 2024, the Debtors executed the Prepetition LOI with the Prepetition Potential Buyer, which required that the Debtors negotiate exclusively with the Prepetition Potential Buyer.

As the Prepetition Marketing Process progressed, the Company required additional liquidity to bridge operations to an anticipated sale.  To address this need, the Company and certain members of the Ad Hoc Group negotiated the Third Amendment to the ABL Credit Agreement, which was executed on July 16, 2024.  Pursuant to the Third Amendment, those lenders made available approximately $100 million of the 2024 Delayed Draw FILO Loans.  This desperately needed liquidity provided by the 2024 Delayed Draw FILO Loans supported the Company's Prepetition Marketing Process and allowed operations to continue with minimal disruption in parallel.

Over the next several months, as discussions continued, it became clear that a transaction was no longer actionable on terms proposed in the Prepetition LOI.  In September 2024, the Prepetition Potential Buyer sent a letter to the Debtors that it was no longer able to pursue a transaction on the terms set forth in the Prepetition LOI.  Due in part to exclusivity restrictions imposed by the Prepetition LOI, on October 9, 2024, the Debtors terminated the Prepetition LOI.

In September 2024, the Debtors engaged Moelis to, among other things, continue marketing the Debtors' assets during the pendency of these Chapter 11 Cases.

C.    *Prepetition Initiatives.*

1.    <u>Corporate Governance Efforts</u>.

On October 4, 2024, the Debtors established a special committee (the "<u>Special Committee</u>") comprised of three disinterested directors: Patrick Bartels, Roger Meltzer, and James Micali.  Mr. Meltzer and Mr. Bartels are seasoned restructuring experts, having decades of experience and dozens of engagements as independent directors between them.  Mr. Micali is an automotive industry expert, having previously served as both chief executive officer and general counsel of Michelin North America, Inc., and having served on the board and audit subcommittee of ATD New Holdings, Inc., the Company's ultimate holding entity.  The board of directors authorized the special committee to, among other things, consider and negotiate a restructuring, reorganization, or other transaction and review, evaluate, and act upon any matters in which the existing directors might have an interest.  On October 21, 2024, Ronald J. Bienias was engaged as chief restructuring officer.  Prior to his appointment, Mr. Bienias had been leading the AlixPartners team advising the Company.

2.    <u>The RSA</u>.

On October 22, 2024, the Debtors reached an agreement with the Ad Hoc Group to work collaboratively to implement a value-maximizing sale and auction process through these Chapter 11 Cases, and that agreement was memorialized in the RSA.  Among other things, the RSA sets forth the key terms of the DIP Facilities through the DIP term sheet attached thereto (and thereafter consummated through the DIP Documents) and contemplated that the Debtors and the Ad Hoc Group would negotiate in good faith regarding the terms on which the Ad Hoc Group would serve as a stalking horse bidder through a credit bid for all or substantially all of the Debtors' assets, subject to the terms of Bidding Procedures Order.

Consistent with the terms of the RSA, the Debtors and the Purchaser entered into the Asset Purchase Agreement on November 26, 2024, and the Debtors selected the Credit Bid, on the terms set forth in the Asset Purchase Agreement, as the stalking horse bid.

## IX.    **EVENTS OF THE CHAPTER 11 CASES.**

A.    *First Day Relief.*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "<u>Petitions</u>"), the Debtors Filed several motions (the "<u>First Day Motions</u>") designed to facilitate the administration of the Debtors' Chapter 11 Cases following the commencement of the Chapter 11 Cases.  A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Ronald J. Bienias, Chief Restructuring Officer of American Tire Distributors, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 15], Filed on October 23, 2024.

The First Day Motions were heard and approved on an interim or final (as applicable) basis at the October 24, 2024, hearing, and all First Day Motions and orders for interim and final relief

granted in the Chapter 11 Cases can be viewed free of charge at https://www.donlinrecano.com/atd.

B.    *Appointment of Official Committee of Unsecured Creditors.*

The U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 128] on November 4, 2024, and Filed the *First Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 139] on November 5, 2024 (collectively, the "UCC Notices"). The UCC Notices notified parties in interest that the U.S. Trustee had appointed an official committee of unsecured creditors (the "Committee" or the "UCC") in these Chapter 11 Cases. The Committee is currently comprised of: (a) Continental Tire the Americas, LLC; (b) Sumitomo Rubber North America, Inc.; (c) Nexen Tire America, Inc.; (d) The Carlstar Group, LLC; (e) 3PLogic, LLC d/b/a Redwood Supply Chain Solutions; (f) Ryder Truck Rental Inc.; and (g) FacilitySource, LLC d/b/a CBRE Retail. The Committee serves as a representative and fiduciary for the interests of unsecured creditors.

On November 7, 2024, the Committee Filed the *Notice of Appearance and Request for Service of Papers* [Docket No. 155], identifying their proposed counsel as Morrison & Foerster LLP and Saul Ewing LLP. The Committee subsequently retained Province, LLC as its financial advisor [Docket No. 578]. The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on December 2, 2024, which was continued to December 23, 2024.

C.    *DIP Financing.*

On October 23, 2024, the Debtors Filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 16] (the "DIP Motion"), initially requesting that the Bankruptcy Court authorize the Debtors' entry into the DIP Facilities and related DIP Documents to obtain funding throughout the Chapter 11 Cases in the form of: (a) a $1,123.3 million superpriority debtor in possession term loan credit facility comprised of (x) $250 million of New Money Loans, the majority of which was to be funded by the Ad Hoc Group, and of which $125 million would be funded into escrow upon entry of the Interim DIP Order (as defined below) (the "Interim New Money DIP Term Loans") with the remainder becoming available upon entry of the Final DIP Order (as defined below) (the "Final New Money DIP Term Loans"), (y) a "roll up" of all outstanding 2024 Delayed Draw FILO Loans into DIP Term Loan Obligations (as defined in the DIP Motion) upon entry of the Interim DIP Order, and (z) upon entry of the Interim DIP Order, a "roll up" of Term Loans held by the Consenting New Money DIP Lenders into DIP Term Loans in a 3 to 1 ratio of Prepetition Term Loan Obligations (as defined in the DIP Motion) to Interim New Money DIP Term Loans actually funded and, upon entry of the Final Order, a "roll up" of additional Term Loans held by the Consenting New Money DIP Lenders into DIP Term Loans in a 3 to 1 ratio of Prepetition Term Loan Obligations to Final New Money DIP Term Loans actually funded (collectively, the "TL Roll-Up"); and (b) a $1,200 million superpriority debtor in possession asset-based financing facility consisting of (y) a "roll up" of approximately $49 million in the face amount of

undrawn letters of credit issued under the Prepetition ABL Facility and all Cash Management Obligations (as defined in the DIP Motion) into the DIP ABL Facility and (ii) the refinancing of the Prepetition ABL Facility pursuant to a "creeping roll-up" upon entry of the Final DIP Order (clauses (a) and (b) collectively, the "DIP Facilities"), the terms of which are more fully described in the DIP Motion.

On October 25, 2024, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [Docket No. 90] (the "Interim DIP Order"), which approved the DIP Facilities as described in the DIP Motion on an interim basis.

After Filing the DIP Motion and prior to the hearing on the Final DIP Order, the Debtors received several formal and informal objections to the DIP Facilities. A hearing on final approval of the DIP Facilities took place on November 19, 2024. In an effort to address the remaining objections and obtain approval of the DIP Facilities on a final basis, the Debtors Filed a revised proposed form of order approving the DIP Facilities on a final basis [Docket No. 309], which form of order proposed to remove the TL Roll-Up and unwind all Term Loan Roll-Up DIP Loans (as defined in the DIP Motion) approved upon entry of the Interim DIP Order. The Final DIP Order also provides that, solely with respect to the DIP Term Loan Agent, the DIP Term Lenders, and the Prepetition Term Loan Secured Parties (for purposes of this paragraph, each as defined in the Final DIP Order), the waiver of the Debtors' surcharge rights under section 506(c) of the Bankruptcy Code is subject to "the assumption or payment of ordinary course operational liabilities in connection with any sale transaction or chapter 11 plan." *See* Final DIP Order at ¶ 15.

A subsequent hearing on final approval of the DIP Facilities took place on November 21, 2024. On November 22, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 340] (the "Final DIP Order"), approving the DIP Facilities, including the modified terms of the DIP Term Loan Facility, on a final basis.

D.     *Bidding Procedures, the Postpetition Marketing Process, and the Asset Sale.*

As described in Articles II and VII.B herein, the Debtors engaged in an extensive Prepetition Marketing Process and commenced these Chapter 11 Cases to continue pursuing—and ultimately consummate—one or more value-maximizing sale transactions. To that end, the Debtors Filed the Bidding Procedures Motion [Docket No. 109] on October 30, 2024, and, on November 26, 2024, the Bankruptcy Court entered the Bidding Procedures Order, which established the Bidding Procedures for any asset sale [Docket No. 361]. Pursuant to the Bidding Procedures Order, the Asset Purchase Agreement served as the stalking horse bid and set a floor for bidding in the Debtors' Postpetition Marketing Process. The Bidding Procedures provided additional time and opportunity for the Debtors to market their assets, receive and evaluate bids, and, if necessary, hold an auction to determine the highest or otherwise best bids. Specifically, the Bidding Procedures were designed to encourage all prospective bidders to offer their best bid,

effectuate an expeditious, value-maximizing process, including an auction, if necessary, to position the Debtors to consummate an Asset Sale.

As approved in the Bidding Procedures Order, the Debtors conducted a sale process consistent with the schedule recited below.  The Debtors announced the Credit Bid as the winning bid on January 12, 2025, and filed the *Notice of Debtors' Proposed Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances, and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 702] on February 7, 2025, which was amended thereafter on February 10 [Docket No. 717] and February 11, 2025 [Docket No. 729] (the "Proposed Sale Order"). Following the Sale Hearing, the Bankruptcy Court entered an *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances, and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 730] (the "Sale Order").  The Debtors anticipate closing the Asset Sale as soon as possible.

As explained in the Sale Order, On Demand Technologies, Inc. d/b/a OneRail ("OneRail") preserved its ability to challenge (a) the Debtors' right to transfer their shares of OneRail stock to the Purchaser and (b) the Debtors' assumption of, and assignment to the Purchaser, of certain other agreements between the Debtors and OneRail.  OneRail's preserved arguments are described more fully in the *Objections of On Demand Technologies, Inc. d/b/a OneRail to: (I) Proposed Cure Amounts Regarding Logistics Service Agreements; and (II) Assumption and Assignment of Shareholder Agreements* [Docket No. 546] and *Objection of On Demand Technologies, Inc. d/b/a OneRail to Debtors' Proposed Sale Transaction* [Docket No. 607].  The Debtors reserve the right to dispute any such challenges, and negotiations regarding a consensual resolution are ongoing.[9]

| **Date and Time**<br>(all times in prevailing Eastern Time) | **Event or Deadline[10]** |
|---|---|
| November 25, 2024, at 5:00 p.m. | The deadline for submission of a non-binding Indication of Interest |
| November 26, 2024, at 3:00 p.m. | Bidding Procedures Hearing |
| Three (3) business days after the entry of the Bidding Procedures Order | The deadline for the Debtors to serve and publish the Sale Notice |
| December 11, 2024 | Serve Cure Notice |
| December 26, 2024, at 5:00 p.m. | Cure Notice Objection Deadline |

---

[9]    The Debtors' interests in OneRail are not subject to the prepetition Liens.

[10]    Capitalized terms used but not otherwise defined in this chart will have the meaning ascribed to such terms in the Bidding Procedures Order.

| **Date and Time**<br>(all times in prevailing Eastern Time) | **Event or Deadline**[10] |
|---|---|
| December 27, 2024 | Deadline to File and Serve Stalking Horse Objections (if applicable) |
| January 10, 2025, at 11:59 p.m. | Bid Deadline |
| January 12, 2025, at 5:00 p.m. | Deadline to File Auction Notice/Designate Qualified Bids |
| January 13, 2025, at 10:00 a.m. | Auction (if necessary) |
| January 13, 2025, at 11:59 p.m. | Notice of Winning Bidder |
| January 14, 2025, at 5:00 p.m. | Sale Objection Deadline |
| February 10, 2025, at 10:00 a.m. | Sale Hearing |

E.    *Special Committee Investigation*.

(i)    *Governance*.

As of the Petition Date, Debtor ATD New Holdings, Inc.'s full Board of Directors (the "Board") consisted of Patrick Bartels (Independent), John Sherman (Polen Capital board designee), James Micali (Independent), Puneet Bhasin (Independent), Michael Kneeland (Independent), Justin Betzen (Goldman Sachs designee), Vince Vangaever (Goldman Sachs designee), and Roger Metzler (Independent).  Since the date of the Debtors' prior emergence from bankruptcy on December 19, 2018, no ownership group has held or controlled a majority of the Board.

(ii)    *Formation of the Special Committee*.

As described in Article VIII.C.1 of this Disclosure Statement, the October 4, 2024 unanimous written consent of the Board indicates that the Board established the Special Committee comprised of three disinterested directors:  Patrick Bartels, Roger Meltzer, and James Micali. The Board Delegated certain rights, authority and powers, including in connection with any:

Transaction and with any matters in which a conflict of interests exists or is reasonably likely to exist between the Company, on the one hand, and any of its current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other

professionals and advisors of such person or entity, and any such person's or entity's respective heirs, executors, estates, and nominees (collectively, the "Related Parties" and each, a "Related Party"), on the other hand as reasonably determined by the Special Committee (each, a "Related Party"), on the other hand, as reasonably determined by the Special Committee (each, a "Conflict Matter.").

Omnibus Unanimous Written Consent of the Governing Bodies, October 4, 2024. On October 22, 2024, the Debtors filed these Chapter 11 Cases. Since the filing, the Special Committee has continued to consider all restructuring alternatives and has been actively involved in the Debtors' marketing and sales efforts, in addition to leading an investigation into any Estate Causes of Action (solely as used in this Article IX.E of this Disclosure Statement, "Claims") in order to evaluate fully the scope of any releases contained in the Plan.

(iii)   ***Investigation Background.***

To assist with its Claims evaluation, the Special Committee directed Kirkland to conduct a thorough review of the Company's books and records, transactions, and actions taken since the Debtors emerged from their prior bankruptcy on December 19, 2018. The Special Committee has been provided unqualified access to Company documents and personnel. Throughout this process, Kirkland reviewed upwards of 20,000 internal documents, board materials, and emails, communicated regularly with Company management, and engaged with counsel for Goldman Sachs ("Goldman").

As part of the Special Committee investigation, Kirkland directed a team of AlixPartners professionals focused on investigatory diligence and forensic accounting in a comprehensive review of those records. The AlixPartners team had unfettered access into ATD's books and records and looked into any and all insider payments, bonuses, reimbursements, corporate expenditures and related policies, including the Company's contract with NetJets. ATD entered into an agreement with NetJets to introduce scheduling efficiencies to executive travel schedules related to normal course of business. Between 2022 and 2024, ATD paid NetJets an initial deposit of $288,115 and $943,515 in fees and lease payments. ATD terminated the agreement effective August 30, 2024.

That team of professionals, led by Mark Rule, CFA, a Partner & Managing Director with over 25 years of experience providing investigative consulting services such as those required in this instance. Kirkland and AlixPartners have presented findings to the Special Committee at regular meetings between November 11, 2024, and the date of this Disclosure Statement. Presentations were made both in writing and orally. The Debtors have produced to the Committee the presentations that have been given to the Special Committee and minutes of the Special Committee's meetings, redacted for privilege and pursuant to the *Order Approving Confidentiality Agreement and Stipulated Protective Order* [Docket No. 310] governing these Chapter 11 Cases.

As set forth in greater detail below, the Special Committee, with assistance from Kirkland and AlixPartners, evaluated (1) ATD's investments in certain automotive-adjacent businesses—*i.e.*, the Adjacencies—and internal technologies between 2020 and 2024; (2) ATD's 2021 refinancing efforts; (3) a potential sale of the business contemplated by ATD in 2022; (4) the departures of ATD's Chief Executive Officer, Stuart Schuette, and Chief Financial Officer,

Ryan Walsh in 2024; (5) payments and distributions to Company insiders and equity holders since October 22, 2020; and (6) the Company's continuing cost-reduction efforts. As part of its investigation, the Special Committee, with the assistance of counsel, assessed the governance involved in ATD's decision-making in these areas of interest, including the existence (if any) of overlapping roles and conflicts of interests. Based on the findings of the investigation, including the information below, the Special Committee supports the releases outlined in the Plan.

 (iv) ***Key Areas of Interest***.

  1. <u>Adjacency- and Technology-Related Investments</u>.

 As described further in this Disclosure Statement, including in <u>Articles II</u> and <u>VI</u> herein, from 2019 to 2021, due to a variety of factors (including a rapid rise in inflation following the COVID-19 pandemic and heightened demand for replacement tires), the Company experienced a sizable increase in profits from sales of its replacement tire and wheel products. As a result of the profit increase, the Company decided to expand beyond its existing businesses and invest in certain Adjacencies, including the businesses of: Torqata; Tirebuyer.com; FLX FWD Logistics, LLC ("<u>FLX FWD</u>"); PolyAtom, LLC ("<u>PolyAtom</u>"); and the Company's Recycling Initiative. In parallel, and continuing through August 2024, the Company also invested in various internal technology projects to enhance its digital presence and support its core business operations (the "<u>Technology Investments</u>," and together with the Adjacencies, the "<u>Investments</u>").

 The Investments identified and investigated by the Special Committee (with Kirkland's assistance) are listed in the table below. As indicated in the far-right column, and as reflected in the Company's books and records, the Company's spend for each Investment consisted of (1) capital contributions and/or (2) various operational expenditures. Additionally, and as discussed more fully below, both the Board and the Company's officers played a role in reviewing, approving, and/or monitoring the roll-out and performance of each Investment.

| **Investment** | **Type** | **Description** | **Gross Company Spend (2020 to 2024)** |
|---|---|---|---|
| Torqata | Adjacency | ATD's homegrown digital analytics platform, which uses point-of-sale data to provide retailers with custom market insights (e.g., regional purchasing trends, projected customer churn). | ~$67 million in combined capital contributions and operational expenditures. |

| Investment | Type | Description | Gross Company Spend (2020 to 2024) |
|---|---|---|---|
| Tirebuyer.com | Adjacency | ATD's homegrown eCommerce platform, offering business-to-business-to-consumer (B2B2C), Fleet and Mobile services using ATD as fulfillment partner. | ~$60 million in combined capital contributions and operational expenditures. In 2021, Tirebuyer completed an arms-length acquisition of Tirescanner.com, Inc. and its subsidiary, TyreScanner Ltd. for a purchase price of $2 million.  Tirebuyer funded the acquisition, while the Company—with Board approval—guaranteed certain of Tirebuyer's payment obligations. |
| FLX FWD | Adjacency | Provides third- and fourth-party logistics and warehousing services to ATD vendors on bailment and consignment basis. | ~$23 million in combined capital contributions and operational expenditures. |
| PolyAtom | Adjacency | Offers a cloud platform solution and a technical platform to integrate various solutions into one flexible digital environment to run operations.  Used by ATD and marketable to other customers. | ~$3 million in capital contributions. |
| Tire Recycling Initiative | Adjacency | Initiative by ATD to transport used tires back from retailers, store such tires temporarily until they could be collected by a recycling operation. Intended to provide value-add to tire retailers. | ~$11 million in combined capital contributions and operational expenditures. |
| Oracle | Internal Technology | Enterprise Resource Planning system. | ~$25 million in combined capital contributions and operational expenditures. |

| Investment | Type | Description | Gross Company Spend (2020 to 2024) |
|---|---|---|---|
| Radius | Internal Technology | Customer-facing purchasing platform launched by the Company to drive additional tire volume. | ~$20 million in combined capital contributions and operational expenditures. |
| Data Ecosystems / MDM | Internal Technology | Master Data Management systems. | ~$12 million in combined capital contributions and operational expenditures. |
| Mobile Tire Installer (MTI) | Internal Technology | Software to drive Mobile Tire Installer business (Avayler). | ~$7 million in combined capital contributions and operational expenditures. |
| Blue Yonder | Internal Technology | New order, warehouse, and yard management systems. | ~$6 million in combined capital contributions and operational expenditures. |
| Palantir | Internal Technology | New automation software. | ~$4 million in combined capital contributions and operational expenditures. |
| Customer Enablement | Internal Technology | Data migration for Radius. | ~$4 million in operational expenditures. |
| System Z / Omega | Internal Technology | Customer service application used by ATD to process customer orders. | ~$3 million in operational expenditures. |

*The Capital Committee.* The Debtors' historical Board materials, along with various internal Company records, reflect that the Company has, since 2018, maintained certain policies governing its expenditures—including a "Capital Policy," "Spend Management Policy," and "Bill of Authority." Notably, under the Bill of Authority, the Company's Chief Executive Officer and Chief Financial Officer maintain the Board-delegated authority to review and approve the Debtors' capital and operational investments.

Internal Company records further reflect that in 2020, Company leadership—citing the Bill of Authority—formed a "Capital Committee" (consisting of the Company's then-existing Chief Executive Officer, Chief Financial Officer, Chief Sales Officer, and General Counsel) to review, approve, and monitor the Investments. As indicated by the Debtors' historical Board materials, certain members of the Capital Committee (*e.g.*, Stuart Schuette—who, as noted, served as both a Director and the Company's Chief Executive Officer) periodically updated the Board on the status

and performance of the Investments in the Board's quarterly meetings, often amidst discussions surrounding the Company's capital budget and annual operating plans. As indicated by various internal Company emails, the Board also received ad hoc updates from Schuette on the performance of certain Investments (mainly, the Adjacencies).

In 2022, the Capital Committee was nominally discontinued, at which point its investment-approval responsibilities shifted to the Company's Executive Leadership Team ("ELT")—which, at the time, consisted of the Capital Committee's members and various other executives (*e.g.*, Tim Eisenmenn, Torqata's then-CEO). The Debtors' historical Board materials, as well as internal Company communications, reflect that the Board continued to receive updates concerning the Investments on a quarterly and ad hoc basis.

*Purpose and Status of the Investments*. The Debtors' internal records (including historical Board and management materials, bidder and financing diligence materials, and emails), as well as various interview statements made by the Debtors' current management team, indicate that the Debtors intended each of the Investments to further the Company's abilities to (1) protect its core business and/or (2) adjust to emerging trends in the U.S. tire market. According to the Debtors' management team, certain of the Adjacencies have helped the Company attract and retain retail customers and/or generate new revenue streams—*e.g.*, in the B2B2C tire market, or the market for third- and fourth-party logistics services. Other Adjacencies—namely, the Company's Tire Recycling program—have been discontinued as part of the Company's cost-reduction and operational optimization efforts (described in section 6, on cost saving initiatives, below). As part of those same cost-reduction and optimization initiatives, some of the Company's internal technology Investments—which, as noted, were intended to bolster the Company's digital presence following a period of rapid growth—have either been paused or discontinued.

### 2. 2021 Refinancing.

Looking to take advantage of its strong performance in 2020 and 2021, the Company explored refinancing its existing debt. At the time, the Company had roughly $1.5 billion USD and $95 million CAD in outstanding, secured debt. The initial maturity dates for its existing debt were as follows: (1) September 1, 2023 for the 2018 first-in last-out facility (the "2018 FILO"); (2) December 21, 2023 for the 2018 asset based lending facility (the "2018 ABL Facility"); and (3) September 1, 2024 for the 2018 term loan facility (the "2018 Term Loan").

The Minutes from the January 25, 2021 Special Called Board Meeting show that the Board authorized the Company to pursue a refinancing of its debt in the current high yield marketplace through a $1 billion secured bond offering (the "Bond Offering"). At that same meeting, the Board resolved to retain Goldman and Bank of America to co-lead the bond offering. Goldman, specifically, was designated as the transaction's lead underwriter. At no point then or after did Goldman execute an engagement letter to underwrite the Bond Offering. As reflected in the January 25 Special Called Board Meeting Minutes, Kristen Hagen—a Goldman-affiliated board member—abstained from voting on Goldman's retention given Goldman's contemplated role in the Bond Offering.

On February 5, 2021, Goldman notified the Debtors that it would not underwrite the Bond Offering, which was scheduled to launch on February 9. Goldman did not provide a reason for its

withdrawal. At no point before or after the withdrawal did Goldman receive compensation (*i.e.*, fees) related to its contemplated underwriting services.

The minutes from the February 8, 2021 Special Meeting of the Board reflect that the Board created a Special Committee consisting of Stuart Schuette (ATD's then-CEO), Jim Micali (Independent), and Michael Kneeland (Independent) to (1) analyze and evaluate Goldman's withdrawal from the transaction and (2) provide recommendations to the Board regarding next steps on the bond offering.

On February 9, 2021, Schuette, on behalf of the Board, requested additional information from Goldman management regarding its withdrawal from the Bond Offering. Goldman responded the following day and declined to provide additional details on its withdrawal. That same day, the Debtors decided to pause the Bond Offering and pursue extending its existing ABL and Term Loan facilities. Shortly thereafter, internal documents reflect that the Board paused its evaluation of extending the existing facilities.

On February 22, 2021, it was publicly announced that Goldman had agreed to advise Goodyear Tire & Rubber Company in its then-forthcoming acquisition of Cooper Tire & Rubber Company. Internal documents reflect that the Special Committee appointed to review Goldman's withdrawal determined that Goldman's withdrawal from the Bond Offering was caused by a potential conflict-of-interest posed by that transaction.

From February to May 2021, the Debtors considered various financing options to capitalize on availability in the then-current high yield marketplace. Aside from considering a bond offering, the Debtors considered a SPAC transaction and potential strategic sales.

In September 2021, ATD pursued a refinancing of its existing ABL Facility to take advantage of favorable market conditions. On October 22, 2021, ATD executed the refinancing. The refinancing paid off all outstanding debt, other than certain letters of credit. As a result of the refinancing, ATD took on $2.2 billion in new debt which included (1) a new $1 billion Term Loan and (2) a new $1.2 billion ABL Facility that consisted of (i) $1.1 billion in Revolving Credit Loans and (ii) $100 million in Original FILO Term Loans.

All as described further in <u>Article VII</u> of this Disclosure Statement, the new ABL Facility was secured by a first-priority security interest in the ABL Priority Collateral—all accounts and payment intangibles, chattel paper, and inventory. It also has a second-priority security interest in all of the new Term Loan Priority Collateral. The maturity date for the ABL Facility is October 22, 2026. Substantially all assets other than the assets securing the ABL Facility serve as Term Loan Priority Collateral for the Term Loan Facility, including equipment, real property, and equity interests of ATD Inc. and the Debtors. In addition, the Term Loan is secured by a second-priority security interest in the ABL Priority Collateral. The maturity date for the Term Loan is October 22, 2028.

Through the refinancing, ATD was able to (1) achieve a more favorable interest rate, which annualized in approximately $15-20 million cash interest savings, (2) repay and retire the existing financing facility from the 2018 Restructuring, (3) negotiate more favorable borrowing base

concessions on the ABL Facility, (4) increase the revolving credit facility by approximately 20 percent, and (5) extended maturities.

As of the Petition Date, approximately $883.6 million in aggregate principal amount remained outstanding for the ABL Facility and approximately $975 million in aggregate principal amount remained outstanding for the Term Loan.

### 3. The 2022 Sale Process.

As described in Article VIII.B of this Disclosure Statement, in May 2022, the Company received communications from a potential strategic partner indicating interest in acquiring the Company.

On August 10, 2022, the Board, by unanimous written consent, resolved to engage Goldman as its financial advisor in connection with a possible strategic sale of the Company. Pursuant to the August 10 Unanimous Written Consent, material facts of the relationship between Goldman, Goldman Sachs Asset Management ("GSAM"), and Goldman-affiliated board members Matthew Baker and Adrian Jones were disclosed to the Board. After this disclosure, the Board, including each of the board members who were not designated by or affiliated with GSAM and were otherwise disinterested with respect to Goldman's engagement, authorized that management to engage Goldman as the Company's financial advisor.

Over a period of approximately six months, the Company contacted nine parties—all strategic investors in the automotive aftermarket industry. All interested parties were provided materials and given access to non-public information and management as appropriate.

Two competing bids, the 2022 Bidders, emerged. On November 23, 2022, Bidder A submitted its best and final IOI to buy ATD. On November 29, 2022, Bidder B submitted its best and final IOI to buy ATD. Both IOIs were non-binding and were subject to further diligence by the Bidders and its advisors.

On December 5, 2022, Goldman presented an overview of the sale process for the Board, including an overview of the process from May through November and presented the breakdown of the final IOIs. That same day, the Board, by unanimous written consent, rejected both IOIs. In the Unanimous Written Consent, the Board stated that the terms of the final IOIs included inadequate financial consideration to stockholders and provided insufficient certainty of execution. The Unanimous Written Consent further indicated that the Board determined that a transaction with Bidder A or Bidder B would not be in the best interests of the Company's stockholders and that the Board believed that the current economic and capital markets conditions were not conducive to executing a transaction at that time. Through the December 5 Unanimous Written Consent, the Board resolved to discontinue discussions with Bidder A and Bidder B regarding a potential transaction and cease pursuit of a transaction at that time. Goldman did not receive any fees as a result of the 2022 sale process.

### 4. CEO and CFO Departures.

*Stuart Schuette (Former CEO).* Stuart Schuette was CEO of ATD from 2016 to 2024 until he resigned on August 22, 2024. Through Schuette's tenure at ATD, Schuette led the Company

through the successful 2018 Restructuring and maintained ATD's reputation as a leader in the tire replacement industry.  During Schuette's time as CEO, there is no documentation to suggest he was the subject of any derivative actions or whistleblower complaints.

Prior to Schuette's official resignation, as confirmed in minutes from a July 30, 2024 Ad Hoc Board Meeting, Schuette made a formal offer to the Company to stay at the Company in a consultant role to assist with a potential transition with an interested strategic.  Those same minutes indicate that the Board discussed and analyzed Schuette's offer and unanimously resolved that Vince Vangaever (Goldman board member) and Eric Hoff (Polen Capital board observer) had the discretion to negotiate and execute a consulting agreement with Schuette.

On August 13, 2024, Schuette and ATD entered into a Separation, Transition Services, and Release Agreement which provided, among other things, a (1) $25,000 monthly Transition Service Fee through December 2024; (2) contingent $500,000 retention bonus if ATD consummated a sale with the Prepetition Potential Buyer; and (3) release of virtually all claims held by Schuette, known or unknown, against the Company.

In September 2024, Schuette received a $20,000 discretionary bonus for his work as part of his departure and his availability for consultation for one month.  Schuette did not receive a retention bonus.  He also did not receive a monthly Transition Service Fee.

Schuette is now CEO of Lipari Foods.

*Ryan Walsh (Former CFO)*.  Ryan Walsh worked at ATD from 2015 to 2024.  Through his tenure at ATD, Walsh was Vice President, Financial Planning & Analysis; Senior Vice President: Corporate Planning, Treasurer & Investor Relations; Chief Financial Officer, Digital Enterprises, Senior Vice President Finance; and was ultimately promoted to CFO in November 2023.  Walsh resigned as CFO on October 4, 2024.  During Walsh's time at the Company, there is no documentation to suggest he was the subject of any derivative actions or whistleblower complaints.

On or around September 26, 2024, Walsh and ATD entered into a Separation and Release Agreement which provided, among other things, a release of virtually all claims held by Walsh, known or unknown, against the Company.  Walsh did not receive a retention or discretionary bonus associated with his departure from ATD.  He also did not receive a Transition Service Fee.

Walsh is now CFO of Renuity Home.

5.   Insider Payments.

To assist the Special Committee, AlixPartners conducted a four-year lookback analysis of all ATD payments to Company insiders ("Insiders") and equity holders.  As part of that effort, 12 individuals were including with the scope of Insiders.  No indications of inappropriate insider transactions were identified.  The payments generally consisted of different forms of payroll expense (*e.g.*, regular pay, bonuses, holiday pay, and paid time off), Board fees, and expense reimbursements.  Further, AlixPartners did not identify any dividends payments to equity holders or management fee payments to Insiders.

As part of its efforts, AlixPartners identified $11,784 in cumulative expense reimbursements paid to two Company equity-holders—Goldman Sachs ($1,085) and Polen Capital ($10,699)—related to their employees' attendance at Company Board meetings between 2021 and 2024.  AlixPartners also identified $2,887 in payments made to a subsidiary of Wells Fargo in 2022 for the lease of a postage mailing system at a Hercules Tire facility.  Based on a review of the Company's shareholder records, Wells Fargo owned 1.89% of Company equity at that time.

6.   Cost Saving Initiatives.

By the end of 2022, demand for automotive products and services compressed, and the surge in the Debtors' profits subsided.  Since 2023, the Debtors' profits continued to decline, due in large part to new market headwinds.  By mid-2024, the Debtors had already implemented cost-saving initiatives in technology and operations.

In connection with the Debtors' sales and marketing process, conducted from early to mid-2024, on June 28, 2024, the Company and a strategic buyer, the Prepetition Potential Buyer, entered into a non-binding letter of intent, the Prepetition LOI, to purchase the Company.  As part of the Prepetition LOI, the buyer included a condition to closing that the Company had a certain minimum run rate EBITDA.  At a June 28, 2024 Ad Hoc Meeting of the Board, the Board noted that, in response to the Prepetition LOI, it was expanding the scope of AlixPartners' engagement to further identify and implement cost savings, inventory management, revenue drivers, and other financial efficiencies to assist the Company in achieving the minimum run rate EBIDTA.

On August 9, 2024, the Board, through unanimous written consent, retained Goldman as its financial advisor for a potential transition.  The August 9 Unanimous Written Consent ratified, confirmed, and approved Goldman's 2022 engagement letter finding that it remained in full force and effect and continuing to use Goldman for this potential sale was in the best interests of the Company and its stockholders.  Goldman's engagement letter also included the following disclosure regarding different groups within Goldman, "GSAM is managed as a separate business unit from the rest of the firm with its own operating, control, compliance and risk management infrastructure.  Stringent regulatory, informational, and operational barriers separate GSAM from PWM and the Investment Banking, and Global Markets Divisions."

On August 6, 2024, in response to the Board's expanded scope of AlixPartners' engagement, AlixPartners provided the Debtors with a QuickStrike presentation to report and deliver on the Debtors' previously mentioned goals.  AlixPartners identified four opportunity areas where the Company could reduce or pause spending: (1) technology; (2) operations/supply chain; (3) inventory; (4) sales, general & administrative expenses ("SG&A").

- **Technology**:  The Company put certain projects on hold until profitability returned and moved a significant number of IT jobs overseas to India.  To date, the Company has achieved $34 million in savings in technology related initiatives.

- **SG&A Head Count**:  The Company implemented a 5% reduction in head count and has achieved $11 million in savings to date.

- **Supply Chain**:  The Company implemented several initiatives, such as switching from UPS to FedEx and reducing the number of trucks to match volume and output.  These initiatives have saved the Company $26 million to date.

- **Sales and Merchandising**:  To improve sales and merchandising, the Company adjusted discounts previously given to large customers and resolved the disconnect between marketing funding from vendors and actual spending such that if no funding was received, the Company spent nothing on marketing.  The Company has achieved $30 million of savings to date.

- **Inventory**:  The Company reduced excess inventory by moving and discounting slow-moving inventory to a new location.

- **Other**:  The Company paused non-essential travel and implemented additional austerity measures, resulting in $2 million in additional savings.

For the majority of these opportunity areas, AlixPartners suggested pausing spending until the Company was profitable—not fully eliminating the initiatives.  AlixPartners identified near term, cost-cutting initiatives made by the Company in response to a market shift.  For context, ATD is a $5 billion Company with approximately $1 billion cost base.  With the help of AlixPartners, ATD incorporated several initiatives within each of these areas to reduce its spending by roughly $100 million (10%).  AlixPartners continues to assist with, and assess, the Company's savings, which are reflected in weekly operational reports.

(v)      ***Coordination with the Committee***.

In addition to supporting the Special Committee, the Debtors provided extensive diligence to assist the UCC with its own informal investigation.

Namely, the Debtors—with the help of Kirkland and AlixPartners—responded to hundreds of discrete UCC diligence requests, provided the UCC with thousands of documents through data room access, answered dozens of informal written UCC questions, and made ATD personnel available for an interview with the UCC's counsel.  Notably, the Debtors established a virtual data room where the UCC's counsel and the financial advisor can review and analyze documents related to the Debtors' financials, operations (including IT, HR, and related functions), legal and regulatory compliance, funded debt, marketing processes, Chapter 11 cases, and investments, among others.

Kirkland also maintained close communication with the UCC's counsel throughout these Chapter 11 Cases to ensure that the UCC had access to critical documents, analyses, and employees.    Additionally,  AlixPartners  engaged  directly  with  the  UCC's  financial advisor, Province.

Based on these collaborative efforts, the Debtors understand that the UCC's own investigation, described further below, has examined several of the same topics as the Special Committee's Investigation, including historical transactions, the Prepetition Marking Process, and

the Adjacencies, among others.  ATD plans to continue providing the UCC with any information it needs to fulfill its duties as an Estate fiduciary.

(vi)    ***The Committee's Investigation***.

Since its appointment, the Committee has been investigating various potential litigation claims involving parties that are proposed to be released under the Plan (including the current and former directors, officers, agents, members of management, and other employees of the Debtors), including as described in Article IX.E(v) of this Disclosure Statement.  The Committee's investigation into these potential claims and causes of action is ongoing and, therefore, the Committee has not yet formed a view as to whether the proposed releases under the terms of the Plan should be approved.  The Committee reserves all rights with respect to the Plan pending the conclusion of its investigation.

F.    *Second Day Relief and Debtors' Other Motions.*

The Debtors also Filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens.  In connection with a hearing held on November 19, 2024, the Bankruptcy Court entered orders granting the following relief:

(i)    ***The Interim Compensation Order*** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 284];

(ii)    ***The Ordinary Course Professionals Order*** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 285]; and

(iii)    ***The Contract Rejection Procedures Order*** approving procedures to reject executory contracts and unexpired leases [Docket No. 286].

In addition to the above procedural and administrative motions, the Debtors Filed the *Motion of the Debtors for Entry of Interim and Final Orders  (I) Authorizing the Debtors to Enter into the Insurance Premiums Financing Agreement and Grant a First Priority Security Interest in Unearned Insurance Premiums and (II) Granting Related Relief* [Docket No. 125] seeking authorization to enter into an insurance premiums financing agreement and grant a first priority security interest in unearned insurance premiums (the "PFA Motion").  On December 16, 2024, the Bankruptcy Court entered a Final Order approving the PFA Motion on a final basis [Docket No. 466].

G.    *Rejection of Certain Executory Contracts and Unexpired Leases.*

The Debtors are party to a substantial number of executory contracts.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.

On November 30, 2024, the Debtors Filed an omnibus *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 378] notifying parties of their intention

to reject the two commercial lease agreements and two subleases identified on Schedule 2 attached thereto. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of November 30, 2024. The Debtors filed a second omnibus *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 487] on December 19, 2024, identifying four commercial lease agreements and two subleases to be rejected by the Debtors. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of December 19, 2024, or December 31, 2024, as applicable. The Debtors filed a third and fourth *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket Nos. 491 and 493] on December 20, 2024, identifying certain contracts to be rejected by the Debtors. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of December 20, 2024. The Debtors filed a fifth and sixth *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket Nos. 515 and 519] on December 23, 2024, identifying certain contracts to be rejected by the Debtors. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of December 23, 2024. On January 15, 2025, the Debtors filed a seventh *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 615] identifying certain contracts to be rejected by the Debtors. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of January 15, 2025. On January 27, 2025, the Debtors filed an eighth *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 663] identifying certain contracts to be rejected by the Debtors. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of January 27, 2025. On January 28, 2025, the Debtors filed a ninth *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 667] identifying certain contracts to be rejected by the Debtors. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of January 31, 2025. On February 9, 2025, the Debtors filed a tenth *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 716] identifying certain contracts to be rejected by the Debtors. No objections were Filed, and pursuant to the Contract Rejection Procedures Order, such rejections were deemed effective as of February 10, 2025.[11] On February 14, 2025, the Debtors filed an eleventh *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 750] identifying certain contracts to be rejected by the Debtors.

---

[11]   On February 17, 2025, Van Wagner Sports & Entertainment, LLC ("Van Wagner") Filed *Van Wagner Sports & Entertainment, LLC's Statement in Response to Debtors' Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 754]. Though Van Wagner does not object to or challenge the Debtors' decision to reject the implicated contract—a Marketing and Sponsorship Agreement between Van Wagner and one of the Debtors—Van Wagner's statement reserves its right to seek payment of an alleged administrative expense claim arising from the Marketing and Sponsorship Agreement. The Debtors reserve all rights with respect to Van Wagner's reservation of rights and the related rejection notice.

H.    *The Debtors' Professionals' Retention Applications.*

To further facilitate the Debtors restructuring efforts and ease administrative burdens, the Debtors Filed—and the Bankruptcy Court approved—applications to retain professionals postpetition pursuant to sections 327, 328, 105, and 363 of the Bankruptcy Code, including:

(i)     ***Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession*** [Docket No. 449];

(ii)    ***Troutman Pepper Locke LLP[12] as Special Counsel for the Debtors and Debtors in Possession*** [Docket No. 444];

(iii)   ***AlixPartners as Restructuring Advisor to the Debtors and Debtors in Possession, Michael Feder as Interim Chief Executive Officer, and Ronald J. Bienias as Chief Restructuring Officer*** [Docket No. 446];

(iv)    ***Moelis as Investment Banker and Capital Markets Placement Agent to the Debtors and Debtors in Possession*** [Docket No. 472].

(v)     ***Donlin Recano as Administrative Advisor to the Debtors and Debtors in Possession*** [Docket No. 441];

(vi)    ***Ernst & Young LLP as Tax, Valuation, and Financial Accounting Advisory Services Provider to the Debtors and Debtors in Possession*** [Docket No. 445];

(vii)   ***Pachulski Stang Ziehl & Jones LLP as Co-Counsel for the Debtors and Debtors in Possession*** [Docket No. 443];

(viii)  ***PricewaterhouseCoopers LLP as Auditor to the Debtors*** [Docket No. 597]; and

(ix)    ***Hilco Real Estate, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession*** [Docket No. 644].

I.    *Expected Timetable of the Chapter 11 Cases*

To ensure that the Debtors' Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation, the Debtors committed to certain case milestones.  Subject to Court approval, the Debtors intend to solicit votes to accept or reject the Plan and proceed in accordance with the following timeline, which is consistent with the milestones below and the Bankruptcy Code.

---

[12]  Pursuant to the *Notice of Firm Name Change for Retained Professional* [Docket No. 575] filed on January 6, 2025, Troutman Pepper Hamilton Sanders LLP merged with Locke Lord LLP to become Troutman Pepper Locke LLP.

| Event | Date |
|---|---|
| **Voting Record Date** | [February 20, 2025] |
| **Solicitation Deadline** | [Two (2) Business Day following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter)] |
| **Publication Deadline** | [Two (2) Business Days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter)] |
| **Deadline to File the Plan Supplement** | [The date that is no later than seven (7) days prior to the Plan Objection Deadline (as defined herein)] |
| **Voting Deadline** | [March 24, 2025], at 4:00 p.m. (prevailing Eastern Time) |
| **Plan Objection Deadline** | [March 24, 2025], at 12:00 p.m. (prevailing Eastern Time) |
| **Confirmation Brief and Plan Objection Reply Deadline** | [March 26, 2025] |
| **Deadline to File the Voting Report** | [March 26, 2025] |
| **Combined Confirmation Hearing** | [March 27, 2025], at [●] [●] a/p.m. (prevailing Eastern Time) |

      J.    *Bar Date Motion.*

On December 26, 2024, the Debtors Filed the *Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 551] (the "Bar Date Motion"). On January 14, 2025, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 603] (the "Bar Date Order"), which established procedures and deadlines for Filing Proofs of Claim against the Debtors and approval of the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Notice, the last date for certain persons and entities to File Proofs of Claim in these Chapter 11 Cases is February 18, 2025, at 11:59 p.m. (prevailing Eastern Time) (the "General Bar Date") and the last date for governmental units to File Proofs of Claim in the Debtors' Chapter 11 Cases is April 21, 2025, at 11:59 p.m. (prevailing Eastern Time). The Bar Date Notice was published in *The New York Times* (national edition) and the *Charlotte Observer*, on or before twenty-one days before the General Bar Date.

K.    *Schedules and Statements.*

The Debtors Filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") on December 10, 2024, and Filed certain amendments to the Schedules and Statements on December 11, 2024.

L.    *Removal Extension.*

On December 26, 2024, the Debtors Filed the *Motion of Debtors for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 552] (the "Removal Extension Motion").  In addition to related relief, the Removal Extension Motion sought an extension of the period of time during which the Debtors may seek removal of certain Actions (as defined in the Removal Extension Motion). The Bankruptcy Court granted the Removal Extension Motion on January 13, 2025, and entered an *Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 598].

M.    *Section 365(d)(4) Extension Motion.*

On January 27, 2025, the Debtors Filed the *Motion of Debtors for Entry of an Order (I) Extending the Time within which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 665] (the "Section 365(d)(4) Extension Motion").  On February 6, 2025, the Bankruptcy Court granted the Section 365(d)(4) Extension Motion and entered an *Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 694].

N.    *Exclusivity Extension Motion.*

On January 27, 2025, the Debtors Filed the *Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 664] (the "Exclusivity Extension Motion").  On February 6, 2025, the Bankruptcy Court granted the Exclusivity Extension Motion and entered an *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 692].

O.    *Litigation Matters.*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to settlement and release upon confirmation of a plan under chapter 11, with certain exceptions.

## X.    SUMMARY OF THE PLAN.

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and readers should refer to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Wind-Down Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan, the Disclosure Statement, and the Plan Supplement, the relevant Plan provision shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of any inconsistency between the Plan, the Disclosure Statement, the Plan Supplement, and the Confirmation Order, the Confirmation Order shall control.  In the event of any inconsistency between the Plan and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.  In the event of any inconsistency between the Confirmation Order and the Sale Order, the Sale Order shall control.

A.    *Classification and Treatment of Claims and Interests.*

1.    Classification of Claims and Interests.

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise settled prior to the Effective Date.

2.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims against or Interests in the Debtors.  The Debtors reserve the right to

modify the Plan in accordance with Article X of the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims against or Interests in the Debtors to render such Class of Claims against or Interests in the Debtors Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

B.    *Means for Implementation of the Plan.*

1.    General Settlement of Claims and Interests.

The Plan incorporates certain settlements of issues among the Debtors and various parties in interest, including the Consenting Prepetition Term Lenders.  As among the settlement parties, the applicable provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved among such parties pursuant to the Plan.  Subject to Article VI of the Plan, all Plan distributions made to Holders of Allowed Claims that are settlement parties are intended to be and shall be final.  As discussed in detail in this Disclosure Statement and as otherwise provided in the Plan, to the extent provided for by the Bankruptcy Code and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  All distributions made to Holders of Allowed Claims, in any Class, are intended to be and shall be final.

2.    Asset Sale.

The implementation of the Asset Sale shall be addressed in the Sale Order and will be subject to the terms of the Asset Purchase Agreement.  The Distributable Proceeds remaining following consummation of the Asset Sale shall be distributed pursuant to and in accordance with the Plan.

3.    Wind-Down.

(a)    Wind-Down Transactions.

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Wind-Down Debtors and Plan Administrator, as applicable, shall take all applicable actions set forth in the Transaction Steps Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Wind-Down, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Wind-Down that are consistent with and pursuant to the terms and conditions of the Plan and Transaction Steps Memorandum, which transactions may include, as applicable and without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation,

restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and Transaction Steps Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Transaction Steps Memorandum, and (if applicable) the Asset Purchase Agreement and having other terms to which the applicable parties agree; and (d) all other actions that the applicable Wind-Down Debtor or the Plan Administrator determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan (including the Transaction Steps Memorandum).

All Holders of Claims receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as the Debtors determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (including the Transaction Steps Memorandum), including the Wind-Down, including, for the avoidance of doubt, any and all actions required to be taken under applicable nonbankruptcy law.

(b)      Sources of Consideration for Plan Distributions.

The Plan Administrator shall fund distributions to Holders of Allowed Term Loan Secured Claims with the proceeds of any Collateral for the Term Loans and to Holders of Allowed Term Loan Deficiency Claims and Holders of Allowed General Unsecured Claims under the Plan with the Distributable Proceeds (if any) and in accordance with the Waterfall Recovery.

(c)      Wind-Down Debtors.

After the Effective Date, the Wind-Down Debtors shall be responsible for purposes of (1) winding down the Debtors' remaining businesses and affairs, if any, as expeditiously as reasonably possible and liquidating any assets, if any, held by the Wind-Down Debtors after the Effective Date, (2) performing the Debtors' obligations under the Asset Purchase Agreement and any related agreements entered into in connection therewith (to the extent agreed by the Wind-Down Debtors), including the Transition Services Agreement (as defined in the Asset Purchase Agreement), (3) resolving any Disputed Claims, (4) making distributions on account of Allowed Claims in accordance with the Plan, (5) filing appropriate tax returns, and (6) administering the Plan.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings

pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to the Asset Purchase Agreement, a prior order or the Plan, the Wind-Down Debtors specifically retain and reserve the right to assert, after the Effective Date, any and all of the Retained Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan; *provided* that any proceeds received by the Debtors or the Wind-Down Debtors, as applicable, on account of Causes of Action assigned to the Purchaser, shall be immediately transferred to the Purchaser.

(i)    Wind-Down Debtors' Assets.

On the Effective Date, the Wind-Down Debtors shall become successors to the Debtors' rights, title, and interests to any Estate assets remaining following the closing of the Asset Sale, which shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummation of the Plan.  The Wind-Down Debtors will not conduct business operations other than as necessary to wind-down such operations and will be charged with winding down the Debtors' Estates.  The Wind-Down Debtors shall be managed by the Plan Administrator.  The Wind-Down Debtors shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget.  Any distributions to be made under the Plan shall be made by the Plan Administrator or its designee.  The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan, the Confirmation Order, and the Plan Administrator Agreement.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtors and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms of the Plan and of the Plan Administrator Agreement, compromise or settle any Wind-Down Debtors' Assets remaining with the Wind-Down Debtors as a successor to the Debtors.  On and after the Effective Date, the Wind-Down Debtors and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Retained Causes of Action or Claims relating to any Wind-Down Debtors' Assets remaining with the Wind-Down Debtors as a successor to the Debtors or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtors and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided for in the Plan and in the Plan Administrator Agreement.  All of the Wind-Down Debtors' activities shall be subject to the Wind-Down Budget.  The Wind-Down Debtors shall be entitled to enforce all defenses and counterclaims to any and all Claims asserted against the Debtors and their Estates, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

On and after the Effective Date, except as otherwise provided in the Plan, each Wind-Down Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval

53

by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

The Wind-Down Debtors shall be deemed to be substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtors' Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtors pursuant hereto. In the event of any conflict between the terms of Article IV.C of the Plan and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

Notwithstanding any prohibition on assignability under applicable nonbankruptcy law, on the Effective Date and thereafter, if additional Wind-Down Debtors' Assets become available, such additional Wind-Down Debtors' Assets, subject to the Plan, the Confirmation Order, and the Plan Administrator Agreement, as applicable, shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the applicable Debtor with all of attendant rights, title, and interests in and to all of the Wind-Down Debtors' Assets, in accordance with section 1141 of the Bankruptcy Code. At such time when any of the Wind-Down Debtors' Assets vest in the Wind-Down Debtors, all such assets shall automatically vest in the Wind-Down Debtors free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth in the Plan and the Wind-Down Debtors' Expenses as set forth in the Plan and in the Plan Administrator Agreement.

(ii)    Administrative Claims Reserve.

On the Effective Date, the Wind-Down Debtors shall establish the Administrative Claims Reserve by depositing Cash in the amount of the Administrative Claims Reserve Amount into the Administrative Claims Reserve (and the Plan Administrator shall deposit Cash into or withdraw Cash from the Administrative Claims Reserve if the Administrative Claims Reserve Amount changes at any time). The Cash in the Administrative Claims Reserve shall be used to pay Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims. Any amounts remaining in the Administrative Claims Reserve after payment of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims shall promptly be transferred to the Wind-Down Reserve without further action or order of the Bankruptcy Court. For the avoidance of doubt, any Allowed Administrative Expense Claims, Allowed Priority Tax Claims or Allowed Other Priority Claims that are Assumed Liabilities (as defined in the Asset Purchase Agreement) shall be satisfied under the Asset Purchase Agreement and not from Cash in the Administrative Claims Reserve.

(iii)    Wind-Down Reserve.

Any contrary provision of the Plan notwithstanding, following the occurrence of the Effective Date, (i) any Cash held by the Wind-Down Debtors in excess of the aggregate amount set forth in the Wind-Down Budget and (ii) any amounts remaining in the Wind-Down Reserve after entry of a final decree closing the last of the Chapter 11 Cases shall be payable to the Purchaser.

(iv)    Appointment of Plan Administrator.

The Plan Administrator shall be appointed by the Debtors, in consultation with the Committee.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.  The Plan Administrator shall administer the distributions to Holders of Allowed Claims to the extent provided under the Plan and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of pursuing Retained Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, board of directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.  On the Effective Date, the Persons acting as managers, directors, and officers of the Debtors and/or Wind-Down Debtors, as applicable, shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Debtors' and/or Wind-Down Debtors', as applicable, managers, directors, and officers.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve.

(v)    Responsibilities of Plan Administrator.

The rights, powers, privileges, obligations, and compensation of the Plan Administrator shall be set forth in the Plan Administrator Agreement, which shall be filed as part of the Plan Supplement.

(vi)    Dissolution of Boards of the Debtors.

As of the Effective Date, the existing board of directors or managers, as applicable, of any Debtor shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Wind-Down Debtors with respect to their affairs.  Subject to the foregoing and in all respects to the terms of the Plan, the Plan Administrator shall have the power

and authority to take any action necessary to wind-down and dissolve any of the Wind-Down Debtors and shall:  (a) file a certificate of dissolution for any of the Wind-Down Debtors together with all other necessary corporate and company documents, to effect the dissolution of any of the Wind-Down Debtors under the applicable laws of each Wind-Down Debtor's state of formation; (b) complete and file all final or otherwise required federal, state, and local tax returns and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Wind-Down Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Wind-Down Debtors or any of their Affiliates.

(vii)    Wind-Down Debtors' Expenses.

The payment of the Wind-Down Debtors' Expenses shall be subject to the Wind-Down Budget.

(viii)    Insurance.

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator subject to the Wind-Down Budget.

To the extent any current or former directors or officers of the Debtors provide assistance to the Wind-Down Debtors after the Effective Date of the Plan, the Wind-Down Debtors will provide such directors and officers with reasonable and customary indemnification, exculpation, and insurance coverage with respect to such services, consistent with the indemnification, exculpation, and insurance coverage provided to the Plan Administrator and subject to the Wind-Down Budget.

(ix)    Fiduciary Duties of the Plan Administrator.

Pursuant to the Plan and to the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive distributions pursuant to the Plan.

(x)    Dissolution of the Wind-Down Debtors.

The Wind-Down Debtors will dissolve on the earlier of:  (i) (A) the final liquidation, administration, and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and the full performance of all other duties and functions as set forth in the Plan or in the Plan Administrator Agreement and (B) the Chapter 11 Cases of the Debtors have been closed; or (ii) the Plan Administrator determines in its reasonable judgment that the Wind-Down Debtors lack sufficient assets and financial resources, after

reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order, and/or the Plan Administrator Agreement. After (i) the final distributions pursuant hereto, (ii) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (iii) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions.

(xi)     No Liability of the Wind-Down Debtors.

On and after the Effective Date, the Wind-Down Debtors shall have no liability on account of any Claims against or Interests in the Debtors in existence prior to the Effective Date except as set forth in the Plan and in the Plan Administrator Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims against or Interests in the Debtors.

4.     Corporate Action.

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the Plan Administrator; (2) implementation of the Wind-Down Transactions (including the steps set forth in the Transaction Steps Memorandum); (3) funding of all applicable escrows and accounts; and (4) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Wind-Down Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). On the Effective Date, all matters provided for in the Plan involving the corporate or organizational structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the equityholders, members, directors, or officers of the Debtors or the Wind-Down Debtors, as applicable. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by Article IV.D of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

5.     Cancellation of Securities and Agreements.

Except as otherwise specifically provided for in the Plan (or to the extent otherwise assigned to the Purchaser, as set forth in the Asset Purchase Agreement, pursuant to the Sale Order) on the Effective Date: (i) the outstanding obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other Securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim against or Interest in the Debtors shall be cancelled and deemed surrendered as to the

Debtors, and the Debtors or the Wind-Down Debtors, as applicable, shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors or the Wind-Down Debtors, as applicable, pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised.  Notwithstanding the foregoing, no Executory Contract or Unexpired Lease that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code shall be terminated or cancelled on the Effective Date.

6.      Effectuating Documents; Further Transactions.

On and after the Effective Date, the Wind-Down Debtors and the Plan Administrator, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Wind-Down in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

7.      Exemption from Certain Taxes and Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, as applicable, or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Wind-Down Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax, fee, or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the imposition or collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

8.      Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan or pursuant to a Final Order, and the Asset Purchase Agreement, each Wind-Down Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to a Final Order (including the Final DIP Order), or as assigned and transferred pursuant to the Asset Purchase Agreement, which, in each case, shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. Except as specifically released or as assigned or transferred under the Plan or pursuant to a Final Order (including the Final DIP Order) or as assigned or transferred pursuant to the Asset Purchase Agreement, the Debtors and the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan or pursuant to a Final Order (including the Final DIP Order), or as assigned and transferred pursuant to the Asset Purchase Agreement. Unless otherwise agreed upon in writing by the parties to the applicable Causes of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Wind-Down Debtor, without the need for any objection or responsive pleading by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Wind-Down Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or the Wind-Down Debtors, as applicable, and the objection party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (including the Final DIP Order), the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the

Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order (including the Final DIP Order), any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

C.    *Treatment of Executory Contracts and Unexpired Leases.*

1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan; (ii) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (iii) is subject to a motion to assume (or assume and assign) such Unexpired Lease or Executory Contract as of the Effective Date; (iv) is to be assumed by the Debtors and assigned to another third party in connection with the Asset Sale, including the Purchaser as set forth in the Asset Purchase Agreement approved pursuant to the Sale Order; (v) is a contract, instrument, release, or other agreement or document entered into in connection with the Plan; or (vi) is a D&O Liability Insurance Policy.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, or the Schedule of Assumed Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Order to assume and assign Executory Contracts and Unexpired Leases to the Purchaser pursuant to the Asset Purchase Agreement and any related documents relating to the Asset Sale. Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors.

The Debtors, the Wind-Down Debtors, and the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases identified in Article V of the Plan and in the Plan Supplement at any time through and including ninety days after the Closing Date (as defined in the Asset Purchase Agreement) of the Asset Sale.  The Debtors or the Wind-Down Debtors, as applicable, shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby. For the avoidance of doubt, Article V of the Plan relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of the Asset Purchase Agreement and the Sale Order.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

2.      <u>Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases</u>.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any nonbankruptcy law to the contrary, the Debtors and the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

3.      <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>.

Unless otherwise provided by a Final Order of the Bankruptcy Court, any Proof of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases, pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the Debtors and the Wind-Down Debtors, as applicable, no later than the later of (i) the Claims Bar Date, or (ii) 11:59 p.m., prevailing Eastern Time, on the date that is thirty days after the later of (a) entry of an order approving the rejection of any Executory Contract or Unexpired Lease of the Debtors or (b) the effective date of rejection of any Executory Contract or Unexpired Lease.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors no later than seven days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed,**

**forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Wind-Down Debtors, or the property for any of the foregoing without the need for any objection by the Debtors or the Wind-Down Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Debtor in accordance with Article III.C of the Plan, except as otherwise provided by order of the Bankruptcy Court.

4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan (it being understood that the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Assumption Procedures set forth and defined in the Bidding Procedures Order shall be authorized and governed by the Sale Order, and, in the event of any inconsistency between the Plan and Sale Order concerning the assumption and assignment of any such Executory Contract or Unexpired Lease, the terms of the Sale Order shall govern and control) shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.

For the avoidance of doubt, all Sale Cure Claims and any related objections with respect to Executory Contracts or Unexpired Leases proposed to be assumed or assumed and assigned by the Purchaser in connection with the Asset Sale shall be or have been satisfied and resolved in connection with the Asset Sale and pursuant to the Sale Order and the terms of the Asset Purchase Agreement, and all Cure Claims and any related objections with respect to Executory Contracts or Unexpired Leases proposed to be assumed or assumed and assigned by the Debtors under the Plan shall be or have been satisfied and resolved in connection with the Plan and pursuant to the Confirmation Order.

As set forth in the Bidding Procedures, on **December 11, 2024**, the Debtors distributed, or caused to be distributed, the Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims or Sale Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related Cure or Sale Cure amount must have been Filed, served, and *actually received* by the parties listed on such Cure Notice no later than **December 26, 2024, at 5:00 p.m. (Eastern Time).**

Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment or amount of any Cure Claim or Sale Cure Claim will be deemed to have assented to such assumption or assumption and assignment and the proposed amount of the Cure Claim or Sale Cure Claim. In the event of a dispute regarding: (i) the amount of any Cure Claim or Sale Cure Claim, (ii) the ability of the Debtors,

the Wind-Down Debtors, the Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (iii) any other matter pertaining to assumption or assignment, then any disputed Cure or Sale Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Debtors, or the Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date. Notwithstanding anything to the contrary in the Plan, the rights of any party to an assumed Executory Contract or Unexpired Lease to seek payment of any obligation arising under such Executory Contract or Unexpired Lease after December 26, 2024, (*i.e.*, the date of the Cure Notice) and before the effective date of assumption are fully preserved.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any nonmonetary defaults arising from or triggered by the filing of these Chapter 11 Cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

5.    <u>Insurance Policies</u>.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed or assumed and assigned to the Purchaser, solely to the extent set forth in the Asset Purchase Agreement, and explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases, all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided* that any insurance policies that are not assumed and assigned to the Purchaser shall be assumed by the Debtors for the sole purpose of resolving any Claims covered by such insurance policies, resolving any Causes of Action retained in connection with such insurance policies, and collecting any and all outstanding deposits, restricted cash, and letters of credit related thereto to the extent reasonably necessary to implement the Wind-Down in accordance with the Plan.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies

and their right to seek payment or reimbursement from the Debtors (or the Purchaser, solely to the extent assumed and assigned to the Purchaser under the Asset Purchase Agreement) or draw on any Collateral or security therefor.  For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a Cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing Cure amounts or Claims.

6.    <u>D&O Liability Insurance Policies</u>.

The D&O Liability Insurance Policies shall be assumed by the Debtors or the Wind-Down Debtors, as applicable, effective as of the Effective Date, pursuant to sections 105, 365, and 1123 of the Bankruptcy Code, and nothing shall alter, modify, or amend, affect, or impair the terms and conditions of (or the coverage provided by) any of the D&O Liability Insurance Policies, including the coverage for defense and indemnity under any of the D&O Liability Insurance Policies, which shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies regardless of whether such officers, directors, trustees, managers, or members remain in such position after the Effective Date.  For the avoidance of doubt, the D&O Liability Insurance Policies will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies.  In addition, after the Effective Date, none of the Debtors or the Wind-Down Debtors, as applicable, shall terminate or otherwise reduce coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect or purchased as of the Petition Date.

7.    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

8.    <u>Reservation of Rights</u>.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding

whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have thirty days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

9.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

D.    *Settlement, Release, Injunction, and Related Provisions.*

1.    Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

2.    Release of Liens.

**For the avoidance of doubt, upon consummation of the Asset Sale as set forth in the Asset Purchase Agreement, the assets sold in such Asset Sale shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Sale Order and the Asset Purchase Agreement, as applicable.**

**Without limiting the foregoing, except as otherwise specifically provided in the Plan, the Plan Supplement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the effectuation of the Wind-Down Transactions and applicable distributions made pursuant to the Plan, and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, and required to be satisfied pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Claim (and the applicable agents for such Holder) shall be authorized and directed to release any Collateral or other property of any Debtor (including any Cash Collateral and possessory Collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien pursuant to this section, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of,**

but shall not be required to effect, the termination of such Liens, mortgages, deeds of trust, pledges, and other security interests pursuant to this section and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall, at the sole cost and expense of the Wind-Down Debtors take any and all steps reasonably requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

3.    Releases by the Debtors.

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtors, their Estates, the Wind-Down Debtors, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative Claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors, their Estates, the Wind-Down Debtors, including any successors to the Debtors or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor and another Debtor, the decision to file the Chapter 11 Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into or Filing of the RSA, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan

Supplement), the Asset Sale, the Asset Purchase Agreement, the Sale Order, or any Wind-Down Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Facilities, the DIP Orders, the DIP Documents, the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the Asset Sale, the Asset Purchase Agreement, the Sale Order, the Filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan or Confirmation Order, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Wind-Down Transaction, the Asset Purchase Agreement, the Sale Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including any Claim or obligation arising under the Plan, (ii) affect the rights of Holders of Allowed Claims to receive distributions under the Plan or payment of any Cure Claim (including any Sale Cure Claim), or (iii) release any Claims or Causes of Action against any non-Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' releases in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' releases in the Plan are:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtors' releases in the Plan; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtors' releases in the Plan against any of the Released Parties.

4.      Releases by Holders of Claims and Interests.

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be,

hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each and every Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claims or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort, or otherwise, including any Avoidance Actions and any derivative Claims asserted or assertable on behalf of any of the Debtors, that such Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the Chapter 11 Cases, any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the decision to file the Chapter 11 Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of the RSA, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Asset Sale, the Asset Purchase Agreement, the Sale Order, or any Wind-Down Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Documents, the DIP Orders, the DIP Facilities, the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the Asset Sale, the Asset Purchase Agreement, the Sale Order, the Filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan or Confirmation Order, the releases set forth above do not (i) release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Wind-Down Transaction, the Asset Purchase Agreement, the Sale Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including any Claim or obligation arising under the Plan, (ii) affect the rights of Holders of Allowed Claims to receive distributions under the Plan or

payment of any Cure Claim (including any Sale Cure Claim), or (iii)  release any Claims or Causes of Action against any non-Released Party.

      5.     Exculpation.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claims and Cause of Action for any Claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or Filing of the Disclosure Statement, the Plan, the Plan Supplement, the Asset Sale, the Asset Purchase Agreement, the Sale Order, the DIP Facilities, the DIP Documents, the DIP Orders, or any Wind-Down Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Asset Sale, the Asset Purchase Agreement, the Sale Order, the DIP Facilities, the DIP Documents, the DIP Orders created or entered into during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place between the Petition Date and the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the Plan, nothing in Article VIII.E of the Plan shall release or exculpate any Exculpated Party for any act or omission arising before the Petition Date or on or after the Effective Date.

      6.     Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims against or Interests in the Debtors that have been released or satisfied pursuant to the Plan or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims against or Interests in the Debtors; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with

or with respect to any such Claims against or Interests in the Debtors; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims against or Interests in the Debtors; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims against or Interests in the Debtors unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, except to the extent that a right of setoff, subrogation, or recoupment is asserted in connection with a timely Filed Proof of Claim, a Cure Claim, or arises from any right of setoff, subrogation, or recoupment that a party to an Unexpired Lease may have under applicable bankruptcy or nonbankruptcy law; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims against or Interests in the Debtors released or settled pursuant to the Plan (other than appeals of the Confirmation Order).  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors until the closing of these Chapter 11 Cases.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim by accepting, or being eligible to accept, distributions under such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

E.    *Conditions Precedent to Confirmation and the Effective Date.*

1.    <u>Conditions Precedent to the Effective Date</u>.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX of the Plan:

a.    the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and such order shall have become a Final Order;

b.    the Debtors shall not be in default under the Final DIP Order (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived or cured in a manner consistent with the Final DIP Order);

c.    the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the

Wind-Down Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the Effective Date;

d.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

e.  all Professional Fee Amounts that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been funded into the Professional Fee Escrow Account pending the approval of such fees and expenses by the Bankruptcy Court;

f.  no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and nonappealable order making illegal or otherwise restricting, preventing, or prohibiting the Consummation of the Plan;

g.  the conditions to effectiveness to the Asset Purchase Agreement shall have been duly satisfied or waived, and the Asset Sale shall have been consummated prior to (or shall be consummated simultaneously with) the Effective Date;

h.  the closing of the Asset Sale shall have occurred, and the Asset Purchase Agreement shall remain in full force and effect;

i.  the Debtors shall have performed all of their obligations through the Effective Date under any transition services agreement with the Purchaser in accordance with the Asset Purchase Agreement;

j.  the Wind-Down Reserve shall have been established and funded consistent with the Wind-Down Budget;

k.  the RSA shall be in full force and effect, no termination event or event that would give rise to a termination event under the RSA upon the expiration of the applicable grace period shall have occurred, and the RSA shall not have been validly terminated prior to the Effective Date; *provided* that this clause (j) will not be deemed unsatisfied if the RSA automatically terminates pursuant to section 13.05 therein;

l.  the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Wind-Down Transactions (and shall not be stayed, modified, revised, or vacated, or subject to any pending appeal), and shall not have been terminated prior to the Effective Date:  (a) if applicable, the Sale Order;  (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Plan; (c) to the extent not included in the foregoing, all financing documents needed to effectuate the

Wind-Down Transactions; and (d) all other material customary documents delivered in connection with transactions of this type (including any and all other documents implementing, achieving, contemplated by or relating to the Wind-Down Transactions); and

m.  the Debtors shall have otherwise substantially consummated the applicable Wind-Down Transactions in a manner consistent in all respects with the Plan.

### 2.    Waiver of Conditions.

The conditions precedent to the Effective Date set forth in Article IX.A of the Plan may be waived by the Debtors with the consent of the Required Consenting Lenders, and, with respect to Article IX.A (a), (e), and (h) of the Plan, the Committee, at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan.

### 3.    Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### 4.    Effect of Nonoccurrence of Conditions to the Effective Date.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) release any Liens, mortgages, deeds of trust, pledges, or other security interests against property of the Estates; (iii) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (iv) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.  Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of the Asset Sale under the Asset Purchase Agreement or the revocation of the Debtors' authority under the Sale Order to consummate such Asset Sale.

## XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.

The following is a brief summary of the confirmation process.  Holders of Claims or Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. **The Bankruptcy Court has scheduled the Confirmation Hearing for [March 27, 2025], at [●]**

**[a/p].m., prevailing Eastern Time.** The Confirmation Hearing may be adjourned from time to time by the Debtors or Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or the Filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and the Solicitation and Voting Procedures. Any objection to confirmation of the Plan or request for modifications to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (3) state, with particularity, the legal and factual basis for the objection to the Plan and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (5) be Filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the notice parties identified in the Combined Hearing Notice (as defined in the Disclosure Statement Order) on or before [March 24, 2025], at 12:00 p.m., prevailing Eastern Time. **Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court**.

> B.      *Confirmation Standards.*

> 1.      Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

> 2.      Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value, as of the Effective Date of the Plan, that is not less than the amount that the non accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims or Interests under the Plan—if any—will be equal to or greater than the recoveries expected to be available in a chapter 7 liquidation.  While the Debtors do not anticipate, as of the date of filing this Disclosure Statement, that any Holders of Claims against the Debtors in Class 3 (Term Loan Secured Claims), Class 4 (Term Loan Deficiency Claims), and Class 5 (General Unsecured Claims) will receive any distribution or recovery on account of their Claim(s), the Debtors believe that proceeding under

the Plan avoids the incremental costs, delays, and uncertainties associated with a chapter 7 liquidation and therefore provides Holders of Claims in Classes 3, 4, and 5 with value that is not less than the amount that would be retained under a chapter 7 proceeding.

As explained throughout this Disclosure Statement, including in Articles VIII.B and IX.D herein, the Debtors ran extensive Prepetition and Postpetition Marketing Processes. With the assistance of their Advisors, and consistent with the Bidding Procedures Order, the Debtors solicited bids for all or substantially all their assets from over one hundred potential buyers. As contemplated by the terms of the RSA, the Debtors and the Purchaser executed the Asset Purchase Agreement to function as a stalking horse bid and set a floor to the Debtors' Postpetition Marketing Process. Ultimately, the Debtors did not receive any higher or otherwise better bids than the Credit Bid, which the Debtors announced as the winning bid on January 12, 2025. Through the Asset Purchase Agreement, the Purchaser will acquire substantially all of the Debtors' assets for aggregate consideration of: (i) a "credit bid" pursuant to section 363(k) of the Bankruptcy Code of (x) 100 percent of the Claims arising under the New Money DIP Credit Agreement, including accrued and unpaid interest as of the date when the Asset Sale closes, and (y) $585 million of the Term Loan Secured Claims; and (ii) the assumption of substantial liabilities—the Assumed Liabilities (as defined in the Asset Purchase Agreement)—including certain of the Debtors' ordinary course liabilities, all Cure Costs (as defined in the Asset Purchase Agreement), outstanding obligations under the Debtors' critical vendor program, and all Allowed Claims against the Debtors arising under section 503(b)(9) of the Bankruptcy Code (not to exceed $1,300,000.00 in the aggregate).

Because the Debtors will have sold substantially all assets pursuant to the Asset Purchase Agreement, the Debtors do not expect, as of the date of this Disclosure Statement, that Holders of Claims in Classes 3, 4, or 5 will receive any distribution under the Plan. In the unlikely scenario wherein Holders of Claims in such classes receive any distribution under the Plan, the Debtors do not anticipate such recoveries to be more than de minimis.

The Debtors believe that the best interests test is satisfied under the facts of these Chapter 11 Cases. In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, creditors that are secured by a particular asset are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

As indicated, the Debtors did not receive any higher or otherwise better bids from third-party purchasers in connection with the Postpetition Marketing Process. Accordingly, substantially all of the assets of the Debtors' business will be sold pursuant to the Sale Order and Asset Purchase Agreement, and the Plan effects a Wind-Down of any remaining assets not

otherwise acquired in the Asset Sale.  Although a chapter 7 liquidation would also result in a liquidation of any remaining assets, chapter 7 proceedings involve additional delay, cost, and uncertainty.  Specifically, the distributable proceeds under a chapter 7 liquidation may be lower because of the chapter 7 trustee's fees and expenses.  This is necessarily the case, because the sole consideration for the Debtors' assets under the Asset Purchase Agreement is the credit bid (*i.e.*, exchanging a secured claim for assets) and Assumed Liabilities (as defined in the Asset Purchase Agreement).  Therefore, it does not result in any consideration being made available under the Plan.  Moreover, the appointment of a chapter 7 trustee would potentially delay the Wind-Down of the Debtors' remaining Estates and add additional costs, draining the Debtors' already limited funds, while doing so.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).  Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.

Therefore, in the unlikely event that value is distributed pursuant to the Plan, liquidating the Debtors' Estates under the Plan will likely provide Holders of Allowed Claims with an equal or, though unlikely, larger, and more timely recovery in part because of the increased uncertainty and expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee.  Relatedly, the appointment of a chapter 7 trustee could inject uncertainty into these Chapter 11 Cases more generally and create risk that the transactions contemplated in the Asset Purchase Agreement would not be consummated.  In fact, conversion of one or more of the Chapter 11 Cases creates a termination right exercisable by the Purchaser under the Asset Purchase Agreement.  Additionally, the delay of the chapter 7 trustee becoming familiar with the assets could easily cause delays to consummation of the Asset Purchase Agreement, if it were not terminated pursuant to its terms.  Any outcome that hinders or prevents the Debtors from consummating the Asset Sale would be value destructive and harm the interests of the Debtors' stakeholders generally.

The conversion to chapter 7 would also require entry of a new bar date.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Debtors believe that, while any distribution to Holders of Claims in Classes 3, 4, and 5 is unlikely as of the date of this Disclosure Statement, proceeding through the Plan avoids the incremental costs, delays, and uncertainties associated with a chapter 7 liquidation and therefore provides Holders of Claims in Classes 3, 4, and 5 with value that is not less than the amount that would be retained under a chapter 7 proceeding.

3.    <u>Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of a chapter 11 plan is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan).

The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

4.    <u>Valuation</u>.

As described above, the Debtors extensively marketed their assets for sale and solicited bids in connection therewith pursuant to the Bidding Procedures Order.  The Debtors believe that the outcome of the Postpetition Marking Process, which was conducted in accordance with the Bidding Procedures and resulted in the Credit Bid being selected as the winning bid, provides the best method of valuing their enterprise, as it allows the market to speak as to that value. The Debtors' Postpetition Marketing Process was a comprehensive and arm's length process with the goal of identifying counterparties for one or more potential value-maximizing sale transactions. Because the Postpetition Marketing Process dictated the value of the Debtors' enterprise under real-world conditions, and to ensure that the integrity of the Postpetition Marketing Process is preserved and value is maximized, this Disclosure Statement does not include a valuation analysis (which the Debtors at this time do not anticipate Filing).  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

C.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.

Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class that contains Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request that the Bankruptcy Court deem the Plan accepted by the Holders of such Claims in such Class.

D.    *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to, subject to the consent rights set forth in the RSA, alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and

satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.  CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.

Holders of Claims against the Debtors entitled to vote should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.  *Risks Related to the Confirmation and Consummation of the Plan.*

1.  <u>Parties in Interest May Object to the Plan's Classification of Claims and Interests</u>.

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims against or Interests in the Debtors, as applicable, that are substantially similar to the other Claims against or Interests in the Debtors, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.  <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur</u>.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived (in accordance with the terms of the Plan) or satisfied, the Effective Date will not take place.

3.  <u>The Debtors May Fail to Satisfy Vote Requirements</u>.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind-down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests or Allowed Claims as those proposed in the Plan.

4.       The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation, subject to the consent rights set forth in the RSA. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

5.       The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Consenting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.      The Debtors Could Lose Exclusivity.

In addition, since the outset of these Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors obtained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan to achieve the Debtors' stated goals.

7.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in distributions being made to creditors not greater than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals. Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

In the alternative, if the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the Estates and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

8.      The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.      Risk of Nonoccurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.    <u>Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan</u>.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11.    <u>The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved</u>.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and releases by Holders of Claims or Interests that may otherwise be asserted against the Debtors, Wind-Down Debtor, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

12.    <u>The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtors</u>.

With respect to Holders of Allowed General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.

13.    <u>The Total Amount of Allowed Administrative and Priority Tax Claims May Be Higher and/or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtors</u>.

The amount of Distributable Proceeds is currently unknown. Additionally, Allowed Administrative Claims not assumed by the Purchaser and Allowed Priority Tax Claims may exceed the total amount of distributable Cash and/or be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Claims not assumed by the Purchaser and Priority Tax Claims on the Effective Date as is required to confirm a chapter 11 plan.

**THE DEBTORS DO NOT CURRENTLY EXPECT DISTRIBUTABLE PROCEEDS TO RESULT IN ANY MATERIAL VALUE OR DISTRIBUTIONS TO HOLDERS OF TERM LOAN DEFICIENCY CLAIMS OR GENERAL UNSECURED CLAIMS.**

14.    <u>The Final DIP Order is Subject to Significant Conditions and Milestones That May Be Difficult to Satisfy</u>.

There are certain material conditions that must be satisfied under the Final DIP Order, including the timely satisfaction of milestones in the Chapter 11 Cases. The ability to timely

complete such milestones is subject to risks and uncertainties, some of which are beyond the Debtors' control.

15.    Certain Tax Implications of the Plan.

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "*Certain United States Federal Income Tax Consequences of the Plan*," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtors and Holders of Claims.

B.    *Other Risks.*

1.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, market and sell their assets will be subject to the risks and uncertainties associated with bankruptcy.  These risks include, but are not limited to, the following:  (a) ability to develop, confirm, and consummate the Wind-Down Transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, the Debtors may not be able to maximize the value of their assets through any asset sale, which could materially affect creditor recoveries.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

2.    The Debtors May Not Consummate the Asset Sale.

The Plan is premised on the implementation of the Asset Sale pursuant to the Asset Purchase Agreement, Bidding Procedures Order, and the Sale Order.  However, in the event the conditions necessary to consummate the Asset Sale are not satisfied or waived (in accordance with the terms of the Asset Purchase Agreement), or the Asset Sale is not otherwise timely consummated, the Debtors may need to pivot to a wind-down and liquidation under chapter 7 of the Bankruptcy Code.

3.      <u>Even if Wind-Down Transactions are Implemented, the Debtors Will Continue to Face Risks</u>.

Even if the Wind-Down Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, bank instability, and other factors.  As a result of these risks and others, there is no guarantee that the Wind-Down Transactions will achieve the Debtors' stated goals.

C.      *Disclosure Statement Disclaimer.*

1.      <u>The Financial Information Contained in this Disclosure Statement Has Not Been Audited</u>.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.      <u>Information Contained in this Disclosure Statement Is for Soliciting Votes</u>.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      <u>This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission</u>.

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

4.      <u>No Legal or Tax Advice Is Provided to You by this Disclosure Statement</u>.

**<u>This Disclosure Statement does not constitute legal advice to you.</u>**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, or other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.      <u>This Disclosure Statement May Contain Forward Looking Statements</u>.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement

other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

      6.     <u>No Admissions Made</u>.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

      7.     <u>Failure to Identify Litigation Claims or Projected Objections</u>.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and may object to Claims against or Interests in the Debtors after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims against or Interests in the Debtors or objections to such Claims against or Interests in the Debtors.

      8.     <u>No Waiver of Right to Object to Claims against or Interests in the Debtors</u>.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

      9.     <u>Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors</u>.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

      10.     <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors

nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

> 11.    No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.   You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

> A.    *Introduction.*

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to certain Holders. The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Changes in these rules or new interpretations of the rules with retroactive effect could significantly affect the U.S. federal income tax consequences described herein.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors have not requested, and do not intend to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, Persons whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who

are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons using a mark-to-market method of accounting, Persons who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).   No aspect of state, local, non-income, or non-U.S. taxation is addressed.   Furthermore, this summary assumes that a Holder holds only Claims or Interests in a single Class and holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).   This summary also assumes that the Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year, and that various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.   This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.   The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims against and Interests in the Debtors described below also may vary depending on the nature of any Wind-Down Transactions that the Debtors and/or Wind-Down Debtors engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

Except as explicitly set forth below, this discussion does not discuss any aspect of an Asset Sale.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC).

For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).  If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of

partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.      *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.*

The Plan is being structured as a wind down, liquidation, and dissolution of the Debtors' Estates following the Effective Date. The implementation of the Asset Sale shall be addressed in the Sale Order and will be subject to the terms of the Asset Purchase Agreement. The Distributable Proceeds remaining, if any, following consummation of the Asset Sale shall be distributed pursuant to and in accordance with the Plan.

Accordingly, the tax consequences of the implementation of the Plan to the Debtors will in large part be a function of, and are generally expected to be immaterial as compared to, the tax consequences of the Asset Sale to the Debtors (which tax consequences are generally not discussed herein). If the Asset Sale is for tax purposes structured as a reorganization of the Debtors under Section 368(a)(1)(G) of the IRC (a "Reorganization Transaction"), the Debtors' tax attributes would, subject to rules (which are not discussed herein) regarding the cancellation of debt income and Section 382 of the IRC, survive the restructuring process and carry over to the purchaser or its affiliate in the Asset Sale. If the Asset Sale is structured as a taxable sale of the assets and/or stock of any Debtor or subsidiary thereof (a "Taxable Transaction"), then any of the Debtors' tax attributes that are not utilized in connection with such Taxable Transaction or otherwise as a result of any transactions undertaken pursuant to the Plan (for example, the disposition by a Wind-Down Debtor of Assets excluded under the Asset Purchase Agreement that remain in the Estates, which disposition results in gain) will not survive the implementation of the Plan. It has not yet been determined whether the Asset Sale will be structured as a Reorganization Transaction or a Taxable Transaction.

C.      *Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.*

The following discussion assumes that the Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the Wind-Down Transactions.

1.      Consequences to Class 3 Holders of Term Loan Secured Claims.

Except to the extent that a Holder of an Allowed Term Loan Secured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of the proceeds of any Collateral for the Term Loans, if any.

If the Asset Sale is structured as a Reorganization Transaction and such Holder is treated as exchanging "securities" in such Reorganization Transaction (as a result of exchanging its Allowed Term Loan Claim) for stock (such stock, the "Reorg Stock") of a party to such Reorganization Transaction, then the receipt of such proceeds under the Plan by such Holder is expected to be treated as the receipt of "boot" in a reorganization.  A U.S. Holder of such Claim should not recognize loss, but should recognize gain to the extent of the lesser of (a) the fair market value of such proceeds received under the Plan, and (b) (i) the sum of (1) the fair market value of such proceeds received under the Plan, and (2) the fair market value of the Reorg Stock received in the Reorganization Transaction, minus (ii) the U.S. Holder's adjusted tax basis in its Claim. **The consequences of the receipt of Reorg Stock are not described herein and Holders are urged to consult their tax advisors regarding the receipt and ownership of any such Reorg Stock.**

If the Asset Sale is structured as a Taxable Transaction, or is structured as a Reorganization Transaction but such Holder is not treated as exchanging "securities" for Reorg Stock, then such Holder should recognize gain or loss equal to the difference between (a) the amount of Cash received and the fair market value of any non-cash consideration received (subject to "Accrued Interest" discussed below) and (b) such Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.

Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Due to the inherently factual nature of the determination, if relevant based on the form of the Asset Sale, U.S. Holders are urged to consult their own tax advisors regarding the status of their Claims as "securities" for U.S. federal income tax purposes.

2.    Consequences to Class 4 Holders of Term Loan Deficiency Claims.

Except to the extent that a Holder of an Allowed Term Loan Deficiency Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Term Loan Deficiency

Claim shall receive, in accordance with the Remaining Waterfall Recovery Allocation, its share of the Distributable Proceeds attributable to each applicable Debtor.

The consequences to a Holder of an Allowed Term Loan Deficiency Claim should be as described above for a Holder of an Allowed Term Loan Secured Claim, mutatis mutandis.

### 3.   Consequences to Class 5 Holders of General Unsecured Claims.

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in accordance with the Remaining Waterfall Recovery Allocation, its share of the Distributable Proceeds attributable to each applicable Debtor.

The consequences to a Holder of an Allowed General Unsecured Claim should be as described above for a Holder of an Allowed Term Loan Secured Claim where an Asset Sale is structured as a Taxable Transaction, mutatis mutandis.

### 4.   Accrued Interest.

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Claims in each Class will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 5.   Market Discount.

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim. Any such market discount is generally the excess of (A) (i) the "revised issue price" of such Claim if the Claim is issued with OID or (ii) the stated redemption price at maturity of

such Claim if the Claim is not issued with OID over (B) such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory de minimis amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Wind-Down Transactions.

6.      Limitation on the use of Capital Losses.

A U.S. Holder who recognizes capital losses will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

7.      Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their own tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

D.      *Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.*

The following discussion assumes that the Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Wind-Down Transactions to such Non-U.S. Holder.

1.      Gain Recognition.

Subject to the discussion of backup withholding and FATCA (as defined below) gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject

to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Wind-Down Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

  2. <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest (Including OID and Interest Attributable to Accrued but Untaxed Interest) under the Plan</u>.

Subject to the discussion of backup withholding and FATCA (as defined below), interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

 • the Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power in the Debtor obligor on a Claim within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

 • the Non-U.S. Holder is not a controlled foreign corporation related to the issuer, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

 • the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

 • the beneficial owner gives the issuer or the issuer's paying agent or other withholding agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a non-U.S. person.

If all of these conditions are not met, interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement (generally a properly executed IRS Form W-8ECI or suitable substitute or successor form or such other form as the IRS may prescribe) is provided to the issuer or the issuer's paying agent or other withholding agent) unless an applicable income tax treaty provides otherwise. If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**The consequences of the receipt of Reorg Stock are not described herein and Holders are urged to consult their tax advisors regarding the receipt and ownership of any such Reorg Stock.**

E.    *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S.

federal withholding. FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN.

F.    *Information Reporting and Backup Withholding.*

The Debtors, the Wind-Down Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS. In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT**

OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XIV.   RECOMMENDATION OF THE DEBTORS.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  February 18, 2025             AMERICAN TIRE DISTRIBUTORS, INC.
                                      on behalf of itself and all other Debtors


                                      */s/ Ronald J. Bienias*
                                      _____
                                      Ronald J. Bienias
                                      Chief Restructuring Officer of the Debtors and
                                      Debtors in Possession