## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Oldco Tire Distributors, Inc., | Case No. 24-12391 (CTG) |
| Post-Effective Date Debtor. | **Related Docket No. 1203, 1305** |

## <u>MEMORANDUM OPINION</u>

The lead debtor in this bankruptcy case was American Tire Distributors, Inc., among the largest replacement tire distributors in North America.[1]  In these bankruptcy cases, the debtors sold substantially all of their assets to their prepetition lenders for approximately $600 million.  The Court approved that sale in an order entered on February 11, 2025.  The sale closed on February 28, 2025.

As is not uncommon in modern chapter 11 practice, the sale to the buyer closed before the buyer had determined which of the debtors' leased premises it planned to keep.[2]  The agreement therefore granted the buyer "designation rights" – the authority to direct the debtors either to assume and assign to the buyer, or to reject, the debtors' leases.

After the closing of the sale, the buyer decided to have the debtors reject the lease on two facilities – one in Lincolnton, North Carolina and another in Mauldin, South Carolina.  Following the procedures the Court had approved, on May 5, 2025, the debtors filed a notice providing for the rejection of the lease in question.  The

---

[1] D.I. 15 at 1.  The Court relies on the first-day declaration in this case only for this background – not for any fact that is material to its resolution of the dispute before it.

[2] Asphalt Buyer II LLC is referred to as the "buyer."

parties have stipulated that the rejection of the lease was effective as of May 30, 2025 (the date on which the debtors' confirmed plan became effective).

Under the terms of the lease, the debtors were required, when the lease terminated, to remove all equipment and hazardous materials from the facility. The debtors did not – leaving behind, among other things, forklifts, racks, and a 55-gallon drum labeled as containing hazardous materials. The landlord accordingly incurred almost $125,000 in expenses in removing the equipment and materials.[3]

The landlord's entitlement to be paid the rent, including the prorated real estate taxes for the period between the petition date and the effective date of the lease's rejection, is not disputed. The parties do dispute, however, the landlord's asserted administrative claim against the bankruptcy estate for the cost of removing the equipment and hazardous materials from its facilities. Alternatively, the landlord asserts a claim against the buyer. The landlord argues that once the sale closed, the buyer owned the materials that were on its premises. And by effectively dumping equipment that the buyer owned in the landlord's facility, the landlord contends that the buyer committed a trespass for which it is liable under state tort law.

The landlord's motion for an allowed administrative claim against the estate will be denied. There is extensive caselaw in this jurisdiction holding that when a lease is rejected, a claim for breach of a contractual obligation to leave the premises in "broom swept" or other specified conditions is a rejection damages claim that

---

[3] HEF NC SC QRS 14-86 Inc. is referred to as the "landlord."

2

becomes a prepetition claim under § 502(g) of the Bankruptcy Code.  The landlord makes a technical argument that here, the date when the equipment was left upon the surrender of the premises was *before* the effective date of the lease's rejection.  On that basis, the landlord argues that its claim is covered by § 365(d)(3), which requires a trustee to perform its post-petition obligations under a lease during the "limbo" period between the petition date and the time a lease is rejected.  That contention is incorrect.  As the extensive caselaw on the issue demonstrates, a claim for violation of a "return condition" provision of a lease is paradigmatically a claim that is incident to the rejection of the lease.  For that reason, § 502(g) speaks directly to the treatment of such a claim, and controls over the more general provision of § 365(d)(3).

The landlord also argues that it should have an administrative claim against the estate under the ordinary application of the test for the allowance of an administrative claim under § 503(b)(1).  It is true that if the tenant damages the property on a post-petition basis, the landlord would have an administrative claim for those damages.  And it *might* follow from that proposition that if the debtor's actions during the post-petition period left the premises in worse condition than they were in on the petition date, such that the landlord incurred *greater* clean-up costs as a result of the debtor's post-petition conduct, that the incremental costs caused by the post-petition conduct would likewise be an administrative expense.  The Court need not, however, resolve that question, as there is nothing in the record to suggest that the condition of the premises on the date of rejection was different from the condition on the petition date.

3

The landlord's claim against the buyer raises an interesting question of subject-matter jurisdiction, as it is a post-confirmation claim between non-debtors without any effect on the bankruptcy estate.  The landlord argues that because of the close relationship between the sale order and the confirmation order, this claim is one that satisfies the "close nexus" test regarding the scope of the related-to jurisdiction.  The effort to tie the landlord's claim against the buyer to the sale order, however, is ultimately unpersuasive.  The only basis for subject-matter jurisdiction over the landlord's claim would be supplemental jurisdiction.  It is clear, however, that under existing law such jurisdiction does not apply in bankruptcy.  The landlord's claim against the buyer will accordingly be dismissed for lack of subject-matter jurisdiction.

## Factual and Procedural Background

The parties to this dispute helpfully stipulated as to the admissibility of various exhibits, including witness declarations.[4]  None of the material facts is in dispute.

The debtor and the landlord were parties to a lease covering two facilities – one in Lincolnton, North Carolina and the other in Mauldin, South Carolina.[5]  The lease provides that upon "the expiration or earlier termination of this Lease," the "Tenant shall (a) remove from the Leased Premises … all property which is owned by

---

[4] *See* Oct. 23, 2025 Hr'g Tr. at 5.

[5] Landlord Ex. 7.  The landlord's counterparty on the March 2002 lease is Heafner Tire Group, Inc.  Landlord states (without contradiction) that debtor American Tire Distributors, Inc. is the successor to Heafner Tire Group Inc.  D.I. 1305 at 4-5.

Tenant or third parties other than Landlord and (b) repair any damage caused by such removal."[6]

The debtors filed these bankruptcy cases in October 2024.[7] Within a week of the filing, the debtors moved to sell substantially all of their assets.[8] The Court approved the sale to the buyer in February 2025.[9] The sale closed later that month.[10]

Earlier in the case, the Court had entered an order addressed to the procedures for rejecting executory contracts. The order provides that the debtors may serve a rejection notice on the contractual counterparty, setting forth the contracts to be rejected and the effective date of the proposed rejection.[11] The procedures go on to state that a party that objects to the rejection of their lease may file an objection within seven days.[12] If the objection is not resolved, the "Debtors shall schedule a hearing on such objection and shall provide at least seven days' notice of such hearing to the applicable Rejection Counterparty."[13]

Here, the debtors filed the rejection notice as contemplated by the procedures order on May 5, 2025, which included a schedule that identified the premises in Lincolnton, North Carolina and Mauldin, South Carolina and stated that the effective

---

[6] Landlord Ex. 7 ¶ 26.

[7] *See* D.I. 1.

[8] D.I. 109.

[9] D.I. 730.

[10] D.I. 843.

[11] D.I. 286 ¶ 2(a).

[12] *Id.* ¶ 2(c).

[13] *Id.* ¶ 2(e).

date of the rejection would be May 20, 2025.[14]  The landlord filed a timely limited objection to the rejection notice, stating that the landlord reserved its rights with respect to the appropriate rejection date and "confirmation that no property has been abandoned in the Leased Premises."[15]

The debtors did not schedule a hearing on the landlord's limited objection.  The parties stipulated, however, that the effective date of the rejection would be May 30, 2025, the date on which the debtors' confirmed plan became effective.[16]

Marina Folz, a vice president of the landlord's parent company, submitted a declaration stating that when the Mauldin, South Carolina premises were turned over, various items of equipment, including "racks, IT equipment, and miscellaneous FF&E in office areas" were left in the facilities.[17]  She further stated that in the Lincolnton, North Carolina premises, the debtors left behind forklifts, racks, tools, a "full 55-gallon drum labeled as containing hazardous materials" and other equipment.[18]  She added that "her team sought offers to remove and dispose of that property from the Leased Premises," and that the "most economical offer" was one for more than $123,000.[19]

---

[14] D.I. 1084, Schedule 2.

[15] D.I. 1097 at 2.

[16] *See* Oct. 23, 2025 Hr'g Tr. at 5; D.I. 1155.

[17] Landlord Ex. 6 at 2.

[18] *Id.*

[19] *Id.  See also id.,* Ex. 2 (offer).

The landlord filed an original proof of claim in February 2023 (by virtue of the bar date order) indicating that the amounts due under the lease had not yet been liquidated.[20]  The landlord amended that proof of claim in June 2025 to assert a claim for more than $8.1 million, including $445,000 "for failure to remove abandoned equipment and other property from the leased premises in accordance with the Lease."[21]

In October 2025, the landlord filed a motion seeking the allowance of an administrative claim to cover the removal costs.[22]  The landlord alternatively sought an order declaring that the buyer is liable to it for the cleanup costs, on the theory that at the time the premises were turned over to the landlord, the buyer was the owner of equipment, and the buyer is therefore liable in tort for having left its equipment in the landlord's premises.[23]  Both the post-effective date debtor and the landlord filed oppositions.[24]  The landlord filed a reply.[25]  The Court held argument on the motion on October 23, 2025.

During the argument, the Court raised the question whether the Court has subject-matter jurisdiction over the landlord's claim against the buyer, and invited

---

[20] Landlord Ex. 3.

[21] Landlord Ex. 5, Ex. A at 2.

[22] D.I. 1305.

[23] *Id.*

[24] D.I. 1309, D.I. 1310.

[25] D.I. 1313.

supplemental submissions directed to that question.  Both the landlord and the buyer filed supplemental submissions.[26]

## Jurisdiction

The landlords' motion seeking an administrative claim against the bankruptcy estate arises under § 503 of the Bankruptcy Code and is therefore within the district court's "arising under" jurisdiction provided in 28 U.S.C. § 1334(b).  That jurisdiction has been referred to this Court pursuant to 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.  The motion seeking an allowed administrative claim is a core matter under 28 U.S.C. § 157(b)(2)(B).  For the reasons discussed in Part II of this Memorandum Opinion, the Court concludes that it lacks subject-matter jurisdiction over the landlord's claim against the buyer.

## Analysis

### I.    The claims against the bankruptcy estate are claims for rejection damages and are not entitled to administrative expense status.

No one disputes that the landlord has a claim against the bankruptcy estate on account of the debtors' failure to live up to the contractual promise to "remove from the Leased Premises … all property which is owned by Tenant or third parties other

---

[26] D.I. 1331; D.I. 1332.  Separately, the post-effective date debtor objected to the landlord's proof of claim.  D.I. 1203.  The landlord responded to the objection, D.I. 1244, and the post-effective date debtor replied.  D.I. 1309.  These briefs generally advance the same arguments made in the briefs on the motion for an allowed administrative claim.  While the Court believes that the analysis set forth in this Memorandum Opinion may be sufficient to permit the parties to settle an order resolving the claim objection, to the extent there are any remaining questions of law or fact that need to be addressed, the parties should reach out to chambers to set a status conference to discuss how to proceed to resolve any remaining unresolved matters.

than Landlord." The question is whether that claim is entitled to administrative priority.[27]

### A. The buyer owned the equipment in the period between the closing of the asset purchase agreement and the debtors' return of the premises to the landlord.

There is little question but that, upon the closing of the asset sale in February 2025, title to the equipment in question would have transferred from the debtors to the buyer. The asset purchase agreement expressly included among the "Acquired Assets," all "Equipment."[28] And that term was defined to include "all furniture, fixtures, equipment… and all other tangible personal property."[29]

The buyer argues that because the premises leases were (ultimately) rejected rather than assumed, the buyer never obtained title to the equipment in question.[30] Specifically, the buyer's argument hinges on the fact that the asset purchase

---

[27] The landlord claims that the assets were improperly "abandoned" under § 554 of the Bankruptcy Code. D.I. 1305 at 13-14. But the bankruptcy "abandonment" power has little or nothing to do with this dispute. In the typical case, the effect of "abandonment" under § 554 is, in effect, to undo the vesting of the debtor's property in the bankruptcy estate under § 541(a). Abandoned property leaves the bankruptcy estate and typically becomes property of the prepetition debtor. *See In re Interpictures Inc.*, 217 F.3d 74, 76 (2d Cir. 2000) ("[O]nce the debtor's property is abandoned in bankruptcy, the property should be treated as though no bankruptcy proceedings had occurred and therefore revert to the party that held a pre-petition interest in it."). Accordingly, the effect of abandonment is that the bankruptcy estate no longer is liable for costs that are associated with ownership. *See also* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection,'* 59 Univ. Colo. L. Rev. 845, 863 (1988) (explaining how abandonment is analogous to the rejection of an executory contract because, as with rejection "the end result is exclusion of an asset from the estate"). But even where a trustee in bankruptcy properly abandons property, that does not eliminate the trustee's contractual obligation (if one otherwise exists) to remove it from a leased premises. Nor is it obvious that the abandonment affects the question whether that contractual claim is entitled to administrative priority.

[28] D.I. 730-1 § 2.1(e).

[29] *Id.* at 9.

[30] D.I. 1310 at 9-11.

agreement defines the term "Leased Real Property" to include "fixtures, systems, Equipment and items of personal property of any Seller attached or appurtenant" to the real property.[31]  Because "Leased Real Property" under any lease that was not assumed is an "Excluded Asset," the buyer contends that the equipment in question is carved out from what it acquired in the purchase.

But that argument fails for two reasons.  *First*, the only equipment that is "excluded" under the APA on the ground that it is in a rejected lease is property that is "attached or appurtenant" to the real property itself.  There is nothing in the record suggesting that the equipment here – which includes forklifts, racks and a 55-gallon drum – fits that description.

*Second*, and perhaps more fundamentally, the asset purchase sale closed on February 28, 2025.[32]  The debtors did not file a lease rejection notice until May 5, 2025, and the rejection did not become effective until May 30, 2025 – three months after the buyer acquired substantially all of the debtors' assets.  It necessarily follows, therefore, that as of February 28, 2025, the equipment in question became the buyer's.  And whatever effect the later rejection of the lease might have had, it cannot have operated *retroactively* to have changed the fact that the buyer owned the equipment from the time the sale closed until the time at which the debtors returned the premises to the landlord.

---

[31] D.I. 730-1 at 13.

[32] D.I. 843 at 2.

The fact that the buyer rather than the debtors owned the equipment as of the time the debtor returned the equipment, however, does not, in and of itself, resolve the landlord's motion for an allowed administrative claim.  The lease, after all, required the debtors to remove "all property which is owned by Tenant *or third parties other than Landlord.*"[33]  The landlord accordingly has a claim for breach of contract without regard to who owned the equipment.  The question is whether that claim is one for rejection damages or is entitled to administrative priority.

> **B.    A claim for breach of a return condition clause in a lease, in connection with the rejection of that lease, is typically a prepetition, rejection damages claim.**

Section 502(g) of the Bankruptcy Code provides that claims "arising from the rejection, under section 365 of this title … of an executory contract or unexpired lease" are treated "as if such claim had arisen before the date of the filing of the petition."[34] The court accordingly explained in *Unidigital* that the costs associated with the removal of equipment, upon the rejection of a lease, are therefore typically prepetition claims.[35]  Following *Unidigital*, the court observed in *Universal Building Products* that a claim that a debtor failed to meet a contractual obligation to "leave the premises in broom-swept condition" is "part of [the landlord's] claim for rejection damages which are treated as pre-petition claims."[36]

---

[33] Landlord Ex. 7 ¶ 26 (emphasis added).

[34] 11 U.S.C. § 502(g).

[35] *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001).

[36] *In re Universal Bldg. Prods.*, No. 10-12453 (MFW), 2011 WL 841231, at *2 (Bankr. D. Del. Mar. 7, 2011).

In its brief, the landlord offers two different reasons why this usual principle should not apply here.  Neither, however, is persuasive.  *First*, the landlord argues that because the effective date of the rejection was *after* the property was returned, that it is entitled to an administrative claim by virtue of § 365(d)(3), which obligates the trustee, "notwithstanding § 503(b)(1)," to "perform all the obligations of the debtor … arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected."[37]

The obvious import of § 365(d)(3) is to require the trustee in bankruptcy to pay post-petition lease obligations as those obligations become due, and to eliminate the argument that a bankruptcy estate should not be required to pay an above-market rent for the time it occupied the premises post-petition, on the theory that the "benefit to the estate" was less than the rental rate provided in the lease.  "Most courts have read [§ 365(d)(3)] to excuse the lessor from showing actual use and benefit to the estate, as required by § 503(b)(1)."[38]  Because the statute requires "timely perform[ance]" of obligations arising before rejection, the Third Circuit held in *Montgomery Ward* that the debtor was obligated to pay taxes that came due post-petition under a lease (including the portion attributable to a prepetition period), not the prorated portion attributable to the post-petition period.[39]  *Goody's Family Clothing* dealt with a slightly different situation – whether a landlord was entitled to

---

[37] 11 U.S.C. § 365(d)(2).

[38] Charles Jordan Tabb, Kara J. Bruce and Laura Napoli Coordes, *Law of Bankruptcy* 888 (6th ed. 2024).

[39] *In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3d Cir. 2001).

an administrative claim for the debtor's post-petition occupancy *before* the first post-petition rent payment becomes due.  There, the Third Circuit held that nothing in § 365(d)(3) precludes a landlord from seeking to recover that stub rent as an administrative claim under § 503(b)(1).[40]

The landlord's argument here is a clever one.  It contends that because the debtor vacated the premises (on May 20, 2025) *before* the effective date of the rejection of the lease (on May 30, 2025), that the statutory command to "timely perform" the lease duties in this period applies.[41]  The argument, however, is too clever.  The landlord points to no case that has ever found that a "return condition" clause should be treated as an administrative claim on this basis.  Rather, for the reasons Judge Walrath explained in *Unidigital* and *Universal Building Products*, the claim paradigmatically "aris[es] from the rejection" of the lease within the meaning of § 502(g).[42]  Accordingly, even if a technical argument could be made for the

---

[40] *In re Goody's Family Clothing, Inc.*, 610 F.3d 812 (3d Cir. 2010).  While the parties' briefs here address the debtor's obligations for real estate taxes, that dispute was resolved consensually by the parties in advance of the hearing and is thus not addressed herein.

[41] D.I. 1305 at 15.

[42] *See also In re Teleglobe Commc'ns Corp.*, 304 B.R. 79, 82-84 (D. Del. 2004) (rejecting the argument that the reasoning of *Montgomery Ward* made the cost of removing "improvements" from the premises administrative because "any liability associated with removing improvements and alterations to the Leased Premises could not arise prior to rejection"); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2015 WL 1806347, at *11 (Bankr. D. Del. Apr. 16, 2015) ("In the case before me, the Landlord would remove the Debtors' furniture and fixtures only upon termination of the lease.") (emphasis omitted).  While the landlord seeks to distinguish these cases on the ground that they are focused on the debtor's abandonment of the equipment at issue, for the reasons set forth above in n. 27, the abandonment of the equipment (which returns the equipment from the bankruptcy estate to the prepetition debtor) has little, if anything, to do with the question of the debtor-in-possession's liability to the landlord, in its capacity as tenant under the lease.

application of § 365(d)(3) to this situation, the Court concludes that § 502(g) is the specifically applicable provision, and thus controls.[43]

Moreover, it is less than clear from the record before the Court that the landlord's technical argument is correct even as far as it goes.  The nub of the Landlord's argument is that the debtor was obligated to remove the equipment when it vacated the premises on May 20, 2025.  But under the terms of the lease, the obligation to remove equipment arises "[u]pon expiration or earlier termination of this Lease."[44]  Nothing in the record before the Court demonstrates, however, that the debtor's vacatur of the premises caused the "expiration" or "termination" of the lease.[45]  Accordingly, even if the claimant's technical argument were correct, and for the reasons set forth above the Court concludes that it is not, the Landlord still would not have carried its burden of demonstrating that its claim for removal costs arose before the rejection of the lease.[46]

*Second*, the landlord argues that it is entitled to an administrative claim for the cost of removing the equipment as an ordinary administrative claim under

---

[43] *See Morales v. Trans World Airlines*, 504 U.S. 374, 384 (1992) ("it is a commonplace of statutory construction that the specific governs over the general").  *See also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.") (internal citations omitted).

[44] Landlord Ex. 7 ¶ 26.

[45] *See Teleglobe*, 304 B.R. at 83 ("a rejection and surrender of a nonresidential real property lease is a breach of the lease and not a termination thereof").

[46] *See In re Hayes Lemmerz Intern. Inc.,* 340 B.R. 461, 471 (Bankr. D. Del. 2006) ("the burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it") (cleaned up).

§ 503(b)(1) on the ground that the debtors' received a post-petition benefit.[47]  There is no question that the debtors benefited from the post-petition use of the premises.  And the debtors accordingly have not contested the landlord's entitlement to post-petition rents as a valid administrative claim under § 503(b)(1).  But it does not follow from the fact that the debtor benefited from the use of the space (for which the estate is obligated to pay) that the cost of removing the equipment is an administrative expense.

The principal argument the debtors make in response to landlord's argument is that having to pay the cost of removing the equipment would harm, rather than benefit, the bankruptcy estate.  As the debtors put the point: "Rather than provide benefit to the estate, the elevation of the Cleanup Costs claim from unsecured to administrative would cause harm to the estate and its creditors."[48]  That way of thinking about the issue, however, cannot be correct.  After all, it's *always* the case that it is better from the estate's perspective for a creditor to hold a general unsecured claim rather than an administrative claim.  The question therefore is not whether paying an administrative claim is beneficial to the estate – it is whether what the debtor *received* from the creditor in exchange provided such a benefit.

---

[47] *See generally Goody's*, 610 F.3d at 819 (discussing circumstances, and citing cases, in which postpetition use of real property will give rise to an administrative claim).  *See also In re Former BL Stores, Inc.*, No. 24-11967 (JKS), 2025 WL 3083496, at *3-*4 (Bankr. D. Del. Nov. 4, 2025) (setting forth "two prong test" to determine whether to allow an administrative claim – "(1) the expense must have arisen from a post-petition transaction between the creditor and the debtor; and (2) the expense must have been 'actual and necessary' to preserve the estate").

[48] D.I. 1309 at 5.

Furthermore, in thinking about the "benefit," one must appreciate that there are certain costs that simply need to be borne in order to run a business.  To the extent the debtor-in-possession as trustee concludes that it is beneficial to creditors and the estate to operate the business rather than to liquidate, those "costs of doing business" are incidental to having the business operate and thus must be viewed as "necessary" to obtaining the benefits associated with operating.  This is the lesson of cases like the Supreme Court's decision in *Reading* and the Third Circuit's decision *Westinghouse*.[49]  In *Reading*, the receiver's negligence caused a fire that damaged a third party.  The Court found (under the prior Bankruptcy Act) that the injured party's claim against the estate was entitled to administrative priority.[50]  The Third Circuit followed that reasoning in *Westinghouse*, where it found that an employment discrimination claim arising out of post-petition conduct was an administrative claim.[51]  While emphasizing that it was not suggesting that businesses should treat employment discrimination as just a "cost of doing business," the court explained that to the extent an employee has a valid claim, that claim is for a "cost ordinarily incident to operation of a business."[52]

The court noted that the question was not whether paying an administrative claim to an employment discrimination victim would benefit the estate, or whether

---

[49] *Reading Company v. Brown*, 391 U.S. 471 (1968); *Ellis v. Westinghouse Elec. Co.,* 11 F.4th 221 (3d Cir. 2021).

[50] *Reading*, 391 U.S. 471.

[51] *Westinghouse*, 11 F.4th at 230.

[52] *Id.*

the act of discrimination benefitted the estate. "Rather than focus on what went wrong, we must look at the utility of the underlying exercise."[53] To that end, the court observed that the "employment discrimination claim arose out of [the claimant's] employment, which without dispute benefitted the Westinghouse estate."[54] And it added that treating "such claims as administrative expenses furthers the policy goal of § 503(b)(1)(A) – providing incentives for employees to continue working for a bankrupt company."[55]

This same understanding of "benefit to the estate" informs Judge Walrath's decision in *Hayes Lemmerz*, which is one of the cases on which the landlord relies.[56] There, the debtor leased equipment from an equipment lessor and caused damage to the equipment – both before and after the filing of the bankruptcy petition. The court held that the lessor had only a prepetition claim for the damage the debtor caused to its machines before the petition date.[57] But to the extent the lessor could show that the debtor caused damage to its machines post-petition, the lessor was entitled to an administrative claim under the same reasoning set forth in *Reading* and *Westinghouse*. "To the extent parts were stripped from the Machines pre-petition, the Court agrees [with the debtor that the claim is a prepetition claim]."[58] On the

---

[53] *Id.* at 231.

[54] *Id.*

[55] *Id.*

[56] *Hayes Lemmerz*, 340 B.R. 461.

[57] *Id.* at 473, 479.

[58] *Id.* at 480.

17

other hand, "[t]o the extent parts were stripped from the Machines post-petition … the tort did arise from the Debtors' business operations.  In fact, by using parts from [the lessor's] Machines to repair its own, Hayes's actions helped sustain its business, and an administrative expense is warranted."[59]

The landlord relies on this principle to argue that by strewing equipment across its premises, the debtors committed a tort similar to that in *Hayes Lemmerz*.  But on the record before the Court, that argument is unpersuasive.  To be sure, if a debtor tortiously damages a landlord's facility on a post-petition basis (consider, for example, a tenant that smashes the lights and breaks the doors), the landlord would be entitled to an administrative claim for the cost of repair.  The record here, however, contains no suggestion of any such damage.  Most importantly, there is nothing in the record to suggest that the condition of facility was any worse when the debtors vacated the premises than it was on the petition date.  And in the absence of any suggestion that the debtors caused damage on a post-petition basis, the reasoning of *Hayes Lemmerz*, *Westinghouse,* and *Reading* does nothing to support the landlord's argument for an administrative claim.[60]  Accordingly, under § 502(g), the landlord's

---

[59] *Id.*

[60] Note that an argument can be made that the rationale of these cases is limited to liability that sounds in tort, not contract.  *See In re Abercrombie*, 139 F.3d 755, 758-759 (9th Cir. 1998) (holding that liability stemming from a "prepetition contract" rather than a "postpetition transaction" cannot give rise to an administrative claim).  Despite this caselaw, this Court does not rule out the possibility that when a trustee engages in post-petition conduct that would give rise to liability on a prepetition contract, the contractual counterparty may have an administrative claim for the contractual damages sustained on a post-petition basis.  *Cf. In re Essar Steel Minnesota* LLC, 652 B.R. 709, 719 (Bankr. D. Del. 2023) (noting that claims arising out of a prepetition contract are typically prepetition claims but not addressing a counterparty's entitlement to an administrative claim for the value of its post-petition

claim against the estate for the cost of removing the equipment is a rejection damages claim that is treated as a prepetition claim.

## II.    The landlord's claims against the buyer are outside of the subject-matter jurisdiction provided in § 1334(b).

The landlord also asserts that the buyer, as the owner of the equipment that was left in its premises, is liable to it on trespass or other theories.[61]  This Court, however, has no occasion to engage the merits of that argument, as the Court lacks subject-matter jurisdiction over this claim – which is one that arises under state law (not the Bankruptcy Code) between two non-debtor parties.

This Court undertook to summarize the controlling law on the bankruptcy court's post-confirmation jurisdiction in its recent decision in *Structurlam Mass Timber*.[62]  The Court will not repeat that analysis in full herein.  The short version, though, is that as a claim that is not created by the Bankruptcy Code itself (so is outside the "arising under" jurisdiction) and that could exist outside of bankruptcy (and is thus outside the "arising in" jurisdiction), the only possible basis for jurisdiction is that the case is "related to" to the bankruptcy.[63]

---

performance).  The Court need not reach that question here, however, as nothing in the record suggests that the debtors engaged in post-petition conduct that *increased* the landlord's removal costs.

[61] *See* D.I. 1331; *Restatement (Second) of Torts* § 158 ("One is subject to liability for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally … fails to remove from the land a thing which he is under a duty to remove.").  In response, the buyer argues that it was under no such "duty" as a matter of state law.  D.I. 1332 at 3-4.

[62] *In re Structurlam Mass Timber U.S. Inc.*, No. 23-10497, 2025 WL 3037162, at *6-*10 (Bankr. D. Del. Oct. 30, 2025).

[63] *See generally* 28 U.S.C. § 1334(b).

Under the Third Circuit's decision in *Resorts*, however, that jurisdiction narrows after confirmation to claims that have a "close nexus" with the confirmed plan.[64]  That jurisdiction is not limited to matters about the implementation or interpretation of the plan.  As the Third Circuit's subsequent decision in *Venoco* confirms, *Resorts* does not limit the post-confirmation related-to jurisdiction to actions that enforce or construe the plan or confirmation order – there remains some jurisdiction over claims by a post-confirmation trust against a non-debtor that seeks to augment creditor recoveries.[65]  As this Court noted in *Structurlam*, however, the precise contours of that jurisdiction are not simple to discern.[66]  But whatever the scope of that jurisdiction may be, it does little to help the landlord, as (unlike the category of cases that *Resorts* was discussing) this is not a claim by a post-petition trust that would augment the recoveries of creditors generally.  It is simply a claim by a *particular* creditor against the buyer.

At argument on the motion, the landlord suggested that, because the confirmation order here was intended largely to effectuate the distribution of the proceeds of the sale, the confirmation order effectively incorporates the sale order. Even if that is so, however, it does little to help the landlord.  No one disputes that this Court has the jurisdiction and authority to construe and enforce all of its prior

---

[64] *See In re Resorts Intern., Inc.,* 372 F.3d 154, 165 (3d Cir. 2004).

[65] *See generally In re Venoco LLC*, 998 F.3d 94, 108 (3d Cir. 2021) (noting that the post-confirmation trust there "exists primarily to facilitate the 'equitable distribution of the debtor's property among the debtor's creditors' and therefore the trust operates "in essence a continuation of the estate") (cleaned up).

[66] *In re Structurlam*, 2025 WL 3037162, at *7 (describing these principles as "a little bit squishy").

orders.[67]  But the claim that the landlord seeks to bring against the buyer is one sounding in tort – not an action to enforce the sale order.  The landlord emphasizes that the buyer is obligated to indemnify the debtors for any obligation that the estate may have for any administrative claims against the estate.[68]  But for the reasons described above, the bankruptcy estate does not have post-petition liability to the landlord for the cleanup costs.  And even if it did, the landlord would lack the authority to enforce the *estate's* rights under the contract (or the sale order) against the buyer.[69]

Accordingly, the Court lacks subject-matter jurisdiction under § 1334(b) over the landlord's tort claims against the buyer.  It is true that the claims against the landlord may well arise out of the same "transaction or occurrence" as the claim against the debtors over which this Court does have subject-matter jurisdiction.  In a typical district court lawsuit, that would be a sufficient basis to permit a court to exercise "supplemental jurisdiction" over those claims under § 1367.  But this Court's *Structurlam* opinion points to the caselaw holding that this jurisdiction is unavailable in bankruptcy, notwithstanding the plausible reasons why authorizing the exercise of such jurisdiction might well make sense as a matter of policy.[70]  The landlord's

---

[67] *See generally Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.").

[68] *See* D.I. 730-1 § 2.5(c)(i) ("Buyer shall be responsible for timely paying all reasonable and documented costs incurred and unpaid as of the Closing Date by Sellers under any Excluded Contracts until they are either (A) rejected by the Sellers or (B) assumed and assigned … during the Designation Rights Period.").

[69] *See id.* § 12.12 (making clear that the agreement is enforceable only by the parties and does not create enforceable rights in any third-party beneficiaries).

[70] *Structurlam*, 2025 WL 3037162, at *9 n.109.

claims against the buyer will therefore be dismissed without prejudice to the landlord's right to assert such claims in a court of competent jurisdiction.

## Conclusion

For the reasons set forth above, the landlord's motion for an administrative claim will be denied.  The landlord's claim against the buyer is dismissed for lack of subject-matter jurisdiction.  The parties are directed to settle appropriate orders.  As set forth above, to the extent there are questions of law or fact on the post-effective date debtor's objection to the landlord's claim that are not fully resolved herein, the parties should contact chambers to set a status conference on how to proceed to resolve any remaining issues.[71]

Dated: November 7, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[71] *See* n. 26.